IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

AUG 1 6 2006

MICHAEL N. MILBY, CLERK OF COURT

| | | |
|---|---|---|
| BASSAM NABULSI, AND HIS WIFE, | § | |
| RIMA NABULSI, | § | |
|     Plaintiffs | § | |
| | § | |
| V. | § | |
| | § | |
| H.H. SHEIKH ISSA BIN ZAYED AL | § | CIVIL ACTION NO. |
| NAHYAN, H.H. SHEIKH NASSER BIN | § | (JURY TRIAL REQUESTED) |
| ZAYED AL NAHYAN, H.H. SHEIKH | § | |
| SAIF BIN ZAYED AL NAHYAN, H.H. | § | |
| SHEIKH ADBULLAH BIN ZAYED AL | § | |
| NAHYAN, H.H. SHEIKH MOHAMMED | § | |
| BIN ZAYED AL NAHYAN, and THE | § | |
| PARTNERSHIP OF THE ROYAL | § | |
| FAMILY BIN ZAYED AL NAHYAN, | § | |
|     Defendants. | § | |

**H-06-2683**

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, BASSAM NABULSI, AND HIS WIFE, RIMA NABULSI, hereinafter referred to as "Plaintiffs," complaining of H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN, H.H. SHEIKH NASSER BIN ZAYED AL NAHYAN, H.H. SHEIKH SAIF BIN ZAYED AL NAHYAN, H.H. SHEIKH ADBULLAH BIN ZAYED AL NAHYAN, H.H. SHEIKH MOHAMMED BIN ZAYED AL NAHYAN, and THE PARTNERSHIP OF THE ROYAL FAMILY BIN ZAYED AL NAHYAN, hereinafter referred to as "Defendants," and for their cause of action would respectfully show this Honorable Court the following:

### A. PARTIES

1.    Plaintiffs, Bassam Nabulsi and Rima Nabulsi, are individuals that are citizens of the United States and the State of Texas.

2.    Defendants, H.H. Sheikh Issa bin Zayed Al Nahyan, H.H. Sheikh Nasser bin

Zayed Al Nahyan, H.H. Sheikh Saif bin Zayed Al Nahyan, H.H. Sheikh Abdullah bin Zayed Al Nahyan, and H.H. Sheikh Mohammed bin Zayed Al Nahyan, are individuals who are citizens of the United Arab Emirates, a foreign state.  Defendant, The Partnership of the Royal Family bin Zayed Al Nahyan, is a group of individuals who have formed a partnership.  All of the members of the partnership are citizens of the United Arab Emirates, a foreign state.  The Plaintiff is in the process of requesting a waiver of service.  If that cannot be accomplished, then the Plaintiff will seek service on all entities under Fed.R.Civ.P. 4(f)(2).

## B.  JURISDICTION

3.    The Court has jurisdiction over this lawsuit under 28 U.S.C., §1332(a)(2), because the suit is between a citizen of the United States and Texas and a citizen of the United Arab Emirates, a foreign state, and the amount in controversy exceeds $75,000.00.  The Court also has jurisdiction under the Torture Victims Act, 28 U.S.C., §1350.

## C.  CONDITIONS PRECEDENT

4.    All conditions precedent have been performed or have occurred.

## D.  FACTS

5.    The Plaintiff, Bassam Nabulsi, is a United States citizen.  In the early 1990's, the Plaintiff ran a corporation which was in the business of serving mid-Eastern nationals seeking medical care and other services in Houston.  Among his many clients was the Royal Family of Abu-Dhabi.  Members of the Royal Family, including Defendant, H.H. Sheikh Issa bin Zayed Al Nahyan, would come to Houston and set up residence in the downtown Four Seasons.  Over the course of many years, the Sheikh and other members of the Royal Family would move to Houston for two to three months a year, enjoying all that the city has to offer.

2

6.     The Plaintiff, Bassam Nabulsi, would provide for all of the Defendant Sheikh Issa bin Zayed Al Nahyan's needs while in Houston.  Over the course of many visits, H.H. Sheikh Issa bin Zayed Al Nahyan developed a relationship with the Plaintiff.  While in Houston, the Sheikh began a campaign to recruit Mr. Nabulsi to work for him full time.  Finally, the Sheikh convinced Mr. Nabulsi to manage the Sheikh's affairs throughout the world.  Their agreement was partially formalized in the Partnership Agreement attached hereto.

7.     Under the agreement, and by virtue of other mutual understandings, Mr. Nabulsi was made general manager of all of the Sheikh's affairs including those centered in Houston. Mr. Nabulsi was given complete power of attorney.  Mr. Nabulsi's stated compensation for his efforts was to be forty-nine percent of all profits.

8.     His efforts proved quite profitable as will be seen below.  See Paragraph 35-45 below.

9.     The Individual Defendants, The Partnership of the Royal Family bin Zayed Al Nahyan, and International Capital Trading, LLC have many contacts with the United States.  The Defendants have invested heavily in the United States.  The Royal Family has traveled extensively in the United States and even founded the U.S. corporation of Alamanda Ltd. to serve the Royal Family while here in the United States.

10.     The Royal Family Zayed Al Nahyan is a highly structured institution that constitutes a partnership in every legal sense of the word.  The adult children of the late H.H. Sheikh Zayed bin Sultan Al Nahyan inherited a huge undivided amount of property that they each own in common.  This property has been invested with each sharing in profits, losses, and control.

3

11.     The members also share in the power that the family holds over Abu-Dhabi and the United Arab Emirates.  By agreement and tradition, the eldest member of the family serves as president of Abu-Dhabi.  In furtherance of this partnership of power, various family members hold various offices within the Abu-Dhabi government.  For example, Sheikh Saif bin Zayed Al Nahyan is the chief of the Abu-Dhabi police force.

12.     The primary purpose of the Royal Family Partnership is to maximize the wealth and power of the family as a unit and thus benefit the individual members.

13.     Sheikh Issa bin Zayed Al Nahyan, one of the adult children of H.H. Sheikh Zayed bin Sultan Al Nahyan, greatly abused the power he derived from being a member of the institution that is the Royal Family of Abu-Dhabi.  He undertook a habit and custom of viciously torturing his employees or anyone else whom he might find in disfavor.

14.     One of the Sheikh's many victims was Mohammed Shah Poor, an Afghani in the employ of the Sheikh.  He fell into the Sheikh's disfavor and suffered a vicious inhumane night of horror at the hands of the Sheikh.  The Sheikh was directly aided by an Abu-Dhabi police officer in uniform, who was undoubtedly supplied to the Sheikh by his brother, the chief of police, Sheikh Saif bin Zayed Al Nahyan, another member of the family organization.

15.     The Sheikh first slapped and beat Mr. Poor, he then forced sand into his mouth and nose, while the police officer held him.  The Sheikh then stood with his full body weight on the man's head.  The Sheikh then had the man stripped so that he could shock him repeatedly in the genitals and in the anus with a cattle prod.

16.     Unsatisfied, the Sheikh took a board that he had specially prepared so that the end was spiked with a large iron nail.  With this weapon, he struck the man over and over into his

4

buttocks.  Each blow gouged out more flesh.  The Sheikh tore at his target so many times that he grew tired and sat down to rest after ordering the police officer to continue the attack.  The officer obliged by striking several more blows.  The Sheikh then ordered salt poured into the wound.

17.     The Sheikh then poured a flammable fluid on Mr. Poor's pubic area and lit a match, burning his hair and skin.

18.     Still not satisfied, the Sheikh ordered that his victim be laid out flat on the ground as a truck slowly drove over his bound legs.  The pop could be heard as the bones snapped into pieces.

19.     All the while, the man begged for mercy up until the time he could no longer talk.  He pled "I am a Muslim like you, why are you doing this to me?"  The Sheikh responded with even more pain.

20.     After his ordeal, Mr. Poor, through the aid of Plaintiff Bassam Nabulsi, was able to get to a hospital and amazingly survived.  Mr. Poor tried to make a claim against the Sheikh and the other participants of the night.  An official "investigation" was opened but nothing came of it because of the power and mutual protection offered by the Royal Family unit.

21.     The details of the night can be proven because the Sheikh's arrogance of power caused him to make a critical mistake.  He actually videotaped his crime against humanity.  He can be heard on the video directing the cameraman in for a close up as he works his horror.  The Sheikh compounded his mistake by giving the video to the Plaintiff, Bassam Nabulsi, his general manager.  There were other videos of other nights with other victims.  The Plaintiffs still have possession of those videos.

5

22.     The Plaintiff was understandably shocked by the atrocities and began to plan a way to extricate himself from his situation with the Sheikh.  This led to a conflict with the Sheikh who then turned on Mr. Nabulsi.

23.     The scandal represented by the torture tapes were a significant threat to each and every member of the Royal Family.

24.     The Sheikh, Issa bin Zayed Al Nahyan, as well as the rest of the Royal Family, became desperate to retrieve the torture tapes in an attempt to stop any leaks.  The Royal Family, by and through Sheikh Issa bin Zayed Al Nahyan and Sheikh Saif bin Zayed Al Nahyan, had Mr. Nabulsi arbitrarily arrested in February of 2005.

25.     Mr. Nabulsi was held without charges for several days.  The police department, under the direction of Sheikh Issa bin Zayed Al Nahyan and other members of the Royal Family thoroughly searched Mr. Nabulsi's residence trying to find the torture tapes.  All of Mr. Nabulsi's computers were confiscated, along with any devices that might somehow contain evidence of the Sheikh's guilt.

26.     In an attempt to find some justification for Mr. Nabulsi's incarceration, the Defendants had all of the books audited for those accounts under the Plaintiff's responsibility, but this proved futile.  The books were all in order.  The Sheikh then made up false accusations of marijuana possession against the Plaintiff.  The search revealed no marijuana.  Mr. Nabulsi's urine was tested with negative results for drug use.

27.     Still, the incarceration continued.  In all, Mr. Nabulsi's false arrest was to last for over three months.

28.     Mr. Nabulsi was told by his jailors that he was also being accused of the

marijuana charges by Sheikh Nasser bin Zayed Al Nahyan, another member of the Royal Family institution.

29.     At one point, the U.S. Embassy attempted to come to Mr. Nabulsi's aid.  They were told by the police department that the issue was between Mr. Nabulsi and Sheikh Issa.  This proved that the Defendants knew that the accusations of marijuana were false.  The issue was not marijuana.  The statement also proved that Sheikh Issa completely controlled the police and orchestrated the detention himself.

30.     Despite the efforts of the U.S. Embassy, Mr. Nabulsi was kept in jail, where he was continuously tortured at the direction of the Defendants.  Each day, the jailors, at the direction of the Royal Family, would have a "session" with Mr. Nabulsi.  They would threaten him with immediate death and extreme pain.  He was told that they were going to put him in a freezer to be frozen to death.  Because of what he had seen on the torture tapes, Mr. Nabulsi was frighteningly aware of the Sheikh's capacity for cruelty as well as his control over the police.

31.     The safety of Mr. Nabulsi's wife and children were also threatened.  Members of his personal staff were held hostage for days without food or water.  Mr. Nabulsi was threatened with their deaths as well.

32.     Sheikh Issa himself conducted some of the sessions.  He asked again and again about the location of the torture tapes.

33.     The Defendants added additional torment to the Plaintiff's incarceration. Knowing that Mr. Nabulsi was fastidious about his hygiene and dress, the Defendants gave Mr. Nabulsi nothing to wear but unwashed clothing that had been disgustingly soiled by other prisoners.  He was placed in a small cell with approximately twenty other prisoners.  The only

"toilet" was a hole in the floor. There was no toilet paper or running water.

34.    To make matters much worse, the Defendants intentionally placed Afghani and Iraqi prisoners who were known to hate Americans in Mr. Nabulsi's cell. The Defendants then had the guards taunt Mr. Nabulsi about being American in front of his hostile cell mates. This led to even more horrible treatment.

35.    Mr. Nabulsi's criminal charges came to trial and he was acquitted of all charges of marijuana possession. Still, even after his innocence was proven in court, the Defendants continued to hold Mr. Nabulsi in jail. Finally, the U.S. Embassy again intervened to force Mr. Nabulsi's release. The Defendants then immediately deported Mr. Nabulsi, depriving him of any opportunity to seek redress or to collect the massive debt owed him by Sheikh Issa.

36.    Mr. Nabulsi's false arrest and vindictive deportation could not have come at a worse time economically for Mr. Nabulsi. Of course, the timing of the events greatly benefitted the Sheikh. Mr. Nabulsi had a contract with the Sheikh to handle all of the Sheikh's business affairs. The Sheikh and Mr. Nabulsi entered into a Partnership Agreement by executing a "Partnership Contract," a copy of which is enclosed. Under the Partnership Agreement, Mr. Nabulsi is made manager and is entitled to 49% of all of the profits.

37.    Pursuant to this agreement, Mr. Nabulsi negotiated the acquisition of a prime piece of real estate in Dubai. The deal netted a $27,000,000.00 profit. Because of the false arrest and orchestrated deportation, Mr. Nabulsi has been unable to collect his 49%, which amounts to $13,230,000.00. That property will net another $2,700,000.00 in receipts each year. Mr. Nabulsi's share of that over five years would be $6,615,000.00.

38.    Mr. Nabulsi also spent much time, talent, and effort to orchestrate a deal between

8

the Syrian government and Bankers Trust in Slovakia. The deal fell through because of the ninety days of wrongful incarceration. A $10,000,000.00 commission was lost. Mr. Nabulsi's share was $4,900,000.00.

39.     Mr. Nabulsi had also negotiated a contract with the Abu-Dhabi police department. The contract was cancelled upon Mr. Nabulsi's false arrest. This created a loss of another $10,000,000.00 in commissions. Mr. Nabulsi's 49% share was $4,900,000.00.

40.     Another achievement Mr. Nabulsi accomplished pursuant to the Partnership Agreement was the turn around of the Sheikh's Chi-Chi's franchise agreement with the U.S. corporation, Tumbleweed. The franchise, under Mr. Nabulsi's stewardship, went from a losing proposition to a monthly profit of $53,000.00. Mr. Nabulsi is entitled to 49% of that amount for at least five years into the future, which amounts to another $1,500,000.00.

41.     Still another prize of Mr. Nabulsi's management grew from his handling of the Sheikh's investment portfolio. Because of his decisions, the original investment increased ten fold for a net profit of $2,430,000.00. Mr. Nabulsi's share to date is $1,190,700.00. Had he not been wrongfully arrested and deported he would have been able to collect this amount as well as 49% of all increases for at least the next five years. If the portfolio increases only 10% a year, the increase will greatly exceed $200,000.00, making Mr. Nabulsi's share $490,000.00.

42.     Mr. Nabulsi also achieved two sponsorship agreements with U.K. companies to do work for ADNOC. This contract was recently approved for $12,500,000.00 per year. The 8% commission would have been $1,000,000.00. Mr. Nabulsi is entitled to 49% of that amount for at least the next five years or $2,450,000.00.

43.     Mr. Nabulsi additionally created two sponsorship agreements with defense related

9

companies to supply the UAE armed forces. These lost profits amount to a $3,000,000.00 loss to Mr. Nabulsi.

44.     These deals alone amount to actual income loss to Mr. Nabulsi in the amount of $38,275,700.00. Much of this amount has been taken and kept by the Defendant, Sheikh Issa bin Zayed Al Nahyan.

45.     In addition to these known losses, the wrongs perpetrated against Mr. Nabulsi have cut him off from all of the contacts and good will he has worked hard to develop over the last decade of his life. These wrongful acts have ruined Mr. Nabulsi's reputation and made it impossible for him to return to the UAE and earn the lucrative livelihood he has demonstrated in the past. These losses over the remainder of his life amount to a loss of at least another $20,000,000.00.

46.     This brings Mr. Nabulsi's total economic loss to over $58,275,700.00.

## E.  CAUSES OF ACTION

### 1.  Torture

47.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

48.     The Defendants committed acts of torture upon the Plaintiff, Bassam Nabulsi, as defined under the Torture Victims Act, 28 U.S.C.A., §1350. Mr. Nabulsi was continuously threatened with immediate death and the infliction of severe pain. His family was threatened. His staff of employees were held hostage without food or water for days.

49.     The tortures were committed under colour of law. Sheikh Issa bin Zayed Al Nahyan had his brother, Sheikh Saif bin Zayed Al Nahyan arrest the Plaintiff using police

10

officers of Abu-Dhabi and holding the Plaintiff in the official jail of the Abu-Dhabi government.

50.    There is no remedy adequate or available to Mr. Nabulsi in the UAE.  In the UAE, the law specifically prohibits criticism of the ruling families under penalty of imprisonment.  *See*, Country Reports on Human Rights Practices, UAE - 2002 (Bureau of Democracy, Human Rights, and Labor of the U.S. Department of State), www.state.gov/g/drl/rls/hrrpt/2002/18291.htm.  Allegations such as these against members of the Royal Family are universally ignored.

51.    For example, as will be demonstrated at trial by the stark video evidence, Mohammed Shah Poor was horribly tortured by Sheikh Issa bin Zayed Al Nahyan.  Mr. Poor tried to file charges against the Sheikh.  He had eye witnesses.  He had his own mutilated and broken body as evidence.  Nothing was done.

52.    Mr. Nabulsi was deprived of even this futile gesture.  Once released, he was immediately deported by the Defendants.  He cannot return and has no opportunity to even attempt a local remedy.

## 2.  Intentional Infliction of Emotional Distress

53.    Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

54.    The Defendants intentionally caused the Plaintiff to suffer severe emotional distress.  The Defendants' conduct as outlined above was extreme and outrageous and an abuse of the Defendants' relationship with the Plaintiff.  Said acts went beyond all possible boundaries of decency so as to be regarded as atrocious and utterly intolerable in a civilized community. The conduct proximately caused injury to the Plaintiff.

11

### 3.  Violations of the Laws of Nations

55.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

56.     International law prohibits torture, the taking of hostages, and arbitrary arrest and incarceration.  The Defendants have violated each of these laws resulting in the Plaintiff's severe injury.

### 4.  Conspiracy

57.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

58.     Sheikh Issa bin Zayed Al Nahyan, Sheikh Nasser bin Zayed Al Nahyan, and Sheikh Saif bin Zayed Al Nahyan, and other members of the Royal Family, in combination, pursued the unlawful purpose of torturing, maliciously prosecuting, and falsely arresting the Plaintiff, Bassam Nabulsi in order to save the Sheikh money and to obtain surrender of the torture tapes.  The members of the combination had a meeting of the minds regarding both objectives and the course of action.  The unlawful acts were committed by members of the combination which caused severe injury to the Plaintiff.

### 5.  Partnership

59.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

60.     The adult children of the late Sheikh Zayed bin Sultan Al Nahyan have formed a partnership by pooling together their property and power for their mutual benefit.  Each member of the partnership has the right to receive a share of the profits and benefits of the partnership.

The members have each openly expressed their intent to share in both the profits and losses of the businesses of the partnership. They each have contributed their share of the individual portion of the estate of the late Sheikh Zayed bin Sultan Al Nahyan as well as other property. Each member of the partnership owns an individual share of that estate.

61.     The acts of the partners, which are outlined in Paragraphs 24-35, were acts in the course of the partnership, with the authority of the partnership for the benefit of the partnership. The partnership therefore is vicariously liable for the injuries to the Plaintiff which were caused by those acts. Each partner is severally liable.

### 6. Joint Enterprise

62.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

63.     H.H. Sheikh Issa bin Zayed Al Nahyan, H.H. Sheikh Nasser bin Zayed Al Nahyan, H.H. Sheikh Saif bin Zayed Al Nahyan, H.H. Sheikh Adbullah bin Zayed Al Nahyan, H.H. Sheikh Mohammed bin Zayed Al Nahyan, and the Partnership of the Royal Family bin Zayed Al Nahyan, and other members of the Royal Family were engaged in a joint enterprise which injured the Plaintiff. These Defendants agreed to the common purpose of retrieving the torture tapes for the mutual benefit of them all. They each had an equal right to direct and control the enterprise. Members of the joint enterprise committed the torts outlined in Paragraphs 24-35 against the Plaintiff.

### 7. False Imprisonment

64.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

13

65.     The Defendant willfully detained the Plaintiff in deplorable conditions, against the Plaintiff's will, and without legal authority or justification.  This resulted in injury to the Plaintiff for which the Defendants are liable under the doctrine of false imprisonment.

## 8.  Malicious Prosecution

66.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

67.     The Defendants initiated and approved the commencement of a criminal prosecution against the Plaintiff.  The Defendants knowingly made false accusations against the Plaintiff.  The Defendants' acts were committed with malice with the evil motive of coercing from the Plaintiff the incriminating evidence of the torture tapes.  The acts were done with gross indifference to the rights of the Plaintiff so as to amount to a willful and wonton act.

68.     The Defendants had no probable cause.  The Plaintiff suffered severe injury because of these tortuous acts.

## 9.  Fiduciary Duty

69.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

70.     By virtue of the Partnership Agreement attached hereto, the Defendant Sheikh Issa bin Zayed Al Nahyan owed a fiduciary duty to the Plaintiff.  Defendant's action constitute a breach of his fiduciary duty and resulted in greater profit to Sheikh Issa bin Zayed Al Nahyan and greater injury to the Plaintiff.

## 10.  Breach of Contract

71.     Plaintiffs incorporate herein by reference the factual allegations found in

14

Paragraphs 1-47 above.

72.     Sheikh Issa bin Zayed Al Nahyan entered into a contract with the Plaintiff Bassam Nabulsi. Under the terms of the contract, the Plaintiff was to receive forty-nine percent of all of the profits from all of the Sheikh's business enterprises. The Plaintiff either performed or tendered performance of all of his obligations under the contract. The Sheikh's profits as a direct result of the efforts of Plaintiff have amounted to over eighty million dollars ($80,000,000.00). The Plaintiffs' share of those profits amounts to $39,200,000.00.

73.     The Defendant Sheikh Issa bin Zayed Al Nahyan has breached the contract by failing to pay Plaintiff Bassam Nabulsi his forty-nine percent share.

## 11. Defamation

74.     The Plaintiff, Bassam Nabulsi, is a private citizen and not a public figure. The Defendants published, both in writing and orally, defamatory statements about the Plaintiff, falsely accusing the Plaintiff of marijuana use and sale. Such an act is highly criminal in the UAE and is considered a sin against Islam. The Defendants acted with actual malice. In the alternative, the Defendants were negligent or strictly liable.

75.     The Plaintiffs have been severely harmed by the defamation. For example, the Plaintiffs' reputation has been ruined in the Middle East and he is no longer able to make his living.

## F. DAMAGES

76.     As a direct and proximate result of the Defendants' conduct, Plaintiff, Bassam Nabulsi, suffered the following injuries and damages:

(1)     Past, present and future physical pain and suffering;

15

    (2)      Past, present and future mental anguish;

    (3)      Past, present and future loss of earning capacity;

    (4)      Past, present and future lost profits in the amount of $58,275,700.00;

    (5)      Past, present and future damage to Plaintiff, Bassam Nabulsi's reputation;

    (6)      Lost benefit of his bargain; and

    (7)      Attorney fees.

77.      Plaintiffs seeks actual damages from the Defendant in excess of the minimum jurisdictional limits of this Court.

78.      As a direct and proximate result of the Defendants' conduct, Plaintiff, Rima Nabulsi, suffered the following injuries and damages:

    (1)      Past, present and future physical pain and suffering;

    (2)      Past, present and future mental anguish; and

    (3)      Attorney fees.

79.      In addition, Plaintiff, Rima Nabulsi, has suffered a loss of consortium and damages including the loss of affection, solace, comfort, companionship, society, assistance, emotional support and love.  She has suffered mental anguish, grief and sorrow as a result of the treatment of her husband and is likely to continue to suffer for a long time into the future.  For all such damages, Plaintiff, Rima Nabulsi, hereby sues.

## Punitive Damages

80.      Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-47 above.

81.      The actions of the Defendants, acting in concert or otherwise conspiring to carry

out, aid, and abet these unlawful objectives of terror, were intentional, malicious, unconscionable, and in reckless disregard of the rights and safety of all Plaintiffs. Defendants, acting individually, jointly, and/or severally, intended to carry out actions that would terrorize and damage Plaintiffs.

82.     As a result of their intentional, malicious, outrageous, willful, reckless, conduct, the Defendants are individually, jointly and severally liable to all Plaintiffs for punitive damages.

83.     The Defendants have a collective net worth of many billions of dollars.

84.     WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000.00), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts and to serve as a deterrent to others.

## G. JURY DEMAND

85.     Plaintiffs respectfully request a trial by jury on all issues to which Plaintiffs are so entitled.

## H. PRAYER

86.     For these reasons, Plaintiffs ask for judgment against Defendants for the following:

a.      Actual damages of $150,000,000.00.

b.      Prejudgment and postjudgment interest.

c.      Costs of suit, including attorney fees.

d.      Punitive damages of $1,000,000,000.00.

17

e.    All other relief the Court deems appropriate.

Respectfully submitted,

ROBERT D. GREEN & ASSOCIATES, P.C.

BY: _____
     ROBERT D. GREEN
     State Bar No. 08368025
     Federal I.D. No. 7684
     440 Louisiana St., Ste. 1930
     Houston, Texas  77002
     (713) 654-9222 - Telephone
     (713) 654-2155 - Telecopier

**ATTORNEY FOR PLAINTIFFS, BASSAM
NABULSI, AND HIS WIFE, RIMA NABULSI**

Dated:        August 16, 2006

18