## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **BASSAM NABULSI, AND HIS WIFE, RIMA NABULSI,** | § § § | |
| **Plaintiffs** | § § | |
| **V.** | § § § | |
| **H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN, H.H. SHEIKH NASSER BIN ZAYED AL NAHYAN, H.H. SHEIKH SAIF BIN ZAYED AL NAHYAN, H.H. SHEIKH MOHAMMED BIN ZAYED AL NAHYAN, AND THE PARTNERSHIP OF THE ROYAL FAMILY BIN ZAYED AL NAHYAN,** | § § § § § § § § § § | **CIVIL ACTION NO. H-06-2683** |
| **Defendants.** | § | |

### PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, BASSAM NABULSI, AND HIS WIFE, RIMA NABULSI, hereinafter referred to as "Plaintiffs," complaining of H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN, H.H. SHEIKH NASSER BIN ZAYED AL NAHYAN, H.H. SHEIKH SAIF BIN ZAYED AL NAHYAN, H.H. SHEIKH MOHAMMED BIN ZAYED AL NAHYAN, and THE PARTNERSHIP OF THE ROYAL FAMILY BIN ZAYED AL NAHYAN, hereinafter referred to as "Defendants," and for their cause of action would respectfully show this Honorable Court the following:

### A. PARTIES

1.     Plaintiffs, Bassam Nabulsi and Rima Nabulsi, are individuals that are citizens of the United States and the State of Texas.

2.      Defendants, H.H. Sheikh Issa bin Zayed Al Nahyan, H.H. Sheikh Nasser bin Zayed

Al Nahyan, H.H. Sheikh Saif bin Zayed Al Nahyan, and H.H. Sheikh Mohammed bin Zayed Al

Nahyan, are individuals who are citizens of the United Arab Emirates, a foreign state.  Defendant,

The Partnership of the Royal Family bin Zayed Al Nahyan, is a group of individuals who have

formed a partnership.  All of the members of the partnership are citizens of the United Arab

Emirates, a foreign state.  The Plaintiff is in the process of requesting a waiver of service.  If that

cannot be accomplished, then the Plaintiff will seek service on all entities under Fed.R.Civ.P. 4(f)(2).

## B.  JURISDICTION

3.      This Court has jurisdiction over this case pursuant to federal question jurisdiction

under 28 U.S.C.A. § 1331 (West 2007).  This Court has diversity jurisdiction over this case under

28 U.S.C.A. §1332(a)(2) (West 2007).  For diversity jurisdiction purposes, complete diversity of

citizenship between the parties is  present because the suit is between a citizen of the United States

and Texas and a citizen of the United Arab Emirates, a foreign state.  Moreover, the amount in

controversy exceeds $75,000.00.  Accordingly, diversity jurisdiction is proper under 28 U.S.C.A.

§1332(a)(2) (West 2007).  The Court also has jurisdiction under the Torture Victim Protection Act

of 1991.  28 U.S.C.A. § 1350 (West 2007).

4.      Additionally, the Defendants in this case possess the requisite minimum contacts with

the United States to satisfy the procedural due process safeguards embodied in the 5th Amendment

and the exercise of jurisdiction over these Defendants will not offend the traditional notions of fair

play and substantial justice.  Rule 4(k)(2) of the Federal Rules of Civil Procedure permits a federal

court to exercise personal jurisdiction over these non-resident defendants.  FED. R. CIV. P. 4(k)(2);

*Muwani v. Osama Bin Laden*, 417 F.3d 1, 10-12 (D.C.Cir. 2005) (applying Rule 4(k) in Alien Tort

Claims Act torture case); *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004).

### C.  CONDITIONS PRECEDENT

5.      All conditions precedent have been performed or have occurred.

### D.  FACTS

6.      The Plaintiff, Bassam Nabulsi, is a United States citizen.  In the early 1990's, the Plaintiff ran a corporation which was in the business of serving mid-Eastern nationals seeking medical care and other services in Houston.  Among his many clients was the Royal Family of Abu-Dhabi.  Members of the Royal Family, including Defendant, H.H. Sheikh Issa bin Zayed Al Nahyan, would come to Houston and set up residence in the downtown Four Seasons.  Over the course of many years, the Sheikh and other members of the Royal Family would move to Houston for two to three months a year, enjoying all that the city has to offer.

7.      The Plaintiff, Bassam Nabulsi, would provide for all of the Defendant Sheikh Issa bin Zayed Al Nahyan's needs while in Houston.  Over the course of many visits, H.H. Sheikh Issa bin Zayed Al Nahyan developed a relationship with the Plaintiff.  While in Houston, the Sheikh began a campaign to recruit Mr. Nabulsi to work for him full time.  Finally, the Sheikh convinced Mr. Nabulsi to manage the Sheikh's affairs throughout the world.  Their agreement was partially formalized in the Partnership Agreement attached hereto.

8.      Under the agreement, and by virtue of other mutual understandings, Mr. Nabulsi was made general manager of all of the Sheikh's affairs including those centered in Houston.  Mr. Nabulsi was given complete power of attorney.  Mr. Nabulsi's stated compensation for his efforts was to be forty-nine percent of all profits.

9.      His efforts proved quite profitable as will be seen below.  See Paragraph 62-72 below.

10.      The Individual Defendants, The Partnership of the Royal Family bin Zayed Al Nahyan, and International Capital Trading, LLC have many contacts with the United States.  The Defendants have invested heavily in the United States.  The Royal Family has traveled extensively in the United States and even founded the U.S. corporation of Alamanda Ltd. to serve the Royal Family while here in the United States.

11.      The Royal Family Zayed Al Nahyan is a highly structured institution that constitutes a partnership in every legal sense of the word.  The adult children of the late H.H. Sheikh Zayed bin Sultan Al Nahyan inherited a huge undivided amount of property that they each own in common.  This property has been invested with each sharing in profits, losses, and control.

12.      The members also share in the power that the family holds over Abu-Dhabi and the United Arab Emirates.  By agreement and tradition, the eldest member of the family serves as president of Abu-Dhabi.  In furtherance of this partnership of power, various family members hold various offices within the Abu-Dhabi government.  For example, Sheikh Saif bin Zayed Al Nahyan is the chief of the Abu-Dhabi police force.

13.      The primary purpose of the Royal Family Partnership is to maximize the wealth and power of the family as a unit and thus benefit the individual members.

14.      Sheikh Issa bin Zayed Al Nahyan, one of the adult children of H.H. Sheikh Zayed bin Sultan Al Nahyan, greatly abused the power he derived from being a member of the institution that is the Royal Family of Abu-Dhabi.  He undertook a habit and custom of viciously torturing his employees or anyone else whom he might find in disfavor.

15.     One of the Sheikh's many victims was Mohammed Shah Poor, an Afghani in the employ of the Sheikh.  He fell into the Sheikh's disfavor and suffered a vicious inhumane night of horror at the hands of the Sheikh.  The Sheikh was directly aided by an Abu-Dhabi police officer in uniform, who was undoubtedly supplied to the Sheikh by his brother, the chief of police, Sheikh Saif bin Zayed Al Nahyan, another member of the family organization.

16.     The Sheikh first slapped and beat Mr. Poor, he then forced sand into his mouth and nose, while the police officer held him.  The Sheikh then stood with his full body weight on the man's head.  The Sheikh then had the man stripped so that he could shock him repeatedly in the genitals and in the anus with a cattle prod.

17.     Unsatisfied, the Sheikh took a board that he had specially prepared so that the end was spiked with a large iron nail.  With this weapon, he struck the man over and over into his buttocks. Each blow gouged out more flesh.  The Sheikh tore at his target so many times that he grew tired and sat down to rest after ordering the police officer to continue the attack.  The officer obliged by striking several more blows.  The Sheikh then ordered salt poured into the wound.

18.     The Sheikh then poured a flammable fluid on Mr. Poor's pubic area and lit a match, burning his hair and skin.

19.     Still not satisfied, the Sheikh ordered that his victim be laid out flat on the ground as a truck slowly drove over his bound legs.  The pop could be heard as the bones snapped into pieces.

20.     All the while, the man begged for mercy up until the time he could no longer talk. He pled "I am a Muslim like you, why are you doing this to me?"  The Sheikh responded with even more pain.

21.     After his ordeal, Mr. Poor, through the aid of Plaintiff Bassam Nabulsi, was able to get to a hospital and amazingly survived.  Mr. Poor tried to make a claim against the Sheikh and the other participants of the night.  An official "investigation" was opened but nothing came of it because of the power and mutual protection offered by the Royal Family unit.

22.     The details of the night can be proven because the Sheikh's arrogance of power caused him to make a critical mistake.  He actually videotaped his crime against humanity.  He can be heard on the video directing the cameraman in for a close up as he works his horror.  The Sheikh compounded his mistake by giving the video to the Plaintiff, Bassam Nabulsi, his general manager.  There were other videos of other nights with other victims.  The Plaintiffs still have possession of those videos.

23.     The Plaintiff was understandably shocked by the atrocities and began to plan a way to extricate himself from his situation with the Sheikh.  This led to a conflict with the Sheikh who then turned on Mr. Nabulsi.

24.     The scandal represented by the torture tapes were a significant threat to each and every member of the Royal Family, including Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan.

25.     In an effort to retrieve the torture tapes and to preclude any public disclosure of the torture sessions, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan collaborated and conspired with his Royal brothers, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan, to

falsely and arbitrarily arrest[1], search, detain, imprison (and ultimately torture) Mr. Nabulsi. The conspiracy among the brothers initially occurred when the relationship between Mr. Nabulsi and Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan deteriorated over the return of the torture videotapes. When the relationship between Mr. Nabulsi and Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan deteriorated, based on information and belief, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan conspired with his brothers Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan to "take care of Mr. Nabulsi."

26.     Initially, H.H. Sheikh Nasser Bin Zayed Al Nahyan  took over all of Mr. Nabulsi's affairs in Abu Dhabi, including all businesses, business dealings, stamps, signatures, office personnel and equipment, and other business affairs and dealings in which Mr. Nabulsi directed and made decisions on behalf of Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan. Once H.H. Sheikh Nasser Bin Zayed Al Nahyan became involved, Mr. Nabulsi was unable to make decisions, or conduct business  unless he obtained clearance from H.H. Sheikh Nasser Bin Zayed Al Nahyan first. The ousting of Mr. Nabulsi ultimately turned abusive when, based on information and belief, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan individually, and collectively, acted under color of law to have Mr. Nabulsi jailed.

27.     During this time period, the Defendants acted under the color of law, in joint participation with the Abu Dhabi Police Department, to effectuate the false arrest, false search, false detainment, false imprisonment and torture of Mr. Nabulsi.

---

[1] Mr. Nabulsi was falsely arrested on trumped up charges on April 6, 2005.

28.     Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan is a police officer in the Abu Dhabi Police Department.  Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan is the Chief of Police for the Abu Dhabi Police Department.  According to the affidavit of Dr. Faraj A. Ahnish, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan is the Crown Prince of Abu Dhabi and, "in his capacity as the Chairman of the Executive Council of Abu Dhabi, oversees the affairs of the Emirate of Abu Dhabi."  (**Ahnish Affidavit, page 4**).  Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan is allegedly "the second highest ranking official in the Government of Abu Dhabi." (**Ahnish Affidavit, page 4**).  At the federal level in the United Arab Emirates, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan is allegedly "a Special Advisor to the President of the U.A.E. and the Deputy Supreme Commander of the U.A.E.'s armed forces."  (**Ahnish Affidavit, page 4**).

29.     Given their "Al Nayhan" royalty status, their position in the Abu Dhabi government, and the symbiotic interdependence that exists between the governmental and law enforcement instrumentalities of Abu Dhabi and these Defendants, Defendants H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan, individually, and collectively, acted under color of law to falsely arrest, search, detain, and jail Mr. Nabulsi (based on information and belief).

30.     In other words, despite the constitutional prohibition against false arrest, false search, false detainment, false imprisonment and torture contained in the United Arab Emirates Constitution[2], Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan knew what Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan was proposing to do to Mr. Nabulsi and directly

---

[2]  United Arab Emirates Const. art. 26.

participated in, and assisted with, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan's human rights violations against Mr. Nabulsi under the color of law.

31.    Mr. Nabulsi was arrested by the Abu Dhabi Police Department on April 6, 2005.[3] Importantly, Mr. Nabulsi could not have been arrested in Abu Dhabi without a charge and/or specific orders from the Chief of Police, H.H. Sheikh Saif Bin Zayed Al Nahyan.  Mr. Nabulsi's employees, who had been previously arrested, were held without charges for 14 days under the direct orders of H.H. Sheikh Nasser Bin Zayed Al Nahyan.  Based on information and belief, Mr. Nabulsi himself was arrested and held without charges for four days under the direct orders of H.H. Sheikh Nasser Bin Zayed Al Nahyan.  Mr. Nabulsi was held in isolation for four days in the jail located at the Abu Dhabi Police Department.   The police officers with the Abu Dhabi Police Department never informed any family member (or anyone else for that matter) that Mr. Nabulsi was being held in captivity at the Abu Dhabi Police Department.

32.    Mr. Nabulsi was kept in isolation in a small, barred cell.  The cell had a small bed, but no toilet or sink in the room.  The lights in Mr. Nabulsi's cell were kept illuminated 24 hours a day for purposes of causing him to experience sleep deprivation.  Human screaming was carried out within close proximity to Mr. Nabulsi's cell for purposes of causing him to experience sleep deprivation.  The screaming was carried out 24 hours a day.  Humiliating pictures were taken of Mr. Nabulsi.  Mr. Nabulsi was mocked by police officers by being refused permission to wash as a part of his Muslim abolution prayer ritual.  As a part of this Muslim prayer ritual, Mr. Nabulsi is required to wash five times per day prior to prayer.  The ritualistic washing is conducted to symbolically

---

[3]   Several weeks before Mr. Nabulsi was arrested, his vehicles were taken away, his salary was taken away, and his office employees were arrested and jailed.

cleanse the body before praying to God.  On April 9, 2005, the United States Embassy called and was requesting information about the "American" being held by the Abu Dhabi Police Department. Mr. Nabulsi overheard the conversation between one of the police officers, and that police officer's supervisor, wherein the supervisor instructed the lower ranking police officer to tell the U.S. Embassy, "We don't have him."  While in the Abu Dhabi jail, based on his understanding and familiarity with the Royal family structure, the "official" positions held by Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan, and what was happening to him, Mr. Nabulsi believed that his torturers were committing the human rights abuses against him with the express consent of the Defendants.

33.     After being held in captivity for four days, Mr. Nabulsi was falsely accused of possession of marijuana.  Before being taken to the prosecutor's office, Mr. Nabulsi was taken to his house in Abu Dhabi along with several police officers for a search of the premises.  Mr. Nabulsi was asked repeatedly about the tapes.  He was told he was going to be put in a freezer to die.  The search revealed no marijuana, only prescription medications.  After Mr. Nabulsi was taken back to police headquarters, the two police officers told him that H.H. Sheikh Saif Bin Zayed Al Nahyan and H.H. Sheikh Nasser Bin Zayed Al Nahyan had ordered them to falsely accuse Mr. Nabulsi of drug charges.

34.     Mr. Nabulsi was subsequently drug tested and taken to the local prosecutor's office for a reading of the charges by the Abu Dhabi police.  No evidence of marijuana was presented to the prosecutor to support the allegations against Mr. Nabulsi.  The drug test revealed no evidence of marijuana in Mr. Nabulsi's system.  Despite the complete lack of evidence (and the prosecutor's comments during the meeting that no evidence was present to justify detaining Mr. Nabulsi and/or

prosecute him for drug charges), the prosecutor told Mr. Nabulsi that he had received a call from his direct supervisor to "do nothing" with Mr. Nabulsi's case. Despite the total absence of evidence against Mr. Nabulsi, he was sent back to confinement at the Abu Dhabi Police Department.

35.    Subsequently, Mr. Nabulsi was transferred to Alwathbah Prison (a maximum security prison) for incarceration while he was awaiting trial. Mr. Nabulsi was placed into a cell with convicted, violent criminals from Afghanistan, Pakistan and Iran. The prison guards expressly remarked to the prisoners in Mr. Nabulsi's 10 x 12 foot cell (and other prisoners of similar nationalities elsewhere in the prison) that Mr. Nabulsi was an "American" and that the prisoners were encouraged to commit violent acts against Mr. Nabulsi at any opportunity. When Mr. Nabulsi was moved to various locations in the prison, he was physically chained to other prisoners. During periods of movement, the prison guards instructed the inmates chained to Mr. Nabulsi to run, thereby causing him to fall and experience physical injury. When Mr. Nabulsi was in prison, agents of the Defendants (most likely Sheikh Issa) called Mr. Nabulsi's wife and threatened to rape her. Mr. Nabulsi was kept in Alwathbah Prison and tortured for 3 ½ months. During this time he lived in constant fear for his safety. He was threatened repeatedly with serious bodily injury and/or death while in confinement. The threats were made by both the prisoners and the prison guards. Mr. Nabulsi was told by one of the prison guards that he had strict orders to threaten Mr. Nabulsi with serious bodily injury and/or death in during his confinement. Based on information and belief, these orders came from Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and/or Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan. While in prison, based on his understanding and familiarity with the Royal family structure, the "official" positions held by Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant

H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan, and what was happening to him, Mr. Nabulsi believed that his torturers were committing the human rights abuses against him with the express consent of the Defendants.

36.     During this time period, Mr. Nabulsi's wife sought the involvement of the U.S. Embassy in Abu Dhabi.  Sheikh Mohammed was contacted by the U.S. Embassy in Abu Dhabi concerning Mr. Nabulsi's whereabout and his release.  Based on information and belief, Sheikh Mohammed responded directly to the U.S. Embassy's requests for information concerning Mr. Nabulsi and Mr. Nabulsi's release.

37.     While in Alwathbah Prison, Mr. Nabulsi's was denied prescription medications that were ordered to be taken by a physician.  At the time of his incarceration, Mr. Nabulsi was taking anti-cholesterol medication (Lipitor and Zytia) for his high cholesterol.  Mr. Nabulsi was also taking low does of aspirin an anti-coagulant.  None of these medications were provided to Mr. Nabulsi while he was incarcerated.

38.     Even though the prison officials knew about Mr. Nabulsi's need to continue taking these medications for his health and well-being, Mr. Nabulsi request for his medications was denied. While in prison, Mr. Nabulsi became extremely ill.  Despite his repeated requests to see a medical doctor, Mr. Nabulsi was denied medical attention for his illness.

39.     After being imprisoned for 3 ½ months, Mr. Nabulsi's case was ultimately heard in Abu Dhabi.  He was acquitted of the marijuana charges brought against him.  Despite the fact that the Abu Dhabi court found him innocent of these charges, he was not immediately released from prison.  Instead, after his trial, he was taken back to the horrors of Alwathbah Prison and wrongfully imprisoned for another 14 days following his acquittal.  Once Mr. Nabulsi was ultimately released,

he was immediately deported back to the United States and taken directly to the airport for return to the United States.

40.     Based on information and belief, in an effort to retrieve the torture tapes and to preclude any public disclosure of the torture sessions, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan collaborated and conspired with his Royal brothers, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan, to falsely and arbitrarily arrest[4], search, detain, imprison (and ultimately torture) Mr. Nabulsi.  Based on information and belief, the Defendants directly participated in the false arrest, search, detainment, imprisonment and torture of Mr. Nabulsi.

41.     The Defendants operate collectively as "Al Nahyan."  Within the "Al Nahyan" an internal hierarchy exist.  Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan is at the top of this hierarchy and is in control of "Al Nahyan."  The members of "Al Nahyan" are regarded as all powerful and untouchable in the United Arab Emirates.  In order for Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan to commence with the false accusations, arrest, detainment, imprisonment and ultimate torturing of Mr. Nabulsi, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan had to expressly approve and expressly ratify the course of conduct proposed by Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan against Mr. Nabulsi.  Based on information and belief, prior to the false arrest and detention of Mr. Nabulsi,  Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan met and collaborated with Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan to obtain approval and ratification of his plan for torturing Mr. Nabulsi, including the conduct described in this Complaint. Based on information and belief, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan obtained the

---

[4] Mr. Nabulsi was falsely arrested on trumped up charges on April 6, 2005.

approval and ratification of his planned course of conduct against Mr. Nabulsi from Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan.  Based on information and belief, but for the approval and ratification of the planned course of conduct, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan would not have been able to torture Mr. Nabulsi.

42.     Based on information and belief, during this time period, but before the false arrest, detention and torture of Mr. Nabulsi, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan also met and collaborated with Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan  to obtain approval and ratification to enlist the assistance of his other brothers, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan to assist him in the false arrest, detention and torture of Mr. Nabulsi. Based on information and belief, this meeting between the brothers occurred prior to the human rights violations and torture being carried out against Mr. Nabulsi, including the conduct described in this Complaint.

43.     Based on information and belief, with full knowledge of Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan's plans for Mr. Nabulsi, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan approved Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan's plan against Mr. Nabulsi for false arrest, false search, false detainment, false imprisonment and torture.  In violation of the Torture Victim Protection Act of 1991, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan (based on information and belief), aided, abetted, authorized, and tolerated (and/or, alternatively, knowingly ignored) the acts of torture committed against Mr. Nabulsi.

44.     Based on information and belief,  Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan directly participated in the abuses committed against Mr. Nabulsi by directing that the instrumentalities of Abu Dhabi law enforcement be illegally employed against Mr. Nabulsi through false arrest, false search, false detainment, false imprisonment and torture.  Based on information and belief, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan conspired, agreed, and engaged in joint concerted action between each other, and the Abu Dhabi Police Department, to illegally employ the instrumentalities of Abu Dhabi law enforcement against Mr. Nabulsi to effectuate his false arrest, false search, false detainment, false imprisonment and torture.

45.     Based on information and belief, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan directed Abu Dhabi law enforcement personnel to carry out the false arrest, false search, false detainment, false imprisonment and torture of Mr. Nabulsi.  Based on information and belief, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan abused their official power and obtained joint cooperation and participation from the Abu Dhabi Police Department to falsely arrest, falsely search, falsely detainment, falsely imprisonment and torture Mr. Nabulsi. Under color of law Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan (based on information and belief), abused their power, individually and collectively, to effectuate the torture

of Mr. Nabulsi through the Abu Dhabi Police Department; and, further acted in concert with Abu Dhabi law enforcement actors, under color of law, to willfully and jointly participate in the human rights abuses discussed in this pleading against Mr. Nabulsi.  Based on information and belief, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan, under color of law, personally directed Abu Dhabi law enforcement personnel, to carry out the false arrest, false search, false detainment, false imprisonment and torture of Mr. Nabulsi.

46.     Based on information and belief, in the absence of Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan's express approval of, ratification of, and participation in, the human rights violations committed against Mr. Nabulsi, Mr. Nabulsi could not have been falsely arrested, falsely searched, falsely detained, falsely imprisoned and tortured.  Based on information and belief, in the absence of Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan's express approval of, ratification of, and participation in, the human rights violations committed against Mr. Nabulsi, Mr. Nabulsi could not have been falsely arrested, falsely searched, falsely detained, falsely imprisoned and tortured.  Based on information and belief, in the absence of Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan's express approval of, ratification of, and participation in, the human rights violations committed against Mr. Nabulsi, Mr. Nabulsi could not have been falsely arrested, falsely searched, falsely detained, falsely imprisoned and tortured.

47.     The conduct by Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan violates the law of nations, the Constitution of the United Arab Emirates, the Arab Charter on Human Rights, The United Nations Convention Against Torture and Other Cruel, Inhuman or

Degrading Treatment or Punishment, and the *jus cogens* preemptive norms that prohibit such human rights violations by anyone acting under color of law of any foreign nation.  Such conduct also violates the Torture Victim Protection Act of 1991.

48.     Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan acted in concert with state and/or law enforcement actors, under color of law, as willful participants in a joint activity with state officials and/or state agents, servants, and employees to carry out the false arrest, false search, false detainment, false imprisonment and torture of Mr. Nabulsi.  Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan personally directed state actors, including law enforcement personnel and/or their agents, servants, and/or employees to carry out the false arrest, false search, false detainment, false imprisonment and torture of Mr. Nabulsi under color of law. As a result, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, Defendant H.H. Sheikh Nasser Bin Zayed Al Nahyan, and Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan are subject to vicarious liability under the Torture Victim Protection Act of 1991.  28 U.S.C.A. § 1350 (West 2007).

49.     Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan, an "individual" acting under "color of law" for the Emirate of Abu Dhabi and/or the United Arab Emirates, subjected Mr. Nabulsi to "torture" as this term is defined under the Torture Victim Protection Act of 1991.  *Id.* at § 1350(b).

50.     Defendant H.H. Sheikh Nassar Bin Zayed Al Nahyan, an "individual" acting under "color of law" for the Emirate of Abu Dhabi and/or the United Arab Emirates, subjected Mr. Nabulsi

to "torture" as this term is defined under the Torture Victim Protection Act of 1991. *Id.* at § 1350(b).

Defendant H.H. Sheikh Saif Bin Zayed Al Nahyan, an "individual" acting under "color of law" for the Emirate of Abu Dhabi and/or the United Arab Emirates, subjected Mr. Nabulsi to "torture" as this term is defined under the Torture Victim Protection Act of 1991. *Id.* at § 1350(b).

51.     As outlined above, Mr. Nabulsi was held without charges for several days. The police department, under the direction of Sheikh Issa bin Zayed Al Nahyan and other members of the Royal Family thoroughly searched Mr. Nabulsi's residence trying to find the torture tapes. All of Mr. Nabulsi's computers were confiscated, along with any devices that might somehow contain evidence of the Sheikh's guilt.

52.     In an attempt to find some justification for Mr. Nabulsi's incarceration, the Defendants had all of the books audited for those accounts under the Plaintiff's responsibility, but this proved futile. The books were all in order. The Sheikh then made up false accusations of marijuana possession against the Plaintiff. The search revealed no marijuana. Mr. Nabulsi's urine was tested with negative results for drug use.

53.     Still, the incarceration continued. In all, Mr. Nabulsi's false arrest was to last for over three months.

54.     Mr. Nabulsi was told by his jailors that he was also being accused of the marijuana charges by Sheikh Nasser bin Zayed Al Nahyan, another member of the Royal Family institution.

55.     At one point, the U.S. Embassy attempted to come to Mr. Nabulsi's aid. They were told by the police department that the issue was between Mr. Nabulsi and Sheikh Issa. This proved that the Defendants knew that the accusations of marijuana were false. The issue was not marijuana.

The statement also proved that Sheikh Issa completely controlled the police and orchestrated the detention himself.

56.     Despite the efforts of the U.S. Embassy, Mr. Nabulsi was kept in jail, where he was continuously tortured at the direction of the Defendants.  Each day, the jailors, at the direction of the Royal Family, would have a "session" with Mr. Nabulsi.  They would threaten him with immediate death and extreme pain.  He was told that they were going to put him in a freezer to be frozen to death.  Because of what he had seen on the torture tapes, Mr. Nabulsi was frighteningly aware of the Sheikh's capacity for cruelty as well as his control over the police.

57.     The safety of Mr. Nabulsi's wife and children were also threatened.  Members of his personal staff were held hostage for days without food or water.  Mr. Nabulsi was threatened with their deaths as well.

58.     The Defendants added additional torment to the Plaintiff's incarceration.  Knowing that Mr. Nabulsi was fastidious about his hygiene and dress, the Defendants gave Mr. Nabulsi nothing to wear but unwashed clothing that had been disgustingly soiled by other prisoners.  He was placed in a small cell with approximately twenty other prisoners.  The only "toilet" was a hole in the floor.  There was no toilet paper or running water.

59.     To make matters much worse, the Defendants intentionally placed Afghani and Iraqi prisoners who were known to hate Americans in Mr. Nabulsi's cell.  The Defendants then had the guards taunt Mr. Nabulsi about being American in front of his hostile cell mates.  This led to even more horrible treatment.

60.     Mr. Nabulsi's criminal charges came to trial and he was acquitted of all charges of marijuana possession.  Still, even after his innocence was proven in court, the Defendants continued

to hold Mr. Nabulsi in jail.  Finally, the U.S. Embassy again intervened to force Mr. Nabulsi's release. The Defendants then immediately deported Mr. Nabulsi, depriving him of any opportunity to seek redress or to collect the massive debt owed him by Sheikh Issa.

61.     Mr. Nabulsi's false arrest and vindictive deportation could not have come at a worse time economically for Mr. Nabulsi.  Of course, the timing of the events greatly benefitted the Sheikh. Mr. Nabulsi had a contract with the Sheikh to handle all of the Sheikh's business affairs.  The Sheikh and Mr. Nabulsi entered into a Partnership Agreement by executing a "Partnership Contract," a copy of which is enclosed.   Under the Partnership Agreement, Mr. Nabulsi is made manager and is entitled to 49% of all of the profits.

62.     Pursuant to this agreement, Mr. Nabulsi negotiated the acquisition of a prime piece of real estate in Dubai.  The deal netted a $27,000,000.00 profit.  Because of the false arrest and orchestrated deportation, Mr. Nabulsi has been unable to collect his 49%, which amounts to $13,230,000.00.  That property will net another $2,700,000.00 in receipts each year.  Mr. Nabulsi's share of that over five years would be $6,615,000.00.

63.     Mr. Nabulsi also spent much time, talent, and effort to orchestrate a deal between the Syrian government and Bankers Trust in Slovakia.  The deal fell through because of the ninety days of wrongful incarceration.  A $10,000,000.00 commission was lost.  Mr. Nabulsi's share was $4,900,000.00.

64.     Mr. Nabulsi had also negotiated a contract with the Abu-Dhabi police department. The contract was cancelled upon Mr. Nabulsi's false arrest.  This created a loss of another $10,000,000.00 in commissions.  Mr. Nabulsi's 49% share was $4,900,000.00.

65.     Another achievement Mr. Nabulsi accomplished pursuant to the Partnership Agreement was the turn around of the Sheikh's Chi-Chi's franchise agreement with the U.S. corporation, Tumbleweed.  The franchise, under Mr. Nabulsi's stewardship, went from a losing proposition to a monthly profit of $53,000.00.  Mr. Nabulsi is entitled to 49% of that amount for at least five years into the future, which amounts to another $1,500,000.00.

66.     Still another prize of Mr. Nabulsi's management grew from his handling of the Sheikh's investment portfolio.  Because of his decisions, the original investment increased ten fold for a net profit of $2,430,000.00.  Mr. Nabulsi's share to date is $1,190,700.00.  Had he not been wrongfully arrested and deported he would have been able to collect this amount as well as 49% of all increases for at least the next five years.  If the portfolio increases only 10% a year, the increase will greatly exceed $200,000.00, making Mr. Nabulsi's share $490,000.00.

67.     Mr. Nabulsi also achieved two sponsorship agreements with U.K. companies to do work for ADNOC.  This contract was recently approved for $12,500,000.00 per year.  The 8% commission would have been $1,000,000.00.  Mr. Nabulsi is entitled to 49% of that amount for at least the next five years or $2,450,000.00.

68.     Mr. Nabulsi additionally created two sponsorship agreements with defense related companies to supply the UAE armed forces.  These lost profits amount to a $3,000,000.00 loss to Mr. Nabulsi.

69.     These deals alone amount to actual income loss to Mr. Nabulsi in the amount of $38,275,700.00.  Much of this amount has been taken and kept by the Defendant, Sheikh Issa bin Zayed Al Nahyan.

70.     In addition to these known losses, the wrongs perpetrated against Mr. Nabulsi have cut him off from all of the contacts and good will he has worked hard to develop over the last decade of his life.  These wrongful acts have ruined Mr. Nabulsi's reputation and made it impossible for him to return to the UAE and earn the lucrative livelihood he has demonstrated in the past.  These losses over the remainder of his life amount to a loss of at least another $20,000,000.00.

71.     This brings Mr. Nabulsi's total economic loss to over $58,275,700.00.

## E.  CAUSES OF ACTION

### 1. Torture

72.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

73.     The Defendants committed acts of torture upon the Plaintiff, Bassam Nabulsi, as defined under the Torture Victims Protection Act of 1991.  28 U.S.C.A. § 1350 (West 2007).  Mr. Nabulsi was continuously threatened with immediate death and the infliction of severe pain.  His family was threatened.  His staff of employees were held hostage without food or water for days.

74.     The tortures were committed under colour of law.  Sheikh Issa bin Zayed Al Nahyan had his brother, Sheikh Saif bin Zayed Al Nahyan arrest the Plaintiff using police officers of Abu-Dhabi and holding the Plaintiff in the official jail of the Abu-Dhabi government.

75.     There is no remedy adequate or available to Mr. Nabulsi in the UAE.  In the UAE, the law specifically prohibits criticism of the ruling families under penalty of imprisonment.  *See*, Country Reports on Human Rights Practices, UAE - 2002 (Bureau of  Democracy, Human Rights, and  Labor  of  the  U.S.  Department  of  State),  www.state.gov/g/drl/rls/hrrpt/2002/18291.htm. Allegations such as these against members of the Royal Family are universally ignored.

76.     For example, as will be demonstrated at trial by the stark video evidence, Mohammed Shah Poor was horribly tortured by Sheikh Issa bin Zayed Al Nahyan.  Mr. Poor tried to file charges against the Sheikh.  He had eye witnesses.  He had his own mutilated and broken body as evidence. Nothing was done.

77.     Mr. Nabulsi was deprived of even this futile gesture.  Once released, he was immediately deported by the Defendants.  He cannot return and has no opportunity to even attempt a local remedy.

## 2.  Intentional Infliction of Emotional Distress

78.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

79.     The Defendants intentionally caused the Plaintiff to suffer severe emotional distress. The Defendants' conduct as outlined above was extreme and outrageous and an abuse of the Defendants' relationship with the Plaintiff.  Said acts went beyond all possible boundaries of decency so as to be regarded as atrocious and utterly intolerable in a civilized community.  The conduct proximately caused injury to the Plaintiff.

## 3.  Violations of the Laws of Nations

80.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

81.     International law prohibits torture, the taking of hostages, and arbitrary arrest and incarceration.  The Defendants have violated each of these laws resulting in the Plaintiff's severe injury.

### 4.  Conspiracy

82.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

83.     Sheikh Issa bin Zayed Al Nahyan, Sheikh Nasser bin Zayed Al Nahyan, Sheikh Mohammed bin Zayed Al Nahyan, and Sheikh Saif bin Zayed Al Nahyan, and other members of the Royal Family, in combination, pursued the unlawful purpose of torturing, maliciously prosecuting, and falsely arresting the Plaintiff, Bassam Nabulsi in order to save the Sheikh money and to obtain surrender of the torture tapes.  The members of the combination had a meeting of the minds regarding both objectives and the course of action.  The unlawful acts were committed by members of the combination which caused severe injury to the Plaintiff.

### 5.  Partnership

84.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

85.     The adult children of the late Sheikh Zayed bin Sultan Al Nahyan have formed a partnership by pooling together their property and power for their mutual benefit.  Each member of the partnership has the right to receive a share of the profits and benefits of the partnership.  The members have each openly expressed their intent to share in both the profits and losses of the businesses of the partnership.  They each have contributed their share of the individual portion of the estate of the late Sheikh Zayed bin Sultan Al Nahyan as well as other property.  Each member of the partnership owns an individual share of that estate.

86.     The acts of the partners, which are outlined in Paragraphs 24-35, were acts in the course of the partnership, with the authority of the partnership for the benefit of the partnership.  The

partnership therefore is vicariously liable for the injuries to the Plaintiff which were caused by those acts. Each partner is severally liable.

### 6. Joint Enterprise

87.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

88.     H.H. Sheikh Issa bin Zayed Al Nahyan, H.H. Sheikh Nasser bin Zayed Al Nahyan, H.H. Sheikh Saif bin Zayed Al Nahyan, H.H. H.H. Sheikh Mohammed bin Zayed Al Nahyan, and the Partnership of the Royal Family bin Zayed Al Nahyan, and other members of the Royal Family were engaged in a joint enterprise which injured the Plaintiff. These Defendants agreed to the common purpose of retrieving the torture tapes for the mutual benefit of them all. They each had an equal right to direct and control the enterprise. Members of the joint enterprise committed the torts outlined in Paragraphs 24-35 against the Plaintiff.

### 7. False Imprisonment

89.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

90.     The Defendants willfully detained the Plaintiff in deplorable conditions, against the Plaintiff's will, and without legal authority or justification. This resulted in injury to the Plaintiff for which the Defendants are liable under the doctrine of false imprisonment.

### 8. Malicious Prosecution

91.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

92.     The Defendants initiated and approved the commencement of a criminal prosecution against the Plaintiff.  The Defendants knowingly made false accusations against the Plaintiff.  The Defendants' acts were committed with malice with the evil motive of coercing from the Plaintiff the incriminating evidence of the torture tapes.  The acts were done with gross indifference to the rights of the Plaintiff so as to amount to a willful and wonton act.

93.     The Defendants had no probable cause.  The Plaintiff suffered severe injury because of these tortuous acts.

## 9.  Fiduciary Duty

94.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

95.     By virtue of the Partnership Agreement attached hereto, the Defendant Sheikh Issa bin Zayed Al Nahyan owed a fiduciary duty to the Plaintiff.  Defendant's action constitute a breach of his fiduciary duty and resulted in greater profit to Sheikh Issa bin Zayed Al Nahyan and greater injury to the Plaintiff.

## 10.  Breach of Contract

96.     Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

97.     Sheikh Issa bin Zayed Al Nahyan entered into a contract with the Plaintiff Bassam Nabulsi.  Under the terms of the contract, the Plaintiff was to receive forty-nine percent of all of the profits from all of the Sheikh's business enterprises.  The Plaintiff either performed or tendered performance of all of his obligations under the contract.  The Sheikh's profits as a direct result of the

efforts of Plaintiff have amounted to over eighty million dollars ($80,000,000.00).  The Plaintiffs' share of those profits amounts to $39,200,000.00.

98.     The Defendant Sheikh Issa bin Zayed Al Nahyan has breached the contract by failing to pay Plaintiff Bassam Nabulsi his forty-nine percent share.

### 11.  Defamation

99.     The Plaintiff, Bassam Nabulsi, is a private citizen and not a public figure.  The Defendants published, both in writing and orally, defamatory statements about the Plaintiff, falsely accusing the Plaintiff of marijuana use and sale.  Such an act is highly criminal in the UAE and is considered a sin against Islam.  The Defendants acted with actual malice.  In the alternative, the Defendants were negligent or strictly liable.

100.     The Plaintiffs have been severely harmed by the defamation.  For example, the Plaintiffs' reputation has been ruined in the Middle East and he is no longer able to make his living.

### F.  DAMAGES

101.     As a direct and proximate result of the Defendants' conduct, Plaintiff, Bassam Nabulsi, suffered the following injuries and damages:

    (1)     Past, present and future physical pain and suffering;

    (2)     Past, present and future mental anguish;

    (3)     Past, present and future loss of earning capacity;

    (4)     Past, present and future lost profits in the amount of $58,275,700.00;

    (5)     Past, present and future damage to Plaintiff, Bassam Nabulsi's reputation;

    (6)     Lost benefit of his bargain; and

    (7)     Attorney fees.

102.    Plaintiffs seeks actual damages from the Defendant in excess of the minimum jurisdictional limits of this Court.

103.    As a direct and proximate result of the Defendants' conduct, Plaintiff, Rima Nabulsi, suffered the following injuries and damages:

(1)    Past, present and future physical pain and suffering;

(2)    Past, present and future mental anguish; and

(3)    Attorney fees.

104.    In addition, Plaintiff, Rima Nabulsi, has suffered a loss of consortium and damages including the loss of affection, solace, comfort, companionship, society, assistance, emotional support and love.  She has suffered mental anguish, grief and sorrow as a result of the treatment of her husband and is likely to continue to suffer for a long time into the future.  For all such damages, Plaintiff, Rima Nabulsi, hereby sues.

### Punitive Damages

105.    Plaintiffs incorporate herein by reference the factual allegations found in Paragraphs 1-72 above.

106.    The actions of the Defendants, acting in concert or otherwise conspiring to carry out, aid, and abet these unlawful objectives of terror, were intentional, malicious, unconscionable, and in reckless disregard of the rights and safety of all Plaintiffs.  Defendants, acting individually, jointly, and/or severally, intended to carry out actions that would terrorize and damage Plaintiffs.

107.    As a result of their intentional, malicious, outrageous, willful, reckless, conduct, the Defendants are individually, jointly and severally liable to all Plaintiffs for punitive damages.

108.    The Defendants have a collective net worth of many billions of dollars.

109.     WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally and/or individually, in an amount in excess of One Billion Dollars ($1,000,000,000.00), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts and to serve as a deterrent to others.

### G.  JURY DEMAND

110.     Plaintiffs respectfully request a trial by jury on all issues to which Plaintiffs are so entitled.

### H.  PRAYER

111.     For these reasons, Plaintiffs ask for judgment against Defendants for the following:

    a.     Actual damages of $150,000,000.00.

    b.     Prejudgment and postjudgment interest.

    c.     Costs of suit, including attorney fees.

    d.     Punitive damages of $1,000,000,000.00.

    e.     All other relief the Court deems appropriate.

Respectfully submitted,

**ROBERT D. GREEN & ASSOCIATES, P.C.**

Robert D. Green
State Bar No. 08368025
440 Louisiana Street, Suite 1930
Houston, Texas  77002
Telephone:     (713) 654-9222
Facsimile:      (713) 654-2155

- and -

**THE KLEIN LAW FIRM**

Alexander B. Klein, III
State Bar No. 11556250
J. Todd Trombley
State Bar No. 24004192
Myriam K. Legge
State Bar No. 00784404
2000 The Lyric Centre
440 Louisiana Street
Houston, Texas  77002
Telephone:     (713) 650-1111
Facsimile:     (713) 227-1121

ATTORNEYS FOR PLAINTIFFS, BASSAM NABULSI, AND HIS WIFE, RIMA NABULSI

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel of record or party via hand delivery, electronic transmission, certified mail, return receipt requested or telecopier, in accordance with the Federal Rules of Civil Procedure on this _18th_ day of May, 2007, as follows:

B. Daryl Bristow
Baker Botts, L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
*Attorney in Charge for H.H. Sheikh*
*Mohammed Bin Zayed Al Nahyan*

_____
J. Todd Trombley