IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BASSAM NABULSI and His Wife,    §
RIMA NABULSI,                    §
                                 §
            Plaintiffs,          §
                                 §
v.                               §
                                 §
H.H. SHEIKH ISSA BIN ZAYED AL    §    CIVIL ACTION NO. H-06-2683
NAHYAN, H.H. SHEIKH NASSER BIN   §
ZAYED AL NAHYAN, H.H. SHEIKH     §
SAIF BEN ZAYED AL NAHYAN,        §
H.H. SHEIKH MOHAMMED BIN ZAYED   §
AL NAHYAN, and THE PARTNERSHIP   §
OF THE ROYAL FAMILY BIN ZAYED    §
AL NAHYAN,                       §
                                 §
            Defendants.          §

## MEMORANDUM OPINION AND ORDER

        Plaintiffs, Bassam Nabulsi and his wife, Rima Nabulsi, bring

this action against defendants, H.H. Sheikh Issa Bin Zayed Al

Nahyan (Sheikh Issa), H.H. Sheikh Nasser Bin Zayed Al Nahyan

(Sheikh Nasser), H.H. Sheikh Saif Ben Zayed Al Nahyan (Sheikh

Saif), H.H. Sheikh Mohammed Bin Zayed Al Nahyan (Sheikh Mohammed),

and the Partnership of the Royal Family Bin Zayed Al Nahyan, for

torture, violation of the laws of nations, conspiracy, intentional

infliction of emotional distress, false imprisonment, malicious

prosecution, breach of fiduciary duty, and breach of contract.

Pending before the court are Defendant H.H. Sheikh Mohammed Bin

Zayed Al Nahyan's Motion to Dismiss for Lack of Subject Matter and

Personal Jurisdiction (Docket Entry No. 15), Plaintiffs' Unopposed
Motion for Alternative Service Pursuant to Federal Rule of Civil
Procedure 4(f)(3) (Docket Entry No. 20), Plaintiffs' Motion for
Leave to Conduct Jurisdictional Discovery and Motion to Continue
the Submission Date for Defendant's Motion to Dismiss for Lack of
Subject Matter and Personal Jurisdiction (Docket Entry No. 25),
Plaintiffs' First Supplemental Motion for Leave to Conduct
Jurisdictional Discovery and Motion to Continue the Submission Date
for Defendant's Motion to Dismiss for Lack of Subject Matter and
Personal Jurisdiction (Docket Entry No. 29), and Defendant H.H.
Sheikh Mohammed Bin Zayed Al Nahyan's Objection to and Motion to
Exclude Affidavit of Plaintiff Bassam Nabulsi (Docket Entry
No. 34).  For the reasons explained below Sheikh Mohammed's motion
to dismiss will be granted, plaintiffs' motions for discovery will
be denied, and the remaining two motions will be declared moot.

## I.  **Plaintiff's Allegations**

Plaintiffs allege that Mr. Nabulsi is a United States citizen
who once ran a business serving mid-Eastern nationals seeking
medical care and other services in Houston, which counted among its
clients members of the Royal Family of Abu-Dhabi, including Sheikh
Issa.  Sheikh Issa persuaded plaintiff to manage his affairs, and
the two entered a partnership agreement pursuant to which
Mr. Nabulsi served as general manager of all of Sheikh Issa's

-2-

affairs in exchange for forty-nine percent of all partnership profits.[1]

Plaintiffs allege that Sheikh Issa viciously tortured individuals who fell into his disfavor and that one of his many victims was an Afghani named Mohammed Shah Poor. Plaintiffs allege that Sheikh Issa had the torture he performed on Mr. Poor and others videotaped and that possession of the videotapes was entrusted to Mr. Nabulsi. Asserting that the "scandal represented by the torture tapes [posed] a significant threat to each and every member of the Royal Family, including [the defendants],"[2] plaintiffs allege that Mr. Nabulsi's relationship with Sheikh Issa "deteriorated over the return of the torture videotapes."[3] "[B]ased on information and belief"[4] plaintiffs allege that "[i]n an effort to retrieve the torture tapes and to preclude any public disclosure of the torture sessions,"[5] Sheikh Issa conspired with his brothers, Sheikh Mohammed, Sheikh Nasser, and Sheik Saif "to falsely and arbitrarily arrest, search, detain, imprison (and ultimately torture) Mr. Nabulsi."[6]

---

[1] Plaintiff's First Amended Original Complaint, Docket Entry No. 24, p. 3 ¶¶ 6-8.

[2] Id. at p. 6 ¶ 24.

[3] Id. at p. 7 ¶ 25.

[4] Id.

[5] Id. at p. 6 ¶ 25.

[6] Id. at p. 7 ¶ 25.  See also id. at p. 13 ¶ 40.

Plaintiffs allege that Mr. Nabulsi was falsely arrested on April 6, 2005, held for four days without charges in a small cell with no toilet or sink that was within hearing distance of human screaming and lighted twenty-four hours a day to prevent Mr. Nabulsi from sleeping.[7]  Plaintiffs allege that Mr. Nabulsi's captors took humiliating pictures of him, mocked him, refused him permission to wash five times a day as required by Muslim prayer ritual, and told callers from the United States Embassy, "We don't have him."[8]  Plaintiffs allege that after being held for four days, Mr. Nabulsi was falsely accused of possession of marijuana, his house was searched, he was drug tested, and despite a complete lack of evidence, he was prosecuted instead of released.[9]

Plaintiffs allege that Mr. Nabulsi was transferred to a maximum security prison where he was housed with violent criminals from Afghanistan, Pakistan, and Iran.  Plaintiffs allege that jailors threatened Mr. Nabulsi with serious bodily injury and/or death, that one of them told Mr. Nabulsi he had strict orders to threaten him, and that "agents of the defendants (most likely Sheikh Issa) called Mr. Nabulsi's wife and threatened to rape her."[10]  Plaintiffs allege that Mr. Nabulsi was chained during

---

[7]Id. at pp. 9-10 ¶¶ 31-32.

[8]Id. at p. 10 ¶ 32.

[9]Id. at pp. 10-11 ¶¶ 33-34.

[10]Id. at p. 11 ¶ 35.

periods of movement, injured when other prisoners were told to run, and denied prescription medicine.[11]   Plaintiffs allege that after being imprisoned for three-and-a-half months, Mr. Nabulsi was tried and acquitted for possession of marijuana but not released for another fourteen days.   Plaintiffs allege that following his release, Mr. Nabulsi was deported to the United States.[12]

## II.   Sheikh Mohammed's Motion to Dismiss

Plaintiffs assert claims against all the defendants, including Sheikh Mohammed, for torture in violation of the Torture Victims Protection Act of 1991 (TVPA), 28 U.S.C. § 1350 Note, as well as violations of the Laws of Nations, and various state law claims including intentional infliction of emotional distress, false imprisonment, malicious prosecution, breach of contract and fiduciary duty, and defamation.   Alleging claims for conspiracy, partnership, and joint enterprise, plaintiffs allege that the defendants agreed to act in concert for the common purpose of retrieving the torture tapes for the mutual benefit of all.[13] Sheikh Mohammed asserts that as an official of the Abu Dhabi and U.A.E. governments he is entitled to sovereign immunity from suit pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C.

---

[11]Id. at pp. 11-12 ¶¶ 35-37.

[12]Id. at pp. 12-13 ¶ 39.

[13]Id. at pp. 22-27 ¶¶ 72-100.

§§ 1602 <u>et seq.</u>, and that he lacks the minimum contacts required to support the exercise of personal jurisdiction for any claims asserted against him in his individual as opposed to official capacity.  Sheikh Mohammed seeks dismissal of the claims asserted against him pursuant to Federal Rule of Civil Procedure 12(b)(1) and (2) for lack of subject matter and personal jurisdiction.

**A.   Subject Matter Jurisdiction**

  1.   <u>Standard of Review</u>

  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." <u>Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.</u>, 143 F.3d 1006, 1010 (5th Cir. 1998).  Because the sovereign immunity provided by the FSIA is immunity from suit, not merely immunity from liability, and because that immunity is effectively lost if a case is permitted to go to trial, the court is authorized to make factual and legal determinations necessary to resolve the jurisdictional dispute raised by Sheikh Mohammed's Rule(b)(1) motion to dismiss.  <u>See Moran v. The Kingdom of Saudi Arabia</u>, 27 F.3d 169, 172 (5th Cir. 1994).  <u>See also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan</u>, 115 F.3d 1020, 1027-28 (D.C. Cir. 1997) (district court "must engage in sufficient pretrial factual and legal determinations to 'satisfy itself of its authority to hear the case' before trial").  "The court's authority to consider evidence presented beyond the

pleadings allows it to devise a procedure which may include considering affidavits, allowing further discovery, hearing oral testimony, [and] conducting an evidentiary hearing." Id. However, "[i]f the court chooses to allow additional discovery, it should be limited to only that which is necessary to determine the preliminary jurisdictional issue." Id. Although plaintiffs seek leave to conduct discovery on the issue of personal jurisdiction, they have not sought leave to conduct discovery on the issue of subject matter jurisdiction.    Nor have plaintiffs cited any evidence in opposition to Sheikh Mohammed's motion to dismiss for lack of subject matter jurisdiction.    Instead, plaintiffs have merely cited allegations made in their First Amended Complaint in support of their argument that the FSIA does not prevent the court from exercising subject matter jurisdiction over their claims against Sheikh Mohammed.[14]

    2.   Analysis

    Sheikh Mohammed argues that the court lacks subject matter jurisdiction over the claims asserted against him because he is the Crown Prince of the Emirate of Abu Dhabi and next in line to be Ruler of the Emirate of Abu Dhabi and President of the United Arab

---

[14]See Plaintiffs' Response to Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan's Motion to Dismiss for Lack of Subject Matter and Personal Jurisdiction (Plaintiffs' Response), Docket Entry No. 26, pp. 5-13.

Emirates (U.A.E.).[15]  Sheikh Mohammed argues that the FSIA entitles
him to immunity from suit because he qualifies as an "'agency or
instrumentality of a foreign state,'"[16] and because the claims
asserted against him are based on official acts to which no FSIA
exception applies.[17]  Plaintiffs counter that Sheikh Mohammed is not
entitled to FSIA immunity because he "has been sued in his
individual capacity under the TVPA,"[18] under which he may be held
vicariously liable for Mr. Nabulsi's torture.[19]

(a)  Foreign Sovereign Immunities Act

The general rule under the FSIA is that foreign states are
immune from the jurisdiction of the United States Courts unless one
of the statute's exceptions applies.  Normally, the FSIA protects
individuals acting within their official capacity as representa-
tives of foreign governments.  <u>See</u> <u>Byrd v. Corporacion Forestal y</u>

---

[15]Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan's Motion
to Dismiss for Lack of Subject Matter and Personal Jurisdiction
(Sheikh Mohammed's Motion to Dismiss), Docket Entry No. 15, p. 7.

[16]<u>Id.</u> at p. 7.

[17]<u>Id.</u> at pp. 7-12.  See also Defendant H.H. Sheikh Mohammed Bin
Zayed Al Nahyan's Reply to Plaintiffs' Response to His Motion to
Dismiss for Lack of Subject Matter and Personal Jurisdiction
(Sheikh Mohammed's Reply), Docket Entry No. 32, pp. 9-10.

[18]Plaintiffs' Sur-Reply to Defendant H.H. Sheikh Mohammed Bin
Zayed Al Nahyan's Reply Briefing Regarding the Motion to Dismiss
for Lack of Subject Matter and Personal Jurisdiction (Plaintiffs'
Sur-Reply), Docket Entry No. 37, p. 4.

[19]Plaintiffs' Response, Docket Entry No. 26, pp. 5-13.

Industrial de Olancho S.A., 182 F.3d 380, 388-99 (5th Cir. 1999) (individual officers of governmental corporation doing business with parties in the United States qualified as state entities and the FSIA accorded immunity for their official acts, despite accusations that their conduct was actuated by retaliatory motives); El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996) (FSIA immunized official of foreign state's central bank for actions taken on behalf of the bank absent evidence that actions were private or personal); Junqquist, 115 F.3d at 1027-28 (Crown Prince's son not entitled to FSIA immunity from suit based on allegedly fraudulent agreement made in furtherance of personal interests).   These decisions rest on the Ninth Circuit's holding in Chuidian v. Philippine National Bank, 912 F.2d 1095, 1106-07 (9th Cir. 1990), that a Philippine government official who instructed the National Bank to dishonor a letter of credit was entitled to FSIA immunity because, regardless of any personal motivation, his action fell within the scope of his official authority.

> (b)   Shifting Burden of Proof

When a foreign defendant like Sheikh Mohammed moves to dismiss for lack of subject matter jurisdiction pursuant to the FSIA the defendant bears the initial burden of making a prima facie showing that his actions fall within the scope of his official authority. See Moran, 27 F.3d at 172.   See also Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F.Supp.2d 277, 287 (S.D.N.Y. 2001) (citing Drexel Burnham Lambert Group Inc. v. Committee of

<u>Receivers for A.W. Galadari</u>, 12 F.3d 317, 325 (2d Cir. 1993), <u>cert. denied</u>, 114 S.Ct. 1644 and 1645 (1994)).  Once the defendant makes a <u>prima facie</u> showing of entitlement to FSIA immunity, the plaintiff may rebut the presumption of immunity with evidence that the defendant's actions fall within the scope of one or more of the specifically enumerated exceptions to FSIA immunity.  <u>Moran</u>, 27 F.3d at 172 ("the plaintiff seeking to litigate in the district court bears the burden of coming forward with facts showing that an exception applies").  If the plaintiff rebuts the defendant's <u>prima facie</u> showing, the burden shifts to the foreign defendant who must prove by a preponderance of the evidence that the putative exceptions are not applicable.  <u>Id.</u>  <u>See also</u> <u>Leutwyler</u>, 184 F.Supp.2d at 287 (citing <u>Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.</u>, 923 F.2d 380, 390 n.14 (5th Cir. 1991)).

    (c)  Sheikh Mohammed's Assertion of FSIA Immunity

Asserting that the U.A.E. along with Abu Dhabi and its officials are entitled to immunity provided by the FSIA, Sheikh Mohammed cites the declaration of Dr. Fararj A. Ahnish as evidence that he is an official of the U.A.E. and Abu Dhabi governments who is immune from suit for acts taken in his official capacity as an agent or instrumentality of those governments.[20]  In his declaration

---

[20]Sheikh Mohammed's Motion to Dismiss, Docket Entry No. 15, p. 7.

Ahnish explains that he is a lawyer who has the right to appear before all the categories of U.A.E. courts, including the Federal High Court of Abu Dhabi, and states that when Sheikh Mohammed's father, H.H. Sheikh Zayed Bin Sultan Al Nahyan (Sheikh Zayed), passed away in 2004

> Sheikh Mohammed was appointed as Crown Prince of Abu Dhabi. Prior to this appointment, Sheikh Mohammed served as Deputy Crown Prince of Abu Dhabi. During the time that Sheikh Mohammed was Deputy Crown Prince, he also served as Chief of Staff of the U.A.E.'s Armed Forces. As Crown Prince, Sheikh Mohammed is in a position to carry out the function and authorities of the Ruler in the event that the Ruler is incapable of exercising his powers and authorities. In addition, Sheikh Mohammed, in his capacity as the Chairman of the Executive Council of Abu Dhabi, oversees the affairs of the Emirate of Abu Dhabi. Sheikh Mohammed is the second-highest ranking official in the Government of Abu Dhabi. At the level of the Federal U.A.E., Sheikh Mohammed is also a Special Advisor to the President of the U.A.E. and the Deputy Supreme Commander of the U.A.E.'s Armed Forces. [Sheikh Mohammed's brother] H.H. Sheikh Khalifa Bin Zayed Al Nahyan is the Supreme Commander.[21]

Plaintiffs do not dispute that as the Crown Prince of Abu Dhabi, Sheikh Mohammed can be considered an instrumentality of a foreign state for purposes of the FSIA; and plaintiffs do not argue that any exceptions to the FSIA apply. Instead, plaintiffs seek to defeat Sheikh Mohammed's claim to immunity on the first prong of the FSIA inquiry by arguing that

> Sheikh Mohammed has been sued in his individual capacity under the TVPA. His reliance on the FSIA is misplaced

---

[21]Declaration of Dr. Faraj A. Ahnish, Exhibit A attached to Sheikh Mohammed's Motion to Dismiss (Ahnish Declaration), Docket Entry No. 15, ¶¶ 8-9.

because, by abusing his official power and directly
participating in the torture of Mr. Nabulsi, Sheikh
Mohammed engaged in non-sovereign conduct that renders
the protections afforded under the FSIA inapplicable. *In
re: Marcos Human Rights Litigation*, 978 F.2d at 497-98.
Sheikh Mohammed's direct participation in the torture of
Mr. Nabulsi violates the law of nations, and cannot, by
definition, fall within the scope of an "official act"
for purposes of seeking immunity under the FSIA. *Id.;
see also Filartiga*, 630 F.2d at 884-890; Restatement
(Third) of Foreign Relations § 702 (1987).  For these
reasons, Sheikh Mohammed's motion to dismiss for lack of
subject matter jurisdiction should be denied.[22]

Citing <u>Doe v. Qi</u>, 349 F.Supp.2d 1258 (N.D. Cal. 2004),

plaintiffs contend that

the FSIA does not afford [Sheikh Mohammed] any protection
whatsoever for the torturous conduct he perpetrated
against Mr. Nabulsi because, by engaging in torture,
Sheikh Mohammed engaged in non-sovereign conduct and
subjected himself to the full measure of liability
provided under the TVPA.[23]

In <u>Doe</u> practitioners of the Falun Gong spiritual movement sought to

hold individual officials of the Peoples Republic of China (PRC)

liable for alleged human rights violations in China.  <u>Id.</u>  The

defendants were the mayor of Bejing, Liu Qi (Liu), and the Deputy

Provincial Governor of the Liao Ning Province, Xia Deren (Xia).

Plaintiffs alleged that Lui

planned, instigated, ordered, authorized, or incited
police and other security forces to commit the abuses
suffered by the Liu plaintiffs, and had command or
superior responsibility over, controlled, or aided and
abetted such forces in their commission of these
abuses. . . . Liu knew or reasonably should have known

---

[22]Plaintiffs' Response, Docket Entry No. 26, p. 8.

[23]Plaintiffs' Sur-Reply, Docket Entry No. 37, p. 3.

that Beijing police and other security forces were
engaged in a pattern and practice of severe human rights
abuses against Falun Gong practitioners, and breached his
duty, under both international and Chinese law, to
investigate, prevent and punish human rights violations
committed by members of the police and other security
forces under his authority.

Id. at 1268.  Plaintiffs alleged that "Defendant Xia together with

other officials, acted in their official capacity and under color

of law, to persecute, punish and intimidate Falun Gong

practitioners in violation of international and domestic laws."

Id. at 1270.  Despite evidence that the PRC had covertly authorized

the acts for which the plaintiffs sought to hold Liu and Xia

liable, the court concluded that those acts could not have been

taken in furtherance of their official responsibilities because the

PRC had publicly disclaimed the alleged acts as illegal.  Id. at

1287.

    The court in Doe explained that whether an official's acts are

outside the scope of his authority must be measured by domestic law

of the foreign state, and that actions taken in violation of that

law are necessarily beyond the scope of official authority.  Id. at

1283-84 ("whether the official acted within the scope of his

authority and pursuant to an 'official mandate' turned on an

analysis of the official's powers under the domestic law of the

foreign state, not international law").  Thus, immunity afforded by

the FSIA ceases when a government official acts beyond the scope of

his validly granted official authority.  Id.  See also Byrd, 182

-13-

F.3d at 388-89 (citing <u>Chuidian</u>, 912 F.2d at 1106 (9th Cir. 1990) ("An obvious example would be if a dispute occurs pertaining to the sale of an employee's personal house, his government employment provides him no shield to liability.")).

Courts applying the FSIA to immunity claims distinguish between acts taken in furtherance of official responsibilities that fall within the scope of official authority and acts that are "personal and private" in nature that fall beyond the scope of official authority.   <u>See</u> <u>Leutwyler</u>, 184 F.Supp.2d at 287.   In determining whether Sheikh Mohammed's acts are beyond the scope of his official authority, the court "must be mindful of 'the nature of [his] alleged actions, rather than the alleged motives underlying them,'" <u>id.</u>, and is "required to give 'great weight' to any extrinsic submissions made by [Sheikh Mohammed] regarding the scope of [his] official responsibilities." <u>Id.</u>

(d)   Alleged Acts of Sheikh Mohammed

Plaintiffs do not allege that Sheikh Mohammed tortured Mr. Nabulsi but, instead, that the TVPA allows him to be held vicariously liable for aiding, abetting, authorizing, and tolerating (and/or alternatively, knowingly ignoring) the acts of torture committed against Mr. Nabulsi by others.[24]   Plaintiffs allege that Sheikh Mohammed participated in Mr. Nabulsi's torture

---

[24]<u>Id.</u> at p. 14 ¶ 43.

by directing that the instrumentalities of Abu Dhabi law enforcement be illegally employed against him through false arrest, false search, false detainment, false imprisonment, and torture.[25]

Sheikh Mohammed argues that "[n]ot one of Plaintiffs' allegations points to actions taken in an unofficial capacity."[26] Plaintiffs do not dispute that the acts for which they seek to hold Sheikh Mohammed liable were taken in his official capacity. Instead, plaintiffs argue that "the prohibition of torture is an established part of the law of nations—a *jus cogens* preemptive norm that cannot be violated by any individual acting in his official capacity."[27]   Plaintiffs explain "[t]he logic is that, because torture is universally illegal, it can never qualify as official action taken on behalf of a foreign sovereign for purposes of immunizing the acts of the individual under the FSIA."[28]   Plaintiffs also note that "[t]orture is illegal in the United States and the United Arab Emirates."[29]   A careful analysis of what plaintiffs

---

[25]<u>Id.</u> at p. 15 ¶ 44.

[26]Sheikh Mohammed's Reply, Docket Entry No. 32, p. 9.

[27]<u>Id.</u> at p. 7.

[28]<u>Id.</u>

[29]<u>Id.</u> at p. 7 & n.7 (citing 28 U.S.C.A. § 1350(1)-(3)(West 2007); U.A.E. Const. art. 26 ("[n]o man shall be subjected to torture or other indignity"); *see also* Arab Charter on Human Rights art. 13 ("[t]he State parties shall protect every person in their territory from physical or psychological torture, or from cruel, inhuman, degrading treatment.   [The State parties] shall take (continued...)

allege Sheikh Mohammed did to make him liable in damages reveals
that they have failed to allege any facts from which it may be
inferred, much less established, that the acts for which they seek
to hold Sheikh Mohammed liable were not taken pursuant to a valid
grant of authority in furtherance of his official responsibilities
but, instead, were taken beyond the scope of his validly granted
authority in furtherance of his personal and private interests.

In <u>Saudi Arabia v. Nelson</u>, 113 S.Ct. 1471, 1480 (1993), the
Supreme Court, explaining that a state is immune from the
jurisdiction of foreign courts as to its sovereign or public acts
but not as to those acts that are private or commercial in
character, acknowledged that a foreign state's exercise of the
powers of its police and penal officers has long been understood as
sovereign or official in nature.  Although plaintiffs argue that
Sheikh Mohammed is not entitled to FSIA immunity because they seek
to hold him liable in his personal capacity, plaintiffs allege that
Sheikh Mohammed, acting in his official capacity, allowed the
instrumentalities of Abu Dhabi's criminal justice system to be
employed against Mr. Nabulsi.  Although plaintiffs contend that
these instrumentalities were employed illegally against
Mr. Nabulsi, they have failed to present any evidence or legal
argument from which the court may conclude that any of the actions

---

[29](...continued)
effective measures to prevent such acts; performing or
participating in them shall be considered a crime punishable by
law.")).

taken against Mr. Nabulsi violated the domestic law of Abu Dhabi and/or the U.A.E., or that any of Sheikh Mohammed's actions or inactions were prohibited by that domestic law or otherwise beyond the scope of his validly granted official authority.   Absent evidence that Sheikh Mohammed's actions were prohibited by the domestic law of Abu Dhabi and/or the U.A.E., the court has no basis on which to conclude that he is not entitled to FSIA immunity. Moreover, none of the cases on which plaintiffs rely in support of their contention that Sheikh Mohammed is not entitled to FSIA immunity have held otherwise.

In Doe v. Qi, 349 F.Supp.2d at 1285-87, the court held that when an official's acts violate the laws of his nation, those acts fall outside the scope of official authority for purposes of the FSIA even when they are authorized by covert national policy.   The court based its holding on submissions from the plaintiffs showing that the acts for which they sought to hold the defendants liable were inconsistent with Chinese law and that the Chinese government had disclaimed the defendants' acts as illegal.   In Trajano v. Marcos, 978 F.2d 493, 498 (9th Cir. 1992), cert. denied, 113 S.Ct. 2960 (1993), the court held that acts committed by President Marcos' daughter, Imee Marcos-Manotoc, were not immunized by the FSIA because she admitted to having acted on her own authority instead of the authority of the government.   In Hilao v. Marcos, 25 F.3d 1467, 1471 (9th Cir. 1994), the court similarly held that acts committed by President Marcos were not immunized from suit by

-17-

the FSIA because the Philippine government contended that his actions had violated Philippine law.  In <u>Xuncax v. Gramajo</u>, 886 F.Supp. 162, 176 n.10 (D. Mass. 1995), the district court held that the former Minister of Defense of Guatemala was not immune from suit for claims of torture, arbitrary detentions, and executions because he did not argue that the acts at issue were officially authorized.  In <u>Cabiri v. Assasie-Gyimah</u>, 921 F.Supp. 1189, 1198 (S.D.N.Y. 1996), the court held the commander of the Ghanian Navy and Deputy Chief of National Security was not immunized from suit for claims of torture because he did not contest plaintiffs' assertions that the alleged acts fell beyond the scope of his official authority or that they were prohibited by local law.  None of these cases allowed plaintiffs to maintain suits in federal court against foreign officials presumptively entitled to FSIA immunity without first having presented facts and legal arguments from which the court could conclude that the acts for which the plaintiffs sought to hold the officials liable were illegal under the domestic law of their countries and, therefore, beyond the scope of their validly granted official authority.

(e)  Conclusions

Plaintiffs allege that Sheikh Mohammed is an official of the Abu Dhabi and U.A.E. governments, and that Mr. Nabulsi was harmed when he was subjected to the Abu Dhabi criminal justice system by government officials -- including Sheikh Mohammed -- who were

-18-

exercising their official authority to make arrests, charge and prosecute crimes, and incarcerate suspects. Plaintiffs have neither presented nor alleged facts from which the court may reasonably conclude that Sheikh Mohammed's alleged conduct was beyond the scope of his validly granted official authority. Instead, plaintiffs' complaint is rife with legal conclusions, such as the assertion that Sheikh Mohammed directly participated in the abuse and torture allegedly perpetrated upon Mr. Nabulsi by directing the instrumentalities of Abu Dhabi law enforcement be illegally employed against Mr. Nabulsi through the intentional torts of false arrest, false search, false detainment, false imprisonment, and torture. Absent factual and legal support showing that Sheikh Mohammed's actions violated domestic law, the court need not conclude that the acts for which plaintiffs seek to hold Sheikh Mohammed liable were necessarily beyond the scope of his validly granted official authority. Accordingly, the court concludes Sheikh Mohammed is entitled to immunity from suit as an instrumentality of a foreign sovereign.

## B.   Personal Jurisdiction

The court's determination that Sheikh Mohammed is entitled to immunity under the FSIA as an agent or instrumentality of a foreign sovereign because the actions for which plaintiffs seek to hold him liable were not beyond his validly granted official authority is sufficient to dispose of the claims asserted against him in this

lawsuit.  However, in the alternative, assuming _arguendo_ that the
actions for which plaintiffs seek to hold Sheikh Mohammed liable
were beyond the scope of his validly granted official authority,
the court concludes that the claims against him should be dismissed
for lack of personal jurisdiction.  A case is properly dismissed
for lack of personal jurisdiction when the foreign defendant is not
amenable to service of process under an applicable long-arm statute
and/or the exercise of jurisdiction does not comport with
constitutional standards of due process.  See _Freudensprung v._
_Offshore Technical Services, Inc._, 379 F.3d 327, 343 (5th Cir.
2004).

1.  _Standard of Review_

        When a foreign defendant moves to dismiss for lack of personal
jurisdiction, the plaintiff bears the burden of demonstrating the
district court's jurisdiction over the defendant.  _Quick_
_Technologies, Inc. v. Sage Group PLC_, 313 F.3d 338, 343-44 (5th
Cir. 2002), _cert. denied_, 124 S.Ct. 66 (2003).  When the district
court rules on a motion to dismiss for lack of personal
jurisdiction "without an evidentiary hearing, the plaintiff may
bear his burden by presenting a _prima facie_ case that personal
jurisdiction is proper."  _Id._ (quoting _Wilson v. Belin_, 20 F.3d
644, 648 (5th Cir.), _cert. denied_, 115 S.Ct. 322 (1994)).  In
making its determination, the district court may consider the
contents of the record before the court at the time of the motion,

including "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." Id. (citing Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir. 1985)). However, the court must accept as true uncontroverted allegations in the plaintiffs' complaint and must resolve all factual conflicts contained in the parties' evidence in the plaintiffs' favor. See Adams v. Unione Mediterranea Di Sicurta, 364 F.3d 646, 650 (5th Cir.), cert. denied, 125 S.Ct. 478 (2004).

2.   Analysis

Plaintiffs argue that

> based on his contacts with and connection to the United States as a whole, Sheikh Mohammed can reasonably anticipate being subjected to the jurisdiction of a U.S. Court.  Sheikh Mohammed had direct contact with the U.S. Embassy in Abu Dhabi regarding the incarceration of Mr. Nabulsi.  This contact with the United States, along with the other contacts described in Mr. Nabulsi's affidavit, established personal jurisdiction.[30]

Where, as here, the plaintiffs' complaint does not allege any contact with the forum state, Federal Rule of Civil Procedure 4(k)(2) provides a long-arm statute for federal causes of action.

(a)  Rule 4(k)(2)

Rule 4(k)(2) provides for service of process and personal jurisdiction in any district court for cases arising under federal

---

[30]Plaintiffs' Response, Docket Entry No. 26, p. 4.

law where the defendant has contacts with the United States as a whole sufficient to satisfy due process concerns and the defendant is not subject to jurisdiction in any particular state.

> If the exercise of jurisdiction is consistent with the Constitution and the laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2). The Rule was enacted to fill a gap in the jurisdiction of federal courts in cases arising under federal law where the defendant may not have sufficient contacts with any single state to satisfy the requirements of due process but does have sufficient contacts with the United States as a whole to satisfy those requirements. See Adams, 364 F.3d at 650-51 (citing World Tanker Carriers Corp. v. M/V Ya Mawlaya, 99 F.3d 717, 721-22 (5th Cir. 1996)). In this circuit as long as a defendant does not concede to jurisdiction in another state, a court may use Rule 4(k)(2) to confer jurisdiction. Id. at 651 (citing ISI International, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001) ("If . . . the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)."). In this case there is no dispute that plaintiffs' torture claim arises under federal law, and neither party has claimed that Sheikh Mohammed is subject to the jurisdiction of the courts of any state. Thus, the only issue is whether exercise of

jurisdiction is "consistent with the Constitution and laws of the United States." Fed. R. Civ. P. 4(k)(2).

      (b)  Sheikh Mohammed's Contacts with the United States

     Application of Rule 4(k)(2) requires the court to determine whether the defendant has sufficient contacts with the United States as a whole to satisfy the due process requirements of the Fifth Amendment.  A court may exercise specific and general jurisdiction over a defendant.  Specific jurisdiction arises from the defendant's contacts with the forum that are related to the suit.  General jurisdiction arises from the defendant's general business contacts with the forum state regardless of whether the subject matter of the suit is related to those contacts.  <u>See Helicopteros Nacionales de Colombia v. Hall</u>, 104 S.Ct. 1868, 1872 nn.8-9 (1984).  To determine whether general jurisdiction exists under Rule 4(k)(2), the court must examine the defendant's nationwide contacts to determine if they are sufficient to support a holding that those contacts constitute "continuous and systematic" presence in the United States.  To determine whether specific personal jurisdiction exists under Rule 4(k)(2), the court must examine whether the plaintiffs' claims arise out of Sheikh Mohammed's contacts with the United States.  Should the court determine that there are adequate minimum contacts with the United States, the court must then determine whether it would be "reasonable" to exercise jurisdiction.  <u>Id.</u>  <u>See also</u> <u>Asahi Metal</u>

<u>Industry Co., Ltd. v. Superior Court of California</u>, 107 S.Ct. 1026 (1987).  Balancing the outcomes of the minimum contacts analysis and reasonableness inquiry is a nuanced and fact-specific exercise.

### (1)  Plaintiffs' Evidence of Contacts

In his affidavit Mr. Nabulsi asserts that Sheikh Mohammed has the following contacts with the United States that are well known and sufficient to establish personal jurisdiction:  (1) Sheikh Mohammed accompanies his father on annual trips to the United States to receive medical care at the Cleveland Clinic in Ohio and the Mayo Clinic in Minnesota; (2) when Sheikh Mohammed comes to the United States he flies aboard planes operated by Amiri Flights, an air carrier for the Royal Family whose pilots must prepare and send flight manifests to United States Authorities and whose operations in the United States are managed by two United States companies, Alamanda, Ltd. and Ogden Aviation; (3) Sheikh Mohammed has  been involved in the purchase of multiple F-16 aircraft from McDonald Douglass; and (4) prior to purchasing F-16 aircraft Sheikh Mohammed was involved in an extensive training program for U.A.E. pilots at a United States Air Force base in San Antonio, Texas.[31]  In their supplemental filing the plaintiffs argue that additional evidence of Sheikh Mohammed's contacts with the United States is provided by "the Embassy Highlights page from the

---

[31]Affidavit of Bassam Nabulsi, Exhibit 1 attached to Plaintiffs' Response, Docket Entry No. 26, p. 2 ¶¶ 2-6.

Abu Dhabi—U.A.E. website featuring a picture of Sheikh Mohammed at a recent May 2007 meeting with President Bush at The White House in Washington, D.C."[32]

### (2)  General Jurisdiction

The facts asserted in Mr. Nabulsi's affidavit and in the plaintiffs' supplemental filing are not sufficient to demonstrate the "continuous and systematic" contacts required for the exercise of general jurisdiction over Sheikh Mohammed.

> As commentators have recognized, the continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum. The Supreme Court has upheld an exercise of personal jurisdiction when the suit was unrelated to defendant's contacts with a forum only once.

Submersible Systems, Inc. v. Perfadora Central, S.A. de C.V., 249 F.3d 413, 419 (5th Cir.), cert. denied, 122 S.Ct. 646 (2001) (citing Helicopteros Nacionales, 104 S.Ct. at 1868). The Supreme Court's decision in Helicopteros Nacionales illustrates the difficulty of establishing general jurisdiction over a nonresident defendant. In Helicopteros Nacionales the defendant was a Colombian corporation that was sued in Texas for personal injuries arising out of the crash of one of its helicopters in Peru. The defendant had negotiated the contract to provide helicopter services in Texas, purchased 80% of its helicopter fleet (for over

---

[32]Plaintiffs' Supplemental Discovery Motion, Docket Entry No. 29, p. 2.

$4.0 million) from a Texas company, sent its pilots to Texas for training, sent members of its management to Texas for technical consultations, and had accepted $5.0 million in payments from a Texas joint venture (in funds drawn on a Texas bank). Nevertheless, the Supreme Court held that general jurisdiction was lacking.  See id. at 1872-74.

In Submersible Systems, 249 F.3d at 420-21, the Fifth Circuit considered whether general jurisdiction could be asserted under Rule 4(k)(2) over a Mexican company.  The company's contacts with the United States included the construction of a marine drilling rig in a Mississippi shipyard, an office at the Mississippi shipyard to oversee the construction project, and a bank account in Texas.  The Mexican company purchased spare parts  and entire vessels in the United States, its vessels occasionally docked at United States ports, and some of its employees attended an annual conference in Texas.  Nevertheless, the Fifth Circuit concluded that "[t]hese contacts with the United States are, at best, sporadic and of small consequence" and "are not continuous and systematic."  Id. at 421.

Plaintiffs in this case have simply alleged that Sheikh Mohammed has had isolated contacts with the United States represented by personal trips made with his father to receive medical treatment in Ohio and Minnesota[33] and official trips made

---

[33]Since Sheikh Mohammed's father died in 2004, annual trips with him could not have continued beyond that date.  See Ahnish Declaration, Docket Entry No. 15, ¶ 8.

to gain pilot training, to purchase military aircraft, and to meet with the President.  When measured against the contacts rejected by the Supreme Court in <u>Helicopteros Nacionales</u>, 104 S.Ct. at 1872-74, and by the Fifth Circuit in <u>Submersible Systems</u>, 249 F.3d at 420-21, plaintiffs' allegations fall far short of the "continuous and systematic" contacts needed to support general jurisdiction. Because the plaintiffs have failed to show that Sheikh Mohammed's contacts with the United States are "continuous and systematic," the court concludes that the plaintiffs have failed to make even a <u>prima facie</u> showing of general personal jurisdiction.

### (3)  Specific Jurisdiction

For the court to exercise specific jurisdiction over plaintiffs' claims against Sheikh Mohammed, plaintiffs must show that Sheikh Mohammed purposely directed his activities at residents of the United States, and the litigation must result from activities that arise out of or relate to those activities.  Sheikh Mohammed must also have had fair warning that his activities could subject him to the jurisdiction of the United States' courts.  <u>See Alpine View Co. v. Atlas Copco AB</u>, 205 F.3d 208, 215 (5th Cir. 2000); <u>Burger King Corp. v. Rudzewicz</u>, 105 S.Ct. 2174, 2182 (1985) (exercise of personal jurisdiction is consistent with constitutional due process if "'the defendant's conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there'").

-27-

In some circumstances tortious acts that occur overseas can constitute sufficient contact with the United States for due process purposes.  For example, in <u>Mwani v. bin Laden</u>, 417 F.3d 1, 10 (D.C. Cir. 2005), the plaintiffs alleged that Osama bin Laden "orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States." <u>Id.</u> at 13.  Plaintiffs alleged that the embassy bombing was part of a conspiracy directed against the United States that included overt acts that occurred inside the United States.  <u>Id.</u>  On these facts, the court had no trouble determining that bin Laden "purposefully directed" his activities at residents of the United States and therefore could be subject to personal jurisdiction there.  <u>Id.</u>  <u>See also</u> <u>Sisso v. Islamic Republic of Iran</u>, 448 F.Supp.2d 76, 89-90 (D.D.C. 2006) (finding specific personal jurisdiction supported by allegations that, if proved, would show terrorist attack in downtown Tel Aviv was calculated to cause injury to persons residing in United States). Courts have made clear, however, that an act of torture against an American citizen that occurs abroad and has no further connection with the United States cannot support the exercise of specific personal jurisdiction over a defendant.  <u>See</u> <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3d 82 (D.C. Cir. 2002).

In <u>Price</u> the plaintiffs were two American citizens who had been arrested in Libya and allegedly tortured while incarcerated in

a Libyan "political prison."  294 F.3d at 86.  Although the court ultimately held that the defendant was not entitled to the protections of the Due Process Clause, it stated as part of its analysis that "the alleged fact that [the defendant] tortured two American citizens in Libya . . . would be insufficient to satisfy the usual 'minimum contacts' requirement."  Id. at 95.  In support of this conclusion, the court cited cases interpreting Calder v. Jones, 104 S.Ct. 1482 (1984), in which the Supreme Court upheld the exercise of personal jurisdiction over a defendant for an intentional tort committed outside the forum state that was "calculated to cause injury" inside the forum.  Price, 294 F.3d at 95.  See also IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 265-66 (3d Cir. 1998) (holding that defendant must have "expressly aimed its tortious conduct at the forum" in order to satisfy minimum-contacts analysis under the "Calder effects test").  Read together these opinions suggest that acts of terror or torture committed against American citizens abroad, standing alone, can support personal jurisdiction only if the defendant expressly intended the effects of the act to be felt in the United States. Based on this understanding of constitutionally sufficient minimum contacts, the court concludes that plaintiffs' allegations do not support the exercise of specific personal jurisdiction over Sheikh Mohammed.

Plaintiffs allege that Sheikh Mohammed planned, ordered, authorized, or knowingly ignored acts committed against Mr. Nabulsi

that took place entirely in Abu Dhabi.  Plaintiffs have not alleged that Sheikh Mohammed -- or any other defendant -- expressly intended the effects of those acts to be felt in the United States. Instead, plaintiffs allege that the acts were targeted at Mr. Nabulsi as an individual living and working in Abu Dhabi, in retaliation for his refusal to release videotapes made in Abu Dhabi to his Abu Dhabi business partner.  Although plaintiffs argue that Sheikh Mohammed's direct contact with the United States Embassy in Abu Dhabi concerning Mr. Nabulsi's alleged torture establishes minimum contacts with the United States necessary to sustain personal jurisdiction because "Sheikh Mohammed's contacts with the United States are such that he 'should reasonably anticipate being haled into court,'"[34] plaintiffs have not cited any relevant authority in support of this argument, and the court has found none.  Moreover, plaintiffs allege that Mr. Nabulsi's wife and the United States Embassy personnel initiated the contact that Sheikh Mohammed allegedly had with the United States regarding this matter.   "A plaintiff's or third party's unilateral activities cannot establish minimum contacts between the defendant and the forum state."  Moncrief Oil International Inc. v. OAO Gazprom, 481 F.3d 309, 311 (5th Cir. 2007).  Because the plaintiffs have failed to show that Sheikh Mohammed purposely directed his activities at residents of the United States, or that this litigation resulted

_____
[34]Plaintiffs' Response, Docket Entry No. 26, p. 18.

from alleged injuries that arise out of or relate to the activities that he directed at residents of the United States, the court concludes that the plaintiffs have failed to make even a <u>prima facie</u> showing of specific personal jurisdiction.

(c)  Conclusions

Because the plaintiffs have failed to show that Sheikh Mohammed's contacts with the United States are "continuous and systematic," or that Sheikh Mohammed purposely directed his activities at residents of the United States, the court concludes that the plaintiffs have failed to make even a <u>prima facie</u> showing of general or specific personal jurisdiction over Sheikh Mohammed. Accordingly, the court concludes that Rule 4(k)(2) does not authorize service of summons upon Sheikh Mohammed.  Since plain-tiffs have not suggested that service is authorized under any other long-arm statute, any claims asserted against Sheikh Mohammed in his personal capacity must be dismissed for lack of personal jurisdiction.

### III.  **Plaintiffs' Discovery Motions**

Plaintiffs have filed two motions seeking continuance of the submission date for Sheikh Mohammed's motion to dismiss and leave to conduct discovery of jurisdictional facts.[35]  Plaintiffs assert

---

[35]Plaintiffs' Motion for Leave to Conduct Jurisdictional Discovery and Motion to Continue the Submission Date for Defendant's Motion to Dismiss for Lack of Subject Matter and

-31-

that "[i]n the present case, additional evidence is discoverable to establish that Sheikh Mohammed has the requisite minimum contacts with the United States to satisfy the procedural due process safeguards embodied in the 5th Amendment and the traditional notions of fair play and substantial justice."[36] Plaintiffs explain that they seek leave to fully develop the evidence pertaining to the contacts between Sheikh Mohammed and the United States as a whole for the purpose of establishing personal jurisdiction under Rule 4(k)(2),[37] and assert that

> [t]he jurisdictional evidence obtained through such discovery is likely to show that Sheikh Mohammed has purposefully engaged in conduct that is directed toward the United States and that Sheikh Mohammed's conduct and connection with the forum are such that he should reasonably anticipate being haled into a United States court.[38]

Specifically, plaintiffs suggest that like his father, Sheikh Mohammed may have received medical treatment at the Cleveland and/or Mayo Clinics and, if so, may have executed a consent form that contains a forum selection clause, a waiver of jury trial, and/or an agreement to arbitrate sufficient to establish the minimum contacts necessary for the court to exercise personal

---

Personal Jurisdiction (Plaintiffs' Discovery Motion), Docket Entry No. 25, and Plaintiffs' First Supplemental Motion for Leave to Conduct Jurisdictional Discovery and Motion to Continue the Submission Date for Defendant's Motion to Dismiss for Lack of Subject Matter and Personal Jurisdiction (Plaintiffs' Supplemental Discovery Motion), Docket Entry No. 29.

[36]Plaintiffs' Discovery Motion, Docket Entry No. 25, p. 2.

[37]Id. at p. 3.

[38]Id. at pp. 3-4.

jurisdiction over him in this case.  Plaintiffs also argue that discovery should be permitted into Sheikh Mohammed's business activities in the United States, specifically in regard to his travel aboard Amiri Flight aircraft, and his business dealings with the United States through Alamanda, Ltd. and Ogden Aviation.[39]  In their supplemental filing plaintiffs argue that additional evidence supporting their position that additional discovery is necessary to fully develop the jurisdictional facts in this case is provided by "the Embassy Highlights page from the Abu Dhabi—U.A.E. website featuring a picture of Sheikh Mohammed at a recent May 2007 meeting with President Bush at The White House in Washington, D.C."[40]

The scope of discovery "lies within the district court's discretion."  <u>Mwani</u>, 417 F.3d at 17.  Plaintiffs argue that jurisdictional discovery is necessary for the court to evaluate the personal jurisdiction issues, yet as mentioned above, plaintiffs have not sought jurisdictional discovery on the issue of subject matter jurisdiction.  In light of plaintiffs' failure to make any showing that the acts for which they seek to hold Sheikh Mohammed liable were not beyond the scope of his validly granted official authority, the court concludes that "discovery would frustrate the significance and benefit of the entitlement to [FSIA] immunity from

---

[39]<u>Id.</u> at p. 6.

[40]Plaintiffs' Supplemental Discovery Motion, Docket Entry No. 29, p. 2.

suit." <u>El-Fadl</u>, 75 F.3d at 671.  <u>See</u> <u>Leutwyler</u>, 184 F.Supp.2d at 296 ("Because sovereign immunity is immunity from *suit* and its attendant burdens, and not merely from *liability*, the underlying purpose of the immunity is frustrated if courts allow cases to proceed against foreign sovereigns on the basis of frivolous allegations . . . that are based on speculation rather than evidence.").  Moreover, the contacts that plaintiffs allege that Sheikh Mohammed has with the United States, and for which they seek leave to conduct discovery, are largely official in nature (purchasing F-16 aircraft, attending pilot training, filing flight manifests, and meeting with the President of the United States), and unrelated to any claims asserted against him in his private or personal capacity (accompanying his father on trips to the United States for medical treatment).  The court concludes that plaintiffs' motions for leave to conduct discovery should be denied because the discovery they seek will not overcome the court's lack of subject matter jurisdiction, and is not likely to overcome the court's lack of personal jurisdiction.

## IV.  Conclusions and Order

For the reasons explained above, Defendant H.H. Sheikh Mohammed Bin Zayed Al Nahyan's Motion to Dismiss for Lack of Subject Matter and Personal Jurisdiction (Docket Entry No. 15) is **GRANTED.**  Plaintiffs' Motion for Leave to Conduct Jurisdictional Discovery and Motion to Continue the Submission Date for

-34-

Defendant's Motion to Dismiss for Lack of Subject Matter and
Personal Jurisdiction (Docket Entry No. 25) is **DENIED**, and
Plaintiffs' First Supplemental Motion for Leave to Conduct
Jurisdictional Discovery and Motion to Continue the Submission Date
for Defendant's Motion to Dismiss for Lack of Subject Matter and
Personal Jurisdiction (Docket Entry No. 29) is **DENIED**.  Because the
court has granted Sheikh Mohammed's motion to dismiss, Plaintiffs'
Unopposed Motion for Alternative Service Pursuant to Federal Rule
of Civil Procedure 4(f)(3) (Docket Entry No. 20), in which plain-
tiffs seek an order directing Sheikh Mohammed to serve the other
defendants named in this lawsuit, is **MOOT**; and Defendant H.H.
Sheikh Mohammed Bin Zayed Al Nahyan's Objection to and Motion to
Exclude Affidavit of Plaintiff Bassam Nabulsi (Docket Entry No. 34)
is **MOOT**.

In the joint discovery/case management plan and at the
August 17, 2007, scheduling conference plaintiffs should be
prepared to discuss how they intend to effect service of process
upon the remaining defendants.

**SIGNED** at Houston, Texas, on this the 19th day of July, 2007.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-35-