IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BASSAM NABULSI and <br> RIMA NABULSI, <br> Plaintiffs, <br><br> V. <br><br> H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN, H.H. SHEIKH NASSER BIN ZAYED AL NAHYAN, H.H. SHEIKH SAIF BIN ZAYED AL NAHYAN, H.H. SHEIKH ADBULLAH BIN ZAYED AL NAHYAN, H.H. SHEIKH MOHAMMED BIN ZAYED AL NAHYAN, and THE PARTNERSHIP OF THE ROYAL FAMILY BIN ZAYED AL NAHYAN, <br> Defendants. | § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. H-06-02683 <br> (JURY TRIAL REQUESTED) |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW Plaintiffs BASSAM NABULSI and RIMA NABULSI, complaining of H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN, and for cause of action respectfully show this Honorable Court the following:

### A. NATURE OF THIS CASE

Plaintiff Bassam Nabulsi is a United States citizen and Houston businessman. Sheikh Issa Bin Zayed Al Nahyan ("Sheikh Issa") is a member of the royal family in the United Arab Emirates ("U.A.E."). Sheikh Issa and Plaintiff Bassam Nabulsi were business partners. The partnership began in Houston, Texas as a result of Sheikh Issa's numerous travels to Houston. With the Sheikh's capital, and Mr. Nabulsi's skill and efforts, the partners earned profits exceeding tens of millions of dollars.

During the course of their partnership, Sheikh Issa began a long, slow spiral into depravity and degeneracy. Specifically, Sheikh Issa came to enjoy torturing people who he perceived had slighted him. He also took pleasure in videotaping the torture sessions, so he could watch the sessions at a later date.[1] On one such occasion, after the Sheikh had violently tortured for forty-five minutes an Afghan national at the Sheikh's ranch in the U.A.E., Mr. Nabulsi, via phone from Egypt, strongly pleaded with Sheikh Issa to allow someone to take the injured and dying Afghan national to the hospital. Sheikh Issa was offended by Mr. Nabulsi's assertiveness to save the dying Afghan.[2] That phone conversation was the beginning of the end of the business relationship between Mr. Nabulsi and Sheikh Issa. Shortly thereafter, Sheikh Issa had Mr. Nabulsi arrested, imprisoned, and tortured, in an effort to obtain from Nabulsi several video tapes of Sheikh Issa's torture sessions. Nabulsi was ultimately able to escape the U.A.E., but never was provided his share of the millions of dollars in profits that the partnership earned. Mr. Nabulsi brings this case to recoup his share of the profits earned by the partnership, and also brings this case for damages for the torture he suffered at the hands of Sheikh Issa.

## B. PARTIES

1. Plaintiffs, Bassam Nabulsi and Rima Nabulsi, are individuals who are citizens of the United States and the State of Texas.

2. Defendant H.H. Sheikh Issa bin Zayed Al Nahyan is an individual who is a citizen of the United Arab Emirates, a foreign state. Plaintiffs are in the process of serving this Defendant

---

[1] Plaintiff Bassam Nabulsi had no involvement whatsoever in such activities.
[2] Sheikh Issa also enjoyed having those in his entourage undergo plastic surgery at his whim to change features on their faces he did not like. On one such occasion, after the telephone dispute, Sheikh Issa ordered that Plaintiff's brother undergo plastic surgery to change the contours of his face. When Plaintiff Nabulsi intervened and, in front of others, defiantly told the Sheikh that he would not allow such surgery, this event was the final straw that ended the two partners' personal and professional relationship.

pursuant to Rule 4 of the Federal Rules of Civil Procedure. Specifically, Plaintiffs are serving the Sheikh personally, as well as serving him using other methods prescribed by the laws of the U.A.E.

## C. JURISDICTION

3. The Court has subject matter jurisdiction over this lawsuit under 28 U.S.C., §1332(a)(2), because the suit is between a citizen of Texas and a citizen of the U.A.E., and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. The Court also has federal question, subject matter jurisdiction under the Torture Victim Protection Act, 28 U.S.C., §1350.

4. The partnership at issue in this case began in Houston, Texas. Plaintiff Bassam Nabulsi is a Houston businessman, and, while in Houston, acted as Defendant Issa's agent. The partners, on behalf of the partnership, sought business opportunities in Texas, with Texas companies. Further, Defendant Sheikh Issa traveled to Houston, Texas in the years, 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2002, 2003, and 2004. Each of Sheikh Issa's flights to Texas was serviced by Ogden Aviation Ground Services in Houston, Texas. During each of his repeated, extended visits to Texas, Sheikh Issa set up residence at the Four Seasons Hotel in Houston. During these Texas visits, Issa hired off-duty Houston police officers as security, and used local limousine services to travel to numerous Houston area restaurants and attractions. While in Texas, Sheikh Issa traded extensively with Houston retail establishments, including A. Taghi Fine Men's Apparel and Shoes, Versace in the Galleria, Neiman Marcus, Sun & Ski Sports, Oshman's, Ammo Dump, and a local BMW dealership. Issa used Houston shipping companies to ship the goods he purchased back to the U.A.E. During several of these extended visits, Sheikh Issa received extensive medical care at St. Luke's Episcopal Health System of Houston, and was also personally treated by Houston physicians Dr.

Allen S. Hoffman, Dr. Tarek Khan, and Dr. William Watters. Additionally, Sheikh Issa traveled elsewhere in the United States, including extended stays at the Four Seasons Hotel in Beverly Hills, California, The St. Regis in Century City, California, and The Luxor Hotel in Las Vegas, Nevada. Sheikh Issa's many purchases of goods and services were not confined to Texas, as he purchased four vehicles, including a custom-made Hummer, in Los Angeles from West Covina Dodge. Due to the fact that the claims at issue in this case arose out of contacts with Texas, that Defendant had an agent in Texas, and due to Defendant's systematic and continuous contacts with both Texas and the United States, this Court has personal jurisdiction over Defendant Sheikh Issa.

## D. FACTUAL SUMMARY

5.  The Plaintiff, Bassam Nabulsi, is a United States citizen. Defendant Sheikh Issa is the son of H.H. Sheikh Zayed bin Sultan Al Nahyan, the late ruler of the U.A.E. Although he is a member of the royal family, Sheikh Issa holds no position in the U.A.E. or Abu-Dhabi governments. In the early 1990's, Mr. Nabulsi, who is fluent in the Arabic language, ran a corporation which was in the business of serving middle-Eastern nationals seeking medical care and other services in Houston. Among Plaintiff's many clients was the Royal Family of Abu-Dhabi. With Plaintiff's assistance, over a ten year period, Sheikh Issa came yearly to Houston and set up residence at the Houston Four Seasons Hotel. During each visit to Houston, the Sheikh purchased numerous goods at various Houston retail establishments. While in Houston, he also sought medical care at the Houston Medical Center. Indeed, on one occasion, a Houston orthopedic surgeon—Dr. William Watters—performed an elective spinal surgery on Sheikh Issa.

6.  During the Sheikh's visits, Mr. Nabulsi provided for all of Sheikh Issa's needs. Over the course of many visits, Sheikh Issa and Mr. Nabulsi developed a personal relationship. Indeed,

while in Houston, Issa personally began an aggressive campaign to recruit Mr. Nabulsi to work for Issa full time. Ultimately, Sheikh Issa convinced Mr. Nabulsi to manage Issa's affairs throughout the world, including Texas. Their agreement was formalized, in part, in a written partnership agreement.

7. According to the partnership agreement, and by virtue of other mutual understandings, Mr. Nabulsi was made general manager of all of Sheikh Issa's affairs, including those centered in Houston. Sheikh Issa also gave Mr. Nabulsi power of attorney over Issa's business affairs to facilitate their partnership. According to the agreement, Nabulsi was to seek out and develop business opportunities throughout the world, including throughout the United States and Texas. In return for Mr. Nabulsi's extensive work, Sheikh Issa was to finance Nabulsi's efforts. It was agreed between the partners that Mr. Nabulsi's compensation was to be forty-nine percent of all profits, after any capital was paid back to the partnership.

8. Nabulsi's efforts pursuant to the partnership quickly proved profitable. Pursuant to the partnership agreement, Mr. Nabulsi negotiated the acquisition of a prime piece of real estate in Dubai. Because of Nabulsi's efforts, the partnership earned $27,000,000.00 in profit. It was expected by the partnership that the property acquired would net approximately $2,700,000.00 in receipts each year.

9. Further, pursuant to the partnership, Mr. Nabulsi worked very hard to orchestrate a deal between the Syrian government and Bankers Trust in Slovakia. The business deal ultimately went unconsummated due to Mr. Nabulsi's wrongful incarceration. Indeed, because of Sheikh Issa's conduct, as described below, the partnership lost a commission in excess of $10,000,000.00.

10. Mr. Nabulsi also negotiated a contract for the partnership with the Abu-Dhabi police department. The contract was later cancelled due Mr. Nabulsi's false arrest. Issa's conduct created a loss of another $10,000,000.00 in commissions to the partnership.

11. Another achievement Mr. Nabulsi accomplished pursuant to the Partnership Agreement was the turnaround of the Sheikh's Chi-Chi's franchise agreement with Tumbleweed, a U.S. corporation. The franchise, under Mr. Nabulsi's stewardship, went from a losing proposition to a monthly profit of $53,000.00. It was expected by the partnership that the previously unprofitable franchise would have earned a net profit of more than $3,000,000.00 over the next five years.

12. Pursuant to their agreement, Mr. Nabulsi also managed Sheikh Issa's investment portfolio. Because of Nabulsi's decisions, the original investment increased tenfold for a net profit of $2,430,000.00.

13. Mr. Nabulsi, pursuant to the partnership, was also able to obtain two sponsorship agreements with U.K. companies. This contract was approved for $12,500,000.00 per year. The 8% commission resulted in a profit of $1,000,000.00 to the partnership.

14. Working pursuant to the partnership agreement, Mr. Nabulsi also created two sponsorship agreements with defense related companies to supply the UAE armed forces. The profits to the partnership from this transaction exceeded $6,000,000.00.

15. Seeing a potential for growth, the partnership also started a construction company. In a short time, the company acquired four contracts totaling $3.2 million. The partnership expected that the company would be highly successful.

16. Mr. Nabulsi also pursued several business opportunities for the partnership in Texas, with Texas companies. One such opportunity involved extensive visits and negotiations by Mr.

Nabulsi on the partnership's behalf, in Houston, with a Houston oil company. Because of the Sheikh's conduct, such opportunities never came to fruition.

17.     From their first meeting, Mr. Nabulsi quickly learned that Sheikh Issa expected no disagreements from those with whom he dealt, including his partner and business manager, Nabulsi. As their relationship progressed, Nabulsi noted that Sheikh Issa grew more aggressive, and less tolerant. Indeed, as the Sheikh's moods grew darker, he began a habit and custom of torturing his employees or anyone else with whom he disapproved. Over the years, these torture sessions grew more brutal, vicious, and bloody. As his degeneracy increased, Sheikh Issa began to have such torture sessions videotaped, so he could enjoy viewing them later. Mr. Nabulsi disapproved vehemently with the Sheikh's behavior, and never took part in such conduct.

18.     One of the Sheikh's many torture victims was Mohammed Shah Poor, an Afghan who did business with the Sheikh. After Poor fell into the Sheikh's disfavor, the Sheikh personally tortured Poor for more than forty-five minutes. The Sheikh was assisted by several members of the Abu-Dhabi police. The torture involved shooting an M-16 into the ground in front of where Poor was kneeling, stuffing sand into his mouth, sticking nails repeatedly into his buttocks, whipping him with a board containing nails, repeatedly kicking his head, whipping his buttocks until they bled, pouring salt onto his wounds, pouring lighter fluid onto his scrotum and lighting it on fire, sticking a cattle prod up his anus, and running over him with the Sheikh's Mercedes SUV. As has now become his custom, at the Sheikh's direction, the torture session was videotaped.

19.     Immediately after the torture session, a member of Sheikh Issa's entourage frantically telephoned Mr. Nabulsi, who was in Egypt on partnership business. During that call, Mr. Nabulsi learned about the torture of Mr. Poor, and learned that Sheikh Issa was refusing to allow the injured

and bleeding victim to be taken to the hospital. Fearing that Mr. Poor might die, Mr. Nabulsi spoke to Sheikh Issa by phone. In that call, Mr. Nabulsi pleaded with Sheikh Issa to allow Poor to be taken to the hospital. Although Sheikh Issa ultimately conceded to Nabulsi's frantic requests, Nabulsi's assertiveness on that call with Sheikh Issa was the beginning of the ultimate end to the two partners' business and personal relationship. Thereafter, although their business dealings continued for a time, the friction between the two partners steadily increased.

20. As personal and business manager for Sheikh Issa, as well as business partner, Mr. Nabulsi maintained all important business and personal items for Sheikh Issa. One such item kept by Mr. Nabulsi was the videotape showing Sheikh Issa torturing Mr. Poor—along with several similar tapes of other torture sessions involving the Sheikh and other victims.

21. As the relationship between the partners continued to deteriorate, Sheikh Issa became desperate to retrieve the torture tapes. To that end, by asserting influence with the Abu-Dhabi police, Sheikh Issa had Mr. Nabulsi arbitrarily arrested in February of 2005.

22. After his arrest, Mr. Nabulsi was held without charges for several days. The police department, under the direction of Sheikh Issa, thoroughly searched Mr. Nabulsi's residence in an effort to find the torture tapes. Further, all of Mr. Nabulsi's computers were confiscated, along with any devices that might contain evidence of Sheikh Issa's involvement in the torture.

23. In an attempt to justify Mr. Nabulsi's incarceration, Sheikh Issa then fabricated false accusations of marijuana possession against Nabulsi. Of course, the resulting search of Nabulsi's home revealed no marijuana, and the test performed on Mr. Nabulsi's urine was also negative for drug use.

24. Mr. Nabulsi was kept incarcerated for three months. During the three-month ordeal, Mr. Nabulsi learned from his jailors that the genesis of the false marijuana charges was Sheikh Issa, as well as his brother, Sheikh Nasser bin Zayed Al Nahyan, another member of the Royal Family, and head of the police force.

25. At one point during the incarceration, the U.S. Embassy attempted to come to Mr. Nabulsi's aid. In response, the Embassy was informed by the police department that the reason for the incarceration was a personal dispute between Mr. Nabulsi and Sheikh Issa.

26. Despite the efforts of the U.S. Embassy, Mr. Nabulsi was kept in jail, where he was continuously tortured. Each day, the jailors, at the direction of the Issa, would have a "session" with Mr. Nabulsi, threatening him with immediate death and extreme pain. Because of what he had seen on the torture tapes, Mr. Nabulsi was frighteningly aware of the Sheikh's capacity for cruelty as well as his apparent influence with the police.

27. During his incarceration, the safety of Mr. Nabulsi's wife and children were also repeatedly threatened. These threats caused Nabulsi great stress. Further, members of his personal staff were held hostage for days without food or water. Mr. Nabulsi was threatened with their deaths as well.

28. Sheikh Issa himself conducted some of the torture sessions. During such sessions, Issa asked repeatedly about the location of the torture tapes, and repeatedly told his business partner Nabulsi that he would be killed, and that his family and staff would be killed.

29. In furtherance of the effort to break Nabulsi mentally so he would give up the tapes, Sheikh Issa instructed the police to place Afghan and Iraqi prisoners, who were known to be hostile an aggressive towards Americans, in Mr. Nabulsi's cell. The Defendant then had the guards taunt

9

Mr. Nabulsi about being an American in front of these cell mates. This effort had the intended effect.

30. Mr. Nabulsi's criminal charges ultimately came to trial and he was acquitted of all charges of marijuana possession. Still, even after his innocence was proven in court, he was kept in jail. Finally, the U.S. Embassy again intervened to force Mr. Nabulsi's release. Mr. Nabulsi was immediately deported from the U.A.E., depriving him of any opportunity to seek redress or to collect the massive debt owed him by Sheikh Issa as a result of their partnership business.

### E. CAUSES OF ACTION

### 1. Breach of Contract

31. Plaintiffs incorporate by reference the factual allegations found in the Paragraphs above.

32. Defendant Sheikh Issa entered into a legally binding partnership agreement with the Plaintiff, Bassam Nabulsi. Under the terms of the contract, the Plaintiff was to receive forty-nine percent of all of the profits from all of the Sheikh's business enterprises. In exchange, Plaintiff Bassam Nabulsi sought out business opportunities throughout the world (including Texas), developed such opportunities, and managed all of Defendant's affairs. Plaintiff fully performed his obligations under the contract, or was wrongly prevented from doing so by Defendant. All conditions precedent were satisfied, or the Sheikh wrongly prevented such. Defendant substantially and materially breached the contract by at least the following ways: 1) failing to pay Plaintiff in accordance with the agreement; 2) preventing Plaintiff's further performance under the agreement; 3) making false charges against Plaintiff to the police; 4) using his influence over the police to gain a

business advantage over Plaintiff; 5) using his influence to have Plaintiff deported; and 6) torturing or causing Plaintiff to be tortured.

33. As set forth above, Defendant is liable for breach of contract. As a result of Defendant's breach, Plaintiff has suffered actual damages that exceed the minimum jurisdictional limits of this Honorable Court. As damages, Plaintiff is entitled to the benefit of his bargain, meaning money damages equal to the value of 49% of profits arising from all of Defendant's business activities of which Plaintiff was a part. Plaintiff also seeks attorneys' fees and costs of Court.

### 2. Conversion

34. Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

35. Through his efforts, Plaintiff caused the partnership to earn more than $80,000,000.00. Due to his efforts, the partnership continues to earn profits.

36. Defendant wrongfully converted Plaintiff's share of the profits from the partnership.

37. Defendant's wrongful conduct proximately caused Plaintiff damages. Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiff seeks an award of punitive damages.

38. Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiff are not subject to capping.

### 3. Breach of Fiduciary Duty

39. Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

11

40. By virtue of the partnership between Sheikh Issa and Bassam Nabulsi, Issa owed a fiduciary duty to the Plaintiff. Defendant's actions, described above, constitute a breach of his fiduciary duty.

41. Defendant's wrongful conduct proximately caused Plaintiff damages. Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiff seeks an award of punitive damages.

42. Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiff are not subject to capping.

### 4. Torture

43. Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

44. The Torture Victim Protection Act of 1991 creates civil liability against an individual who, under actual or *apparent authority*, or *color of law*, of any foreign nation, subjects an individual to torture

45. Defendant is an individual and holds no government position. He is not entitled to sovereign immunity, as he is not a sovereign or an agent of a sovereign. However, as a member of the royal family, Defendant had influence over the police sufficient to cause Plaintiff to be wrongly imprisoned and tortured. The Defendant personally committed and caused to be committed acts of torture upon the Plaintiff, Bassam Nabulsi, as defined under the Torture Victims Act, 28 U.S.C.A., §1350. Under color of law, and with apparent authority, Defendant subjected Plaintiff Bassam Nabulsi with the threat of severe physical pain and suffering, the threat of imminent death, and the

threat that his wife, children, and staff would be subject to death, and severe physical pain or suffering.

46. There is no remedy adequate or available to Mr. Nabulsi in the UAE. In the UAE, the law specifically prohibits criticism of the ruling families under penalty of imprisonment. *See*, Country Reports on Human Rights Practices, UAE - 2002 (Bureau of Democracy, Human Rights, and Labor of the U.S. Department of State), www.state.gov/g/drl/rls/hrrpt/2002/18291.htm. Further, allegations such as these against members of the Royal Family are universally ignored.

47. Defendant's conduct proximately caused Plaintiffs' damages, including damages for pain and suffering and mental anguish, both past and future.

48. Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiffs seek an award of punitive damages.

49. Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiffs are not subject to capping

### 5. Intentional Infliction of Emotional Distress

50. Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

51. The Defendant intentionally caused the Plaintiffs to suffer severe emotional distress. The Defendant's conduct as outlined above was extreme and outrageous and was an abuse of the Defendant's relationship with the Plaintiff. Said acts went beyond all possible boundaries of decency so as to be regarded as atrocious and utterly intolerable in a civilized community. The conduct described proximately caused injury to the Plaintiffs.

52. Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiffs seek an award of punitive damages.

53. Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiffs are not subject to capping

### 6. Malicious Prosecution

54. Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

55. Defendant fabricated false allegations against the Plaintiff. Defendant initiated and approved the commencement of a criminal prosecution against the Plaintiff, knowing such prosecution was meritless and brought with an ulterior motive—primarily, to obtain the torture tapes and secondarily, to avoid his obligations under the partnership agreement. The Defendant's acts were committed with malice and with the evil motive of coercing from the Plaintiff the incriminating evidence of the torture tapes. The acts were done with gross indifference to the rights of the Plaintiff so as to amount to a willful and wonton act. The charges were false, and Plaintiff was fully acquitted of such charges.

56. The charges fabricated by Defendant concerning Plaintiff were baseless. The Plaintiff suffered severe injury because of these tortuous acts.

57. Defendant's wrongful conduct proximately caused Plaintiff damages. Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiffs seek an award of punitive damages.

58. Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiffs are not subject to capping.

## F. DAMAGES

59. As a direct and proximate result of the Defendant's conduct, Plaintiff Bassam Nabulsi has suffered the following injuries and damages:

   (1) Past, present and future physical pain and suffering;

   (2) Past, present and future mental anguish;

   (3) Past, present and future loss of earning capacity;

   (4) Past, present and future lost profits;

   (5) Lost benefit of his bargain; and

   (6) Attorney fees and costs of court.

60. As a direct and proximate result of the Defendant's conduct, Plaintiff Rima Nabulsi has suffered the following injuries and damages:

   (1) Past, present and future physical pain and suffering;

   (2) Past, present and future mental anguish;

   (3) Loss of consortium and damages including the loss of affection, solace, comfort, companionship, society, assistance, emotional support and love.

61. Both Plaintiffs also seek punitive damages, and because of the criminal nature of Defendant's conduct, such punitive damages are not subject to capping.

## G. JURY DEMAND

62. Plaintiffs respectfully request a trial by jury on all issues to which Plaintiffs are so entitled.

## H. PRAYER

63. For these reasons, Plaintiffs ask for judgment against Defendant for the following:

15

a. Actual damages;

b. Prejudgment and postjudgment interest;

c. Costs of suit, including attorney fees;

d. Punitive damages; and

e. All other relief the Court deems appropriate.

Respectfully submitted,

## THE BUZBEE LAW FIRM

By: _____/S/ Tony Buzbee_____
Anthony G. Buzbee
State Bar No. 24001820
Federal Bar No. 22679
The Buzbee Law Firm
1910 Ice & Cold Storage Bldg.
104 21st Street (Moody Avenue)
Galveston, Texas 77550
Phone: (409) 762-5393
Fax: (409) 762-0538
www.txattorneys.com

OF COUNSEL:

THE AZEM FIRM
Samer Al-Azem
State Bar #00793240
2703 Newman Street
Houston, Texas 77098
Phone: (713) 429-5319
Facsimile: (713) 528-7247

**ATTORNEY FOR PLAINTIFFS, BASSAM NABULSI, AND HIS WIFE, RIMA NABULSI**