IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BASSAM NABULSI and<br>RIMA NABULSI,<br><br>Plaintiffs,<br><br>v.<br><br>H.H. SHEIKH ISSA BIN ZAYED AL<br>NAHYAN,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-06-02683 |

---

## DEFENDANT H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL

---

Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan ("Sheikh Issa") files this response to Plaintiffs' Motion to Compel and in support thereof, would respectfully show the Court as follows:

### Introduction

The vast majority of issues raised in the Plaintiffs' Motion to Compel have been considered by this Court. At the October 1, 2008 hearing, the Court stated that it had looked at Sheikh Issa's responses to Plaintiffs' discovery requests and asked Plaintiffs' counsel which ones he took issue with: "I looked at them. Let's rule on them now. Which ones do you have a concern with?" *See* **Exhibit A** (Hr'g Tr. 7:13–14, Oct. 1, 2008). After Plaintiffs' counsel presented his numerous issues with Sheikh Issa's discovery responses, the Court stated that "I

don't think this is stonewalling in the sense that I have seen in some cases." (Hr'g Tr. 13:11–12, Oct. 1, 2008).

The Court then asked for further briefing *only* on the issue of whether the Plaintiffs' photographs were relevant to the jurisdictional issues.   (Hr'g Tr. 11:3–5, Oct. 1, 2008). Plaintiffs' counsel agreed, stating, "We'll ripen the issue on the pictures and that will probably be everything I need."  (Hr'g Tr. 14:4–5, Oct. 1, 2008).  As the Court properly observed, the remainder of Sheikh Issa's discovery responses were "fairly reasonable as discovery goes." (Hr'g Tr. 13:8, Oct. 1, 2008).

Despite representing to the Court that a ruling on the issues pertaining to the photographs would "be everything I need," Plaintiffs have now submitted a 34-page missive complaining about almost every one of Sheikh Issa's discovery responses.   For the reasons that follow, Plaintiffs' motion should be denied.

## Argument

## I.   The Forum Non Conveniens Discovery Requests are Irrelevant

Plaintiffs' served a set of requests for admissions, interrogatories, and requests for production that purportedly relate to Sheikh Issa's forum non conveniens motion.  The requests ask Sheikh Issa to identify several individuals pictured in the various photographs.   The arguments and authorities pertinent to this issue have been fully briefed in Sheikh Issa's Motion for a Protective Order.  (Docket Entry No. 75).   As stated in that Motion, "[n]one of these requests [were] made for the purpose of furthering the jurisdictional debate." (*Id.* at 3).  The photos are neither relevant to the Plaintiffs' fear for their safety, nor to the determination of whether the U.A.E. legal system is fair.  Sheikh Issa hereby incorporates that Motion as though

2

fully set forth herein.  For the reasons stated in that Motion, Plaintiffs' Motion to Compel should be denied.

In addition, the cases cited in Plaintiffs' Motion to Compel regarding use of the photos are inapposite to the current debate.  The issue presently before the Court is not whether and to what extent allegations concerning personal safety are relevant to a forum non conveniens determination, but rather whether these particular photographs will aid the Court in ruling on the forum non conveniens motion.  Plaintiffs' argument misses this point.

*Menendez Rodriguez v. Pan Am Life Ins. Co.*, 311 F.2d 429 (5th Cir. 1962), *vacated on other grounds*, 376 U.S. 779 (1964), involved the payment of life insurance premiums by Cuban refugees to U.S.-based insurance companies.  The district court granted the insurance companies' forum non conveniens motion on the basis that the transactions occurred in Cuba and are thus governed by Cuban law, and the witnesses and documents were in Cuba.  *Id.* at 431–32.

The Fifth Circuit reversed, holding that the district court had failed to consider properly whether the plaintiffs could receive a fair trial in Cuba, in light of evidence of political instability, and Fidel Castro's nationalized policy of confiscation of all property owned by Cuban nationals who had left the country.  *Id.*  The district court's order was reversed because it failed to consider these issues.  However, *Menendez Rodriguez* did not address the analysis a court considers when a plaintiff opposing a forum non conveniens motion alleges that his personal safety is at risk.

As stated in Sheikh Issa's Motion for Protective Order, the photos have no relevance to the Plaintiffs' allegations of personal threats and wrongful incarceration (i.e., neither Plaintiffs nor their family is alleged to be in the photographs), and under *MBI Group, Inc. v. Credit*

3

*Foncier Du Cameroun*, 558 F. Supp. 2d 21 (D.D.C. 2008), the photos are irrelevant to whether the *judicial branch* of the Abu Dhabi government will afford the Plaintiffs' a fair trial. *Menedez Rodriguez* is wholly inapplicable to the present case.

Similarly, although the courts in the other cases cited by Plaintiffs—*Rasoulzadeh v. Associated Press*, 574 F. Supp. 854 (S.D.N.Y. 1983), *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005), *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 106 (2d Cir. 2000), *Abiola v. Abubakar*, 267 F. Supp. 2d 907 (N.D. Ill. 2003), *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003), and *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189 (S.D.N.Y. 1996)—also considered specific allegations concerning the plaintiffs' personal safety, these cases miss the mark.  None of the cases address whether purported evidence of executive-branch corruption or of violence directed to individuals other than the plaintiffs should be considered in the forum non conveniens analysis.  The issue before this Court is not whether allegations of fear of one's safety are relevant.  The issue is whether the Court should permit the Plaintiffs' continued use of incendiary photographs that have no relationship whatsoever to their ability to obtain a fair trial in the U.A.E.  None of the cases Plaintiffs cite address this issue.

The photographs purportedly show an Afghan man named Mohammed Shah Poor being tortured.  Plaintiffs allege that the photographs are relevant because they purport to show the influence that Sheikh Issa has over the Abu Dhabi police.  However, as discussed in Sheikh Issa's Motion for Protection, even if the person in the photographs was a member of the Abu Dhabi police, this would have no bearing on the pending forum non conveniens motion because the issue in a forum non conveniens analysis is whether the plaintiff can receive a fair trial in the alternative forum.  In other words, the only issue is whether there is alleged corruption or

4

influence over the judiciary, not over an executive branch of government.  As the court in *MBI Group Inc.* stated, "Most importantly, the alleged actions at issue were taken by the executive branch of the Cameroonian government, not by the judiciary. And defendants have submitted evidence that Cameroon's judiciary is formally independent of the executive as a matter of the nation's Constitution. As explained above, plaintiffs cannot disturb that presumption of independence by merely pointing to generalized reports that the executive branch may exert undue influence over the judiciary."  558 F. Supp. 2d at 30.

Sheikh Issa has presented evidence that the U.A.E. judiciary is independent from the other branches of government, and is not subject to outside influence.  (Docket Entry No. 61, Ex. E, Expert Witness Statement of Dr. Faraj, ¶¶ 11-29, 102).   In addition, members of the Al Nahyan family can be sued in the U.A.E. by anyone, including foreigners, (*id.*, ¶¶ 98-102), and members of the Al Nahyan family are not above the law, and do not enjoy any special privilege or exemption from the laws of the U.A.E. (*id.*, ¶ 100).

The Plaintiffs have presented no evidence to refute these facts.  Nor do they attempt to do so by the use of the photographs.   Because the photographs have nothing to do with the Plaintiffs' allegations of fear for their safety or with whether the Plaintiffs can receive a fair trial in the U.A.E., the Court should enter an order prohibiting their further use in the litigation.

## II.    The Relevant Time Period for the Jurisdictional Inquiry is from January 1, 2000 to June 19, 2008

Plaintiffs ask Sheikh Issa and this Court to consider contacts with the forum going back more than twelve years.  Although the Fifth Circuit has stated that "[g]eneral jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed," *Access Telecom, Inc. v. MCI Telecommunications Corp.*,

197 F.3d 694, 717 (5th Cir. 1999), the facts of this case show that suit was filed two years before Sheikh Issa was allegedly served with process. Plaintiffs filed this suit in April 2006, but do not allege to have effected service on Sheikh Issa until June 19, 2008.

In determining whether a court may exercise general jurisdiction over a defendant, it is the defendant's *continuous and systematic* contacts that determine whether he has a "presence" in that forum. *See Holt Oil & Gas v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986). A court's finding that it may exercise general jurisdiction over a nonresident defendant effectively means not only that the court has jurisdiction over the defendant in the dispute at hand but also that the defendant is subject to the jurisdiction of the courts of the forum for all purposes and that it will consequently be required to defend against any and all claims which may be filed against it. *See Int'l Shoe v. Washington*, 326 U.S. 310 (1945); *see also Gregoire v. Schleicher & Co. Int'l, A.G.*, 1991 WL 168644, at *4–5 (E.D. Pa. Aug. 22, 1991) (**Exhibit B**). "Thus, to comport with requirements of due process and of fundamental fairness, such a finding of general jurisdiction must in large part be based upon the nonresident defendant's present contacts with the forum." *Gregoire*, 1991 WL 168644, at *4. Because the general jurisdiction inquiry requires examination of a defendant's ongoing forum contacts, the relevant period in this case should not end in 2006.

Moreover, considering contacts as far back as 1996, as Plaintiffs insist, is beyond reasonable. Rather, courts in this circuit typically consider a period of five to seven years as reasonable in determining whether a defendant has minimum contacts with the forum. For example, the Fifth Circuit in *Access Telecom* considered defendant's forum contacts during a period from 1990 to 1996 in determining whether general jurisdiction existed. 197 F.3d at 717–

6

18.   Similarly, in *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 611 (5th Cir. 2008), the court considered the defendants' forum contacts over a five-year period during which it sold approximately $140,000 worth of goods and services in Texas.  *See also Wilson v. Belin*, 20 F.3d 644, 650–51 (5th Cir. 1994) (holding that the defendants' forum contacts three to five years before suit was filed did not establish general jurisdiction); *cf. D&S Turbine Int'l, Inc. v. Research Mgmt. Sys., L.C.*, 2006 WL 287971, at *3–4 (S.D. Tex. Feb. 6, 2006) (Lake, J.) (considering defendant's forum contacts over an eight-year period; declining to exercise general jurisdiction) (**Exhibit C**).

In light of this authority, it would be unreasonable to require Sheikh Issa to comb through records reaching as far back as 1996 for evidence of medical and shopping trips to the forum. Accordingly, Sheikh Issa respectfully submits that the relevant time period for considering contacts with the forum for purposes of general jurisdiction should be from January 1, 2000 to June 19, 2008.  This period of eight and one-half years should more than suffice to enable the Court to determine whether general jurisdiction exists.

## III.   Sheikh Issa Responded in Good Faith to the Jurisdictional/Service of Process Interrogatories

Sheikh Issa provided good-faith substantive responses to Interrogatories No. 4, 6, 8, 9, 11, 14, and 18.  Sheikh Issa and the undersigned counsel undertook diligent efforts to locate information responsive to the Plaintiffs' requests.  Unfortunately, some of the Plaintiffs' requests seek information no longer available to Sheikh Issa.  For example, few if any receipts were available to adduce specific items purchased years ago from Houston restaurants or retailers. Where information was still available, Sheikh Issa responded accordingly, such as by producing credit card statements from the period.  As one court aptly stated, "The duty to respond to

7

interrogatories and requests for production requires an attorney to conduct a reasonable inquiry into the factual basis of the claims and defenses in a case and the relationship of all relevant information to the discovery requests of the opposing party." *Liberty Mutual Ins. Co. v. Tedford*, 2008 WL 2080930, at *6 (N.D. Miss. May 13, 2008) **(Exhibit D)**.

Sheikh Issa objected to some of the requests because they were confusing, unlimited as to time, or suffered from some other defect.  For example, interrogatory request number 4 asks for a list of all purchases of goods, products, or services from individuals within the United States. Sheikh Issa objected because the request is unduly burdensome by seeking information about purchases of goods, products, or services for which he has no record and cannot reasonably recall.   But Sheikh Issa then went on to provide a thorough and comprehensive answer comprised of the information and knowledge available.   In addition, Sheikh Issa produced documents showing his purchases of good and services from the United States during the relevant time period, referring the Plaintiffs to such documents.  *See* FED. R. CIV. P. 33(d) (authorizing parties responding to interrogatory requests to refer to documents produced); *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 357 (1978) (same).  It is clear that Plaintiffs are complaining when there is no legitimate basis for doing so.

Plaintiffs' other objections to Sheikh Issa's interrogatory responses are similarly off-base and without merit.  For example, in response to request number 8, asking Sheikh Issa to identify the individuals who acted on his behalf while in the United States, Sheikh Issa responded that he principally employed Mr. Nabulsi to handle arrangements for his travels to the United States, and that he does not have knowledge of the identities of the various persons and companies Mr. Nabulsi might have used.  (Rather, Mr. Nabulsi would be in the best position to answer this

8

question.)  Sheikh Issa also responded that staff and officials from the U.A.E. embassy in Washington D.C. occasionally assisted in making arrangements for his trips, and that in connection with a lawsuit in 2002, he engaged two law firms to represent him.  This response is complete and accurate, to the best of Sheikh Issa's recollection.

With respect to interrogatory numbers 20 and 21, Sheikh Issa is unable to respond without revealing privileged communications.  In addition, irrespective of the privilege issue, neither of these requests has any bearing on whether service of process was effected under Rule 4(f)(2)(A), which is the subject of the motion to dismiss for lack of service.  The issue before the Court is whether the attempted service under Rule 4(f)(2)(A) was effective under the laws of the U.A.E. This Court has not ordered that service be effected under Rule 4(f)(3).  In fact, Plaintiffs' request for alternative service under Rule 4(f)(3) has already been denied.  (Docket Entry No. 42).  Because it is uncontested that Sheikh Issa was not personally served, whether and how he learned of this lawsuit is irrelevant, and more importantly, is subject to the protections of the attorney-client privilege.

## IV.     Sheikh Issa Has Dutifully Responded to the Requests for Production

Plaintiffs also complain that Sheikh Issa has failed to respond to a litany of requests for production.  This is not true.  Sheikh Issa lodged objections to request numbers 3, 5, 6, 7, 8, 9, 10, 14, 15, and 16 because the requests were unlimited as to time, were poorly phrased, or suffered from some other defect that required an objection.  But following each objection, Sheikh Issa stated that if documents responsive to the requests existed, they would be produced.  And they were.  Following a reasonable and diligent search, Sheikh Issa produced over 400 pages of documents responsive to these and the other discovery requests, which comprise the universe of

9

presently known and available responsive documents.   Like their complaints about the interrogatory responses, Plaintiffs' complaints here are similarly misguided.

Sheikh Issa asserted a privilege objection in response to requests 21 and 22, which ask for documents pertaining to legal services that Dr. Faraj has performed for Sheikh Issa *or any of his brothers* in the past ten years, and any correspondence between Dr. Faraj and Sheikh Issa or anyone acting on his behalf in this lawsuit.   These requests can be read to seek all correspondence between Dr. Faraj, a lawyer, and any member of Sheikh Issa's extended family. While it is true that under Rule 26 correspondence between a testifying expert and counsel or the client related to the lawsuit may be subject to disclosure, to the extent any such communications exist, they have been produced.

But there is no disclosure requirement for privileged communications unrelated to the suit that were not relied upon by the expert in forming his opinions in this case.   *See* FED. R. CIV. P. 26(a)(2)(B) (requiring disclosure of the data or other information considered by the witness in forming his opinions).   The Advisory Committee Notes to the 1993 Amendments to the Federal Rules clarifies the intent of the disclosure requirement:

> The [expert] report is to disclose the data and other information considered by the expert. . . . Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

Dr. Faraj has served as <u>legal counsel</u> for Sheikh Issa or members of his family in the past on other matters unrelated to the present litigation.   It is the protection of these communications for which the privilege has been asserted.   There is no requirement under Rule 26 or the cases interpreting that rule that these privileged communications are subject to disclosure.

1233.00001/417595.1

## V.     The Physician-Patient Privilege

The Texas doctor-patient privilege protects from disclosure communications between a physician and a patient in connection with the rendering of professional services, as well as records of the identity, diagnosis, evaluation, or treatment of a patient that are created or maintained by the doctor.   TEX. R. EVID. 509.   Request numbers 5, 8, 9, 10, 14, and 15 seek information that would reveal not only the identity of Sheikh Issa's treating physicians in the United States, but also the treatment provided, the diagnoses, the procedures performed, and the advice sought by Sheikh Issa and provided by the physicians.   All of this information is explicitly protected under Rule 509.

Plaintiffs' are suing, in part, for breach of a partnership agreement between Bassam Nabulsi and Sheikh Issa.   Although the Fifth Circuit has not addressed the question of whether federal or state law governs the application of evidentiary privileges in cases where claims arise under both federal and state causes of action, it has provided that where state law supplies the rule of the decision, questions of privilege are to be determined by that State's laws.   *See In re Avantel, S.A.*, 343 F.3d 311, 323 (5th Cir. 2003) (citing FED. R. EVID. 501).   If this case proceeds to the merits, the Texas law of privilege would almost certainly apply to the state-law claims.   It would be anomalous to find that the federal privilege should govern the state-law claims at the jurisdictional inquiry, but apply the Texas privileges to those claims during the merits.

Moreover, the information pertaining to Sheikh Issa's medical condition is irrelevant to the jurisdictional inquiry.   Sheikh Issa has already stipulated to the fact that he came to the United States one to two times per year between 2001 and 2004 for medical treatment.   The type of treatment sought, the identity of the physicians, and their diagnoses have no bearing on the

11

jurisdictional dispute.  What is arguably relevant to the pending jurisdictional motion is the fact that Sheikh Issa received medical treatment in the United States, not the specific treatment or diagnoses he received from his doctors.

## VI.    The Responses to the Requests for Admission

Plaintiffs' complaints about Sheikh Issa's responses to the requests for admission are a re-hash of issues addressed above.  For the reasons set out previously, Sheikh Issa's limited objections to the Requests for Admission should be sustained.  For example, Plaintiffs' complain that Sheikh Issa has objected to Requests 71–76, which ask about trips to Houston before the relevant time period.  As set out above, the relevant time period in this case should be from January 1, 2000 to June 19, 2008.  Questions about contacts with the forum that pre-date January 1, 2000 are irrelevant to the general jurisdiction inquiry.  Similarly, Requests 93–97 inquire about irrelevant areas protected by the physician-patient privilege, including the identity of various physicians and treatment received.  Because such information is both irrelevant and privileged, Sheikh Issa's objections should be sustained.  Requests 141 and 144, which ask whether Sheikh Issa has "actual notice" of the suit and understands the Plaintiffs' allegations, were objected to because "actual notice" is a legal term.  Requests 150–154, and 156–158, which deal with the alleged torture photos, are not relevant to the issues presently before this Court, as set out above and in Sheikh Issa's Motion for Protective Order.

## Conclusion

WHEREFORE, PREMISES CONSIDERED, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan respectfully requests that Plaintiffs' motion be denied.  Defendants also request that

Defendants be awarded any and all further relief, in law or in equity, to which they may be justly entitled.

Respectfully submitted,

BECK, REDDEN & SECREST, L.L.P.

By:   /s/ Alistair B. Dawson
      Alistair B. Dawson
      State Bar No. 05596100
      S.D. Tex. Bar No. 12864
1221 McKinney Street, Suite 4500
Houston, Texas  77010-2010
Telephone:   (713) 951-3700
Telecopier:   (713) 951-3720

**ATTORNEY-IN-CHARGE FOR DEFENDANT H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN**

13

1233.00001/417595.1

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was served upon all counsel of record on October 29, 2008, in accordance with the Federal Rules of Civil Procedure.

/s/ Alistair B. Dawson
Alistair B. Dawson

14

1233.00001/417595.1

# EXHIBIT A

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3    BASSAM NABULSI, AND HIS       .   Civil Action
      WIFE, RIMA NABULSI,           .   No. H-06-2683
 4                                  .
                  Plaintiffs,       .
 5                                  .
                                    .
 6    VS.                           .
                                    .
 7                                  .
                                    .
 8    H.H. SHEIKH ISSA BIN          .
      ZAYED AL NAHYAN, H.H.         .
 9    SHEIKH NASSER BIN ZAYED       .
      AL NAHYAN, H.H. SHEIKH        .
10    SAIF BIN ZAYED AL             .
      NAHYAN, H.H. SHEIKH           .
11    ADBULLAH BIN ZAYED AL         .
      NAHYAN, H.H. SHEIKH           .
12    MOHAMMED BIN ZAYED AL         .
      NAHYAN, and THE               .
13    PARTNERSHIP OF THE ROYAL      .
      FAMILY BIN ZAYED AL           .
14    NAHYNA,                       .   October 1, 2008
                                    .   11:30 A.M.
15                Defendants.       .   HOUSTON, TEXAS

16                    TRANSCRIPT of PROCEEDINGS
                  BEFORE THE HONORABLE SIM LAKE
17                 UNITED STATES DISTRICT JUDGE

18    APPEARANCES:

19    FOR PLAINTIFFS:          MR. ANTHONY G. BUZBEE
                               The Buzbee Law Firm
20                             1910 Ice Cold Storage Building
                               104 21st Street Moody Avenue
21                             Galveston, Texas 77550

22    FOR DEFENDANTS:          MR. ALISTAIR BYRNE DAWSON
                               Beck, Redden & Secrest, LLP
23                             1221 McKinney
                               Suite 4500
24                             Houston, Texas 77010

25    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
```

2

1   <u>APPEARANCES</u>  (Continued):

2


3   OFFICIAL COURT REPORTER:  MS. STEPHANIE KAY CARLISLE-NEISSER
                             U.S. District Court
4                            515 Rusk, Suite 8016
                             Houston, Texas 77002
5                            713.250.5157

6

7

8

9

10

11

12

13

14

15

16                              *  *  *

17

18

19

20

21

22

23

24

25

# P R O C E E D I N G S

(October 1, 2008)

THE COURT:  Good morning.  Please be seated.

This is Civil Action H-06-2683, Bassam Nabulsi versus His Highness Sheikh Issa Bin Zayed Al Nahyan.

Will counsel please identify themselves?

MR. BUZBEE:  Tony Buzbee for the plaintiffs, Your Honor.

MR. DAWSON:  Alistair Dawson for the defendant, Your Honor.

THE COURT:  Thank you.

We are here on several docketed motions but I also have Mr. Buzbee's September 24th letter and Mr. Dawson's September 26th letter.  They are not docketed.

Do you want me to have the clerk docket them?

MR. DAWSON:  I don't think it's necessary.

MR. BUZBEE:  No, Your Honor.

MR. DAWSON:  I will also inform the Court that with respect to the depositions of the folks in Paris, we have reached agreement on the dates for those.

THE COURT:  What dates are they?

MR. DAWSON:  The 5th and 6th of November.

MR. BUZBEE:  Yes, sir.

THE COURT:  Okay.  So, we're here on Docket Entry 67, which is plaintiff's motion to compel the depositions of

1   Sheik Issa and his business manager in Houston, and Docket

2   Entry 68, which is defendant's response and motion for

3   protective order.

4                   I have read the very thorough briefing on the

11:32:10AM  5   issue.  I don't see any issue -- any briefing by the plaintiff

6   about whether the business manager would be subject to the

7   subpoena powers of this Court.  You make a lot of arguments

8   that his testimony is relevant.  How can I subpoena a U.A.E.

9   citizen to be deposed anywhere?

11:32:33AM 10        MR. BUZBEE:  Your Honor, you cannot.  Obviously, I'm

11  not trying to argue that you can.  My argument was that the

12  Sheikh controls this man because he is his business manager

13  and that the Sheikh could be forced -- you have power over him

14  because -- I believe you have jurisdiction over him to force

11:32:51AM 15  him to have his business manager.  So, that was my argument.

16        THE COURT:  All right.  There's a suggestion by the

17  defendant that I should rule on the motions in a certain order

18  and if I follow the defendant's suggestion that the Sheikh's

19  deposition may not be needed.  I intend to resolve all the

11:33:14AM 20  pending jurisdictional issues at the same time.  Although the

21  Sheikh raises different arguments, they are nevertheless

22  related.  This is an old case, and it raises important issues.

23  Judicial economy counsels that the motions be addressed

24  together and soon.

11:33:36AM 25        The deposition of the Sheikh is relevant to his

1   motions to dismiss; and I will allow him to be deposed about

2   his contacts with this forum and to be deposed concerning

3   other questions dealing with the pending motions, including

4   the defendant's motion to dismiss based on *forum non*

11:33:58AM   5   *conveniens*.  Plaintiff's counsel may not question him about

6   the merits of the case, although, I realize there may be some

7   overlap potentially on some questions.

8              However, the business manager, Saif Al Suwaidi,

9   is not subject to the subpoena powers of the Court.

11:34:20AM   10              So, the plaintiff's motion to compel Sheikh

11   Issa's deposition is granted.

12              Plaintiffs's motion to compel the deposition of

13   Saif Al Suwaidi is denied.

14              Defendant's motion for protective order is

11:34:35AM   15   denied as to the Sheikh and granted as to Mr. Al Suwaidi.

16              As to the location of the deposition, the

17   Sheikh should be deposed in Paris on November 5th or 6th at

18   the same time counsel is there deposing the other two people.

19   Apparently, he travels frequently to Europe.  So, I'm ordering

11:34:58AM   20   that you-all tell me now or soon -- certainly within this next

21   week -- the dates, times, and places of all three deponents.

22              I don't think the Sheikh's deposition should

23   take more than -- I don't think Mr. Buzbee should be allowed

24   more than two hours of questioning, assuming he gets answers

11:35:20AM   25   and not objections.  If you want to, of course, depose him at

1    the same time for purposes of the pending motions, you may.

2    But Mr. Buzbee is limited to two hours of questioning.

3            The defendant sent over a proposed protective

4    order.  Have you-all agreed to the protective order?

11:35:43AM  5            MR. BUZBEE:  We have not, Your Honor.

6            THE COURT:  I looked at these documents.  There's

7    nothing particularly exciting about these documents.  Why do

8    you need a protective order?

9            MR. DAWSON:  As I understand it, Your Honor, my

11:35:56AM 10    colleague at my firm collected these documents and he is the

11    one who told me -- he is in Judge Kent's court right now.  But

12    there are bank records that have confidential banking

13    information and credit card payment -- bills, if you will,

14    that have confidential information in them.  Those are the

11:36:15AM 15    only things that we have asked to be treated with

16    confidentiality.  I think it is both the bank account numbers,

17    the credit card numbers, and, frankly, there are some rather

18    large transactions in there.

19            THE COURT:  Give these two stacks to Mr. Dawson.

11:36:31AM 20            You can either give Mr. Buzbee a stack now with

21    the understanding he doesn't really care about the American

22    Express account numbers or you can redact the account numbers

23    and send them to him.  The amounts could conceivably be

24    relevant.  The only thing you can redact is personal

11:36:50AM 25    identifiers.  I didn't see any Social Security numbers.  There

1    are a lot of account numbers.

2            Mr. Buzbee probably has a bigger American

3    Express account than the Sheikh anyway; so, he probably

4    wouldn't be concerned about that.

11:37:03AM  5            MR. DAWSON:  We will redact them, Your Honor.

6            THE COURT:  Now, I also -- the defendant sent me

7    objections to the proposed discovery.  Nobody has asked that I

8    rule on any of the objections.  You don't have a motion to

9    compel answers to interrogatories or requests for admissions

11:37:20AM  10   or anything.

11           MR. BUZBEE:  It's not ripe before you right now.  I

12   am going to.

13           THE COURT:  I looked at them.  Let's rule on them

14   now.  Which ones do you have a concern with?

11:37:29AM  15           MR. BUZBEE:  The first problem that I have, Your

16   Honor, is that the interrogatories are not verified.

17           THE COURT:  They need to be verified certainly

18   before the deposition.

19           MR. DAWSON:  Yes, Your Honor.

11:37:38AM  20           THE COURT:  What else?

21           MR. BUZBEE:  The first issue, Your Honor -- I think

22   it is a crux issue -- on the issue of forum non conveniens,

23   that is, an alternative adequate forum, it's my position, as I

24   put in the brief, that if the Sheikh is indeed in these

11:37:54AM  25   pictures that I submitted, that he has influence over the

1  police and over the Court system such that Bassam Nabulsi

2  cannot get a fair trial in that forum.  And I think that's

3  absolutely -- it is weird; it is unusual.  But in this

4  particular instance I think I'm entitled to know what his

11:38:12AM  5  position is about those pictures.

6            THE COURT:  Which particular motion -- which

7  particular set of discovery are you referring to?

8            MR. BUZBEE:  I think I titled it "Plaintiffs'

9  Discovery Request Pertaining to *Forum Non Conveniens*."  I have

11:38:28AM  10  a copy of it, if I can approach.

11            THE COURT:  Yeah, let me see it.

12            MR. BUZBEE:  This is the answers that defendant

13  provided.

14                 Essentially, Your Honor --

11:38:42AM  15            THE COURT:  Where are the photographs?  That's the

16  one I'm talking about.

17            MR. BUZBEE:  They are in the record.  I have a bunch

18  of the photographs.  I don't know if you want to see those.

19  The actual request themselves that I sent to Mr. Dawson, I

11:38:56AM  20  don't have on my person.

21            THE COURT:  I don't think you sent me those with

22  your protective order materials, did you?

23            MR. DAWSON:  I don't think that I did.  Not with the

24  protective order, no.

11:39:07AM  25            THE COURT:  You sent me objections to request for

1   production dealing with service of process and request for

2   admissions dealing with service of process and interrogatories

3   dealing with service of process.  I didn't get the papers

4   dealing with *forum non conveniens*.

11:39:23AM  5   MR. DAWSON:  I don't think I submitted those because

6   there was no motion on them and I didn't know that we would

7   be --

8   THE COURT:  Well, if you want a formal motion, my

9   concern is that when you get --

11:39:34AM  10   MR. DAWSON:  I am happy to argue it now.  If I

11   could --

12   THE COURT:  If, in fact -- I don't recall all the

13   photographs now; but I do seem to recall that there are law

14   enforcement officials, or at least some type of people with

11:39:49AM  15   uniforms, in some of the photographs.  Wouldn't that be

16   relevant?

17   MR. DAWSON:  No.

18   THE COURT:  Why?

19   MR. DAWSON:  The Court in *MBI Group, Inc., versus*

11:39:59AM  20   *Credit Foncier Du Cameroun* -- the cite to that is 558

21   F.Supp.2d 21 -- addressed this exact issue.  In that case, the

22   plaintiff, just like this plaintiff, said, look, I was

23   arrested in Cameroon.  All these bad things happened to me in

24   Cameroon.  And the executive branch is in cahoots with the

11:40:21AM  25   defendant.  I cannot get a fair trial in Cameroon.  And,

1  therefore, argue that *forum non conveniens* should not apply

2  for the same reasons Mr. Buzbee has just argued.

3          The Court went through and said -- actually, in

4  that case, if you read it, Judge, they had a lot more evidence

11:40:39AM 5  that Cameroon was -- not -- that you couldn't have an adequate

6  remedy in Cameroon.  They had a thing from the Justice

7  Department saying that the judiciary in Cameroon is not

8  independent of the executive branch.  And they had a lawyer

9  put a thing in the record saying:  This guy can't get a fair

11:40:57AM 10  trial.  He has been arrested.  All these terrible things have

11  happened to him.

12          And here's what the Court said:  The Court says

13  "the alleged actions at issue were taken by the executive

14  branch of the Cameroonian government, not the judiciary."

11:41:11AM 15          The defendants have submitted evidence that the

16  Cameroon judiciary is independent.  The plaintiffs cannot

17  disturb that presumption -- and there is a presumption under

18  *forum non conveniens* law -- of independence by merely pointing

19  to generalized reports that the executive branch may exert

11:41:28AM 20  undue influence over the judiciary.

21          They went on to say "the fact that the fellow

22  can't travel to Cameroon is not relevant for the *forum non*

23  *conveniens*."  They said "the mere fact that the plaintiff

24  could not personally travel to the proceedings..."

11:41:43AM 25          THE COURT:  Do you have some authority to the

1    contrary?

2        MR. BUZBEE:  I haven't looked at that case.

3        THE COURT:  We better have some briefing on this.

4    What else -- what else -- other than the photographs, what is

11:41:55AM  5    in dispute with respect to these -- written discovery?

6        MR. BUZBEE:  My primary dispute -- and it's clear

7    from reading.  Because I've done a lot of my own due diligence

8    and informal discovery on this case -- is that I do not

9    believe -- and Mr. Dawson can correct me -- that the Sheikh

11:42:09AM  10   has even been consulted in answering these discovery answers,

11   has not even been consulted.

12        Because, for instance, Ali Tahgi is a guy

13   that's well-known here in Houston that sells fancy clothes

14   across from the Galleria.  He is a personal friend of this

11:42:22AM  15   Sheikh.  But yet in his discovery responses, he says "after a

16   diligent search, I cannot confirm or deny."  That tells me

17   right there that they never even asked this guy about these

18   discovery requests.

19        Another example.  He was asked if he met the

11:42:37AM  20   Mayor Brown.  Well, Your Honor, I have a picture of him with

21   Mayor Brown.  They spent a lot of time together when the mayor

22   was in office here in Houston at the Four Seasons.  And he

23   again says in his deposition -- or his discovery responses, "I

24   cannot confirm it after a due diligence search."  Now, one

11:42:57AM  25   could say, well, he's such an important and busy man that he

1    meets so many great dignitaries that he wouldn't know.  But

2    remember, Your Honor, this is a guy that lived as much three

3    months out of the year here in Houston.  This was a

4    significant part of his life here in Houston.  He spent a lot

11:43:09AM  5    of time with Mayor Brown.  Mayor Brown sent letters for him

6    for their business dealings and so forth.  That tells me, just

7    commonsensically, that he has not been consulted.

8             So, all the answers I have, which explains why

9    they are not verified, are simply part of his little entourage

10   over there answering this stuff for him while he -- I'll tell

11   the Court -- I know for a fact -- is in Germany.  He is in

12   Germany.  They are arguing the case should be in the U.A.E.

13   Well, this fellow is living in Germany now.  That's my problem

14   with their discovery.

11:43:44AM 15             THE COURT:  What contact have you had with the

16   Sheikh?

17             MR. DAWSON:  Well, Your Honor, respectfully, how we

18   went about answering these -- and I can tell you that my firm

19   was actively involved in preparing these answers and spent --

11:43:57AM 20   a colleague -- colleague spent 10 days in the U.A.E. working

21   to get these answers and working to get these documents.

22   Frankly, how we went about it, who we talked to, and how we

23   gathered information is all protected by privilege, Your

24   Honor.  I don't think that we --

11:44:12AM 25             THE COURT:  You do need to have the Sheikh verify

1  the answers.

2       MR. DAWSON:  I understand that.  We will follow the

3  Court's order with respect to that.  Mr. Buzbee can examine

4  him at his deposition, if that's how he wants to spend his

11:44:24AM 5  time, cross-examining him about the answers --

6       THE COURT:  Let me say, most of the answers that I

7  read that deal with the three sets of objections, the answers

8  were fairly reasonable as discovery goes.  There were many

9  cases where he denied a request but said "but I will admit a

11:44:41AM 10  limited subset of that" or  "you're not correct but here's the

11  name of the right company."  I don't think this is

12  stonewalling in the sense that I have seen in some cases.

13       MR. BUZBEE:  I agree with you, Your Honor.  I do

14  think, though, that the answers are not comprehensive and

11:44:57AM 15  complete because the actual defendant has not been contacted

16  or discussed.  I believe that to be the case.  I haven't heard

17  otherwise.

18       THE COURT:  There used to be a rule of Texas Civil

19  Procedure, a motion to show authority, whether the attorney

11:45:11AM 20  was required to show authority.  I even filed a couple of

21  those back in the dark ages.  I'm not aware of any analog

22  under the federal rules.  Mr. Dawson is an officer of the

23  Court.  I take his word that he has dealt with the Sheikh.  I

24  don't know that you are prohibited from talking to a client

11:45:30AM 25  through an intermediary.  I bet plaintiff personal injury

1  lawyers sometimes go through referring attorneys, at least I'm

2  told that might happen.

3        MR. BUZBEE:  Yes, Your Honor.  The verification will

4  be a step towards.  We'll ripen the issue on the pictures and

11:45:46AM 5  that will probably be everything I need.

6              I would just point out to the Court that when

7  we take the man's deposition, I'm limited to two hours; but I

8  want remind the Court that we're going to have an interpreter

9  which is going to slow the process down substantially.

11:46:03AM 10        THE COURT:  If you are going to do that in Paris,

11  what is that, an 8-hour difference?

12        MR. DAWSON:  Six or seven, I believe, Your Honor.

13  Six to London.  I don't know if Paris is another hour or not.

14        THE COURT:  Paris is another hour, I think.

11:46:17AM 15              So -- well, you better -- if you start first

16  thing in the morning, you can call me if there's a problem.

17  You might do the Sheikh early in the morning.  These other two

18  people -- the previous day -- I will let you worry about that.

19  If you start the Sheikh's deposition at -- seven hours

11:46:42AM 20  later -- you think about it, about the logistics.

21        MR. BUZBEE:  I was just -- as far as the two hours.

22        THE COURT:  Doesn't the Sheikh speak English?

23        MR. DAWSON:  I don't believe he does.

24        MR. BUZBEE:  He does.

11:47:01AM 25        MR. DAWSON:  I think he's got limited English.  I

1    think in that deposition it's probable that we will have an

2    interpreter.  I think there will be an interpreter in the

3    deposition of Mr. Albars.  I'm not sure that it will be

4    necessary in the deposition of Mr. Faraj.

11:47:15AM  5        THE COURT:  I'm going to change my mind and allow

6    three hours for the Sheikh because of the interpreter.

7            MR. DAWSON:  Are there any time limits on the other

8    depositions or just that one?

9            THE COURT:  I'm more concerned about the Sheikh.  I

11:47:27AM  10   think one of the other depositions will be fairly brief.  I

11   don't know about the lawyer's deposition.

12           MR. DAWSON:  Fair enough.

13           THE COURT:  Doesn't your co-counsel speak Arabic?

14           MR. BUZBEE:  He does.  My client and my co-counsel

11:47:39AM  15   speak Arabic.

16           THE COURT:  Okay.

17           MR. BUZBEE:  They will be there to check the

18   interpreter.  I will be completely ignorant.

19           THE COURT:  Get your motion to compel filed fairly

11:47:49AM  20   quickly.

21           MR. BUZBEE:  Yes, sir.

22           THE COURT:  The turnaround was really remarkable on

23   the pending motions.  And I will rule as quickly as I can.

24           MR. BUZBEE:  Yes, Your Honor.

11:48:00AM  25           THE COURT:  Now that we're all here, is there

1  anything else we can profitably address this morning?

2        MR. DAWSON:  I will tell the Court that I was

3  disappointed not to get to argue a case that Mr. McDade lost

4  that was relevant to this issue.

11:48:15AM  5        THE COURT:  Which case is that?

6        MR. DAWSON:  They *Wyatt versus Kaplan* case where

7  Mr. McDade sued on behalf of Oscar Wyatt having to do with

8  defamation or slander or something.  And the Court denied

9  discovery and then denied -- said there was no jurisdiction.

11:48:35AM 10  The issue up on appeal was whether that was appropriate.  And

11  Mr. McDade lost again.  I was looking forward to using his

12  losses to hopefully try and convince the Court of our

13  position.

14        THE COURT:  As you point out, Mr. Dawson, in a

11:48:50AM 15  previous opinion I denied discovery because the then

16  plaintiff's counsel basically asked for it very late as kind

17  of a fallback argument in case he lost on the merits.  This

18  discovery has been timely and it is relevant.  I'm not saying

19  you are going to win on the motion, but I think plaintiff is

11:49:13AM 20  entitled to reasonable discovery on these jurisdictional

21  issues.

22        MR. DAWSON:  I understand that, Your Honor.  The law

23  in the Fifth Circuit -- I'm not trying to reargue the issue.

24  We may have to tea this up.  But the law in the Fifth Circuit

11:49:25AM 25  is clear that you are not entitled to discovery about

1   undisputed facts in a jurisdictional situation.  And there's

2   been a lot of facts that have been stipulated to.  We gave, I

3   think, 90 admissions in those set of admissions.  We admitted

4   90 sets of facts.  We are not contesting any of his

11:49:46AM  5   jurisdictional assertions.  He said you came here every year.

6   You bought all this stuff.  All of that is uncontested.  The

7   law in the Fifth Circuit is you are not entitled to

8   depositions or any further --

9           THE COURT:  That may not be contested --

11:50:00AM 10           MR. DAWSON:  But there are other things that might

11   be contested.

12           THE COURT:  I don't know that the defendant is

13   allowed to circumscribe the universe of relevant facts and say

14   "these are the relevant facts and we don't contest them;

11:50:10AM 15   therefore, you are not entitled to discovery."  There's a

16   big -- let's don't beat around the bush.  I am very skeptical

17   about general jurisdiction but there might be specific

18   jurisdiction here.  I know the contract was signed in the

19   U.A.E. and I know it's subject to U.A.E. law.

11:50:28AM 20           The plaintiff alleges in his amended complaint

21   that the partnership began, whatever that means, here; and I

22   assume the plaintiff will have some evidence showing that

23   there was some type of oral agreement with the Sheikh here.

24   Now, whether that's true or is sufficient, I don't know; but

11:50:52AM 25   it certainly is a colorable claim that I think warrants some

1    discovery.

2              MR. DAWSON:  I understand.

3              MR. BUZBEE:  Your Honor, we will prove that this

4    business that you see is just -- they formed many businesses.

11:51:02AM  5    That's just one vehicle through which they did some of their

6    work.  And we will prove to you that two months out of every

7    year they were conducting their business out of the Four

8    Seasons.  Two months a year out of Houston, Texas, all their

9    business was centered right there because that's where they

11:51:18AM 10    were.

11              THE COURT:  Well, I look forward to the briefing.  I

12    can't wait for the new year --

13              MR. BUZBEE:  I bet.

14              THE COURT:  Anything else?

11:51:26AM 15              MR. BUZBEE:  No, sir.

16              THE COURT:  Thank you.  You are excused.

17         (Proceedings concluded)

18                            * * *

19    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled cause, to the best
20    of my ability.

21

22    //s_____          10/15/2008
      Stephanie Kay Carlisle-Neisser CSR, RPR        Date
23    Official Court Reporter

24

25

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1991 WL 168644 (E.D.Pa.)

**C**
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Joseph P. GREGOIRE and Rose Musafi Gregoire,
individually and as parents and natural guardians of
Nicole Gregoire, a minor,
v.
SCHLEICHER & CO. INTERNATIONAL, AG.
**Civ. A. No. 90-4720.**

Aug. 22, 1991.

Frank J. Eisenhart, Dechert, Price & Rhoads, Washington, D.C., for plaintiffs.
Deborah J. Krabbendam, John H. Mc Keon, Jr., Conrad, O'Brien, Gellman, De Stefano & Rohn, P.C., Philadelphia, Pa., for defendant.

*MEMORANDUM*

BUCKWALTER, District Judge.
**\*1** This case is a product liability action which arises from an accident which occurred on July 22, 1988 in the United States Embassy in Khartoum, Sudan. Currently before the court is defendant's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

*Factual Background*

On July 22, 1988, Joseph P. Gregoire, plaintiff and father of minor plaintiff, a career foreign service officer, was serving as First Secretary of the United States Embassy in Khartoum, Sudan.[FN1] July 22 was a Friday, a day reserved for religious observances in this Moslem country, so the embassy was closed. Wishing to catch up on some work, Mr. Gregoire decided to go to the embassy and to bring his son Christian, then age seven, and his daughter Nicole, the minor plaintiff in this action, then age six. While at the embassy, Nicole helped her father feed documents into a shredding machine manufac-

tured by defendant Schleicher & Co., International, AG. While Mr. Gregoire was allegedly "briefly distracted" from the shredding room by the activities of Christian, Nicole's right hand became caught in the shredding machine causing her to sustain severe injuries.

The plaintiffs filed suit in this Court on July 19, 1990. The plaintiffs aver that this Court has personal jurisdiction over the defendant foreign corporation because, at the time of the accident, it "systematically conducted substantial business activities within the Commonwealth of Pennsylvania, and it derived substantial profit from such activities." Complaint, para. 5. Central to these alleged activities was the defendant's sales of its products to Datatech Enterprises, Inc. ("Datatech"), a Pennsylvania corporation with its principal place of business at West Conshohocken, Pennsylvania. Datatech is a distributor of office equipment, dealing mostly in paper shredders. The parties have stipulated that all paper shredders sold by Datatech are Schleicher paper shredders.

Additionally, the parties have stipulated to the following facts:

Defendant Schleicher & Co. International Aktiengesellschaft (Schleicher AG) is a corporation organized under the laws of Germany and located in Markdorf, Germany. Schleicher AG designs, manufactures and sells data disposal equipment, chiefly consisting of paper and microfilm shredding machines. Schleicher AG markets its shredding machines worldwide and has subsidiaries in the United States, Great Britain, France, Austria, Hong Kong, and Germany. Schleicher AG's United States Subsidiary is Schleicher & Co. of America, Inc. ("Schleicher US"). Schleicher US is a North Carolina corporation which was organized in 1979 and which has its principal place of business in Sanford, North Carolina. Schleicher US is a wholly owned subsidiary of Schleicher AG. Schleicher AG and Schleicher US have no common officers, although

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 168644 (E.D.Pa.)

Lothar Thomas and Hartmut Strangenberg, both of whom are officers and directors of Schleicher AG, are also directors of Schleicher US.

**\*2** In 1989, combined North American sales for Schleicher US and Schleicher AG equaled 33% of the total combined sales for both corporations.

On February 15, 1977, Feinwerktechnik Schleicher & Co. entered into a contract with Datatech Incorporated, a predecessor of Datatech Enterprises, Inc. FN2

In 1985, Schleicher GMBH, a predecessor to Schleicher AG, entered into a distribution and sales contract with Datatech which was effective from March 27, 1985 through December 31, 1987. This contract replaced the earlier contract of February 15, 1977. Under the terms of this contract and as part of its regular business, "Datatech bought and sold machinery manufactured by Schleicher AG for Datatech's own account as an independent contractor, and also sold the machinery under private labels to several corporations."FN3 Also under this contract, Datatech was given the exclusive right to distribute specified models of "INTIMUS" Schleicher shredders in the North American market. In return, Datatech agreed to purchase minimum numbers of specified shredders and to promote the sale of INTIMUS shredders.

On September 15, 1987, Datatech entered into a contract with Schleicher US which was to become effective on January 1, 1988. This contract replaced the above described contract of March 27, 1985 between Schleicher AG and Datatech. Under the terms of this contract, Datatech was again given the exclusive right to market and sell certain specified models of Schleicher shredders within the North American market.FN4

During the period when Datatech had its exclusive distributorship with Schleicher AG, a Schleicher AG representative visited Datatech in Pennsylvania approximately once a year. Since Datatech has had its exclusive distributorship with Schleicher US,

Lothar Thomas visits Datatech once or twice a year in his capacity as a director of Schleicher US.

The shredders sold by Schleicher US are either purchased by Schleicher US directly from Schleicher AG or are assembled by Schleicher US from component parts, approximately two-thirds of which are purchased from Schleicher AG while the remaining parts are obtained from other sources. All shredders sold by Schleicher US were designed by Schleicher AG utilizing technology owned by Schleicher AG and covered by German patents also owned by Schleicher AG. Schleicher AG currently has patent applications pending in the United States on these shredders or on components of them. There are, however, no contractual agreements, including technology or patent license agreements, between Schleicher AG and Schleicher US.

Schleicher AG has never been qualified as a foreign corporation under the laws of Pennsylvania, nor has Schleicher AG ever consented to the jurisdiction of Pennsylvania courts.

The particular INTIMUS 007S shredder which the plaintiff minor was using at the time of her injury was shipped from the Schleicher AG plant in Markdorf, Germany via Antwerp, Belgium to The United States Embassy in Khartoum where it arrived in January of 1987. Thus the INTIMUS 007S which is the subject of this action never passed through Pennsylvania or the United States.

*Discussion*

**\*3** Rule 4(e) of the Federal Rules of Civil Procedure provides that a district court may assert personal jurisdiction over a nonresident to the same extent permitted by the law of the state in which the district court sits. Pennsylvania law permits Pennsylvania courts to exercise jurisdiction over nonresidents "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 168644 (E.D.Pa.)

United States." 42 Pa.C.S.A. § 5322(b). We must therefore determine whether our exercise of jurisdiction over the defendant would be permissible under the due process clause of the Fourteenth Amendment. *Dutoit v. Strategic Minerals Corp.,* 735 F.Supp. 169, 171 (E.D.Pa.1990), *aff'd,* 922 F.2d 830 (3rd Cir.1990).

When a defendant makes a timely challenge to the court's personal jurisdiction over him, the plaintiff has the burden of proving that the defendant's contacts with the forum state are sufficient. *Id.* at 170. A court may obtain specific jurisdiction over a defendant in a cause of action which is "related to" or "arises out of" a defendant's contacts with the forum. *Helicopteros Nacionales De Columbia, S.A. v. Hall,* 466 U.S. 408, 414 (1984) quoting *Shaffer v. Heitner,* 433 U.S. 186 (1977). However, when an action against a non-resident defendant does not arise out of that defendant's specific contacts with the forum state, a court may exercise general jurisdiction over a foreign defendant without violating the due process clause if the defendant has sufficient systematic and continuous contacts with the forum state. *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437 (1952); *see also Helicopteros, supra,* 466 U.S. at 414-16. "[T]he plaintiff must show significantly more than mere minimum contacts to establish general jurisdiction" and [t]he nonresident's contacts to the forum must be continuous and substantial." *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3rd Cir.1987) (citations omitted).

Because the plaintiff's claim against the defendant foreign corporation did not arise from specific contacts or activities within Pennsylvania, we may only exercise jurisdiction over the defendant if it is subject to our general jurisdiction. We must therefore determine whether Schleicher AG has continuous and systematic contacts with Pennsylvania which are of a substantial nature.

The foundation of the plaintiff's contention that we may properly exercise general jurisdiction over the defendant is Schleicher AG's relationship with Datatech, referred to by the plaintiff as Schleicher AG's "Pennsylvania Connection." As was previously described in detail, Datatech entered into a series of contractual relationships, first with Schleicher AG and later with Schleicher U.S. Through these agreements, Datatech was granted the exclusive right to distribute certain lines of Schleicher shredders in the North American market in return for Datatech's agreement to purchase minimum quantities of shredders and to actively promote their sale.

**\*4** A court may obtain personal jurisdiction over a nonresident defendant corporation through its ties to a related, resident corporation but "only where the corporations have common officers and directors; a common marketing image; common use of a trademark or logo; common use of employees; an interchange of managerial and supervisor personnel; or an integrated sales system." *Omni Exploration, Inc. v. Graham Eng'g Corp.,* 562 F.Supp. 449, 454 (E.D.Pa.1983); *Superior Coal v. Ruhrkohle, A.G.,* 83 F.R.D. 414, 421 (E.D.Pa.1979). "A court may also examine whether the related corporation performs business duties and functions which the principal corporation would normally transact through its own agents or departments; whether the related corporation acts as a marketing arm of the principal corporation, or operates as an exclusive distributor, and whether the officers of the related corporation receive instructions from the principal corporation. *Superior Coal, supra,* at 421 (citations omitted). Our determination of whether we may obtain general jurisdiction over Schleicher AG based upon its affiliation with Datatech requires "unremitting scrutiny into the relationship between the two entities" in which "[t]he substance, not the form, of the inter-corporate nexus will be dispositive." *Id.* at 421.

As was described above, from 1977 till 1985, Datatech's predecessor had an exclusive distributorship with Feinwerktechnik Schleicher and from 1985 until 1987, Schleicher's predecessor had a distribution sales contract with Datatech. Since 1987, Data-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                           Page 4
Not Reported in F.Supp., 1991 WL 168644 (E.D.Pa.)

tech has had a distribution sales contract with Schleicher US. According to the deposition testimony of Datatech employee Kent Fredericksen, relied upon by both parties, Datatech no longer has any relationship with Schleicher AG and deals only with Schleicher US. (Fredericksen Deposition, pp. 38-39). We believe that Datatech's lack of any present contractual relations with Schleicher AG is of paramount significance in our determination of whether Schleicher AG is subject to our general jurisdiction.

A court's finding that it may exercise general jurisdiction over a nonresident corporate defendant effectively means not only that the court has jurisdiction over the defendant in the dispute at hand but rather that the defendant is subject to the jurisdiction of the courts of the forum for all purposes and that it will consequently be required to defend against any and all claims which may be filed against it. Thus, in order to comport with requirements of due process and of fundamental fairness, such a finding of general jurisdiction must in large part be based upon the nonresident defendant's present contacts with the forum. A nonresident defendant corporation which has had past contacts with a forum state, even if these contacts were substantial, may not fairly be found subject to the general jurisdiction of the forum and thus answerable to claims unrelated to these past contacts unless it presently continues to have substantial contacts with the forum state. (See *Provident Nat'l Bank, supra,* 819 F.2d at 437).

**\*5** Under *International Shoe v. Washington,* 326 U.S. 310 (1945), general jurisdiction over a nonresident corporation is based upon the defendant's "presence" in the forum state as manifested by its continuous and systematic activities within the state. (See 326 U.S. at 316-17). Once all such contacts and activities have ceased, the defendant's presence in the forum state must logically be found to have ceased as well and there can no longer be an adequate justification for imposing general jurisdiction. Therefore, in deciding whether we may

properly subject Schleicher AG to the general jurisdiction of the Pennsylvania courts, the nature of Schleicher AG's *present* contacts to Pennsylvania must be given great weight.

The record before us leads us to conclude that although Schleicher AG did in the past have contacts with Pennsylvania which might arguably be described as "substantial," the plaintiffs have not adequately established that the defendant corporation continues to maintain contacts in Pennsylvania which are sufficiently substantial so that it could properly be subjected to the general jurisdiction of the courts of this Commonwealth. Since 1987, when Datatech began dealing exclusively with Schleicher US, Datatech has ceased to be Schleicher AG's "Pennsylvania Connection." We may only find that Schleicher AG has continued to engage in substantial business activities in Pennsylvania if we determine that Schleicher US is nothing more than a conduit or hollow front organization for Schleicher AG. The undisputed facts of this case reveal that such was not the case. Schleicher AG is a German corporation while Schleicher US is an American corporation. Schleicher AG and Schleicher US have no officers in common. They do have two directors in common, but this is not in itself sufficient for us to disregard their distinct corporate identities. (See *Dutoit, supra,* at 171). Of course Schleicher US is a wholly owned subsidiary of Schleicher AG, but it is an old and well established point of law that "[a] parent-subsidiary relationship is by itself an insufficient reason to pierce the corporate veil in the jurisdictional context." *Id.* at 171 citing *Canon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333 (1925). The plaintiffs have not satisfactorily demonstrated that these two corporations disregarded corporate formalities in any significant way; that Schleicher US was directly controlled by Schleicher AG; that Schleicher US acts as the mere agent for Schleicher AG; that Schleicher US makes no significant independent management decisions or that the two corporations operate on a common marketing or distribution system. In short, we have not been provided with evidence adequate to permit

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 168644 (E.D.Pa.)

Page 5

us to find as a matter of law that Schleicher AG and Schleicher US should be treated as a single corporate entity for jurisdictional purposes.

The plaintiffs have stated that they do not ask us to pierce the corporate veil for jurisdictional purposes and hold Schleicher AG subject to our general jurisdiction because of Schleicher US's activities there. Rather, they ask us to "consider the entire history of the relationship which Schleicher AG has had with Datatech in Pennsylvania and determine whether that relationship has been so supplanted by some separate and independent relationship with Schleicher US that it is no longer fair to subject Schleicher AG to suit in Pennsylvania." (Plaintiff's Memo. p. 27).

*6 We believe, however, that this statement is nothing more than a circuitous way of asking us to pierce the corporate veil for jurisdictional purposes by treating Schleicher US as being nothing more than an extension of Schleicher AG. Because we find that the plaintiffs have not presented adequate evidence to overcome the presumption of corporate independence, we therefore decline to exercise general jurisdiction over Schleicher AG.

The plaintiffs have asked that if we should find that we do not have jurisdiction over Schleicher AG that we transfer this action to North Carolina as the plaintiffs suggest that Schleicher AG has sufficient contacts to North Carolina to be subject to the general jurisdiction of its courts. We note that the arguments presented on the motion before us dealt primarily with Schleicher AG's contacts with Pennsylvania through its relationship with Datatech while the question of Schleicher AG's contacts with North Carolina through its relationship with Schleicher US was dealt with only collaterally. Because the parties have not fully briefed this issue and because of our belief that the question of North Carolina's jurisdiction is best settled by a North Carolina court, the interest of justice compels us to transfer venue of this action to North Carolina pursuant to 28 U.S.C. § 1406(a).[FN5]

An order follows.

### ORDER

AND NOW, this 22nd day of August, 1991, upon consideration of defendant Schleicher & Co. International, AG's Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Venue and Plaintiff's Response thereto, we hereby find as follows:

1. This Court lacks personal jurisdiction over the Defendant;

2. Under 28 U.S.C. §§ 1391(a) and 1391(c), venue for this action does not lie in this judicial district;

3. It is hereby ORDERED that this action shall be transferred to the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1406(a);

4. This case may be marked CLOSED.

> FN1. 1. According to para. 1 of the Complaint, the plaintiffs are "citizens of the State of Connecticut" who currently reside in Belgium where Mr. Gregoire has been stationed by the United States Department of State.

> FN2. Feinwerktechnik Schleicher & Co.'s capital was purchased by Schleicher AG on April 1, 1989.

> FN3. From para. 12 of the Affidavit of Lothar Thomas. The facts in this Affidavit have been stipulated to by all parties, with the sole exception of para. 10.

> FN4. On September 12, 1984, both Schleicher AG and Schleicher US contracted with Fellowes Manufacturing Company of Itsaca, Illinois ("Fellowes"). Under the terms of this contract, Fellowes was granted the exclusive right to market certain lines of Schleicher shredders worldwide.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 168644 (E.D.Pa.)

However, the lines to be marketed by Fellowes were different from those lines for which Datatech was granted exclusive North American sales rights.

FN5. Under *Goldlawr, Inc. v. Heiman*, 369 U.S. 463 (1962), a district court may transfer an action under section 1406(a) even if the transferor court lacks personal jurisdiction over the defendant.

E.D.Pa.,1991.
Gregoire v. Schleicher & Co. Intern., AG
Not Reported in F.Supp., 1991 WL 168644 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d                                                                     Page 1
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

C

Only the Westlaw citation is currently available.
United States District Court,S.D. Texas, Houston
Division.
D & S TURBINE INTERNATIONAL, INC.,
Plaintiff,
v.
RESEARCH MANAGEMENT SYSTEMS, L.C.,
Defendant.
No. Civ.A. H-05-2158.

Feb. 6, 2006.

Dawn Rene Meade, Joseph John Hroch, Spencer &
Associates PC, Houston, TX, for Plaintiff.
Lauren J. Harrison, Vinson & Elkins LLP, Houston,
TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*

LAKE, J.
*1 Plaintiff, D & S Turbine International, Inc.
(Turbine), filed this action alleging breach of con-
tract, quantum meruit, and fraudulent inducement
against defendant Research Management Systems,
L.C. (RMS).[FN1] Pending before the court are De-
fendant's Motion to Dismiss for Lack of Personal
Jurisdiction and Venue (Docket Entry No. 9),
Plaintiff's Response (Docket Entry No. 21),
Plaintiff's Motion for Sanctions (Docket Entry No.
25), Plaintiff's Supplemental Motion for Sanctions
and First Supplement to its Motion for Sanctions
(Docket Entry Nos. 28 and 30), Defendant's Reply
in Support of Motion to Dismiss and Response in
Opposition to Motion for Sanctions (Docket Entry
No. 29), Defendant's Response to Supplemental
Motion for Sanctions (Docket Entry No. 32), and
Plaintiff's Surresponse in Support of its Motion for
Sanctions and Denial of Defendant's Motion to Dis-
miss (Docket Entry No. 33). For the reasons ex-
plained below, the court will grant Defendant's Mo-
tion to Dismiss and deny Plaintiff's Motion for
Sanctions.

FN1. Plaintiff's Original Complaint, Dock-
et Entry No. 1.

I. *Turbine's Allegations*

According to Turbine's complaint,[FN2] RMS is a
company that coordinates contingency support for
the Air Force as part of the Air Force Contract
Augmentation Program (AFCAP). RMS's principal
office is in Panama City, Florida. The Air Force
uses AFCAP to facilitate worldwide support for
noncombatant military operations. AFCAF has a
one-year contract with RMS that includes an option
for up to seven one-year extensions. In February of
2003 the U.S. Agency for International Develop-
ment (USAID) awarded AFCAP a contract for lo-
gistical support in Iraq.

FN2. Plaintiff's First Amended Complaint,
Docket Entry No. 31.

One of the public works projects undertaken by
RMS, USAID, and AFCAP in Iraq is restoration of
the Al Karkh Water Treatment Plant ("Plant"),
which is located approximately 25 miles outside of
Baghdad. This plant cleans and generates all of the
water for Baghdad and the surrounding areas. On
February 29, 2004, RMS agreed to purchase from
Turbine a Pratt Whitney Model FT4A-11 Mobile
Pac (Pratt Whitney) for $5.5 million. The Pratt
Whitney, also referred to as the generator, is the
turbine that would operate the plant. Turbine is a
small corporation based in Houston, Texas, that
specializes in brokering international deals for the
sale of heavy equipment and machinery. David
Samaha, Turbine's president and chief negotiator,
signed the RMS contract.

On March 25, 2004, Samaha agreed that Turbine
would provide additional products and services to
RMS. The memorandum confirming this agreement
offered RMS products and services, including the
Pratt Whitney, totaling approximately $8.8 million.
The additional products included a Chiller Unit, a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

Pulse-Jet Self Cleaning Filter, and spare parts. The services included the installation, commission, and training on the Pratt Whitney and maintenance for the first year.

RMS sent Turbine a Purchase Order contract for the goods and services. The Purchase Order contract included terms of payment, installation, and shipping. The Purchase Order contract noted that other vendors would provide the following services: (1) the flat concrete bed on which the Pratt Whitney would sit, (2) the fuel line to the generator, and (3) the electrical lines.

**\*2** Turbine assembled the Pratt Whitney in Jacksonville, Florida, for RMS's approval, and RMS was then responsible for shipping it to Iraq. Turbine contracted with Turbine Logistics to install the generator, supervise the installation of the chiller and filter, and train the personnel. Turbine Logistics' principal, Kenneth Welch, went to Iraq to oversee the start-up of the generator along with three Turbine engineers. Welch estimated that starting up the generator would take 12 to 15 days. This portion of the job actually took 7 weeks.

RMS agreed to provide Turbine representatives in Iraq with transportation, food, lodging, and security. When Turbine's electrical engineer and contractor arrived in Iraq they were not provided transportation to Karkh and had to find their own way to the site. Additional problems emerged. There was no satellite communication between the site and Turbine. The housing unit for the air filter was mangled. Power supplies were stolen. The computer ribbon was damaged. Cables for fans were missing. The fittings on the filter hose had been stolen. The Control System had been damaged and sabotaged. The Chiller suffered an improvised explosive device attack. The electrical grid necessary to install the generator was not properly set up.

Although RMS provided cranes, equipment, and local manpower, it did not provide money to pay the local laborers. Turbine paid the laborers. Security was inadequate at the plant. The lodging

provided by RMS consisted of one building housing all four of the Turbine contractors, 17 to 30 soldiers, and 22 Iraqi Nationals. The building had only one shower with a sub-standard restroom for everyone's use. RMS provided no food or water.

Turbine's personnel improvised repairs to damaged equipment. RMS failed to install the Chiller and the Filter, so Turbine's personnel also installed these parts. When the Turbine personnel attempted to start the generator they discovered problems with the mainframe computer for the generator. Arranging for its replacement took more than a month.

Repairing the equipment put Turbine behind schedule and over budget. Turbine sought reimbursement for its additional costs from RMS. RMS agreed to pay, but failed to do so. Turbine gave RMS an ultimatum: either RMS pay the outstanding invoices from Turbine, or Turbine would pull its personnel from Iraq. RMS demanded that Turbine complete the work. Turbine refused and ordered its personnel to leave Iraq. RMS sent Turbine a notice of termination and cure, demanding that Turbine complete the contract. Turbine offered to keep its personnel in Iraq if RMS would pay the amount necessary for completion of the job. RMS refused, and Turbine's personnel returned to the United States.

Turbine sued RMS alleging breach of contract, quantum meruit, and fraudulent inducement.

## II. *Standard of Review*

The burden rests on the plaintiff to establish that the court has personal jurisdiction over a nonresident defendant who moves for dismissal. *Wilson v. Belin,* 20 F.3d 644, 648 (5th Cir.1994). The plaintiff meets this burden by presenting a prima facie case that personal jurisdiction is proper.[FN3] *Jones v. Petty-Ray Geophysical Geosource, Inc.,* 954 F.2d 1061, 1067 (5th Cir.1992). A district court may consider affidavits and other properly obtained evidence when making its determination but must accept the uncontroverted al-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

legations in the complaint as true, and resolve all factual conflicts in favor of the plaintiff. *Wilson,* 20 F.3d at 648.

> FN3. Defendant argues that when discovery has been conducted, plaintiff must prove jurisdiction by a preponderance of the evidence. *See, e.g., Pieczenik v. Dyax Corp.,* 265 F.3d 1329, 1334 (Fed.Cir.2001). Defendant's Reply, Docket Entry No. 29, p. 5 n. 2. The court declines to hold plaintiff to this increased burden of proof because, as defendants admit, the Fifth Circuit has not adopted this standard. The Fifth Circuit, while not directly addressing this issue, has stated that "[w]hen, as here, the district court conducted no evidentiary hearing, the party seeking to assert jurisdiction must present sufficient facts as to make out only a prima facie case supporting jurisdiction." *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 215 (5th Cir.2000).

**\*3** A federal court sitting in diversity may exercise personal jurisdiction over a defendant to the extent permitted by the forum state's law.Fed.R.Civ.P. 4(e)(1), (h)(1) and (k)(1); *see also Central Freight Lines Inc. v. APA Transport Corp.,* 322 F.3d 376, 380 (5th Cir.2003). The Texas long-arm statute allows personal jurisdiction to the full extent allowed by the Due Process Clause of the Fourteenth Amendment. *See* 2 TEX. CIV. PRAC. & REM.CODE ANN. § 17.042; *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990). Thus, the typical two-step analysis for personal jurisdiction in diversity cases contracts to a one-step analysis of whether exercising jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 214 (5th Cir.2000).

The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when

(1) the defendant has had "minimum contacts" with the forum state, and

(2) the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice."

*See International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

### III. *In Personam Jurisdiction*

Minimum contacts exist when a defendant's contact with the forum state is such that "he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). The minimum contacts requirement can be analyzed by viewing contacts that give rise to either specific or general jurisdiction. *Gundle Lining Construction Corp. v. Adams County Asphalt,* 85 F.3d 201, 205 (5th Cir.1996).

### A. General Jurisdiction

General Jurisdiction subjects a defendant to a court's jurisdiction regardless of whether the controversy is related to the defendant's activities within the forum. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). To make the required prima facie showing, Turbine must demonstrate that RMS's contacts with Texas unrelated to the litigation are substantial, continuous, and systematic. *See Helicopteros,* 104 S.Ct. at 1872-73; *Alpine View,* 205 F.3d at 217.

The court assesses whether general jurisdiction exists by evaluating a defendant's contacts with the forum over a reasonable number of years, up to the date the suit was filed. *Access Telecom, Inc. v. MCI Telecommunications Corp.,* 197 F.3d 694, 717 (5th Cir.1999). The court examines a defendant's con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

tacts with the forum "in toto" rather than examining each contact in isolation. *Id.*

Turbine submits evidence that in the past eight years RMS has had the following contacts with Texas: (1) RMS hired three people from Texas to work outside the United States; (2) RMS had a business relationship with Selrico Services, Inc. (Selrico) and GE Packaged Power, Inc. (GE), both Texas-based companies; (3) RMS contracted with Turbine-the relationship forms the basis of the present lawsuit; (4) RMS advertised in *Air Force Times,* a news publication that was distributed in Texas; and (5) RMS representatives visited Texas six to seven times for such purposes as attending an educational conference and soliciting business.[FN4]

> FN4. Plaintiff's Response, Docket Entry No. 21, pp. 13-17. There is some dispute over Turbine's claims that RMS advertised in the *Air Force Times.* Turbine bases this claim on statements made by two RMS employees. Both of these employees, however, indicated that Linda Dillon was the person most knowledgeable about RMS's advertising. In her deposition, Dillon stated unequivocally that RMS does not advertise in the *Air Force Times .Id.* at Exhibit K, 10:15-22.

**\*4** The court will begin its analysis with the trips by RMS personnel to Texas. Although RMS did send representatives to Texas to attend conferences and solicit business, these trips did not result in any direct business for RMS.[FN5] *See Central Freight Lines,* 322 F.3d at 381 (finding no general jurisdiction when "even though APA ... apparently sends sales people to the state on a regular basis to develop business, negotiate contracts, and service national accounts, APA has never actually operated any trucks or picked up or delivered any freight in Texas"). Furthermore, these trips were isolated events, occurring six to seven times over eight years.

> FN5. Deposition of Dwight E. Clark,

57:11-59:10, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit E attached thereto.

The evidence suggesting that RMS advertises for employees in Texas shows only that RMS advertises in one national journal, *Air Force Times,* which is distributed in Texas. *See Wenche Siemer v. Learjet Acquisition Corp.,* 966 F.2d 179, 182 (5th Cir.1992) (finding no general jurisdiction when defendant had advertised in forum state through national journals). There is no evidence as to how frequently RMS ran ads in *Air Force Times,* the amount spent on these ads, the length of times the ads were placed, or the results of these ads. *See Access Telecom,* 197 F.3d at 717-18; *Gardemal v. Westin Hotel Co.,* 186 F.3d 588, 596 (5th Cir.1999).

The three people hired from Texas do not establish RMS's systematic and continuous contacts with Texas. Any connection RMS had with Texas by virtue of these three individuals is tenuous at best, given that RMS did not go to Texas to recruit them and that their work was performed outside of Texas.[FN6] Because they work outside of Texas, these three individuals do not establish that RMS has employees in Texas.

> FN6. Deposition of Linda Dillon, 12:7-12:11, 15:20-16:20, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit K attached thereto. The employees from Texas work outside the United States in Qatar and Kyrgyzstan.

Turbine has presented evidence that RMS has limited business relationships with three Texas entities: Turbine-regarding the disputes at issue in this case; Selrico-a company that serves as RMS's subcontractor for food services; and GE-a company that agreed to provide RMS with equipment and services for Iraq. Turbine points to RMS's contract with Selrico, a Texas company, as evidence that RMS has a systematic, continuous relationship with Texas. Selrico prepared and served meals in New

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

Page 5

Orleans, Louisiana, and outside of the United States.[FN7] Turbine argues that RMS's contracting with Selrico during the two or three years prior to the filing of this lawsuit "demonstrates RMS' continuous and systematic contact with Selrico for the last 2 or 3 years."[FN8]

> FN7. Deposition of James A. Jackson, Jr., 23:15-26:6, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit A attached thereto.

> FN8. Plaintiff's Response, Docket Entry No. 21, p. 16.

Turbine conflates the legal standard. The general jurisdiction analysis does not focus on whether RMS had continuous and systematic contact with a domiciliary of the forum state, but whether RMS had continuous and systematic contact with the forum state. Contracting with a Texas entity is relevant to this analysis, but is not dispositive. Furthermore, despite the fact that Selrico is a Texas-based company, its contract with RMS does not establish that RMS had continuous and systematic ties with Texas. Contracting with a Texas business when the performance of the contract occurs out-of-state does not constitute systematically and continuously doing business in Texas. *See LeBlanc v. Patton-Tully Transp., LLC,* 138 F.Supp.2d 817 (S.D.Tex.2001).

*5 The same analysis applies to RMS's contract with Turbine, out of which this lawsuit arises. The contract between Turbine and RMS does not significantly add to RMS's contacts with Texas. Turbine argues, however, that the fact that the lawsuit arises from a controversy involving RMS's contacts with Texas is relevant to the general jurisdiction inquiry. *See Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 779 (5th Cir.1986). While the court agrees that this factor is relevant, this case is distinguishable from *Holt Oil,* where there was general jurisdiction. *Id.* In *Holt Oil* the Fifth Circuit found systematic and continuous contacts with the forum state when a defendant attended college in and used to be em-

ployed in the state, owned real estate in the state, visited the state frequently, and transacted a great deal of business in the state, including holding the position of director of a company based in the state. *Id.* at 773. In *Holt Oil* the defendant had "constant and extensive personal and business connections with Texas throughout his adult life." *Id.* at 779. The relevance of the fact that the controversy arose out of the defendant's business contacts in the forum state in *Holt Oil* was viewed in light of these other extensive contacts. In this case, the other contacts with Texas do not rise to the level of the nature and the frequency of the contacts in *Holt Oil.*

Finally, Turbine submits evidence that RMS entered into a contract with GE, a Texas-based company, to provide two generators, equipment, and technical advising services for RMS's use at the Karkh Water Treatment Plant in Iraq. This contract is the subject of a lawsuit currently pending in federal court in the Northern District of Georgia.[FN9] RMS's contacts with Texas as a result of this contract are minimal at best: RMS did nod not solicit the relationship with GE; at the time of the contract the generators were located in Athens, Greece; the generators were destined for use in Iraq; RMS did not negotiate the contract with GE; no RMS representative traveled to Texas in connection with the contract.[FN10]

> FN9. Plaintiff's First Supplement to its Motion for Sanctions, Docket Entry No. 30, Exhibit 2A attached thereto.

> FN10. Affidavit of James A. Jackson contained in Defendant's Response to Plaintiff's Supplemental Request for Sanctions, Exhibit B attached thereto.

The Fifth Circuit has distinguished doing business "in" a forum state from doing business "with" a forum state in the context of general jurisdiction. *Access Telecom,* 197 F.3d at 718. Doing business "with" Texas, even if done systematically and continuously, is not sufficient to confer general jurisdiction over a defendant in Texas. *Id.* at 717 (noting

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                        Page 6
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

that "the totality of the contacts suggests that Tel-mex conducted a great deal of business with Texas, but virtually none in Texas, as such general jurisdiction cannot be shown, even on a prima facie basis). While the three contracts RMS had with residents of Texas might arguably constitute doing systematic and continuous business "with" Texas in the form of doing business "with" Texas entities, they do not constitute doing business "in" Texas. Beyond the mere fact of contracting with Texas entities, any contact with Texas was tangential to the purposes of the contracts, which were for goods or services provided outside of Texas-Selrico in New Orleans and overseas, GE and Turbine in Iraq.

\*6 RMS's contacts, taken together, do not constitute the type of systematic and continuous business activity within the state of Texas that the Supreme Court or other courts have found necessary to subject it to the general jurisdiction of Texas. In *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), the Court found systematic and continuous contacts when a corporation temporarily relocated its principal place of business to the forum state by virtue of conducting directors' meetings in the state, maintaining records and bank accounts in the state, and making important business decisions in the state. *Id.* at 419-20.The contacts RMS has with Texas stand in stark contrast to the facts of *Perkins.*

There is no evidence that RMS is registered to conduct business in Texas or pays taxes in Texas. There is no evidence that RMS has any offices, agents, or employees in the state of Texas. There is no evidence that RMS owns property or facilities in the state of Texas. There is no evidence that RMS has a bank account in Texas. *See Wilson,* 20 F.3d at 651; *Wenche Siemer,* 966 F.2d at 182; *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 376 (5th Cir.1987).

Because RMS's contacts with Texas do not, by virtue of their frequency, duration, or nature, rise to the level of systematic and continuous, the court concludes that there is no general jurisdiction over

RMS in Texas.

B. Specific Jurisdiction

Specific jurisdiction derives from "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977). The requirement of minimum contacts for specific jurisdiction is satisfied when a defendant has purposefully directed its activities at the forum state, and the litigation results from alleged injuries that arise out of or relate to those activities. *Burger King,* 105 S.Ct. at 2183. For specific jurisdiction to exist "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting business within the forum State, thus invoking the benefits and protections of its laws."*Id.* (quoting *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 1239-40, 2 L.Ed.2d 1283 (1958)). Contract-based cases require more than mere contracting with a resident of the forum state to establish specific jurisdiction over a non-resident defendant. *Burger King,* 105 S.Ct. at 2185. *See also Dickson Marine Inc. v. Panalpina, Inc.,* 179 F.3d 331, 337 (5th Cir.1999).

In examining defendant's contacts with Texas the court takes a realistic approach, looking at "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine if defendants purposefully established minimum contacts with the forum. *Burger King,* 105 S.Ct. at 2185;*see also Stuart v. Spademan,* 772 F.2d 1185, 1193-94 (5th Cir.1985).

There is no evidence that RMS has any physical ties to Texas other than six to seven brief trips during the course of more than eight years for purposes unrelated to this lawsuit. *See Burger King,* 105 S.Ct. at 2184 (noting that territorial presence, while not necessary, will enhance a potential defendant's affiliation with a state and reinforce the reasonable foreseeability of suit there). Turbine notes that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

RMS sent a subcontractor to Houston to inspect the Chiller prior to its shipment to Iraq. Turbine has not, however, presented the court with authority for imputing the actions of a subcontractor to the contractor for jurisdictional purposes. *See Freudensprung v. Offshore Technical Servs., Inc.,* 379 F.3d 327, 346 (5th Cir.2004) (noting that a plaintiff must overcome the presumption of corporate independence, which defeats the assertion of jurisdiction over one by using the contacts of another).

**\*7** In the absence of physical ties and territorial presence related to this litigation, Turbine argues that the following contacts with Texas satisfy the minimum contacts prong of specific jurisdiction: (1) Turbine performed part of the contract in Texas, (2) RMS initiated contract negotiations with Turbine in Texas, (3) the interstate communication between RMS and Turbine in Texas was voluminous, (4) one of the contracts signed by the parties contains a Texas forum selection clause, and (5) the parties had a continuous and long-term business relationship. The court will examine each of Turbine's points in turn.

Turbine first argues that the contract envisages and requires performance in Texas. Despite Turbine's vigorous argument that the contract contemplated Turbine's performance of work in Texas, an examination of the contract reveals that any performance due in Texas was de minimus. Although Turbine undoubtedly engaged in activities in Texas to meet its obligations pursuant to the contract, this is true almost any time a Texas company contracts with an out-of-state defendant.

The Scope of Work in the Purchase Order contract states that Turbine's performance consisted of installing, commissioning, training, and maintaining the generator.[FN11] All of these activities were to take place in Iraq. The only performance in Texas was the unilateral activity of Turbine. *See Hydrokinetics, Inc. v. Alaska Mech., Inc.,* 700 F.2d 1026, 1029 (5th Cir.1983). The unilateral activity of Turbine in Texas does not constitute purposeful availment by RMS. *Id.* The actual performance Tur-

bine rendered under the contract occurred in Iraq.

> FN11. Purchase Order ¶ 7, pp. 4-5, contained in RMS's Reply, Docket Entry No. 29, Exhibit D attached thereto.

Although Turbine argues that RMS reached out to Texas to solicit the sale of the Pratt-Whitney generator, the evidence does not support this allegation. Turbine cites the deposition of James A. Jackson, RMS's director of logistics, as the evidentiary basis of the solicitation argument. However, Jackson stated that to the best of his recollection Turbine was brought to his attention by an employee of SCI, one of RMS's subcontractors.[FN12]

> FN12. Deposition of James A. Jackson, Jr., 66:3-68:11, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit A attached thereto. Turbine cites to a different portion of Jackson's deposition to establish that RMS initiated contact with Turbine in Texas. However, the question asked was "[a]t some point during the negotiations did RMS representatives contact D & S [Turbine] in Texas to solicit the sale of the generator?"*Id.* at 69:9-69:12.Jackson responded in the affirmative. This does not establish who *initiated* the contact between RMS and Turbine. It merely shows that at some point in the negotiations RMS contacted Turbine in Texas.

Turbine's argument that voluminous communications between RMS and Turbine in Texas regarding the negotiation and execution of the contract support personal jurisdiction is not persuasive. As the Fifth Circuit has repeatedly held,

"the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

over the nonresident defendant."

*Freudensprung,* 379 F.3d at 344. It is not the number but the quality of contacts that demonstrates purposeful availment. *Stuart,* 772 F.2d at 1194.

Turbine next argues that RMS submitted to jurisdiction in Texas by virtue of one of the contracts entered into between the parties. Turbine and RMS executed a Non-Circumvention & Non-Disclosure (NCND) Agreement that contained a Texas forum selection clause. The actual language of the contract is relevant to the minimum contacts analysis. *See Gundle Lining,* 85 F.3d at 205 ("[O]ne factor that might affect the minimum contacts analysis is the actual language present in the contract itself"). While the NCND Agreement does contain a Texas forum selection clause, the NCND Agreement governs only a small portion of the parties' relationship. It states that "[t]he purpose of this agreement is to prevent and prohibit the disclosure of confidential information to any, and all non-parties to this agreement."[FN13] The forum selection clause itself is limited to "any controversy arising under or in relation to the Agreement."[FN14] Turbine's lawsuit stems from an alleged breach of the Purchase Order contract, not from a breach of the NCND Agreement; and the Purchase Order contract does not contain a Texas choice-of-law or choice-of-forum provision.

> FN13. NCND Agreement, p. 1, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit C attached thereto.

> FN14. *Id.* at p. 4.

**\*8** The Purchase Order contract incorporates various attachments.[FN15] The General Conditions-Purchases Attachment (GC-P) applies to all of the items specified in the Purchase Order except installation and maintenance. The General Conditions-Construction Services Order Attachment (GC-C) applies to installation and maintenance. Neither the GC-P nor the GC-C contains forum selection clauses, but both contain a choice-of-law

provision. A choice-of-law provision is a relevant factor in considering whether or not a defendant has minimum contacts with the forum state. *Jones,* 954 F.2d at 1069.

> FN15. Purchase Order Contract, ¶ 3.0, p. 3, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit D attached thereto.

The GC-P states that "[t]he definitions of terms used, interpretation of this Agreement, and rights of the parties hereunder shall be construed under and governed by the laws of the jurisdiction wherein Buyer's office is located...."[FN16] The GC-C states the following: "Irrespective of the place of performance, this subcontract will be construed and interpreted according to the federal common law of contracts.... To the extent that the Federal Common law of government contracts is not dispositive, the laws of the state from which Contractor's subcontract is issued shall apply."[FN17]

> FN16. GC-P, ¶ 16, p. 6, to Plaintiff's Response, Docket Entry No. 21, Exhibit D attached thereto.

> FN17. *Id.* at GC-C, ¶ 22.

The GC-P does not specify where the buyer's office is located. Neither does the GC-C specify what state the subcontract was issued from. But the Purchase Order contract contains RMS's address at the beginning of the document as Panama City, Florida. These documents, while unclear as to exactly what law applies, give no indication that the parties intended Texas law to apply.

Because neither the Purchase Order, the GC-P, nor the GC-C invoked Texas law, and the NCND Agreement's limited application restricted the effect of its forum selection clause, the contracts between the parties do not establish that RMS reached out to Texas, or that it should have foreseen being haled into court in Texas.

Turbine also argues that the relationship between itself and RMS was continuous and long-term, in-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

volving several transactions. But there is no evidence that RMS and Turbine had any business relationship prior to the negotiations for the sale of the Pratt-Whitney. The contracts at issue did not envisage a long-term, multi-year relationship of the sort enjoyed by the parties in *Burger King*, 105 S.Ct. at 2186. *See also Electrosource, Inc. v. Horizon Battery Techs., Ltd.,* 176 F.3d 867, 872 (5th Cir.1999) (finding specific jurisdiction when the actual course of dealing between the plaintiff and defendant involved wide-reaching contacts and contemplated future consequences within the forum state). While RMS and Turbine did enter into multiple contracts, including the NCND Agreement and the Purchase Order contract, this does not establish a continuous and long-term relationship. All of the contracts were related to the objective of providing equipment and services for the Plant in Iraq. The NCND Agreement governs non-circumvention and non-disclosure related to the sale of the Pratt-Whitney.[FN18]The Purchase Order contract was for the installation and commissioning of equipment in Iraq, as well as the training of personnel to run the Plant after taking over the responsibility from Turbine.

> FN18. NCND Agreement, p. 2, contained in Plaintiff's Response, Docket Entry No. 21, Exhibit C attached thereto.

**\*9** There is no indication in the contract or the dealings between the parties that the relationship was intended to extend beyond one year. Turbine's complaint admits as much, stating that Turbine anticipated that the "start-up" work for the generator would take twelve to fifteen days to complete.[FN19]The work remaining to Turbine under the contract after "start-up" was maintenance, which the contract spells out under the heading "First Year Maintenance."[FN20]Despite Turbine's attempts to characterize the relationship between RMS and Turbine as long-term, a contract whose potential span is little more than a year does not by itself suffice.

> FN19.  Plaintiff's First Amended Com-

> plaint, Docket Entry No. 31, ¶ 16, p. 5.

> FN20. Purchase Order contract, ¶ 8.0, p. 5, contained in Plaintiff's Response, Docket Entry No. 2, Exhibit D attached thereto.

Furthermore, the actual course of dealing between the parties did not evolve into a long-term business relationship. The two began negotiations in February of 2004 and signed the contracts shortly thereafter. Although the parties have not submitted evidence establishing an actual time line for the deployment of Turbine's personnel to Iraq, Turbine's pleadings indicate that its personnel remained in Iraq for about two months.[FN21]There is no indication that the parties had any further productive dealings after Turbine's representatives left Iraq. This lawsuit was filed on June 22, 2005. The contract, which did not envisage a long-term relationship between the parties, did not in fact create one.

> FN21.  Plaintiff's First Amended Complaint, Docket Entry No. 31, ¶ 16, p. 5.

Turbine cites *Enviro Petroleum, Inc. v. Kondur Petroleum, S.A.,* 79 F.Supp.2d 720 (S.D.Tex.1999), as presenting a strikingly similar factual situation where the court concluded that there were sufficient minimum contacts to support specific jurisdiction. However, the facts in *Enviro Petroleum* are distinguishable from the facts in this case. *Enviro Petroleum* involved significant contract performance in Texas through overseeing design and construction of an entire oil refinery that was later to be shipped out of state. *Id.* Here, although some preliminary procurement and testing took place in Texas, the performance of the primary contract between the parties was for the sale and servicing of equipment in Iraq.[FN22]

> FN22. Turbine also cites *Sydow v. Acheson & Co.,* 81 F.Supp.2d 758 (S.D.Tex.2000), a case in which the court found personal jurisdiction in Texas. *Sydow* is also distinguishable. The defendants in *Sydow* sought out the services of plaintiffs in Texas and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

entered into agreements requiring plaintiffs to perform a substantial portion of their contractual obligations in Texas.

Nor do the quantum meruit and fraudulent inducement causes of action establish an independent basis for specific jurisdiction. The quantum meruit cause of action is based on an allegation that RMS failed to meet its contractual obligations, yet pressured Turbine to get the Plant in Iraq up and running, resulting in Turbine's performing work it was not obligated to perform under the contract. The quantum meruit claim arises from the same set of operative facts as the breach of contract cause of action. Just as RMS's contacts with Texas do not constitute purposeful availment for the breach of contract cause of action, they do not constitute purposeful availment for the quantum meruit cause of action.

Turbine's complaint also alleges that RMS fraudulently induced it to enter into a contract to provide goods and services with no intention of providing the services the contract required of RMS. An out-of-state defendant's communications with a party in a forum can be relevant to personal jurisdiction if the content of the communication has a direct connection to the causes of action asserted. *See Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 213 (5th Cir.1999). However, "[f]oreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum." *Id.* at 212.While Turbine has presented extensive argument related to RMS's activities directed toward Texas in relation to the contract, it has not presented any evidence that RMS's activities directed toward Texas relate to the fraudulent inducement cause of action. In fact, Turbine's responsive pleadings are devoid of argument on this issue. Absent evidence regarding what activity or communication RMS directed toward Texas that fraudulently induced Turbine to enter into a contract with RMS, there is no prima facie case for specific jurisdiction on this tort.

**\*10** Turbine has failed to establish that RMS had

minimum contacts with the state of Texas sufficient to subject it to specific jurisdiction. Because the minimum contacts prong of the jurisdiction analysis is not met, the court need not address the second prong, whether the exercise of jurisdiction over RMS offends traditional notions of fair play and substantive justice. *See Asahi Metal Ind. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987).[FN23]

> FN23. Because the court has found that it lacks personal jurisdiction over RMS, it need not address RMS's argument that venue is improper in this district.

### IV. *Motion for Sanctions*

Turbine's Motion for Rule 11 sanctions is based on its argument that RMS's Motion to Dismiss for lack of personal jurisdiction was frivolous and baseless and on an allegation that RMS is attempting to hide its contacts with TEXAS from the court. FED. R. CIV. P. 11 requires that in signing a pleading an attorney certifies that (1) the attorney has conducted a reasonable inquiry into the facts that support the document, (2) the attorney has conducted a reasonable inquiry into the law, and (3) the motion is not interposed for the purposes of delay, harassment, or increasing costs of litigation. *Id.See also Thomas Capital Sec. Servs., Inc.,* 836 F.2d 866, 873-74 (5th Cir.1988).Rule 11 review evaluates an attorney's conduct at the time the document in question is signed. *Id.*

Because the court has determined that it does not have personal jurisdiction over RMS, Turbine's argument that RMS's Motion to Dismiss was frivolous is without merit. Although several of RMS's contacts with Texas were not revealed until discovery and after the initial motion to dismiss was filed, the court is not persuaded that this was due to the failure of RMS's counsel to perform a reasonable inquiry into the facts. Therefore, Turbine's Motion for Sanctions will be denied.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 287971 (S.D.Tex.)

Page 11

### V. *Conclusions and Order*

For the reasons explained above, the court con-
cludes that it lacks personal jurisdiction over de-
fendant RMS. Defendant's Motion to Dismiss
Plaintiff's Claims for Lack of Personal Jurisdiction
(Docket Entry No. 9) is therefore GRANTED.
Plaintiff Turbine's Motion for Sanctions (Docket
Entry No. 25) is DENIED.

S.D.Tex.,2006.
D & S Turbine Intern., Inc. v. Research Manage-
ment Systems, L.C.
Not Reported in F.Supp.2d, 2006 WL 287971
(S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT D

Westlaw.

Slip Copy
Slip Copy, 2008 WL 2080930 (N.D.Miss.)

**H**

Only the Westlaw citation is currently available.
United States District Court,N.D. Missis-
sippi,Western Division.
LIBERTY MUTUAL INSURANCE COMPANY,
et al., Plaintiffs
v.
Pauline TEDFORD, et al., Defendants
andFranklin Corporation, Counter-Plaintiff
v.
Liberty Mutual Insurance Company, et al., Counter-
Defendants.
Civil Action No. 3:07CV73-A-A.

May 13, 2008.

David M. Ott, Rick D. Norton, William Arthur
Whitehead, Jr., Bryan Nelson PA, Hattiesburg, MS,
for Plaintiffs.
Heber S. Simmons, III, Simmons Law Group, PA,
Jackson, MS, L.F. Sams, Jr., John Samuel Hill, Otis
R. Tims, Mitchell, Mcnutt & Sams, Tupelo, MS, for
Defendants.
David M. Ott, Rick D. Norton, William Arthur
Whitehead, Jr., Bryan Nelson PA, Hattiesburg, MS,
for Counter-Defendants.
L.F. Sams, Jr., John Samuel Hill, Otis R. Tims,
Mitchell, Mcnutt & Sams, Tupelo, MS, for
Counter-Plaintiff.

ORDER ON MOTIONS TO COMPEL

S. ALLAN ALEXANDER, United States Magis-
trate Judge.
*1 Franklin has filed a motion to compel more
complete responses to interrogatories and requests
for production propounded to the Liberty Mutual
[78]. The parties tried and were unable to resolve
their discovery disputes without court intervention.
The motion is fully briefed and ready for review.

Franklin argues that the following responses are de-
ficient:

*INTERROGATORY NO. 1:* Identify each person
who participated in formulating responses to
these interrogatories and requests for production
of documents.

*RESPONSE:* Attorneys for Liberty Mutual

*INTERROGATORY NO. 5:* Specifically identify
all persons who participated in or have know-
ledge of the decision by Liberty Mutual to
provide Franklin a defense under a reservation of
rights in the underlying state court civil action
brought against Franklin by the individual de-
fendants in this action.

*RESPONSE:* The identities of the persons who
participated in or have knowledge of the decision
by Liberty Mutual to provide a defense to Frank-
lin Corporation and the individually named De-
fendants in the underlying civil action are con-
tained within the claim file records produced by
Response to Franklin Corporation's Requests for
Production of Documents. The in-house attorney
that prepared the initial coverage position letter
was an attorney in Liberty Mutual's legal depart-
ment, Michael Keary. Liberty Mutual is willing
to provide documents reflecting his involvement
if there is an agreement or court order defining
the scope of any waiver of the attorney-client
privilege.

*INTERROGATORY NO. 6:* Specifically identify
all persons who participated in or have know-
ledge of the decision by Liberty Mutual to file the
complaint for declaratory judgment and other re-
lief in this action.

*RESPONSE:* Liberty Mutual objects to identifica-
tion of persons who participated in or have know-
ledge of the decision to file the Complaint for
Declaratory Relief on the basis that the informa-
tion is subject to the attorney-client privilege and
constitutes attorney work product.

*INTERROGATORY NO. 7:* Specifically identify

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2008 WL 2080930 (N.D.Miss.)

all persons who participated in or have know-
ledge of claims handling activities by Liberty
Mutual pertinent to the claims asserted against
Franklin in the underlying state court civil action.

*RESPONSE:* Liberty Mutual objects to Interrog-
atory No. 7 to the extent that it is overly broad,
unduly burdensome and not reasonably calculated
to lead to the discover of admissible evidence. In
particular, Interrogatory No. 7 seeks the identity
of all people who have knowledge of Liberty Mu-
tual's claims handling activities pertinent to the
claims asserted against Franklin, even if those
persons had no involvement in handling the
claims against Franklin. Because Liberty Mutual
handles claims in all fifty (50) states, identifica-
tion of all the people who have knowledge of
Liberty Mutual's claims handling activities would
require Liberty Mutual to identify people who
have absolutely no connection to any of the
claims connected with this litigation. Without
waiving the foregoing objections, Liberty Mutual
responds: Doug Morgan. The identities of other
persons who participated in or have knowledge
Liberty Mutual's handling of claims asserted
against Franklin in the underlying state court
civil action are contained within the claim file re-
cords produced in response to Franklin Corpora-
tion's Request for Production of Documents.

**\*2 INTERROGATORY NO. 8:** Identify all actions
brought against you within the last ten years in
which one of your insured has alleged that you
failed to advise them of their legal rights follow-
ing the tender by you of defense under a reserva-
tion of rights. In that identification provide the
identity of your insured and the style and cause
number of any resulting legal action.

*RESPONSE:* Liberty Mutual objects to this Inter-
rogatory as it seeks information not relevant to
the claims or defenses of the parties and is not
likely to lead to the discovery of admissible evid-
ence. Also, this Interrogatory is overly broad and
unduly burdensome in that Liberty Mutual cannot
reasonably be expected to maintain such informa-

tion in a retrievable format, the search of historic-
al files for the last ten (10) years to locate any
such claims would not be possible or accurate
and the burden of doing so would be cost prohib-
itive.

*INTERROGATORY NO. 9:* Identify all actions as-
serted against you within the last ten years in
which your insured has asserted that your actions
gave rise to coverage under an insurance policy
by estoppel. In that identification provide the
identity of your insured and the style and cause
number of any resulting legal action.

*RESPONSE:* Liberty Mutual objects to this Inter-
rogatory as it seeks information not relevant to
the claims or defenses of the parties and not
likely to lead to the discovery of admissible evid-
ence. Also, this Interrogatory is overly broad and
unduly burdensome in that Liberty Mutual cannot
reasonably be expected to maintain such informa-
tion in a retrievable format, the search of historic-
al files for the last ten (10) years to locate any
such claims would not be possible or accurate
and the burden of doing so would be cost prohib-
itive.

*INTERROGATORY NO. 10:* Specifically identify
all persons who participated in setting Liberty's
reserves for the claims made against Franklin by
the individual defendants to this action in the un-
derlying state court civil action.

*RESPONSE:* Primarily Doug Morgan and Albert
Greasby. However, see documents in claim files
for others. Additionally, Liberty Mutual incorpor-
ated information from attorneys representing
Franklin and the individual Franklin defendants
in the state court civil action to the extent it was
provided to Liberty Mutual.

*INTERROGATORY NO. 11:* If you claim that any
employee, representative or agent of Franklin has
made a statement against interest relevant to any
matter at issue in this action, identify the person
making the statement, the date that the statement

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2080930 (N.D.Miss.)

was made, all persons in privity to any such statement and the substance of any such statement.

*RESPONSE:* Such statements are believed to exist in the communications between Franklin and attorneys hired by Franklin and/or Liberty Mutual which have not been provided to Liberty Mutual at this time. Additionally, correspondence, pleadings, depositions and trial transcripts for the underlying civil action may contain statements by employees, representatives and/or agents of Franklin Corporation that are against the interest of Franklin Corporation.

*3 *INTERROGATORY NO. 12:* If you allege that the bodily injuries alleged to have been suffered by the individual defendants to this action in the underlying state court civil action were the result of an accident, state the factual basis of your claims in that regard, identify all documents on which you intend to reply to support those claims and identify all persons whom you intend to rely to support those claims.

*RESPONSE:* Liberty Mutual objects to this Interrogatory to the extent that it calls for a legal conclusion or opinion. Without waiving this objection, Liberty Mutual responds as follows: Liberty Mutual originally was given notice of and handled claims of the individual Defendants as Workers' Compensation claims. A jury after an extensive trial has found underlying Plaintiffs' claims (individual Defendants herein) are not covered by Workers' Compensation and a Judgment has been entered based on a finding that the actions of Franklin were intentional. Therefore, the claims of the individual Defendants are not covered by the Liberty Mutual Workers' Compensation and Employers Liability policies issued to Franklin. The proof, evidence, documents and testimony introduced at the trial of the claims by the individual Defendants are claimed to support the findings of the jury. Additionally, documents contained within the files of the attorneys hired by Franklin Corporation and/or Liberty Mutual may contain information responsive to this discovery requests.

*INTERROGATORY NO. 13:* If you allege claim [sic] that the bodily injuries alleged to have been suffered by the individual defendants to this action in the underlying state court civil action were the result of disease, state the factual basis of your claims in that regard, identify all documents on which you intend to rely to support those claims and identify all persons on whom you rely to support those claims.

*RESPONSE:* Liberty Mutual objects to this Interrogatory to the extent it calls for a legal conclusion or opinion. Without waiving this objection, Liberty Mutual responds as follows: The records of individual Defendants, doctors they saw, experts that testified at the underlying trial and other evidence available and presented in the underlying trial of the claims of the individual Defendants against Franklin demonstrate what the individual Defendants claim to suffer as a result of their claim of exposure to chemicals or compounds used at Franklin where they worked. Additionally, documents contained within the files of the attorneys hired by Franklin Corporation and/or Liberty Mutual may contain information responsive to this discovery request.

*REQUEST NO. 5:* Documentation of your present net worth, to be supplemented by the most recent documentation of your net worth at the time of trial.

*RESPONSE:* Liberty Mutual objects to production of privileged or confidential financial information.

*REQUEST NO. 12:* All documents relating to your decision to file a declaratory judgment action against Franklin.

*4 *RESPONSE:* Liberty Mutual objects to production of any documents related to the decision to file this Declaratory Judgment action as being subject to the attorney-client privilege and consti-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 4
Slip Copy, 2008 WL 2080930 (N.D.Miss.)

tutes work product and documents prepared in anticipation of litigation.

*REQUEST NO. 13:* All documents relating to your analysis of coverage for any judgment rendered against Franklin in the underlying state court civil action.

*RESPONSE:* Such documents prior to the retention of the firm of Bryan Nelson, P.A., will be produced subject to the objection set forth in response to Request No. 2. After Liberty Mutual retained Bryan Nelson, P.A., any such documents are subject to the objection stated in Response to Request for Production No. 12.

*REQUEST NO. 14:* All documents relating to your analysis of the extent of potential coverage available to Franklin for any judgment rendered against it in the underlying state court action.

*RESPONSE: See* Response and objection to Request for Production No. 13.

*REQUEST NO. 15:* All documents relating to your consideration of duties owed by you to Franklin upon your decision to defend Franklin in the underlying state court civil action under a reservation of rights.

*RESPONSE: See* Response and objection to Request for Production No. 13.

*REQUEST NO. 16:* All documents, including those extant in 2004 to the current date, delineating your policies, practices or procedures upon a determination to defend an insured in Mississippi under reservation of rights.

*RESPONSE:* To the extent known, such documents are being produced or will be made available for inspection and copying subject to the objection set forth in response to Request No. 2. However, at this time Liberty Mutual is not aware of specific documents responsive to this request.

*REQUEST NO. 17:* All documents possessed by any of your employees or agents participating in the decision to defend Franklin in the underlying state court civil action under a reservation of rights relating to an insurer's duties to its insured in Mississippi upon the insurer's tendering a defense to its uninsured under a reservation of rights.

*RESPONSE:* Liberty Mutual objects to this Request because it is unclear what is sought such that Liberty Mutual is not on fair notice of the documents being requested. Liberty Mutual further objects to Request No. 17 to the extent that it seeks documents that are not in the possession, custody or control of Liberty Mutual. Liberty Mutual also objects to Request No. 17 to the extent that it seeks documents relating to claims made by other insureds on the ground that such request is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, Liberty Mutual as it understands this Request responds that to the extent known and not subject to objection or privilege, such documents are being produced or will be made available for inspection and copying subject to the objection set forth in response to Request No. 2.

**\*5** Under 26(b)(1) of the Federal Rules of Civil Procedure, the scope of discovery is relatively broad. A party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," and for good cause a court may order production of information as long as it is relevant to the subject matter of the case.

*Interrogatory No. 1:* There is no legitimate reason for not answering this interrogatory by providing the complete identity of each individual who participated in formulating Liberty Mutual's responses. Although everyone involved in this case may know who "Attorneys for Liberty Mutual" are, it is so simple to list the individual names and other information-and such a basic obligation under the Rules-that it is not even necessary to further ad-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2080930 (N.D.Miss.)

dress this point.

*Interrogatory No. 5:* Liberty Mutual's response lists by name Michael Keary, Liberty Mutual's in-house attorney who prepared the initial coverage letter to Franklin, but indicates that there are other individuals who may have participated in the decision to provide defenses to the underlying case under a reservation of rights. When asked for names of individuals with knowledge of matters relevant to the claims and counterclaim in this case, Liberty Mutual named 53 individuals and mentioned that more might be found through the discovery process.[FN1] If there are other individuals who participated in Liberty Mutual's decision to provide a defense under a reservation of rights, Franklin should be allowed to discover their identity, as defined by the interrogatories, and the substance of the information known to them or their participation in the decision-making process. Liberty Mutual's response to this interrogatory is insufficient if there are more individuals associated with Liberty Mutual who participated in the decision to defend under a reservation of rights. Liberty Mutual makes no effort to supply that information. Liberty Mutual shall provide a compete response to this interrogatory detailing each relevant person and all appropriate identifying information.

> FN1. In response to Interrogatory No. 2, not currently in issue in this motion, Liberty Mutual listed the names of 53 individual who might have knowledge relevant to the claims.

*Interrogatory No. 6:* As discussed fully in this court's Order of May 1, 2008, the attorney-client privilege applies to *communications* between an attorney and client for the purpose of facilitating rendition of professional legal services to the client. *See Dunn v. State Farm,* 927 F.2d 869, 875 (5th Cir.1991). The identification of individuals who have knowledge of a matter that may or may not be subject to the attorney-client privilege is strictly factual information that is not protected by either the privilege or the work product doctrine. Liberty

Mutual will be required to provide a full and complete response to this interrogatory.

*Interrogatory No. 7:* The court agrees that this interrogatory is overly broad and responding to it would be unduly burdensome. Although it clearly does not seek information related to all 50 states in which Liberty Mutual handles claims, as Liberty Mutual argues, the request for "all persons who participated in or have knowledge of claims handling activities by Liberty Mutual pertinent to the claims asserted against Franklin in the underlying state court civil action" does not seek with particularity any individual or group of individuals. In fact, "claims handling activities" is such an all-encompassing term that it could refer to an agent, a receptionist or assistant who opens the mail regarding claims, or attorneys and specialists who evaluate claims and policy provisions. Liberty Mutual will not be required to respond more fully to this interrogatory.

*6 *Interrogatory No. 8:* This interrogatory requests information regarding claims made against Liberty Mutual similar to those alleged in the counterclaim within the last ten years. Liberty Mutual objects to this request as being overly broad and unduly burdensome and states that it is not able to retrieve such information or that the burden of retrieving it would be cost prohibitive. Franklin has agreed to limit the request to cases filed in Mississippi and argues that it is not necessary to rely on computer retrieval of relevant information, but on information provided by employees of Liberty Mutual. The court agrees that there may be less expensive means for determining if such information exists. For example, an e-mail to all Liberty Mutual employees asking if they recall any such claims or cases in the last ten years is a simple, inexpensive means of discovering whether any claims were ever made in Mississippi. Liberty Mutual has a duty to at least attempt to determine if information responsive to this interrogatory exists, if not by computerized search of files (a general search of a computer data base surely would be a start), then at least by inquiry of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 2080930 (N.D.Miss.)

Page 6

employees who may have relevant, discoverable information. At a minimum, a good faith effort is required. Liberty Mutual shall initiate a search into the existence of relevant information, and after receiving any such information, fully and completely respond in an organized manner to Interrogatory No. 8 with any discoverable information. The court is aware that there may be no information available that is responsive to this request, but Liberty Mutual must at least make an attempt to find it.

*Interrogatory No. 9:* As with Interrogatory No. 8, the information sought by this interrogatory is within the permissible scope of discovery. As with No. 8, Franklin has agreed to limit its request to claims within the state of Mississippi within the last ten years. There may be no information responsive to this request, and the means for discovery of the information may not necessarily be as simple as typing a request into a computer, but Liberty Mutual has a duty to make a good faith inquiry into the existence of such information, to follow up on the validity of the information and provide all relevant information responsive to this inquiry to the defendant in an organized manner.

*Interrogatory No. 10:* Liberty Mutual's response, "see documents in claims files for others" is not only insufficient, but also fatally unclear. The duty to respond to interrogatories and requests for production requires an attorney to conduct a reasonable inquiry into the factual basis of the claims and defenses in a case and the relationship of all relevant information to the discovery requests of the opposing party. *See National Ass'n of Radiation Survivors,* 115 F.R.D, 554, 556 (N. D.Cal.1987)("[A] reasonable inquiry into the factual basis of [a party's] discovery responses ... require[s], at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the [party] potentially possessing responsive information, and to account for the collection and subsequent production of the information to [the opposing party]."). Liberty Mutual's response does not reflect that it made any inquiry to provide all necessary information responsive to this request; it shall provide a full response, which requires review of the claims files to determine the identity of other relevant individuals and information.

*7 *Interrogatory No. 11:* Franklin argues that the response to this interrogatory is a "non-response" in that Liberty Mutual does not state that it has knowledge of any statements against interest, yet alludes to their existence. The court is without sufficient information to determine whether such statements exist, particularly in light of the court's recent ruling regarding attorney-client privilege and work product doctrine. What is clear, however, is that Liberty Mutual must provide a good faith response, which includes searching "correspondence, pleadings, depositions and trial transcripts for the underlying civil action" to determine whether such statements are there if it intends to use them in this case. Liberty Mutual may respond that it is doing so and intends to supplement its response, but it is reminded that it must supplement in a timely manner or be barred from introducing such evidence at trial. Liberty Mutual shall provide a more complete response to this interrogatory, and if any responsive information exists, provide it in an organized manner, with supplementation as necessary.

*Interrogatory No. 12:* Franklin again claims that Liberty Mutual's answer to this interrogatory is "non-responsive." The court agrees. Liberty Mutual provides only the chronology of events that led to its seeking a declaratory judgment that the claims in the underlying state court case were not covered by its policies and states that the documents and information provided during the underlying trial provide the basis for the jury's conclusions and ultimately Liberty Mutual's filing of this case. At the end of the response, however, the court-and presumably Franklin as well-is unable to determine whether, after all, Liberty Mutual *is* claiming that the bodily injuries were the result of an accident. The court presumes that it is not since Liberty Mutual filed suit on grounds the injuries were the result of intentional acts, but Liberty Mutual never

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2080930 (N.D.Miss.)

*says so* in its response. As with No. 11, if Liberty Mutual is claiming accident here, then it must provide a specific response to the question.

*Interrogatory No. 13:* This response is insufficient. Liberty Mutual must specify the particular documents, exhibits or testimony or other information it will rely upon for any claim that bodily injuries were the result of disease.

*Request No. 5:* While sympathetic to Liberty Mutual's objection and position regarding this request for a net worth statement, the court is aware of a previous case in this district in which a trial had to be delayed to locate and update a previously sealed net worth statement. Due to the sensitive nature of the information, Liberty Mutual is ordered to provide the requested information, to the extent that the information is available in the regular course of business, in a sealed envelope, to defendant's counsel by May 30, 2008. Franklin's counsel only may examine the documents,[FN2] and counsel is prohibited from revealing the contents of the documents to any other person or entity, including Franklin. Franklin's counsel is ordered to treat the information as strictly confidential until such time as it is received into evidence at the trial. If and when the evidence is ruled admissible at trial, Liberty Mutual will be required to have available an updated net worth statement for introduction into evidence. If at any point it is determined that this confidential information is disseminated beyond Franklin's attorneys, sanctions may be imposed for failure to comply with this Order.

> FN2. It is only fair that Franklin's counsel have some idea of the nature and extent of the net worth of the Liberty Mutual going into the trial; moreover, if the documentation presented is deficient, Franklin's counsel should have the means to correct that before trial.

**\*8** *Request Nos. 12 through 16:* Liberty Mutual's counsel has a duty under Rule 26 to make a reasonable inquiry into the factual basis for its client's

claims and to respond fully to discovery requests unless the requested information is privileged. If the documents requested by this interrogatory are protected by the attorney-client privilege, then Liberty Mutual must identify the documents properly in a privilege log. Failure to do so may result in sanctions.[FN3]

> FN3. In Franklin's supplement to motion to compel more complete responses to interrogatories and requests for production [86], Franklin noted that Liberty Mutual had filed supplemental responses to Requests No. 13, 14, 15, 16 and 17 and had created a privilege log identifying documents withheld from production on the basis of attorney-client privilege or work product doctrine. It is not clear whether this privilege log encompasses the documents discussed in relation to Request No. 12. If not, the privilege log should be amended or supplemented as necessary.

*Request No. 17:* Although Liberty Mutual properly objects to being asked to produce any documents that are outside its custody and control, The court does not read the request to include documents which would fall into this category. Of course, Liberty Mutual has custody and control of documents in the possession of its employees and agents. Liberty Mutual must make a full, complete, and organized response if it has not been made or supplemented to date.

Rule 37(5) provides guidance for dealing with payment of expenses when a motion to compel is filed. The Rule previously stated that upon granting a motion to compel, a court "shall ... require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees," absent certain extenuating circumstances. FED.R.CIV.P. 37(a)(4)(A). These sanctions were mandatory and self-operating to ensure full compliance with the discovery rules. See

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Comment. Rule 37 was amended in 2007 and now states

(5) *Payment of Expenses; Protective Orders.*

(A) *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing* ). If the motion is granted-or if the disclosure or requested discovery is provided after the motion was filed-the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

(iii) other circumstances make an award of expenses unjust.

(B) *If the Motion Is Denied.*If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

**\*9** (C) *If the Motion Is Granted in Part and Denied in Part.*If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion.

Fed.R.Civ.P. 37(5). Liberty Mutual's objections were, for the most part, well founded. The court concludes that given the environment of this case, responses that the court has ordered must be supplemented or more completely answered do not warrant Liberty Mutual's payment of fees associated with the filing of this motion, and therefore holds that no such sanctions will be awarded.

Franklin's motion to compel is granted in part and denied in part. All discovery responses and materials responsive to the requests and required by this Order shall be completed, all supplementations completed and, if necessary, privilege logs completed and provided to Franklin no later than June 1, 2008.

Franklin's supplement to this motion, filed as docket entry no. 86 and considered in this ruling, is found to be moot.

SO ORDERED.

N.D.Miss.,2008.
Liberty Mut. Ins. Co. v. Tedford
Slip Copy, 2008 WL 2080930 (N.D.Miss.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.