## IN THE UNITED STATE DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BASSAM NABULSI and | § | |
| RIMA NABULSI, | § | |
|     Plaintiffs, | § | |
| | § | |
| V. | § | |
| | § | |
| H.H. SHEIKH ISSA BIN ZAYED AL | § | |
| NAHYAN, H.H. SHEIKH NASSER BIN | § | **CIVIL ACTION NO. H-06-02683** |
| ZAYED AL NAHYAN, H.H. SHEIKH | § | **(JURY TRIAL REQUESTED)** |
| SAIF BIN ZAYED AL NAHYAN, H.H. | § | |
| SHEIKH ADBULLAH BIN ZAYED AL | § | |
| NAHYAN, H.H. SHEIKH MOHAMMED | § | |
| BIN ZAYED AL NAHYAN, and THE | § | |
| PARTNERSHIP OF THE ROYAL | § | |
| FAMILY BIN ZAYED AL NAHYAN, | § | |
|     Defendants. | § | |

### PLAINTIFFS' THIRD AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

    COME NOW Plaintiffs, BASSAM NABULSI and RIMA NABULSI, complaining of

Defendant, H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN, and for cause of action respectfully

show this Honorable Court the following:

### A. NATURE OF THIS CASE

    Plaintiff, Bassam Nabulsi ("Mr. Nabulsi" or "Plaintiff"), is a United States citizen and

Houston businessman. Sheikh Issa Bin Zayed Al Nahyan ("Sheikh Issa" or "Defendant") is a

member of the royal family in the United Arab Emirates ("U.A.E."). Sheikh Issa and Plaintiff,

Bassam Nabulsi, were business partners. The partnership was formed in Houston, Texas, as a result

of Sheikh Issa's numerous travels to Houston. With Sheikh Issa's capital, and Mr. Nabulsi's skill and

efforts, the partners earned profits exceeding tens of millions of dollars.

During the course of their partnership, and notably after Sheikh Issa's father, the well-respected founder of the U.A.E., died in November 2004, Sheikh Issa began a long, slow spiral into depravity and degeneracy. Specifically, Sheikh Issa came to enjoy torturing people he perceived had slighted him. He also took pleasure in videotaping the torture sessions, so he could watch the sessions at a later date.[1]  On one such occasion, Sheikh Issa spent forty-five minutes violently torturing an Afghan national at Sheikh Issa's ranch in the U.A.E. Mr. Nabulsi, who was out of the country at the time that he received word of that torture, called Sheikh Issa and pleaded with him to allow someone to take the injured and dying Afghan man to the hospital. Sheikh Issa was offended by Mr. Nabulsi's assertiveness to save the dying Afghan national.

That telephone conversation was the beginning of the end of the partnership between Mr. Nabulsi and Sheikh Issa. Shortly thereafter, Sheikh Issa had Mr. Nabulsi arrested, imprisoned, and tortured, in an effort to retrieve from Mr. Nabulsi several videotapes of Sheikh Issa's torture sessions that Sheikh Issa had given to Mr. Nabulsi[2].  Mr. Nabulsi was ultimately able to escape the U.A.E., but Sheikh Issa never provided Mr. Nabulsi with his share of the millions of dollars in profits that the partnership earned through Mr. Nabulsi's hard work.  Mr. Nabulsi brings this case to recoup his share of the profits earned by the partnership, and for damages for the torture he suffered at the hands of Sheikh Issa.

## B. PARTIES

Plaintiffs, Bassam Nabulsi and Rima Nabulsi, are individuals and citizens of the United States and of the State of Texas.

Defendant, H.H. Sheikh Issa bin Zayed Al Nahyan, is an individual who is a citizen of the United Arab Emirates, a foreign state.  Plaintiffs have served Sheikh Issa pursuant to the laws of the

---

1 Plaintiff, Bassam Nabulsi, had no involvement whatsoever in such activities.
2 Sheikh Issa has never denied his involvement in the arrest, imprisonment, and torture of Mr. Nabulsi.

United States and in accordance with the laws of the U.A.E. He is being served with a copy of this amended complaint through his attorneys of record.

## C. JURISDICTION

The Court has subject matter jurisdiction over this lawsuit under 28 U.S.C., §1332(a)(2), because the suit is between a citizen of Texas and a citizen of the U.A.E., and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. The Court also has federal question subject matter jurisdiction under the Torture Victim Protection Act, 28 U.S.C. §1350.

The partnership at issue in this case was formed in Houston, Texas, and the partnership's business activities were focused in Houston, Texas, as well as the U.A.E. and other countries. Plaintiff, Bassam Nabulsi, is a Houston businessman, and, while in Houston, acted as Defendant, Sheikh Issa's, agent. The partners, on behalf of the partnership, sought business opportunities in Texas, with Texas companies. Further, Defendant Sheikh Issa traveled to Houston, Texas in the years, 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2002, 2003, and 2004 for up to four months per year.[3] The purpose of said trips was, in part, to conduct business. During each trip to Texas, Sheikh Issa conducted extensive business with Texans. Each of Sheikh Issa's flights to Texas was serviced by Ogden Aviation Ground Services in Houston, Texas. During each of his repeated, extended visits to Texas, Sheikh Issa and his entourage set up residence at the Four Seasons Hotel in Houston. During these Texas visits, Issa hired off-duty Houston police officers as security, and used local limousine services to travel to numerous Houston area restaurants and attractions. While in Texas, Sheikh Issa traded extensively with Houston retail establishments, including A. Taghi Fine Men's Apparel and Shoes, Versace in the Galleria, Neiman Marcus, Sun & Ski Sports, Oshman's, Ammo

---

3 Sheikh Issa would customarily spend at least half of each year outside the U.A.E.

Dump, and a local BMW dealership, among many others.  Sheikh Issa used Houston shipping companies to ship the goods he purchased back to the U.A.E.  Because of Sheikh Issa's extensive contacts in Houston, one of the Houston shipping companies with whom Sheikh Issa had dealt, sued him in Houston.  Sheikh Issa's lawyers had the case removed to federal court and the court found that he had properly been served in Houston.  Sheikh Issa settled that suit and the settlement agreement called for the application of Texas law.

During several of his extended visits to Houston, Sheikh Issa received extensive medical care at St. Luke's Episcopal Health System of Houston, and was also personally treated by Houston physicians, Dr. Alan S. Hoffman, Dr. Tarek Khan, Dr. Steven Hamilton and Dr. William Watters, among others.  Additionally, Sheikh Issa traveled elsewhere in the United States, including extended stays at the Four Seasons Hotel in Beverly Hills, California, The St. Regis in Century City, California, and The Luxor Hotel in Las Vegas, Nevada.  Sheikh Issa also routinely traveled between Houston and Cancun, Mexico on either Continental Airlines flights purchased in Texas, or on private jets chartered from Houston.  Sheikh Issa's many purchases of goods and services were not confined to Texas, as he purchased four vehicles, including a custom-made Hummer, in Los Angeles, California, from West Covina Dodge.  Moreover, Sheikh Issa was personally involved in negotiations relating to being awarded a franchise of GEM electric cars for sale in Abu Dhabi.

Further, Sheikh Issa has personally entered into contracts with several United States companies, many of which arose from his many travels to the United States.  Sheikh Issa and companies that he owns engaged in extensive business activities in Texas and the United States. Further, Sheikh Issa's agents, Mr. Nabulsi and others, pursued business opportunities in Texas and in the United States on behalf of Sheikh Issa.

4

Due to the fact that the claims at issue in this case arose out of contacts within Texas, the Defendant had an agent in Texas, the Defendant formed a partnership in Texas that was be carried out, in part, in Texas, and due to Defendant's systematic and continuous contacts within both Texas and the United States, this Court has personal jurisdiction over Defendant, Sheikh Issa.

## D. FACTUAL SUMMARY

Plaintiff, Bassam Nabulsi, is a United States citizen. Defendant, Sheikh Issa, is the son of H.H. Sheikh Zayed bin Sultan Al Nahyan, the late ruler of the U.A.E. Although he is a member of the royal family, Sheikh Issa holds no official position in the U.A.E. or Abu Dhabi governments. In the early 1990s, Mr. Nabulsi, who is fluent in the Arabic language, operated a Texas corporation which was in the business of serving Middle Eastern nationals seeking medical care and other services in Houston. Among Mr. Nabulsi's many clients were members of the Royal Family of Abu Dhabi. With Mr. Nabulsi's assistance, over a ten year period, Sheikh Issa came at least once yearly to Houston and he and his entourage set up residence at the Houston Four Seasons Hotel. The purpose of each trip was, in part, to conduct business. The purpose of the trips was also to obtain medical care and to purchase goods and services in Texas, not available in the U.A.E. During each visit to Houston, Sheikh Issa purchased numerous goods at various Houston retail establishments. While in Houston, Sheikh Issa also sought medical care at the Houston Medical Center. Indeed, on one occasion, a Houston orthopedic surgeon—Dr. William Watters—performed an elective spinal surgery on Sheikh Issa in Houston; on another occasion, a Houston plastic surgeon—Dr. Steven Hamilton—performed plastic surgery on Sheikh Issa in Houston.

During Sheikh Issa's visits to Houston, Mr. Nabulsi provided for most of Sheikh Issa's needs. Over the course of many visits, Sheikh Issa and Mr. Nabulsi developed a personal relationship.

Indeed, during Sheikh Issa's Houston visits in 1995 and 1996, Sheikh Issa personally began an aggressive campaign to recruit Mr. Nabulsi to work for him full time. In response to Sheikh Issa's repeated requests, Mr. Nabulsi refused, stating that he was instead willing to work "with" Sheikh Issa, but not "for" Sheikh Issa. At Sheikh Issa's urging, Mr. Nabulsi traveled to Abu Dhabi to discuss the issue further and to review Sheikh Issa's business operations. The next year, in Houston, Sheikh Issa and Mr. Nabulsi again discussed the issue. During this 1997 visit to Houston, Sheikh Issa and Mr. Nabulsi finally agreed to become partners; they sealed the agreement with a handshake. The partners agreed that Mr. Nabulsi would provide the "sweat" equity, and Sheikh Issa would provide financing or capital for any project or opportunity the partners mutually agreed the partnership would pursue. The partners further agreed that they would split profits from any venture on a 50/50 basis. It was further agreed that, because of the partners' associations and connections in both Texas and Abu Dhabi, the partnership would focus its efforts to find business opportunities in these two areas. Pursuant to the partnership, Nabulsi also began managing all of the Sheikh's assets and holdings, including his ranches, his buildings, and the companies, Western General Trading and Western General International, among others. Again, the partners agreed that any profits from these partnership ventures would be split on a 50/50 basis. The partners also formed at least one new entity to further their partnership, IBA Co. L.L.C. To further assist Mr. Nabulsi in performing his obligations under the partnership, Sheikh Issa ultimately gave Mr. Nabulsi power of attorney over all of his affairs, both business and private.

Pursuant to the partnership agreement, Mr. Nabulsi thereafter began "splitting" his time in both Houston and Abu Dhabi, pursuing business deals and opportunities in both areas for the partnership, as well as managing those business activities already in place at the time of the

6

partnership formation. Again, pursuant to their Houston-formed partnership, all profits from these ventures were to be split 50/50 by Mr. Nabulsi and Sheikh Issa. Mr. Nabulsi ultimately moved to Abu Dhabi in 2002, but continued to visit Houston regularly with Sheikh Issa, as well as maintain a business office, now for the partnership, in Houston, Texas. In each of the Houston visits, Nabulsi and the Sheikh, as partners, held business meetings in Houston and sought out Texas and United States opportunities for the partnership and entities formed pursuant to the partnership.

Mr. Nabulsi's efforts pursuant to the partnership quickly proved profitable. Pursuant to the partnership, Mr. Nabulsi negotiated the acquisition of a prime piece of real estate in Dubai for the partnership. Because of Mr. Nabulsi's efforts, the partnership received property valued today at over $100 million. After acquisition, the partners planned to seek out investment and construction partners in Texas to build a hotel or residential tower on the property acquired. Because Sheikh Issa breached the partnership agreement, such effort never materialized. It now appears that Sheikh Issa has announced plans to build a mammoth, sixty-one floor tower (the "Wisdom Tower") on that property.

Further, pursuant to the partnership, Mr. Nabulsi worked very hard to orchestrate a debt restructuring arrangement between the Syrian government and Bankers Trust in Slovakia. The deal was on the eve of closing; however, Shiekh Issa's orchestration of Mr. Nabulsi's wrongful incarceration prevented the closing from happening. Indeed, because of Sheikh Issa's conduct, as described below, the partnership lost a commission in excess of $10,000,000.00.

Mr. Nabulsi also negotiated contracts for the partnership with the Abu Dhabi police department. The contract was later cancelled as a result of Mr. Nabulsi's false arrest. Sheikh Issa's conduct created a loss of another $825,000.00 million in annual commissions to the partnership.

Another achievement Mr. Nabulsi accomplished pursuant to the partnership was the turnaround of Sheikh Issa's Chi-Chi's franchise agreement with Tumbleweed, a U.S. corporation. The franchise, under Mr. Nabulsi's stewardship, went from a losing proposition to a monthly profit of $68,000.00.   In the course of doing so, Mr. Nabulsi was sent by Sheikh Issa to meet with Tumbleweed representatives in Kentucky.  The partnership expected that the previously unprofitable franchise would have earned a net profit of more than $4,000,000.00 over the next five years.

Pursuant to their agreement, Mr. Nabulsi also managed Sheikh Issa's investment portfolio. Because of Mr. Nabulsi's decisions and hard work, the original investment increased tenfold for a net profit of $2,430,000.00.

Mr. Nabulsi, pursuant to the partnership, was also able to obtain a sponsorship agreement with a U.K. company.  This contract was approved for $12,500,000.00 UAE dirhams per year.  The 6% commission on the maintenance contract portion of that agreement alone would have resulted in a profit of more than $200,000.00 USD to the partnership, per year.[4]  It was also expected that the partnership would realize even further profits from this particular venture from the sale of parts.

Working pursuant to the partnership agreement, Mr. Nabulsi also created two sponsorship agreements with defense related companies to supply the U.A.E. armed forces.  The profits to the partnership from such transactions would have exceeded $6,000,000.00.

Seeing a potential for growth, the partnership also started a construction company. In a short period of time, the company acquired four contracts totaling $3.2 million with an anticipated profit of $1,162,000.00. The partnership expected that the company would be highly successful.

As demonstrated, Mr. Nabulsi pursued various business opportunities for the partnership in

---

4 The bulk of the profits were to come from supplying parts under that contract, the commission for which was in excess of 6% and was to be split 50/50 between Nabulsi and Sheikh Issa.

Texas, with Texas companies and with other U.S. companies. One such opportunity involved extensive visits and negotiations by Mr. Nabulsi on the partnership's behalf, in Houston, with a Houston based oil company.  Because of Sheikh Issa's conduct, such opportunities never came to fruition. Mr. Nabulsi and Sheikh Issa, pursuant to their partnership, also met and negotiated with several Texas entities in an effort to acquire at least two refineries in Texas.   Mr. Nabulsi also negotiated a letter of credit arrangement with a United States company on behalf of the partnership.

From their first meeting, and as might be expected from someone who had grown up in a very wealthy royal family that ran a country, Mr. Nabulsi quickly learned that Sheikh Issa expected no disagreements from those with whom he dealt.  This conduct certainly did not rise to the level that Sheikh Issa would later exhibit.   Particularly, after his father's death in November 2004, Sheikh Issa's moods grew darker and he appeared to be less constrained in his depravity.  Sheikh Issa's father had kept tight control over Sheikh Issa, which apparently had kept his true colors in check. After his death, Sheikh Issa apparently no longer felt constrained.  Sheikh Issa began demonstrating increasingly bizarre behavior.  Mr. Nabulsi, an observant Muslim, gave Sheikh Issa passages from the Koran which expressly forbade the behavior.  This did not sit well with Sheikh Issa.[5]

Also, and unbeknownst to Mr. Nabulsi, Sheikh Issa had begun a habit and custom of torturing his employees or anyone else with whom he disapproved.  Over time, these torture sessions grew more brutal, vicious, and bloody[6]. As his degeneracy increased, Sheikh Issa began to have such

---

5 Sheikh Issa's lawyers apparently now contend that Mr. Nabulsi is a "radical Muslim" simply because he is an observant Muslim.  In doing so, they attempt to draw on the anti-Muslim sentiment held in some quarters of the West, which believe that any observant Muslim must really be a terrorist.  Sheikh Issa's attorneys now are also attempting to imply that Mr. Nabulsi had some dealings with Saddam Hussein.  It is ironic that Sheikh Issa would allow his lawyers to even suggest such, in light of the content of multiple letters Sheikh Issa sent to Saddam Hussein pledging support of Saddam Hussein and condemnation of the United States' actions in Iraq, and in light of Sheikh Issa's other conduct.
6 Sheikh Issa has never denied engaging in these videotaped torture sessions.

torture sessions videotaped, so he could enjoy viewing them later. Mr. Nabulsi disapproved vehemently with Sheikh Issa's behavior, never took part or personally observed in such conduct, and once he caught wind that it was happening, constantly attempted to steer Sheikh Issa away from this behavior.

One of Sheikh Issa's many torture victims was Mohammed Shah Poor, an Afghan who did business with Sheikh Issa.  Upon learning of Mr. Poor's alleged misdeeds, Sheikh Issa summoned Mr. Poor to his ranch in the U.A.E., under the guise of talking business.  As Mr. Poor's family (including his children) waited at the gate of the ranch, Mr. Poor entered the grounds and was grabbed by the Abu Dhabi police.  With the aid of the Abu Dhabi police, Sheikh Issa proceeded to personally torture Mr. Poor for more than forty-five minutes.  The torture involved shooting an M-16 into the ground in front of where Mr. Poor was kneeling, stuffing sand into his mouth, sticking nails repeatedly into his buttocks, whipping him with a board containing nails, repeatedly kicking his head, whipping his buttocks until they bled, pouring salt onto his wounds, pouring lighter fluid onto his scrotum and lighting it on fire, sticking a cattle prod up his anus and on his genitals, and running over him with Sheikh Issa's Mercedes SUV.  As has now become the custom, the torture session was videotaped at Sheikh Issa's direction.

Immediately after the torture session, Sheikh Issa telephoned Mr. Nabulsi, who was out of the country on partnership business and proudly told Nabulsi of what Sheikh Issa had done to Mr. Poor. Initially, Mr. Nabulsi did not take Sheikh Issa seriously and attributed that telephone call to Sheikh Issa being drunk.  However, very shortly after hanging up with Sheikh Issa, Mr. Nabulsi received a frantic call from Abu Dhabi during which Mr. Nabulsi learned that not only had Sheikh Issa indeed tortured Mr. Poor, but he was also refusing to allow the injured and bleeding victim to be taken to the

hospital.  Fearing that Mr. Poor might die, Mr. Nabulsi spoke to Sheikh Issa by phone. During that call, Mr. Nabulsi pleaded with Sheikh Issa to allow Mr. Poor to be taken to the hospital. Although Sheikh Issa ultimately conceded to Mr. Nabulsi's frantic requests[7], Mr. Nabulsi's assertiveness on that call with Sheikh Issa, coupled with Mr. Nabulsi's disapproval of Sheikh Issa's other behaviors[8], was the beginning of the ultimate end to the two partners' business and personal relationship.

As personal and business manager for Sheikh Issa, as well as business partner, Mr. Nabulsi maintained all important business and personal items for Sheikh Issa, including—unbeknownst to Mr. Nabulsi—the videotapes containing the recorded torture sessions which Sheikh Issa had given to Mr. Nabulsi.  As the relationship between the partners deteriorated, Sheikh Issa became desperate to retrieve the torture tapes.  This effort clued Mr. Nabulsi in on what was on the videotapes. In his efforts to retrieve the tapes, Sheikh Issa asserted his considerable influence with the Abu-Dhabi police, ultimately having Mr. Nabulsi arbitrarily arrested on April 6, 2005.

After his arrest, Mr. Nabulsi was held without charges for several days.  The police department[9], under the direction of Sheikh Issa, thoroughly searched Mr. Nabulsi's residence in an effort to find the torture tapes.  Further, the police confiscated all of Mr. Nabulsi's computers, along with any devices that might contain evidence of Sheikh Issa's involvement in the torture.  Sheikh Issa had also ordered an audit of all of the partnership's business activities, including those in Texas

---

7 Sheikh Issa has never denied torturing Mr. Poor.

8 Sheikh Issa also enjoyed having those in his entourage undergo plastic surgery at his whim to change features on their faces he did not like.  On one such occasion, after the telephone dispute relating to the treatment of Mr. Poor, Sheikh Issa ordered that Mr. Nabulsi's brother undergo plastic surgery to change the contours of his face.  When Mr. Nabulsi intervened and, in front of others, defiantly told Sheikh Issa that he would not allow such surgery.  These events, among others, were the final straw that ended the two partners' personal and professional relationships.

9 The Abu Dhabi police department falls under the direction of the Interior Department, which is headed by another of Sheikh Issa's brothers.

two months prior to his ordering the arrest of Mr. Nabulsi. No wrongdoing was found.

In an attempt to justify Mr. Nabulsi's incarceration, Sheikh Issa then fabricated false accusations of marijuana possession against Mr. Nabulsi, which the police adopted.  Of course, the resulting search of Mr. Nabulsi's home revealed no marijuana, and the test performed on Mr. Nabulsi's urine was also negative for any type of drug use. At Sheikh Issa's urging, the police and public prosecutor, a member of the judiciary, then fabricated new charges that Mr. Nabulsi was in possession of, and was distributing, narcotics. Various prescription medications prescribed to Sheikh Issa and Mr. Nabulsi by Houston physicians and purchased from pharmacies in Houston pursuant to these prescriptions, were at Mr. Nabulsi's villa . Mr. Nabulsi was able to obtain letters from his and Sheikh Issa's Houston physicians, making it clear that the medications in Mr. Nabulsi's possession were, for the most part, Sheikh Issa's, and all of them had been prescribed by Houston physicians. The court system, the presiding judge, and the police refused to consider this information—even though Sheikh Issa's name actually appeared on the bottles of medications at issue. The court system also refused to call any witnesses to the trial.

Mr. Nabulsi was kept incarcerated for approximately two and a half months. During this two and a half month ordeal, Mr. Nabulsi learned from his jailors that the genesis of the various false charges was Sheikh Issa, as well as his brother, Sheikh Seif bin Zayed Al Nahyan, another member of the Royal Family, and head of the police force.

At one point during the incarceration, the United States Embassy in the U.A.E. attempted to come to Mr. Nabulsi's aid.  In response, the Embassy was informed by the Abu Dhabi police department that the reason for the incarceration was a personal dispute between Mr. Nabulsi and Sheikh Issa. This explanation was repeated frequently to Mr. Nabulsi by several officials with whom

12

he dealt during this difficult time. Indeed, one official went so far as to state: "give the Sheikh back his tapes, and this matter will be closed." In fact, the staff of the United States Embassy in the U.A.E., knowing that Mr. Nabulsi was imprisoned because of a personal dispute between Mr. Nabulsi and Sheikh Issa, pleaded with Mr. Nabulsi to simply write a letter to Sheikh Issa, pleading for his release.

Despite the efforts of the United States Embassy, Mr. Nabulsi was kept in jail, where he was continuously tortured. Each day, the jailors, at the direction of Sheikh Issa, would have a "session" with Mr. Nabulsi, physically abusing him, humiliating him, and threatening him with immediate death. As an example, the jailors would take pleasure in penetrating Mr. Nabulsi's anus with their fingers and other such acts, each time stating: "this is a 'hello'" from Shiekh Issa." Because of what he had seen on the torture tapes, Mr. Nabulsi was frighteningly aware of Sheikh Issa's capacity as well as his clear influence with the police, who even forced Mr. Nabulsi to undress and pose for pictures for Sheikh Issa while Mr. Nabulsi was bent over with his legs spread and genitalia exposed

During his incarceration, in addition to the brutal torture he experienced almost daily, the safety of Mr. Nabulsi's wife and children were also repeatedly threatened. These threats caused Mr. Nabulsi great stress. Further, members of Mr. Nabulsi's personal staff (the "Staff") were kept at Sheikh Issa's palace where they were held captive for fourteen days without food or water. While they were under arrest at Sheikh Issa's palace, Sheikh Issa would communicate with the Staff on a daily basis, in an attempt to illicit information from them regarding the whereabouts of the torture tapes that Sheikh Issa had given to Mr. Nabulsi. After failing in his attempts to get those captives to provide him with the information that he was seeking, Sheikh Issa had the Abu Dhabi police come to his palace, arrest the Staff without any charges, and place them first in isolation cells with Mr.

13

Nabulsi, and then in the same high security prison in which Sheikh Issa had placed Mr. Nabulsi. Sheikh Issa's power and influence over the police and security apparatus of the U.A.E. was such that he was even able to order the deportation of the Staff under the pretense that they posed a "security risk" to the U.A.E.

Sheikh Issa received daily reports from Mr. Nabulsi's jailers on Mr. Nabulsi's torture sessions. During such sessions, the Abu Dhabi police, at the direction of Sheikh Issa, asked repeatedly about the location of the torture tapes, and repeatedly told Mr. Nabulsi that he would be killed by being frozen to death, that his family would be killed after Mr. Nabulsi's wife and children were raped, and that the Staff would be killed as well. Sheikh Issa also personally contacted the public prosecutor, instructing that Mr. Nabulsi was not to be released under any circumstances.

In furtherance of the effort to break Mr. Nabulsi mentally so that he would give up the videotapes, Sheikh Issa instructed the police to place Afghan, Pakistani, Iranian, and Iraqi prisoners, who were known to be hostile and aggressive toward Americans, in Mr. Nabulsi's cell. The Defendant then had the guards taunt Mr. Nabulsi about being an American in front of these cell mates. This effort had the intended effect.

Meanwhile, Mrs. Nabulsi was making every possible attempt to have her husband released. In response to her repeated inquiries to the United States Embassy in the U.A.E., Mrs. Nabulsi was repeatedly advised, in no uncertain terms, that that United States Embassy could not do anything to secure the release of Mr. Nabulsi because this was not a governmental matter but, instead, was a personal matter between Mr. Nabulsi and Sheikh Issa. Even the U.A.E. embassy in Washington D.C., whom Mr. Neil Bush (brother of U.S. President George W. Bush) later approached on behalf of Mr. Nabulsi ignored the fact that the U.A.E.'s governmental instrumentalities were being used by

Sheikh Issa to pursue his personal vendetta against Mr. Nabulsi..

During each of Mr. Nabulsi's U.A.E. court appearances, it was clear that Sheikh Issa was the driving force behind the legal farce that continued to keep Mr. Nabulsi incarcerated. When Mr. Nabulsi's criminal charges were ultimately addressed, Mr. Nabulsi was acquitted of the trumped up charges of possession of marijuana (despite repeated thorough searches of Mr. Nabulsi's home and its grounds, the police had found no marijuana, and Mr. Nabulsi's urine test had come back negative). He was also acquitted of narcotics possession and distribution. Despite the fact that the prescription medications at issue belonged to Sheikh Issa, and despite the fact that Mr. Nabulsi was able to provide the U.A.E. court with the requisite properly authenticated medical prescriptions from duly licensed Texas physicians for the medications at issue, Mr. Nabulsi was nevertheless ordered to pay a token fine for something he was never formally charged with—holding prescription medications without registering them with the government.

Still, even after his innocence was proven in court and, after the same court had ordered his release, Mr. Nabulsi was sent back to jail where he stayed for thirteen additional days, after which he was taken directly to the airport and deported, with no advance notice or hearing, upon orders of the Minister of Interior, Sheikh Issa's brother. Mr. Nabulsi's summary deportation deprived him of any opportunity to seek redress or to collect the massive debt owed him by Sheikh Issa as a result of their partnership and the various businesses it formed and managed. Further, nearly all of the Nabulsi possessions and money were left in the U.A.E. because Plaintiffs were not able to retrieve them after Mr. Nabulsi was deported. This included $257,000.00 USD in capital that Mr. Nabulsi had personally provided for one of the companies in the partnership and $150,000.00 USD worth of property.

15

## E.  CAUSES OF ACTION

### 1.  Breach of Contract

Plaintiffs incorporate by reference the factual allegations found in the Paragraphs above.

Defendant, Sheikh Issa, entered into a legally binding oral partnership agreement with Plaintiff, Bassam Nabulsi.  Because it was formed in Texas and carried out, in large part, in Texas, Texas law governs the partnership. Under the terms of the partnership, Plaintiff, Bassam Nabulsi, was to receive fifty percent of all of the profits from all of Sheikh Issa's business enterprises which Mr. Nabulsi managed.  In exchange, Plaintiff, Bassam Nabulsi, sought out business opportunities throughout the world (including Texas), developed such opportunities, and managed all of Sheikh Issa's affairs.  Plaintiff, Bassam Nabulsi, fully performed his obligations under the contract, or was wrongly prevented from doing so by Defendant.  The partnership formed at least one vehicle (IBA Co, LLC)[10] through which it conducted business, but the majority of the partnership business was conducted through the partnership itself.  All conditions precedent were satisfied, or the Defendant wrongly prevented such.  Further, because he accepted the benefits of Mr. Nabulsi's efforts and acted pursuant to the partnership for literally years, Sheikh Issa is estopped from denying the existence of the partnership agreement. Defendant substantially and materially breached the partnership in the following ways, among others: 1) failing to pay Plaintiff, Bassam Nabulsi, in accordance with the agreement; 2) preventing Plaintiff, Bassam Nabulsi's further performance under the agreement; 3) making false charges against Plaintiff, Bassam Nabulsi, to the police; 4) using his influence over the police to gain a business advantage over Plaintiff, Bassam Nabulsi; 5) using his influence to have

---

10  IBA Co, LLC, one of the various business ventures of the partnership, sets forth distribution of profits as follows: 51% to the Sheikh; 49% to Nabulsi.  This distribution was mandated by U.A.E. law because Mr. Nabulsi was not a U.A.E. citizen.

Plaintiff, Bassam Nabulsi, deported from the U.A.E.; and 6) torturing or causing Plaintiff, Bassam Nabulsi, to be tortured.

As set forth above, Defendant is liable for breach of contract. As a result of Defendant's breach, Plaintiff, Bassam Nabulsi, has suffered actual damages that exceed the minimum jurisdictional limits of this Honorable Court. As damages, Plaintiff, Bassam Nabulsi, is entitled to the benefit of his bargain, meaning money damages equal to the value of 50% of profits arising from all of Defendant's business activities of which Plaintiff, Bassam Nabulsi, was a part.  Plaintiff, Bassam Nabulsi, also seeks attorneys' fees and costs of Court.

## 2.  Conversion

Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

Through his efforts, Plaintiff, Bassam Nabulsi, caused the partnership to earn more than $150,000,000.00 in profits. Due to Mr. Nabulsi's efforts, the partnership continues to earn profits.

Defendant wrongfully converted Plaintiff, Bassam Nabulsi's, share of the profits from the partnership, monies held in partnership accounts and Plaintiffs' personal property.

Defendant's wrongful conduct proximately caused Plaintiffs damages.

Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiffs seeks an award of punitive damages.

Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiffs are not subject to capping.

## 3.  Breach of Fiduciary Duty

Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

17

By virtue of the partnership between Sheikh Issa and Bassam Nabulsi, Sheikh Issa owed a fiduciary duty to the Plaintiff, Bassam Nabulsi. Defendant's actions, described above, constitute a breach of his fiduciary duty to Bassam Nabulsi.

Defendant's wrongful conduct proximately caused Plaintiff, Bassam Nabulsi, damages. Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiff, Bassam Nabulsi, seeks an award of punitive damages.

Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiff, Bassam Nabulsi, are not subject to capping.

### 4. Torture

Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

The Torture Victim Protection Act of 1991 creates civil liability against an individual who, under actual or *apparent authority*, or *color of law*, of any foreign nation, subjects an individual to torture.

Defendant is an individual and holds no government position. He is not entitled to sovereign immunity, as he is not a sovereign or an agent of a sovereign. However, as a member of the royal family, Defendant had influence over the police sufficient to cause Plaintiff, Bassam Nabulsi, to be wrongly imprisoned and tortured. The Defendant personally committed and caused to be committed acts of torture upon the Plaintiff, Bassam Nabulsi, as defined under the Torture Victims Act, 28 U.S.C.A. §1350. Under color of law, and with apparent authority, Defendant subjected Plaintiff, Bassam Nabulsi, with the threat of severe physical pain and suffering, the threat of imminent death, and the threat that his wife, children, and staff would be subject to death, and severe physical pain or suffering.

18

There is no remedy adequate or available to Mr. Nabulsi in the U.A.E.  In the U.A.E., the law specifically prohibits criticism of the ruling families under penalty of imprisonment.  *See*, <u>Country Reports on Human Rights Practices, UAE - 2002 (Bureau of Democracy, Human Rights, and Labor of the U.S. Department of State)</u>, <u>www.state.gov/g/drl/rls/hrrpt/2002/18291.htm</u>.  Further, allegations such as these against members of the Royal Family are universally ignored.

Defendant's conduct proximately caused Plaintiffs' damages, including damages for pain and suffering and mental anguish, both past and future.

Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiffs seek an award of punitive damages.

Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiffs are not subject to capping

### 5.  Intentional Infliction of Emotional Distress

Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

Defendant intentionally caused the Plaintiffs to suffer severe emotional distress.  The Defendant's conduct as outlined above was extreme and outrageous and was an abuse of the Defendant's relationship with the Plaintiffs.  Said acts went beyond all possible boundaries of decency so as to be regarded as atrocious and utterly intolerable in a civilized community.  The conduct described proximately caused injury to the Plaintiffs.

Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiffs seek an award of punitive damages.

Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiffs are not subject to capping.

19

## 6. Malicious Prosecution

Plaintiffs incorporate by reference the factual allegations found in the above Paragraphs.

Defendant fabricated false allegations against Plaintiff, Bassam Nabulsi. Defendant initiated and approved the commencement of a criminal prosecution against Plaintiff, Bassam Nabulsi, knowing such prosecution was meritless and brought with an ulterior motive—primarily, to obtain the torture tapes and secondarily, to avoid his obligations under the partnership agreement.  The Defendant's acts were committed with malice and with the evil motive of coercing from Plaintiff, Bassam Nabulsi, the incriminating evidence of the torture tapes.  The acts were done with gross indifference to the rights of Plaintiff, Bassam Nabulsi, so as to amount to a willful and wanton act. The charges were false, and Plaintiff, Bassam Nabulsi, was fully acquitted of such charges.

The charges fabricated by Defendant concerning Plaintiff, Bassam Nabulsi, were baseless. Plaintiff, Bassam Nabulsi, suffered severe injury because of these tortuous acts.

Defendant's wrongful conduct proximately caused Plaintiff, Bassam Nabulsi, damages. Because of the nature of Defendant's actions, that is, because he acted intentionally, willfully, knowingly, and maliciously, Plaintiffs seek an award of punitive damages.

Defendant's conduct was in violation of the criminal laws of Texas, thus the punitive damages sought by Plaintiffs are not subject to capping.

## F. DAMAGES

As a direct and proximate result of the Defendant's conduct, Plaintiff, Bassam Nabulsi, has suffered the following injuries and damages:

(1)     Past, present and future physical pain and suffering;

(2)     Past, present and future mental anguish;

    (3)      Loss of monies held in the partnership's account and personal property;

    (4)      Past, present and future lost profits;

    (5)      Lost benefit of his bargain; and

    (6)      Attorney fees and costs of court.

As a direct and proximate result of the Defendant's conduct, Plaintiff, Rima Nabulsi, has suffered the following injuries and damages:

    (1)      Past, present and future physical pain and suffering;

    (2)      Past, present and future mental anguish;

    (3)      Loss of consortium and damages including the loss of affection, solace, comfort, companionship, society, assistance, emotional support and love.

Both Plaintiffs also seek punitive damages, and because of the criminal nature of Defendant's conduct, such punitive damages are not subject to capping.

### G.  JURY DEMAND

Plaintiffs respectfully request a trial by jury on all issues to which Plaintiffs are so entitled.

### PRAYER

For these reasons, Plaintiffs ask for judgment against Defendant for the following:

a.      Actual damages;

b.      Prejudgment and postjudgment interest;

c.      Costs of suit, including attorney fees;

d.      Punitive damages; and

e.      All other relief the Court deems appropriate.

Respectfully submitted,

### THE BUZBEE LAW FIRM


By:   */s/ Anthony G. Buzbee*
      Anthony G. Buzbee
      State Bar No. 24001820
      Federal Bar No. 22679
      JPMorgan Chase Tower
      600 Travis, Suite 6850
      Houston, Texas 77002
      Tel:  (713) 223-5393
      Fax: (713) 223-5909

OF COUNSEL:
THE AZEM FIRM
Samer Al-Azem
State Bar No. 00793240
2425 West Loop South, Suite 200
Houston, Texas 77027
Tel: (713) 335-5527
Fax: (713) 528-7247

      ATTORNEYS FOR PLAINTIFFS
      BASSAM NABULSI, AND HIS WIFE,
      RIMA NABULSI

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document will be served or has been served on all interested parties in accordance with the Federal Rules of Civil Procedure on the ____ *day of December, 2008*.  Service on E-Filing Users will be automatically accomplished through the Notice of Electronic Filing; non-Filing Users will be served by certified mail, return receipt requested and/or via facsimile.

*/s/ Tony Buzbee*

Tony Buzbee

23