IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BASSAM NABULSI, AND HIS WIFE, RIMA NABULSI, | § § § | |
| Plaintiffs | § § | C.A. NO. H-06-02683 |
| V. | § § § | |
| H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN, et al, | § § § | JURY TRIAL REQUESTED |
| Defendants. | § § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

**THE BUZBEE LAW FIRM**
Anthony G. Buzbee
State Bar No. 24001820
Federal Bar No. 22679
JPMorgan Chase Tower
600 Travis, Suite 6850
Houston, Texas 77002
Tel: (713) 223-5393
Fax: (713) 223-5909

Samer Al-Azem
State Bar  No. 00793240
2425 West Loop South, Suite 200
Houston, Texas 77027
Tel: (713) 335-5527
Fax: (713) 528-7247

ATTORNEYS FOR PLAINTIFFS
BASSAM NABULSI, AND HIS WIFE,
RIMA NABULSI

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| I.  SUMMARY OF RESPONSE | 8 |
| A.  Case Overview | 8 |
| B.  Service | 9 |
| C.  Personal Jurisdiction | 9 |
| D.  *Forum Non Conveniens* | 11 |
| II.  PROCEDURAL BACKGROUND | 12 |
| III. STANDARD OF REVIEW | 14 |
| A.  Service | 14 |
| B.  Jurisdiction | 14 |
| C. *Forum Non Conveniens* | 15 |
| IV. FACTUAL BACKGROUND | 15 |
| Argument and Authorities | 28 |
| V.  SHEIKH ISSA HAS BEEN SERVED | 28 |
| VI.ALTERNATIVE MOTION FOR ALTERNATIVE SERVICE UNDER FED. R. CIV. P. 4(f)(3) | 36 |
| VII.  SHEIKH ISSA IS SUBJECT TO THE PERSONAL JURISDICTION OF THIS COURT | 40 |
| A.  Jurisdiction Overview | 40 |
| B.  The Court Has Specific Jurisdiction | 44 |
| C.  The Court Has General Jurisdiction Over Sheikh Issa | 47 |
| D.  Fair Play and Substantial Justice Requirement is Met | 50 |
| VIII. THE U.A.E. IS NOT AN ADEQUATE ALTERNATIVE FORUM | 52 |
| A.  The U.A.E. is Not an Adequate Alternative Forum | 53 |
| B.  Private and Public Factors Do Not Favor Dismissal | 58 |
| 1.  Private Factors | 58 |
| 2.  Public Factors | 59 |
| IX. PRAYER | 60 |

## TABLE OF AUTHORITIES

| Statutes and Rules | Page |
|---|---|
| 28 U.S.C. §1332 | 14 |
| 28 U.S.C. § 1350 | 14 |
| FED. R CIV. P. 4(f)(2)(A) | 29, 30, 33 |
| Fed. R. Civ. P. 4(f)(2)(C)(i) | 30, 33 |
| FED. R. CIV. P. 4(f)(2)(C)(ii) | 12 |
| FED. R. CIV. P. 4(f)(3) | 36,37, 38, 39 |
| FED. R. CIV. P. 4(k)(2) | 40,43, 44 |
| TEX. CIV. PRAC. & REM. CODE ANN. 17.042 | 41 |

| Cases | Page |
|---|---|
| *Abiola v. Abubakar*, 267 F.Supp.2d 907 (N.D. Ill. 2003) | 55 |
| *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694 (5th Cir.1999), *cert. denied,* 531 U.S. 917 (2000) | 47 |
| *Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d 1174 (9th Cir. 2004) | 44 |
| *Adams v. Unione Mediterranean Di Sicurta,* 2004 WL 624763 (5th Cir. April 14, 2004) | 43 |
| *Baker v. Putnal*, 75 F.3d 190 (5th Cir.1996) | 28 |
| *Ballard v. Savage*, 65 F.3d 1495 (9th Cir.1995) | 42 |
| *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz*, 2006 WL 1643202 (S.D.N.Y. 2006) | 37 |
| *Baxter v. Palmigiano*, 425 U.S. 308 (1976) | 57 |
| *BP Products North America, Inc. v. Dag*ra, 232 F.R.D. 263 (E.D.Va. 2005) | 38 |
| *Bullion v. Gillespie*, 895 F.2d 213 (5th Cir. 1990) | 42 |

| | |
|---|---|
| *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) | 41,42, 43,48, 50 |
| *Cabiri v. Assasie-Gyimah*, 921 F.Supp. 1189 (S.D.N.Y.1996) | 56 |
| *Carter v. M/V American Merlin*, 991 F. Supp. 853 (S.D. Tex. 1998) | 46 |
| *Coats v. Penrod Drilling Corp.*, 5 F.3d 877 (5th Cir. 1993), *reh'g granted*, 20 F.3d 614 (1994), *relevant part reinstated*, 61 F.3d 1113 (1995) | 46 |
| *Colwell Realty Investments, Inc. v. Triple T Inns of Arizona, Inc.*, 785 F.2d 1330 (5th Cir. 1986) | 41 |
| *Cosmetech Int'l, LLC v. Der Kwei Enterprise and Co., Ltd.*, 943 F.Supp. 311 (S.D.N.Y. 1996) | 34 |
| *Doe v. Exxon Mobil Corp.*, 393 F.Supp.2d 20 (D.D.C. 2005) | 54 |
| *D.R.I., Inc. v. Dennis*, 2004 WL 1237511 (S.D.N.Y. 2004) | 38 |
| *Ehrenfeld v. bin Mahfouz*, 2005 WL 696769 (S.D.N.Y. 2005) | 38 |
| *Enviro Petroleum, Inc. v. Kondur Petroleum*, 79 F.Supp.2d 720 (S.D. Tex. 1999) | 45 |
| *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997) | 44 |
| *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 2005 WL 1123755 (S.D.N.Y. 2005) | 37,38 |
| *Forum Fin. Group, LLC v. President and Fellows of Harvard College*, 199 F.R.D. 22 (D.Me. 2001) | 38 |
| *Freudensprung v. Offshore Technical Servs., Inc.*, 398 F.3d 327 (5th Cir. 2004) | 43 |
| *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223 (Tex.1991) | 50 |
| *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) | 52 |
| *Guyton v. Pronav Ship Mgmt., Inc.*, 139 F. Supp. 2d 815 (S.D. Tex. 2001) | 46 |
| *Hall v. Envtl. Chem. Corp.*, 64 F. Supp. 2d 638 (S.D. Tex. 1999) | 45 |
| *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) | 42,50 |

| | |
|---|---|
| *Henderson v. United States*, 116 S.Ct. 1638 (1996) | 28 |
| *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 772 (5th Cir. 1986) | 46 |
| *In re Cyrus II Partnership*, 392 B.R. 248 (Bkrtcy. S.D.Tex. 2008) | 29 |
| *In re Int'l Telemedia Assoc., Inc.,* 245 B.R. 713 (N.D.Ga.2000) | 37 |
| *Inc21.com Corp. v. Flora*, 2008 WL 5130415 (N.D. Cal. 2008) | 33 |
| *International Controls Corp. v. Vesco*, 593 F.2d 166 (2nd Cir. 1979) | 38 |
| *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) | 41,42 |
| *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir.2001) | 44 |
| *IUE AFL-CIO Pension Fund v. Herrmann*, 9F.3d 1049 (2d Cir. 1993) | 44 |
| *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 603 (5th Cir. 2008) | 42 |
| *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061 (5th Cir. 1992) | 41 |
| *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258 (5th Cir.2001) | 52 |
| *Levin v. Ruby Trading Corp.*, 248 F.Supp. 537 (S.D.N.Y. 1965) | 38 |
| *Lindsey v. United States R.R. Ret. Bd.,* 101 F.3d 444 (5th Cir.1996) | 14 |
| *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403 (5th Cir.2001) | 52 |
| *Menendez Rodriguez v. Pan Am Life Ins. Co.*, 311 F.2d 429 (5th Cir.1962), vacated on other grounds, 376 U.S. 779 (1964) | 53,54 |
| *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d. Cir. 2006) cert. denied, 519 U.S. 1007 (1996) | 47 |
| *Mieczkowski v. Masco Corp.*, 997 F.Supp 782 (E.D. Tex. 1998) | 48 |
| *Modern Computer Corp. v. Ma*, 862 F.Supp. 938 (E.D.N.Y. 1994) | 34 |
| *Mullane v. Central Hanover Bank & Trust Co.*, 70 S.Ct. 652 (1950) | 28,37, 39 |
| *New England Merchs., Nat'l Bank v. Iran Power Generation & Transmission Co.*, 495 F.Supp. 73 (S.D.N.Y.1980) | 37,38 |

| | |
|---|---|
| *Nikbin v. Islamic Republic of Iran*, 471 F.Supp.2d 53 (D.D.C. 2007) | 44 |
| *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1 (D.C.Cir. 1977) | 44 |
| *Omni Capital Intern. v. Rudolf Wolff & Co., Ltd.*, 108 S.Ct. 404 (1987) | 28 |
| *Patterson v. Dietze, Inc.*, 764 F.2d 1145 (5th Cir. 1985) | 46 |
| *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952) | 49 |
| *Piper Aircraft Co. v. Reyno*, 102 S.Ct. 252, 266 (1981) | 15,52 53 |
| *Potts v. Cameron Offshore Boats, Inc.*, 401 F. Supp. 2d 733 (S.D. Tex. 2005) | 51 |
| *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D. N.Y. 2003) | 55 |
| *Quackenbush v. Allstate Ins. Co.*, 116 S.Ct. 1712 (1996) | 52 |
| *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854 (S.D.N.Y.1983) *aff'd without opinion*, 767 F.2d 908 (2d Cir.1985) | 54 |
| *Retractable Technologies, Inc. v. Occupational & Medical Innovations, Ltd.*, 253 F.R.D. 404 (E.D. Tex. 2008) | 33 |
| *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir.2002) | 29,36 37,38 |
| *Robinson Eng'g Co. Ltd. Pension Plan & Trust v. George*, 223 F.3d 445 (7th Cir. 2000) | 44 |
| *Robinson v. Penn Cent. Co.*, 484 F.2d 553 (3d Cir. 1973) | 44 |
| *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415 (5th Cir.1993) | 14,41 42 |
| *Ryan v. Brunswick Corp.*, 2002 WL 1628933 (W.D.N.Y. 2002) | 38 |
| *S.E.C. v. Tome*, 833 F.2d 1086 (2nd Cir. 1987) | 38 |
| *Smith v. Islamic Emirate*, 2001 WL 1658211 (S.D.N.Y. 2001) | 38 |
| *Stuart v. Spademan*, 772 F.2d 1185 (5th Cir. 1985) | 46 |
| *Submersible Sys., Inc. v. Perforadora Central, S.A.*, 249 F.3d 413 (5th Cir. 2001) | 43 |

| | |
|---|---|
| *Sydow v. Acheson & Co.*, 81 F.Supp.2d 758 (S.D.Tex.2000) | 52 |
| *Tech. Dev. Co. v. Onischenko*, 174 Fed.Appx. 117 (3d Cir.2006) | 53 |
| *Torreblanca de Aguilar v. Boeing Co.*, 806 F.Supp. 139 (E.D. Tex. 1992) | 52 |
| *Travis v. Anthes Imperial Ltd.,* 473 F.2d 515 (8th Cir. 1973) | 44 |
| *U.S. v. Botefuhr*, 309 F.3d 1263 (10th Cir. 2002) | 44 |
| *Vaz Borralho v. Keydril Co.*, 696 F.2d 379 (5th Cir. 1983) | 53 |
| *Williams v. Adver. Sex LLC*, 231 F.R.D. 483 (N.D.W.Va.2005) | 37 |
| *Williams v. Green Bay & W.R. Co.*, 326 U.S. 549 (1946) | 53 |
| *Williams-Sonoma Inc. v. Friendfinder Inc.*, 2007 WL 1140639 (N.D.Cal. 2007) | 37 |
| *Wilson v. Belin*, 20 F.3d 644 (5th Cir. 1994) | 41 |
| *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) | 54,55 |
| *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717 (5th Cir.1996) | 43 |
| *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) | 49 |
| **Other Materials** | **Page** |
| Gary N. Horlick, A Practical Guide to Service of United States Process Abroad, 14 Int'l Law, 637, 640 (1980) | 34 |
| 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1083 (3d ed.2002) | 29 |
| 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961) | 57 |

Plaintiffs, Bassam and Rima Nabulsi ("Plaintiffs"), respond to Defendant, Sheikh Issa bin Zayed Al Nahyan's ("Sheikh Issa" or "Defendant"), Motion to Dismiss and, in support, show the following:

## I.    SUMMARY OF RESPONSE

### A.    Case Overview

Sheikh Issa is a member of the Ruling Family of Abu Dhabi, one of the Emirates making up the United Arab Emirates ("U.A.E."). One brother is the Crown Prince of Abu Dhabi and Deputy Supreme Commander of the U.A.E. armed forces; another is the President of the U.A.E.; another is the Minister of Interior which runs the police force; another is the Minister of Foreign Affairs; another is the Minister of Public Works; and two others serve as Deputy Prime Ministers.

Sheikh Issa moved his family and employees to Houston for, on average, three months, every year between and 1994 and 2004, except the year 2000. He conducted extensive business in Houston, saw doctors in Houston, and spent vast sums of money in Houston, as well as the United States. He entered into a partnership with United States citizen Bassam Nabulsi in Houston and that partnership forms the basis of the claims in this suit. Sheikh Issa recruited Bassam Nabulsi to move to the U.A.E., as part of their partnership.

When Bassam Nabulsi fell in Sheikh Issa's disfavor, Sheikh Issa froze him out of all of their businesses, had him arrested, tortured and tried for no good reason, other than Sheikh Issa's desire to retrieve some videotapes of Sheikh Issa torturing other people.

As the Court will see, Sheikh Issa is a man completely out of control and above the law in his home country. His grotesque personal whims are carried out with the help of the police, the court system and his brothers, who run the country.

**B.**    **Service**

Sheikh Issa was properly served with citation.    The method of service in which Sheikh Issa was served is not prohibited, and is permitted in the U.A.E., for cases which originate in the U.A.E.  Therefore, the U.A.E. does not prohibit service in the method and manner in which he was served here.

**C.**    **Personal Jurisdiction**

Sheikh Issa and Bassam Nabulsi were business partners.  The partnership was formed in Houston, Texas, as a result of Sheikh Issa's numerous travels to Houston. With Sheikh Issa's capital, and Nabulsi's skill and efforts, the partners earned profits exceeding tens of millions of dollars.

The partnership's business activities were focused in Houston, Texas, as well as the U.A.E. and other countries.  While in Houston, and throughout the world, Nabulsi acted as Sheikh Issa's agent. The partners, on behalf of the partnership, sought business opportunities in Texas, with Texas companies.  Sheikh Issa traveled to Houston, Texas in the years, 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2002, 2003, and 2004 for two and a half to three months per year.[1]  The purpose of said trips was, in part, to conduct business.

During each of his repeated, extended visits to Texas, Sheikh Issa, his family; entourage and employees set up residence at the Four Seasons Hotel in Houston. During these Texas visits, Sheikh Issa hired off-duty Houston police officers as security, and

---

[1] Sheikh Issa would customarily spend at least half of each year outside the U.A.E.

used local limousine services to travel to numerous Houston area restaurants and attractions. The costs associated with these services amounted to several million dollars. Documents produced in this case by Sheikh Issa demonstrate that he personally spent more than $506,544.48 between March 7, 2001 and November 12, 2004, primarily with Houston companies. *See* Summary of Issa Charges to U.S. Vendors, attached as **Exhibit D.**

While in Texas, Sheikh Issa traded extensively with Houston retail establishments. Sheikh Issa used Houston shipping companies to ship the goods he purchased in Texas back to the U.A.E. One of the shipping companies sued Sheikh Issa in Houston. Sheikh Issa's lawyers had the case removed to federal court and the court found that he had properly been served in Houston. Sheikh Issa settled that suit and the settlement agreement called for the application of Texas law.

During several of his extended visits to Houston, Sheikh Issa received extensive medical care at St. Luke's Hospital, and was also personally treated by Houston physicians. Additionally, Sheikh Issa traveled from Houston for extended stays in California and Las Vegas. Sheikh Issa also routinely traveled between Houston and Cancun, Mexico on either commercial or private flights, purchased in Texas from Texas companies.

Sheikh Issa has personally entered into contracts with several United States companies, many of which arose from his many travels to the United States. Sheikh Issa and companies that he owns engaged in extensive business activities in Texas and the United States. Further, Sheikh Issa's agents--Nabulsi and others--pursued business opportunities in Texas and in the United States on behalf of Sheikh Issa.

Due to the fact that the claims at issue in this case arose out of contacts within Texas, Sheikh Issa formed a partnership in Texas that was be carried out, in part, in Texas, Sheikh Issa had agents in Texas who conducted business on his behalf in Texas, and due to Sheikh Issa's systematic and continuous contacts within both Texas and the United States, this Court has personal jurisdiction over Sheikh Issa.

**D.** ***Forum Non Conveniens***

After Sheikh Issa spent months at a time in Houston for years on end, entered into a partnership with Nabulsi, and then recruited Nabulsi to move with his family to the U.A.E., Nabulsi fell out of favor with Sheikh Issa. Specifically, after his father died, Sheikh Issa began to engage in deplorable behavior, including performing gruesome torture sessions, aided by the Abu Dhabi, U.A.E. police. Nabulsi condemned this behavior and implored Sheikh Issa to stop.

Instead of stopping his behavior, Sheikh Issa turned his sights on Nabulsi. With the help of his brothers, members of the Ruling Family of Abu Dhabi, Sheikh Issa used the police and prosecutors as his personal score-settlers. The police arrested Nabulsi and tortured him for months. The police arrested Nabulsi's staff. The prosecutor's office presented fraudulent charges to the court. Ultimately, Nabulsi was vindicated, but was summarily deported from the U.A.E. and is not allowed to ever return.

There is no possible way that the U.A.E. presents an adequate alternative forum for this dispute. Application of the public and private factors call for the motion to be dismissed.

## II.    PROCEDURAL BACKGROUND

Plaintiffs originally filed this case on August 16, 2006, against Sheikh Issa, Sheikh Mohammed Bin Zayed Al Nahyan ("Sheikh Mohammed") Sheikh Abdulla Bin Zayed Al Nahyan ("Sheikh Abdulla"), Sheikh Saif Bin Zayed Al Nahyan ("Sheikh Saif"), Sheikh Nasser Bin Zayed Al Nahyan ("Sheikh Nasser") and the Partnership of the Royal Family Bin Zayed Al Nayhan (the "Partnership").

On November 20, 2006, the Court ordered service by mail on all defendants pursuant to FED. R. CIV. P. 4(f)(2)(C)(ii). (Docket Entry No. 7).  On December 22, 2006, the Court mailed registered packages contianing the summons and complaint, return receipt requested, to each of the Defendants at addresses supplied by the Plaintiffs. (Unnumbered entry on Clerk's docket sheet for December 22, 2006).

The package to Sheikh Mohammed came back to the Court signed and, on March 30, 2007, Sheikh Mohammend filed a Motion to Dismiss for lack of subject matter jurisdiction, claiming sovereign immunity, and lack of personal jurisdiction.  (Docket Entry No. 15)

On May 3, 2007, Plainitffs filed a motion for alternative service, pursuant to FED. R. CIV. P. 4(f)(3), seeking an order directing Sheikh Mohammed to serve the other defendants and, alternatively, seeking leave to serve Sheikh Issa, Sheikh Nasser, Sheikh Saif, Sheikd Abdullah and the Parntership by regular mail and overnight delivery service. (Docket Entry No. 20).

On July 19, 2007, the Court granted Sheikh Mohammed's Motion to Dismiss, on foreign sovereignty grounds.  Alternatively, the Court granted the motion on personal

jurisdiction grounds, finding that Plaintiffs had not made sufficient jurisdictional allegations against Sheikh Mohammed.    The Court's order also found that Plaintiffs' previous motion for alternative service was rendered moot. (Docket Entry No. 39).

On July 20, 2007, the Court received a receipt for the registered mail sent to Sheikh Issa. (Docket Entry No. 40).  The receipt was not signed.

At a hearing on August 17, 2007, Plaintiffs notified the Court that they believed their motion for substitute service was not fully moot because they had sought alternative service based on regular mail, overnight delivery, electronic mail and facsimile.

On October 9, 2007, the Court denied Plaintiffs' motion for alternative service without prejudice and directed Plaintiffs that any future motions for alternative service should include a prima facie showing of minimum contacts needed to establish personal jurisdiction over each defendant.

On April 2, 2008, Plaintiffs submitted their Second Motion for Service by Mail. (Docket Entry No. 44).  On April 29, 2008, The Court denied the motion, finding that Plaintiffs had failed to show that service by mail was not prohibited by U.A.E. law and that a second attempt at serving defendants by mail was likely to succeed.  (Docket Entry No. 46).

On June 16, 2008, Plaintiffs filed their Second Amended Complaint, asserting claims against Sheikh Issa only.   (Docket Entry No. 50).  The return of service was filed on June 23, 2008.  (Docket Entry No. 51).

On June 19, 2008, Plaintiffs served Sheikh Issa in Abu Dhabi, U.A.E.

Plaintiffs moved to dismiss Sheikhs Abdulla, Saif, Nasser and the Partnership and on June 27, 2008, the Court entered an order of nonsuit as to these defendants. (Docket Entry No. 55)

Thus, as it stands, Plaintiffs now bring claims against Sheikh Issa only, asserting claims of breach of contract, conversion, breach of fiduciary duty, torture, intentional infliction of emotional distress and malicious prosecution. Plaintiffs assert diversity jurisdiction under 28 U.S.C. §1332 and federal question jurisdiction under 28 U.S.C. § 1350.

On August 8, 2008, Sheikh Issa filed a Motion to Dismiss on three grounds: (1) Improper Service, (2) Lack of Personal Jurisdiction, and/or (3) *Forum Non Conveniens*.

## III.    STANDARD OF REVIEW

### A.    <u>Service</u>

The Fifth Circuit reviews an order quashing service and granting dismissal for failure to effect timely service of process for an abuse of discretion. *Lindsey v. United States R.R. Ret. Bd.,* 101 F.3d 444, 445 (5th Cir.1996).

### B.    <u>Jurisdiction</u>

"Absent any dispute as to the relevant facts, the issue of whether personal jurisdiction may be exercised over a nonresident defendant is a question of law to be determined de novo by this Court." *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 418 (5th Cir.1993). "When alleged jurisdictional facts are disputed, we must resolve all conflicts in favor of the party seeking to invoke the court's jurisdiction." *Id.*

C.    *Forum Non Conveniens*

A district court's dismissal for *forum non conveniens* is reviewed by a court of appeal for an abuse of discretion. *Piper Aircraft Co. v. Reyno*, 102 S.Ct. 252, 266 (1981).

## IV.    FACTUAL BACKGROUND

Plaintiffs, Bassam Nabulsi and his wife Rima Nabulsi, are individuals and citizens of the United States and of the State of Texas. *See* Affidavit of Bassam Nabulsi, at ¶ 2 & 4, attached as **Exhibit B**; *See* R. Nabulsi Aff. at ¶ 4, attached as **Exhibit C**. Bassam Nabulsi was born and raised in Lebanon and moved to the United States on a student visa in 1979. *See* B. Nabulsi Aff., at ¶ 2. He has lived in Texas since 1980, at ¶ 2. He became an American citizen in 1991, at ¶ 4. Rima Nabulsi was born and raised in Syria. *See* Affidavit of R. Nabulsi, at ¶ 2, attached as **Exhibit C**. She moved to the United States in 1984 and has resided in Houston since 1984. *See id.*, at ¶ 2.

Defendant, Sheikh Issa is a member of the Royal Family of Abu Dhabi. *See* Deposition of Sheikh Issa, at page 13, attached as **Exhibit D**.[2] He is the son of H.H. Sheikh Zayed bin Sultan Al Nahyan, the late ruler of the U.A.E.  Although he is a member of the royal family, Sheikh Issa holds no official position in the U.A.E. or Abu Dhabi governments.  Sheikh Issa has not lived in the U.A.E. since September 1, 2008, having moved to Germany. *See* Sheikh Issa Deposition, at p. 41.

In the early 1990s, Mr. Nabulsi, who is fluent in the Arabic language, was operating a Houston, Texas, company (Gulf Medical Services of "GMS") served as a concierge of sorts to Middle Eastern nationals seeking medical care and other services in

---

[2] Pursuant to the Court's order, Sheikh Issa's deposition is not being filed in the public record.  The Court's copy will contain a copy of the deposition.

Houston. *See* B. Nabulsi Aff. at ¶ 5. Among Mr. Nabulsi's many clients were members of the Royal Family of Abu Dhabi. *See id.* With Mr. Nabulsi's assistance, over a ten year period, Sheikh Issa came at least once yearly to Houston and he and his entourage set up residence at the Houston Four Seasons Hotel. *See id.*, at ¶ 36 These trips were expensive. By way of example, the Four Season bills from a 2002 and 2003 trip to Houston totaled $333,891.35 and $973,686.53. *See id.* These bills were typical and customary for Shiekh Issa's and his entourage's annual trips to Houston. *See id.* By Sheikh Issa's own admission, his average stay in Houston was two to two and one-half months. *See* Sheikh Issa Deposition, at p. 44.

The purpose of each trip was, in part, to conduct business. Indeed, Sheikh Issa brought his entire family and entourage with him and set up residence in Houston. *See* B. Nabulsi Aff., at ¶ 36. He set up a specific room and fax line at the Four Seasons, solely dedicated to business operations. *See id.*

The purpose of the trips was also to obtain medical care and to purchase goods and services in Texas, not available in the U.A.E. Based on the limited records that he was able to recover after being summarily deported from the U.A.E., we know that Sheikh Issa saw doctors in Houston at least 74 separate times, including having two surgeries, between March 20, 1995 and August 19, 2004. Sheikh Issa admits to extensive medical visits in Houston and two surgeries. *See* Issa's Deposition, at p. 29. [3]

During each visit to Houston, Sheikh Issa would also take side trips to California and Las Vegas, lasting as long as thirty days. *See* B. Nabulsi Aff. at ¶ 12 & ¶ 39. Sheikh Issa also routinely traveled from Houston to Cancun, Mexico. These trips, which Sheikh

---

[3] Since he stopped coming to Houston after he had Bassam Nabulsi arrested and tortured, Sheikh Issa now flies Houston doctors to the U.A.E. to treat him.

Issa paid for, were made on Houston-based Continental Airlines, or charter jets, chartered from Houston. *See id.*, ¶ 26.

In the course of his visits, Sheikh Issa would purchase numerous items, primarily from Houston vendors. Documents produced by Sheikh Issa reflect that he spent $560,544.48 in 156 different transactions between March 7, 2001 and November 12, 2004 alone. *See* **Exhibit B-8**.

During Sheikh Issa's visits to Houston, Mr. Nabulsi and GMS provided for most of Sheikh Issa's needs. This included arranging all hotel arrangements, security (primarily provided by Houston Police officers), transportation and translation services. *See* B. Nabulsi Aff., at ¶ 6 & 12. At first, GMS was instructed to submit their bills to the U.A.E. embassy. *See* ¶ 5. Later, GMS was instructed to submit these bills to Almanda, Ltd., a Florida company that had been set up by Sheikh Issa's father to pay for travel and other expenses to the Royal Family when they were in the United States.[4] Id. A partial list of the services provided and bills shows that GMS billed Almanda $705,961.66 for services provided to Sheikh Issa in Houston between March 6, 2001 and September 2, 2003. *See id.* at ¶ 15.

Over the course of many visits, Sheikh Issa and Mr. Nabulsi developed a personal relationship. *See id.* at ¶ 6. Indeed, during Sheikh Issa's Houston visits in 1995 and 1996, Sheikh Issa personally began an aggressive campaign to recruit Mr. Nabulsi to work for him full time. *See id.* at ¶ 6 & 10. In response to Sheikh Issa's repeated requests, Mr. Nabulsi refused, stating that he was instead willing to work "with" Sheikh Issa, but not "for" Sheikh Issa. During this 1997 visit to Houston, Sheikh Issa and Mr.

---

[4] Plaintiffs' sent a subpoena to Almanda for all records relating to Sheikh Issa's temporary relocation to the United States. Almanda responded that all records had been shipped back to the U.A.E. *See* **Exhibit E.** Sheikh Issa produce none of these documents in response to Plaintiffs' discovery requests.

Nabulsi finally agreed to become partners; they sealed the agreement with a handshake. *See* id at ¶ 10. The partners agreed that Mr. Nabulsi would provide the "sweat" equity, and Sheikh Issa would provide financing or capital for any project or opportunity the partners mutually agreed the partnership would pursue. *See* id at ¶ 10. The partners further agreed that they would split profits from any venture on a 50/50 basis. *See* id at ¶ 10. It was further agreed that, because of the partners' associations and connections in both Texas and Abu Dhabi, the partnership would focus its efforts to find business opportunities in these two areas. *See* id at ¶ 32. Pursuant to the partnership, Nabulsi later managed all of Sheikh Issa's assets and holdings, including his ranches, his buildings, and the companies, Western General Trading and Western General International, among others. *See* id at ¶ 28. Again, the partners agreed that any profits from these partnership ventures would be split on a 50/50 basis. *See* id at ¶ 27. The partners also formed at least one new entity to further their partnership, IBA Co. L.L.C. *See* id at ¶ 14.

Although Sheikh Issa was actively involved in their businesses, to further assist Mr. Nabulsi in performing the day to day operations of the partnership, Sheikh Issa ultimately gave Mr. Nabulsi power of attorney over all of his affairs, both business and private. *See* id at ¶ 31.

Pursuant to the partnership agreement, Mr. Nabulsi thereafter began "splitting" his time in both Houston and Abu Dhabi, pursuing business deals and opportunities in both areas for the partnership, as well as managing those business activities already in place at the time of the partnership formation. Mr. Nabulsi ultimately moved to Abu Dhabi in 2002, but continued to visit Houston regularly with Sheikh Issa, as well as

maintain a business office, now for the partnership, in Houston, Texas. *See id* at ¶ 27 & 12. In each of the Houston visits, Nabulsi and Sheikh Issa, as partners, held business meetings in Houston and sought out Texas and United States opportunities for the partnership and entities formed pursuant to the partnership. *See id.* at ¶ 16; *See also* Affidavit of Mohammed Taghizadeh at ¶ 22 & 24, attached as **Exhibit F.**

As demonstrated, Mr. Nabulsi and Sheikh Issa pursued various business opportunities for the partnership in Texas, with Texas companies and with other U.S. companies. *See* B. Nabulsi Aff. at ¶ 37. One such opportunity involved extensive visits and negotiations by Mr. Nabulsi on the partnership's behalf, in Houston, with a Houston based oil company, Richfield Petroleum. *See id.* At ¶ 17; *See also* Taghizadeh Aff. at ¶ 12. Mr. Nabulsi and Sheikh Issa, pursuant to their partnership, also met and negotiated with several Texas entities in an effort to acquire at least two refineries in Texas. *See* B. Nabulsi Aff. at ¶ 17; S*ee also* Taghizadeh Aff. at ¶ 21 & 26. Mr. Nabulsi also negotiated a letter of credit arrangement with a United States company on behalf of the individual partners. *See* B. Nabulsi Aff. at ¶ 16. Sheikh Issa personally entered into contracts with U.S. Companies. *See* B. Nabulsi Aff. at ¶ 11. Sheikh Issa also met with a Houston congresswoman to discuss business relations between Houston companies and U.A.E. companies. *See id.* at ¶ 37.

Particularly, after his father's death in November 2004, Sheikh Issa began to demonstrate increasingly bizarre and immoral behavior. *See id.* at ¶ 41. Bassam Nabulsi tried to intervene with Sheikh Issa to get him to stop. *See id.* Indeed, Bassam Nabulsi later learned that Sheikh Issa's brothers, who ran the country, expected Bassam to keep Sheikh Issa in check. *See id.* at ¶ 42. Bassam Nabulsi would send Sheikh Issa excerpts

from the Quran.  *See id.* at ¶ 41.  This did not sit well with Sheikh Issa and only alienated Sheikh Issa from Bassam Nabulsi even more.[5]  *See id.*

In one case, Bassam and Rima Nabulsi and their son were driving to get dinner one night when Sheikh Issa wrecked his car in front of them.  *See id.* at ¶ 42.  He exited the car with an automatic rifle, then returned to his car and drove off, with several police officers in pursuit.  *See id.*  The Nabulsis followed behind.  *See id.*  Sheikh Issa then pulled over, threw his gun out the car window and berated the officers.  *See id.*  Later, Bassam Nabulsi saw Sheikh Issa and his brother, Sheikh Saif's (the chief of police) house, complaining about the treatment of the officers.  *See id.*  Bassam Nabulsi later learned that Sheikh Saif was displeased with Nabulsi for not keeping Sheikh Issa in check.  *See id.*  Of course, it apparently never occurred to the Royal Family that Sheikh Issa should be prosecuted just like any other citizen.

More concerning, Sheikh Issa had begun a habit and custom of torturing his employees or anyone else with whom he disapproved.  *See id.* at ¶ 43.  Over time, these torture sessions grew more brutal, vicious, and bloody.  *See id.*  As his degeneracy increased, Sheikh Issa began to have such torture sessions videotaped, so he could enjoy viewing them later.  *See id.*  Mr. Nabulsi disapproved vehemently with Sheikh Issa's behavior, never took part or personally observed in such conduct, and once he caught wind that it was happening, constantly attempted to steer Sheikh Issa away from this behavior.  *See id.*

---

[5] Sheikh Issa's lawyers apparently now contend that Mr. Nabulsi is a "radical Muslim" simply because he is an observant Muslim.  In doing so, they attempt to draw on the anti-Muslim sentiment held in some quarters of the West, which believe that any observant Muslim must really be a terrorist.  Sheikh Issa's attorneys now are also attempting to imply that Mr. Nabulsi had some dealings with Saddam Hussein.  It is ironic that Sheikh Issa would allow his lawyers to even suggest such, in light of the content of multiple letters Sheikh Issa sent to Saddam Hussein pledging support of Saddam Hussein and condemnation of the United States' actions in Iraq, and in light of Sheikh Issa's other conduct.

One of Sheikh Issa's many torture victims was Mohammed Shah Poor, an Afghan who did business with Sheikh Issa. *See* Declaration of Ghassan Naboulsi at *See id.* at p. 2, attached as **Exhibit G**.   Upon learning of Mr. Poor's alleged misdeeds, Sheikh Issa summoned Mr. Poor to his ranch in the U.A.E., under the guise of talking business. *See id.* As Mr. Poor's family waited at the gate of the ranch, Mr. Poor entered the grounds and was grabbed by the Abu Dhabi police.   *See id.* Sheikh Issa ordered one of his personal assistants to videotape the session and, if he refused, he would be tortured. *See id.* With the aid of the Abu Dhabi police, Sheikh Issa proceeded to personally torture Mr. Poor for more than forty-five minutes. *See id.*; see also B. Nabulsi Aff. at ¶ 41.   The torture involved shooting an M-16 into the ground in front of where Mr. Poor was kneeling, stuffing sand into his mouth, sticking nails repeatedly into his buttocks, whipping him with a board containing nails, repeatedly kicking his head, whipping his buttocks until they bled, pouring salt onto his wounds, pouring lighter fluid onto his scrotum and lighting it on fire, sticking a cattle prod up his anus and on his genitals, and running over him with Sheikh Issa's Mercedes SUV. *See* G. Nabulsi Dec. at p. 2.[6]

Immediately after the torture session, Mr. Nabulsi received a frantic call from Abu Dhabi during which Mr. Nabulsi learned that not only had Sheikh Issa indeed tortured Mr. Poor, but he was also refusing to allow the injured and bleeding victim to be taken to the hospital. *See* B. Nabulsi Aff., at ¶ 44.   Fearing that Mr. Poor might die, Mr. Nabulsi spoke to Sheikh Issa by phone. *See id.*   During that call, Mr. Nabulsi pleaded with Sheikh Issa to allow Mr. Poor to be taken to the hospital. *See id.*   Sheikh Issa ultimately conceded to Mr. Nabulsi's frantic requests. *See id.*

---

[6] Still shots from the video are attached as Exhibits A-D of Dec. of G. Naboulsi and Exhibits 29 & 30 of Aff. of B. Nabulsi.

Mr. Poor survived the ordeal and later filed a claim with the Abu Dhabi police against Sheikh Issa and the police officers involved. *See id.* at ¶ 45. However, no action was taken on this claim. *See id.*

When Nabulsi returned from his trip, Sheikh Issa summoned him to his palace, and showed him the video of the torture of Mr. Poor. *See id.* at ¶ 46. Nabulsi was sickened and told Sheikh Issa that he must not be a God-fearing man to do such things. *See id.*

In addition to the session involving Mr. Poor, Sheikh Issa had also tortured several Sudanese men, with the aid of the Abu Dhabi police, and had that session videotaped as well.[7] *See* G. NabouLsi Dec. at p. 2.

As personal and business manager for Sheikh Issa, as well as business partner, Nabulsi maintained all important business and personal items for Sheikh Issa, including the videotapes containing the recorded torture session which Sheikh Issa had given to Nabulsi. *See* B. Nabulsi Aff. at ¶ 47.

As the relationship between the partners deteriorated, Sheikh Issa became desperate to retrieve the torture tapes. *See id.* at ¶ 48. In his efforts to retrieve the tapes, Sheikh Issa first shut Nabulsi out from all of their joint businesses. *See id.* Sheikh Issa had the businesses audited but the audit found no wrongdoing. *See id.* Sheikh Issa later had Nabulsi's office staff held under house arrest with the assistance of the Abu Dhabi police. *See id.* at ¶ 54. *See also* R. Nabulsi Aff. at ¶ 7; *See* Declaration of Wissam El Debel at p. 1, attached as **Exhibit H.** The police continually implored the staff to give false statements that Nabulsi had stolen money from Sheikh Issa, but they refused. *See* R. Nabulsi Aff. at ¶ 7. *See also* W. El Debel Dec. at p. 1. Sheikh Issa then had the staff

arrested and jailed, and later threatened with deportation from the country. *See* W. El Debel at p. 1.

Ultimately, Sheikh Issa had Mr. Nabulsi arrested on April 6, 2005. *See* B. Nabulsi Aff. at ¶ 49. After his arrest, Mr. Nabulsi was held without charges for several days, during which time he was tortured. *See id.* Rima Nabulsi contacted the United States Embassy, who inquired to the U.A.E. government about the whereabouts of Bassam Nabulsi. *See* R. Nabulsi Aff. at ¶ 9. The police repeatedly told Nabulsi and the U.S. Embassy staff that this was a private matter between Sheikh Issa and Bassam Nabulsi. *See id.* at ¶ 10. The U.S. Embassy staff strongly encouraged Nabulsi to write a letter to Sheikh Issa, pleading for his release, and offered to take it to Sheikh Issa. *See* B. Nabulsi Aff. at ¶ 58.

All throughout his incarceration, the police repeatedly told Bassam Nabulsi that, if he would just return the tapes, he would be released. *See id.* at ¶ 63.

The police department[8], under the direction of Sheikh Issa, then thoroughly searched Mr. Nabulsi's residence in an effort to find the torture tapes. *See* R. Nabulsi Aff. at ¶ 10; See also B. Nabulsi Aff. at ¶ 56. Further, the police searched all of Mr. Nabulsi's computers, along with any devices that might contain evidence of Sheikh Issa's involvement in the torture sessions. *See* R. Nabulsi Aff. at ¶ 10. At the end of the search, the officer in charge told Rima Nabulsi that this was all happening because Sheikh Issa was mad at Bassam Nabulsi and once the Sheikh had "vented", this would be over.

After being held for several days with no charged lodged against him, the police then created charges of marijuana possession against Nabulsi. *See* R. Nabulsi Aff. at ¶

---

[8] The Abu Dhabi police department falls under the direction of the Interior Department, which is headed by Sheikh Issa's brother, Sheikh Saif.

59.    Of course, the search of Nabulsi's home revealed no marijuana, and the test performed on Mr. Nabulsi's urine was also negative for any type of drug use.  *See id.* Later, the police and public prosecutor, a member of the judiciary, then fabricated new charges that Mr. Nabulsi was in possession of, and was distributing prescription drugs that were found in his home.  *See id.* at ¶ 59.  However, Mr. Nabulsi was able to obtain letters from his Houston physician, making it clear that the medications in Mr. Nabulsi's possession were properly prescribed to him by Houston physicians. *See id.*  The court system, the presiding judge, and the police refused to consider this information.  *See id.*

Mr. Nabulsi was kept incarcerated for approximately two and a half months, primarily in a maximum security prison in which he suffered considerable abuse and torture.  *See id.* at ¶ 60.  He was strip searched jailers penetrated his rectum, he was denied medication, he was mocked for engaging in his Muslim prayer ritual, and he was placed in cells with criminals from countries not amenable to the U.S. who were told that Nabulsi was an American.  *See id.* at ¶ 53, 60, 62.  The jailers would also force Nabulsi to undress and pose for pictures for Sheikh Issa while Mr. Nabulsi was bent over with his legs spread and genitalia exposed.  *See id.* at ¶ 61.   The arresting officer repeatedly threatened to injure and rape Nabulsi's wife. *See id.* at ¶ 52.

During his incarceration, the Abu Dhabi police, at the direction of Sheikh Issa, asked repeatedly about the location of the torture tapes, and repeatedly told Mr. Nabulsi that he would be killed. *See id.* at ¶ 60.

Meanwhile, Rima Nabulsi was making every possible attempt to have her husband released.   In response to her repeated inquiries to the United States Embassy in the U.A.E., Mrs. Nabulsi was repeatedly advised, in no uncertain terms, that that United

States Embassy could not do anything to secure the release of Mr. Nabulsi because this was not a governmental matter but, instead, was a personal matter between Mr. Nabulsi and Sheikh Issa. See R. Nabulsi Aff. at ¶ 11.    They encouraged her to try to talk to Sheikh Issa and ask for his clemency. *See id.* Taking this advice, she tried many times to talk to Sheikh Issa, but he refused to see her. *See id.*

Ultimately, Rima Nabulsi was put into contact with an American adviser to the Crown Prince of Abu Dhabi. *See id.* at ¶ 13.  She pleaded with him to ask the Crown Price to ensure that her husband was treated fairly and had a fair trial. *See id.* Within days, she learned that the Crown Prince would do that, provided that she agreed that, once the trial was over, she and her husband and family would leave to country and never contact Sheikh Issa again. *See id.* Rima Nabulsi agreed to this. *See id.* at ¶ 13 (2nd).  She sent her children and mother back to the United States and made the necessary preparations so that she and her husband could leave the U.A.E. as soon as the trial was over. *See id.* ¶ 13 (2nd).

Shortly thereafter, Nabulsi's charges came to trial.  Nabulsi was acquitted of the trumped up charges of possession of marijuana. *See* B. Nabulsi Aff. at ¶ 64.  He was also acquitted of narcotics possession and distribution. *See id.* Despite the fact Nabulsi was able to provide the U.A.E. court with the requisite properly authenticated medical prescriptions from duly licensed Texas physicians for the medications at issue, Mr. Nabulsi was nevertheless ordered to pay a token fine for something he was never formally charged with—holding prescription medications without a proper prescription. *See id.* *See also* R. Nabulsi Aff. at ¶ 14.

Still, although he paid the fine and the court had ordered his release, Nabulsi was sent back to jail where he stayed for fifteen additional days, after which he was taken directly to the airport and deported, with no advance notice or hearing, upon orders of the Minister of Interior, Sheikh Issa's brother. *See* B. Nabulsi Aff. at ¶ 65; R. Nabulsi Aff. at ¶ 15. Mr. Nabulsi's summary deportation deprived him of any opportunity to seek redress or to collect the massive debt owed him by Sheikh Issa as a result of their partnership and the various businesses it formed and managed. *See id.* at ¶ 65. Further, nearly all of the Nabulsi possessions and money were left in the U.A.E. because Plaintiffs were not able to retrieve them after Mr. Nabulsi was deported. *See id.* at ¶ 65.

After this case was filed, the Court ordered that the Defendants could be served by certified mail. Docket Entry No. 7. The receipt for service on Sheikh Issa came back to the Court without signature.

On June 4, 2008, Plaintiffs obtained new service documents from the Court. (Unnumbered Docket Entry dated June 4, 2008). On Plaintiff's process server had an affiliate in the U.A.E. mail the service documents to the Defendant at the Defendant's last known address, P.O. Box 464, Abu Dhabi, U.A.E. *See* Declaration of Nelson Tucker, at ¶ 5, Docket No. 51, and attached as **Exhibit I**. Plaintiffs' process server then traveled to Dubai, UAE for the purpose of serving the Defendant. *See id.* at ¶ 7. On June 19, 2008, the process server attempted service on Sheikh Issa at his business address of Emirates Towers Office Building, 45th Floor, Sheikh Zayed Road, Dubai, UAE. *See id.* at ¶ 8. He was advised by the security guard that the Defendant had moved his offices. *See id.*

On June 19, 2008, at 1:45 p.m., he called the telephone number provided for the Defendant, +1971043366661. *See id.* at ¶ 9. The phone was answered as "Pearl

Properties." *See id.* Sheikh Issa has admitted in his Motion to Dismiss that he owns Pearl Properties. *See* Motion to Dismiss at p. 5. The process server inquired if the Sheikh Issa was available and the receptionist advised Mr. Tucker that he was not in the office but that his Business Manager could assist him. *See* Tucker Dec. at ¶ 9.

On June 19, 2008, Plaintiffs' process server attempted service on Sheikh Issa at his current business address of Pearl Properties, Oud Medha Road at 10th Street, First Floor, Dubai, UAE. *See id.* at ¶ 10. The process server was advised by the receptionist that Sheikh Issa was not in the office. *See id.* The process server inquired if the Defendant's Business Manager, Saif Al Swuidi, was present. *See id.* Sheikh Issa has admitted in a previous Motion for Protection that Mr. Al Swuidi is his business manager. *See* Motion for Protection, Docket Entry 68, at p. 1. Further, Sheikh Issa has produced a power of attorney that shows that Sheikh Issa owns Pearl Properties and that Mr. Al Swuidi is his business manager. *See* General Power of Attorney to Saif Al Swuidi, attached as **Exhibit J.**

The receptionist called an unknown party of the intercom and advised the process server that he would be right out. *See* Tucker Declaration at ¶ 10. On June 19, 2008, at 1:50 p.m., Ismail Alabras came out and identified himself as Assistant to Sheikh Issa. Mr. Alabras stated to the process server that he was employed by Sheikh Issa. *See id.* at ¶ 11. He further advised the process server that Sheikh Issa was not currently in the office. *See id.* The process server advised Mr. Alabras as to the general nature of the papers and he agreed to accept them on behalf of the Sheikh Issa. *See id.* Mr. Alabras appeared to be over the age of eighteen years and spoke fluent English. *See id.* Mr. Alabras represented

27

to the process server that he agreed to accept the papers on behalf of Sheikh Issa and agreed to provide the papers to Sheikh Issa. *See id.*

On June 19, 2008, the process server mailed a copy of the service documents to Sheikh Issa at the same address where the documents were left. *See id.* at ¶ 12. The mailing was done in Dubai, U.A.E. *See id.* The process server also mailed copies of the service documents to Sheikh Issa at his business addresses. *See id.* at ¶ 14.

## ARGUMENT AND AUTHORITIES

## V.     SHEIKH ISSA HAS BEEN SERVED.

Sheikh Issa moves to dismiss, arguing that the process server who served Sheikh Issa's agent with the lawsuit is not authorized under U.A.E. law to serve process; the agent who was served with the lawsuit is not really an agent of Sheikh Issa; Sheikh Issa has never even seen the lawsuit; and the service had other allegedly fatal flaws.

In considering a motion to dismiss, the court must accept as true all well-pleaded facts and must draw all reasonable inferences from those allegations in the plaintiff's favor. *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996). Presuming that venue, personal jurisdiction and subject matter jurisdiction are satisfied, there must be authorization to serve summons in a particular case. *Omni Capital Intern. v. Rudolf Wolff & Co., Ltd.*, 108 S.Ct. 404, 409 (1987). Constitutional due process requires that service of process be reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 70 S.Ct. 652 (1950); *Henderson v. United States*, 116 S.Ct. 1638 (1996)("[T]he core function of service is to supply notice of the

pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections.")

The Constitution itself does not specify or require any particular means of service of process, only that the method selected be reasonably calculated to provide notice and an opportunity to respond. *See Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1017 (9th Cir.2002). The general attitude of the federal courts is that the provisions of Federal Rule 4 should be liberally construed in the interest of doing substantial justice and that the propriety of service in each case should turn on its own facts within the limits of the flexibility provided by the rule itself. This is consistent with the modern conception of service of process as primarily a notice-giving device. *In re Cyrus II Partnership* 392 B.R. 248, 257 (Bkrtcy. S.D.Tex. 2008)(quoting 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1083 (3d ed.2002))[9].

Sheikh Issa was properly served, pursuant to FED. R CIV. P. 4(f)(2)(A).  That rule provides:

> "[u]nless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States....if there is no internationally agreed means, or if an international agreement allows but does not specify other means, *by a method[10] that is reasonably calculated to give notice...as prescribed[11] by the foreign country's law for service in that country in an action in its courts of general jurisdiction.*" (Italics added)

---

[9] The court found that service does not have to be perfect to be effective, particularly when the party served had notice of the suit. *See id.* at 26.

[10]  Webster's defines "method" as: "a procedure or process for attaining an object."  Merriam-Wesbter's Online Dictionary.

[11] Webster's defines "prescribe" in the transitive verb form as it is used here, as "to lay down as a guide, direction, or rule of action." Merriam-Wesbter's Online Dictionary.

The method of service of process used by Plaintiffs in this case is consistent with FED. R CIV. P. 4(f)(2)(A) in that the method used is in fact prescribed by the laws of the U.A.E.

Further, Sheikh Issa was also properly served, pursuant to FED. R CIV. P. 4(f)(2)(C)(i).  That rule provides:

> "[u]nless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States…unless prohibited by the foreign country's law, by delivering a copy of the summons and of the complaint to the individual personally.

The method of service of process used by Plaintiffs in this case is consistent with FED. R CIV. P. 4(f)(2)(C)(i) in that the method used is not prohibited by the laws of the U.A.E. and, in the U.A.E., personal service on a person like Sheikh Issa can be made through agents.

As set out in Plaintiffs' expert report, the service on Sheikh Issa's agent, while present at Sheikh Issa's business premises, is a lawful method of serving process on Sheikh Issa, under U.A.E. law and Islamic law.  *See* Declaration of Professor L. Ali Kahn, at ¶ 2, attached as **Exhibit K**.

Further, Plaintiffs' process server qualifies as expert on service.  He has authored three books on service of process and regularly teaches a college course on service, and has trained 1700 process servers over the past 24 years, has supervised the service of approximately 100 papers in the U.A.E.  *See* Tucker Dec. at ¶ 1.  He has used mail or personal service (including personal service through agents) in his serving papers in the U.A.E. *See id.* at ¶ 2.  He states that service that he effected on Sheikh Issa has been properly made on Sheikh Issa. *See id.* at ¶ 13.

There are no agreements between the United States and the U.A.E. regarding service of process. Thus, the question is whether the service was reasonably calculated to give notice and is it prescribed in the U.A.E. for cases in its courts of general jurisdiction. Service here passes both tests.

According to Plaintiffs' expert, along with the application of common sense, the efforts made to serve Sheikh Issa were reasonably calculated to give notice to Sheikh Issa of the suit. *See* Khan Dec., at ¶ 2. In addition to the numerous mailings to Sheikh Issa, and the return of the receipt of the copy mailed to him by the Court, the serving of his assistant at Sheikh Issa's place of business was reasonably calculated to give Sheikh Issa notice of the suit. Probably the best evidence that the service was reasonably calculated to give Sheikh Issa notice is the fact that his U.S. lawyers made an appearance in the case thirteen days after service was effected. Further, Sheikh Issa's expert's records show that he reviewed a copy of the summons on July 2, 2008. *See* Billing Records from Expert, attached as **Exhibit L.**

Also, by Sheikh Issa's expert's own admission, service in this manner is prescribed under U.A.E. law. Generally, service is allowed in the U.A.E. only through the court clerk when a case is originated in a U.A.E. court, or when the U.A.E. has agreed to service through a treaty or convention. *See* Faraj Abdullah Ahnish Deposition, attached as **Exhibit P**, at p. 48, 50; Kahn Dec., at ¶ 8. Neither applies here. In his report, Sheikh Issa's expert (who has represented Sheikh Issa's family many times and whose law partners was recently named Minister of Justice)[12] tried to claim that there actually private process servers who are able to serve lawsuits from out of the country, and that Plaintiffs' process server simply did not qualify. *See* Ahnish Deposition, at p. 48.

---

[12] *See* Ahnish Deposition, at p. 8, 12.

However, on deposition, he conceded that 1) only the courts can effect service and they will only effect service of lawsuits that originate in those courts and 2) that this "private process server" option that he describes in his report has not really been implemented yet. *See id.*, at p. 72. Thus, following Sheikh Issa's expert's analysis, citation on a case originating in the U.S. could never be served in the U.A.E.[13]

Obviously, the drafters of Rule 4 did not intend that service could never be permitted in a foreign country. Otherwise, they would have not written the rule in the first place as it is specifically designed for service of U.S. cases outside of the U.S. Every country has their own rules for service of cases originating in their countries, which are reserved only for cases for originating in their countries. Indeed, Sheikh Issa's own legal expert says that the U.A.E. does not have any law that specifically bans service like that made here, *See* Ahnish Deposition, at p. 64, or bans service of suits from outside the country. *See* id. at ¶ 62. On the other hand, the U.A.E. does ban service of process by registered mail. *See id.* at ¶ 44.

Plaintiffs' expert on U.A.E. and Islamic law and Plaintiff's process server expert both state that service here is prescribed by the U.A.E. and proper. *See* Tucker Aff. at ¶ 13; *See* also Khan Aff. at ¶ 2. Sheikh Issa's expert acknowledges that, in the U.A.E., that when the court determines that a person is avoiding personal service, the court can order service by alternative means. *See* Ahnish Deposition, at p. 118. Notably, service by posting at the home or residence, or through an agent, or even service by publication, are

---

[13] The expert claims that service of a U.S. suit could be effected through diplomatic channels. *See id.* at 52. However, he acknowledges that there is no formal process for doing this and it is a matter of discretion. A plaintiff who attempts this drawn-out process and does not receive the "courtesy" of service from the U.A.E. has no avenue for relief to challenge its refusal to serve. *See id.* at 58. Plaintiffs' legal expert adds that there is no such procedure and that the UAE and the U.K. have a formal treaty that calls for service through diplomatic channels. *See* Khan Dec. at ¶ 8. If there were really was a diplomatic channel option for service between the U.S. and U.A.E., there would be a treaty calling for it. There is not.

allowed. *See id.* at 107, 109.   Specifically, he acknowledges that the court can allow service by leaving service documents with a person at a place of business, while confirming that the person it is being left with the person to be served both work at the business.   *See id.* He acknowledges that he could himself be served through his receptionist if the server confirmed that he worked at his firm and his receptionist did too. *See id.* at 111-112.   The court can even deem that a party has been served when the court finds that the party is avoiding service.   *See id.* at 115-116.

Common sense tells us that the drafters of Rule 4 intended for service under Rule 4(f)(2)(a) and 4(f)(2)(C)(1) to meet the general methods of service available in the country of service.   The case law supports this common sense approach to Rule 4(f).   In *Inc21.com Corp. v. Flora*, 2008 WL 5130415, *5-6 (N.D. Cal. 2008), the plaintiff had served the defendant by publication in the Philippines.   The plaintiff cited a Philippine law that allowed service by publication.   While the summons and order for publication were not issued by the Philippine court, the district court nonetheless found that this manner of service was effective for the U.S. case because the method of service was in fact "prescribed" by Philippine law and consistent with American law and that the notice was reasonanbly calculated to apprise the defendant of the lawsuit.

In *Retractable Technologies, Inc. v. Occupational & Medical Innovations, Ltd.*, 253 F.R.D. 404 (E.D. Tex. 2008), the plaintiff served an Australian defendant by private process server in Australia.   The Court noted that "Rule 4(f)(2)(A) incorporates, generally, the service rules of a foreign country as they apply to citizens of that country. A foreign jurisdiction's service rules do not need to contain a special providing applicable to foreign litigants for Rule 4(f)(2)(A) to incorporate the foreign law." id. at

405-406 (citing Gary N. Horlick, A Practical Guide to Service of United States Process Abroad, 14 Int'l Law, 637, 640 (1980)("substituted service in Italy by delivery to the concierge of the building where the person to be served lives, as long as the method of service is likely to give the actual notice required by United States due process concepts.")   The court noted that "[t]he Australian Federal Court Rules have no specific provision dealing with foreign process being served in Australia[14]," just as is the case with the U.A.E.  *Id.* at 406.   The court concluded that Australian law allowed for service by private process servers in cases originated in those courts, and therefore, service of a foreign suit by a private process was effective as well. *See id.* at 407.

In *Modern Computer Corp. v. Ma*, 862 F.Supp. 938, 946 (E.D.N.Y. 1994), the plaintiff had served the defendant, a Taiwanese individual, via registered mail in Taiwan. Among other things, the defendant argued that service was improper because Taiwanese law restricted service in that country to clerks of court.  The court rejected the argument and found that service was proper under Taiwanese law.  In *Cosmetech Int'l, LLC v. Der Kwei Enterprise and Co., Ltd.*, 943 F.Supp. 311, 316 (S.D.N.Y. 1996), the court also found service by private process to be proper in Taiwan.

Here, Plaintiffs' process server served a man who worked at Sheikh Issa's office. It is clear that this method and manner or service are prescribed under U.A.E. law.   In addition to the fact that Sheikh Issa was served through his employee at his office, the repeated mailings to Sheikh Issa, the fact that his expert was reviewing a copy of the summons to prepare his expert report days after Sheikh Issa was served, and the fact that

---

[14]   Later in the opinion, the court did note a government report that suggested that service of foreign suits could be served by private process servers.

Sheikh Issa appeared in this case thirteen days after service confirm that service was reasonably calculated to give him notice of the suit and, in fact, did so.

Sheikh Issa also claims that the citation did not provide a proper "notification document." First, as Sheikh Issa's expert acknowledged, the "notification document" they reference must be issued by a court and only for cases originating in U.A.E. courts. *See* Ahnish Deposition, at p. 83. It cannot be obtained, except from those courts. *See id.* Again, had the drafters of Rule 4 intended for service to only be accomplished with such a document that could only be obtained from the foreign court and only when one files a suit in the foreign court, they would not have created Rule 4(f) in the first place. Second, this Court can compare its citation and return of service to the requirements of a "notification document"[15] and see that the citation meets every requirement: it gives the date and time of notification, it gives information about the party giving service, it gives information about the party being served, it gives information about the "Notification Officer" or process server, it provides the subject of the notification and it provides for the name of the person being served or the reason for refusing such refusal. This Court's citation and service documents clearly track the requirements of a "notification document."

Sheikh Issa also claims that Ismael Alabras[16] is not his agent. The testimony of Plaintiffs' process server shows otherwise, specifically that Alabras is employed by Sheikh Issa. *See* Tucker Dec., at 11. Further, Mr. Alabras's affidavit varied considerably from his deposition testimony. It is most important to note that Mr. Alabras is not a citizen of the U.A.E. and his visa is sponsored by Sheikh Issa. *See* Alabars Deposition, at

---

[15] *See* Ahnish Deposition at p. 79.
[16] In their Motion, Defendant appears to challenge the process server's thoroughness because he did not spell Alabras' name right. However, the process server got it right.

p. 23, 37, 38, attached as **Exhibit M**.    Based on Sheikh Issa's deporting of employees who fell out of favor with him in the past, Sheikh Issa holds considerable control over this witness.  Mr. Alabras says was provided with the affidavit by one of Sheikh Issa's lawyers. *See id.* at p. 7-8.  He says he made changes to the affidavit before signing it. *See id.* at 8.  However, the affidavit has his name mis-spelled.  *See id.* at 23.  Also, his affidavit swears that Sheikh Issa owns Pearl Properties, but in his deposition, Mr. Alabars hotly denies that he knows who owns Pearl Properties. *See id.* at 25.

Mr. Alabars acknowledges that he works for Mr. Swuidi, who Sheikh Issa admits is his business manager, who holds power of attorney to manage Sheikh Issa's affairs and works at the offices of Pearl Properties, which Shiekh Issa admits to owning.  *See id. at* 14; *See* Docket Entry No. 68, at p. 1; Docket Entry No. 61, at p. 5; **Exhibit M**.  Mr. Alabars admits that he received the package from the process server. *See id.* As Sheikh Issa's own expert acknowledges, service in this manner is proper in the U.A.E.

## VI.    ALTERNATIVE MOTION FOR ALTERNATIVE SERVICE UNDER FED. R. CIV. P. 4(f)(3)

If the Court determines that service has not been properly effected, Plaintiffs seek an order of alternative service pursuant to Rule 4(f)(3).  Rule 4(f)(3) provides:

> Unless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States…by other means not prohibited by international agreement, as the court orders.

To qualify for alternative service, the plaintiff must demonstrate that the proposed method of alternative service comport with the constitutional notions of due process. *See Rio Properties, Inc.* 284 F.3d 1007, 1017 (9th Cir.2002). The Constitution itself does not specify or require any particular means of service of process, only that the method

selected be "reasonably calculated under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 70 S.Ct. 652 657 (1950); *Rio Properties*, 284 F.3d 1017.

Under the plain language of Rule 4(f)(3), service of process must be directed by the court, and must not be prohibited by any international agreement. *Rio Properties, Inc.*, 284 F.3d at 1014. There are no other limitations within the rule. id. In fact, the court may order service under Rule 4(f)(3) that does not comply with the laws of the foreign country. *Id.*; *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 2005 WL 1123755, *4 (S.D.N.Y. 2005).

By design, Rule 4(f)(3) was "adopted in order to provide flexibility and discretion to the federal courts in dealing with questions of alternative methods of service of process in foreign countries." *In re Int'l Telemedia Assoc., Inc.*, 245 B.R. 713 (N.D.Ga.2000). Federal courts have traditionally incorporated advances in telecommunications technology to methods of notice giving. *See New England Merchs., Nat'l Bank v. Iran Power Generation & Transmission Co.*, 495 F.Supp. 73, 81 (S.D.N.Y.1980).

Applying Rule 4(f)(3), courts have authorized several alternative methods of service, including service by publication, ordinary mail, mail to the defendant's last known address, delivery to the defendant's attorney, delivery to the defendant's United States subsidiary, telex, and, increasingly, e-mail. **By E-mail**: *Rio Properties*, 284 F .3d at 1016; *Williams-Sonoma Inc. v. Friendfinder Inc.*, 2007 WL 1140639, at *2-3 (N.D.Cal. 2007); *Williams v. Adver. Sex LLC*, 231 F.R.D. 483, 488 (N.D.W.Va.2005); *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,* , 2006 WL 1643202 (S.D.N.Y.

2006); *Export-Import Bank*, 2005 WL 1123755; *D.R.I., Inc. v. Dennis*, 2004 WL 1237511 (S.D.N.Y. 2004); **Through Attorney**: *Ehrenfeld v. bin Mahfouz*, 2005 WL 696769, *3 (S.D.N.Y. 2005); *BP Products North America, Inc. v. Dagra*, 232 F.R.D. 263, 265 (E.D.Va. 2005); *Forum Fin. Group, LLC v. President and Fellows of Harvard College*, 199 F.R.D. 22, 23 (D.Me. 2001); *Levin v. Ruby Trading Corp.*, 248 F.Supp. 537 (S.D.N.Y. 1965); **By Publicaton**: *S.E.C. v. Tome*, 833 F.2d 1086, 1094 (2nd Cir. 1987); *Smith v. Islamic Emirate*, 2001 WL 1658211 (S.D.N.Y. 2001); **Sent to Last Known Address**: *International Controls Corp. v. Vesco*, 593 F.2d 166, 176-78 (2nd Cir. 1979); **Telex**: *New England Merch.*, 495 F. Supp. at 80.

Rule 4(f)(3) stands on its own. *Rio Properties*, 284 F.3d at 1015. There is no requirement that a plaintiff attempt service under either Rule 4(f)(1) or Rule 4(f)(2), before moving for leave to serve under Rule 4(f)(3). *See id.* "[S]ervice of process under Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief.' It is merely one means among several which enables service of process on an international defendant." *Id.* As a result, the task of determining when the particularities and necessities of a given case require alternate service of process rests within the sound discretion of the district court. *See id.* At the same time, the court may require the plaintiff to show that reasonable efforts to serve the defendant have already been made, "to prevent parties from whimsically seeking alternative means of service and thereby increasing the workloads of the court." *Ryan v. Brunswick Corp.*, 2002 WL 1628933, *2 (W.D.N.Y. 2002).

Plaintiffs have previously provided the Court with evidence about their prior efforts to serve Shiekh Issa. They, and the court, have mailed service documents to him several times. They sought to enlist the help of 32 different law firms in the U.A.E.

(including, unbeknownst to them at the time, Sheikh Issa's legal expert). *See* Correspondence to U.A.E. firms and summary, attached as **Exhibit N**. Every one of those firms either rejected the request or did not respond. *See id.* Plaintiffs sent a copy of the service documents to the U.A.E. Ministry of Justice with a request to serve Shiekh Issa, but there has been no response.[17] *See* Correspondence to U.A.E. Minsistry of Justice, attached as **Exhibit O**. Plaintiffs spent close to $30,000.00 to pay an expert international private process server to travel to the U.A.E. to serve Sheikh Issa's employee at his office. Plaintiffs also personally served Shiekh Issa's attorney in charge in this case. Plaintiffs have made reasonable efforts to serve Sheikh Issa and believe they have done so.

It is clear that Sheikh Issa and his U.S. and U.A.E.-based lawyers all are "apprise[d] … of the pendency of the action" and have been afforded "an opportunity to present their objections." *See, e.g., Mullane*, 70 S.Ct. at 657. Service on his attorneys will obviously meet the standards of Rule 4(f)(3) and they can be served by personal service. Additionally, Sheikh Issa may be served via a private process server, the front attendant at his palace in the U.A.E. or by an employee at the offices of his company, Pearl Properties, in the U.A.E. These are places that he is certain to be found. *See* B. Nabulsi Aff. at ¶ 40. And, although the common law states that alternative service need not be in compliance with the law in the foreign country, according to Sheikh Issa's expert, service in this manner would meet the laws of the U.A.E. for service originating in the U.A.E.

---

[17] A committee appointed by the U.A.E. Minister of Justice, who is appointed by Sheikh Issa's brother, is the sole authority for granting licenses to practice law in the U.A.E. *See* Ahnish Deposition, at p. 7.

Therefore, if the Court finds that service has not been properly effected, Plaintiffs request that the Court enter an order allowing them to serve Sheikh Issa through his attorneys of record in this case; through his American lawyer who works in the U.A.E. (Christopher J. Pittinger, Al Sarfa Tower, Apartment #103, Khalidiya Street, Abu Dhabi, U.A.E.)[18]; or by private process service, Process Service Network, LLC, which may leave a copy of the service documents with the front gate attendant at Sheikh Issa's palace in Abu Dhabi or with any employee at the offices of Pearl Properties, Oud Medha Road at 10th Street, First Floor, Dubai, UAE, or the current office of Pearl Properties.

## VII.   SHEIKH ISSA IS SUBJECT TO THE PERSONAL JURISDICTION OF THE THIS COURT.

Next, Sheikh Issa moves to dismiss, contending that the Court does not have specific jurisdiction over this dispute and that Sheikh Issa's contacts with the U.S. and Texas do not rise to the level such that the Court's exercise of general jurisdiction is appropriate.   However, the partnership at issue was formed in Texas by Sheikh Issa and a Houston resident.   Sheikh Issa engaged in extensive business in Texas and the U.S. as part of that partnership.  He appointed agents to act on his behalf in Houston.  He spent months on end in Houston and spent millions of dollars here.   Specific and general jurisdiction have certainly been established.

### A.   <u>Jurisdiction Overview</u>

In Federal Court, for cases not involving Rule 4(k)(2), personal jurisdiction over a nonresident defendant is proper if: 1) the defendant is amenable to service of process under the forum state's long-arm statute; and 2) the exercise of jurisdiction over the

---

[18] *See* **Exhibit O**, confirming this address and that Mr. Pittinger is one of Sheikh Issa's lawyers in this matter.

defendant is consistent with due process. *See Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992). The Texas long-arm statute authorizes service of process on a nonresident defendant if the defendant is determined to be "doing business" in Texas. *See* TEX. CIV. PRAC. & REM. CODE ANN. 17.042. Because the phrase "doing business" has been interpreted to reach as far as the United States Constitution permits, the jurisdictional inquiry collapses into a single due-process inquiry. *See Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993).

Determining whether or not a court may exercise personal jurisdiction over a defendant is a fact-specific inquiry "in which the Supreme Court has accepted a 'highly realistic' approach over a mechanical or talismanic analyses." *Colwell Realty Investments, Inc. v. Triple T Inns of Arizona, Inc.*, 785 F.2d 1330, 1334 (5th Cir. 1986) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478-79 (1985)).

Whether the exercise of personal jurisdiction over a defendant is consistent with the Due Process Clause of the United States Constitution likewise requires a two-prong inquiry. First, the Court must conclude that the defendant has had "minimum contacts" with Texas. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Second, the Court must determine that requiring the defendant to litigate in Texas does not offend "traditional notions of fair play and substantial justice." *Id.*; *see Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).

The "minimum contacts" aspect of due process can be satisfied by either finding specific jurisdiction or general jurisdiction. *See Wilson*, 20 F.3d at 647. If the conduct of a defendant that supports personal jurisdiction is related to a stated cause of action, personal jurisdiction is known as "specific jurisdiction." *See Ruston Gas Turbines*, 9 F.3d

at 418-19. The minimum contacts prong for specific jurisdiction can be satisfied by a single act if the nonresident defendant "purposefully avails itself of the privilege of conducting activities in the forum state, thus invoking the benefit and protection of its laws." *Burger King*, 471 U.S. at 475 (holding that a defendant establishes minimum contacts by purposely engaging in conduct directed toward the forum state "such that the [defendant] should reasonably anticipate being haled into court there"); *see also Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990) ("It is well settled that specific jurisdiction may arise without defendant's ever stepping foot on the forum state's soil . . .").

Alternatively, if a defendant has insufficient contacts related to the stated cause of action to support specific jurisdiction, contacts unrelated to the cause of action may confer general jurisdiction. These contacts must be both "continuous and systematic" and "substantial." *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984); *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 603, 609 (5th Cir. 2008).

After finding that sufficient contacts exist, the Court next examines whether requiring a defendant to defend a suit in Texas would satisfy "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316. In determining the fundamental fairness issue, the Court must examine five factors: the defendant's burden; the forum state's interests; the Plaintiff's interest in convenient and effective relief; the judicial system's interest in efficient resolution of controversies; and the states' shared interest in furthering fundamental social policies. *See Ruston Gas Turbines*, 9 F.3d at 421. An otherwise valid exercise of personal jurisdiction is presumed to be reasonable. *See Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir.1995). Thus, once the plaintiff has

made a prima facie showing of a defendant's minimum contacts with the forum state, the burden shifts back to the defendant to present a compelling case that the exercise of personal jurisdiction would not comport with fair play and substantial justice. *Burger King Corp.*, 471 U.S. at 477; *Freudensprung v. Offshore Technical Servs., Inc.*, 398 F.3d 327, 343(5th Cir. 2004)(internal citations omitted).

> Rule 4(k)(2), also applies here.  That rule provides states:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Rule 4(k)(2) sanctions personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state. *See World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717 720 (5th Cir.1996) (emphasis omitted). "The due process required in federal cases governed by Rule 4(k)(2) is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment." *Submersible Sys., Inc. v. Perforadora Central, S.A.*, 249 F.3d 413, 420 (5th Cir. 2001). The last sentence of Rule 4(k)(2)  provides that the rule only applies if the defendant is not subject to jurisdiction in any state.  However, the Fifth Circuit has found that, so long as a defendant does not concede to jurisdiction in another state, a court may use Rule 4(k)(2) to confer jurisdiction.  *See Adams v. Unione Mediterranean Di Sicurta*, 2004 WL 624763, *4 (5th Cir. April 14, 2004)(citing *ISI Int'l, Inc. v. Borden*

*Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir.2001). Sheikh Issa has not conceded to jurisdiction in any other state.

While Sheikh Issa correctly states that Rule 4(k)(2) applies only to claims arising under federal law, the court has "discretion to exercise 'pendent personal jurisdiction' over ... [state law claims] that arise out of common nucleus of operative facts" with the federal law cause of action. *See Nikbin v. Islamic Republic of Iran*, 471 F.Supp.2d 53, 71 n. 16 (D.D.C. 2007), citing *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 4-5 (D.C.Cir. 1977). Pendent personal jurisdiction has adopted by every circuit court that has addressed the issue. *See Robinson v. Penn Cent. Co.*, 484 F.2d 553, 555-56 (3d Cir. 1973); *Travis v. Anthes Imperial Ltd.*, 473 F.2d 515, 529-30 (8th Cir. 1973); *Oetiker*, 556 F.2d at 4-5; *IUE AFL-CIO Pension Fund v. Herrmann*, 9F.3d 1049, 1056 (2d Cir. 1993); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 628-29 (4th Cir. 1997); *Robinson Eng'g Co. Ltd. Pension Plan & Trust v. George*, 223 F.3d 445, 449 (7th Cir. 2000); *U.S. v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002); *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004).

Specific jurisdiction exists here. And, under either a Rule 4(k)(2) "nationwide contacts" analysis or Texas long-arm jurisdiction, Sheikh Issa's extensive contacts establish general jurisdiction, as well.

**B.    The Court Has Specific Jurisdiction Over Defendant**

Sheikh Issa recruited a Houston resident to work with him, while they were both in Houston. Sheikh Issa entered into a contract with a Houston resident in Houston in 1997. For the next seven years, the two partners to the contract, Sheikh Issa and Bassam Nabulsi conducted business, in person, in Houston, for on average, three months out of

the year. As part of this partnership, Sheikh Issa appointed Bassam Nabulsi to serve as his agent to pursue business opportunities. The substantial part of this work was done while Bassam Nabulsi was in Houston. As part of this contract, Sheikh Issa entered contracts in Houston, in his personal capacity and on behalf of businesses that were created as part of the partnership.

Although anyone would be hard pressed to find a case in which a defendant with the contacts that Sheikh Issa has here would even try to contend that the Court could not exercise jurisdiction over him, one case comes close. However, even the contacts in that case were much lighter than those here, and the court still found jurisdiction. In *Enviro Petroleum*, the court found that it could exercise specific personal jurisdiction over Indonesian defendants because, like here, they actively sought a contract in Texas with a Texas-based company and negotiated a contract that called for a significant part of the contract to be performed in Texas. *Enviro Petroleum, Inc. v. Kondur Petroleum*, 79 F.Supp.2d 720, 724-25 (S.D. Tex. 1999). While the refinery was to be constructed in Texas and the plaintiff intended to fulfill its obligations of project oversight and managing the refinery from Houston, the refinery was ultimately to be located in Kazakhstan. *Id.* at 724.

This case is also somewhat analogous to cases in which out of state defendants solicited Texans to work for them. Although Nabulsi initially worked with Sheikh Issa, he ultimately came to manage all of Sheikh Issa's personal affairs.

In one case, the defendant's agent called the plaintiff, a Texan, to recruit him for out-of-state employment. *See Hall v. Envtl. Chem. Corp.*, 64 F. Supp. 2d 638, 642 (S.D. Tex. 1999). The recruitment resulted in the plaintiff accepting employment with the

defendant. *See id.* The plaintiff was injured out of state. *See id.* at 643. The court found that the defendant had "purposely availed itself of conducting recruitment and employment activities in Texas. *Id.* (internal citations omitted).

In another case, the court found that the defendant's recruitment of the plaintiff in Texas, through plaintiff's union, satisfied specific jurisdiction. *See Guyton v. Pronav Ship Mgmt., Inc.*, 139 F. Supp. 2d 815, 818 (S.D. Tex. 2001). Plaintiff was injured out of state, but the court also concluded that the recruitment and hiring of the plaintiff was "sufficiently related to Plaintiff's cause of action to support specific jurisdiction." *Id.* at 820 (citing *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 884 (5th Cir. 1993), *reh'g granted*, 20 F.3d 614 (1994), *relevant part reinstated*, 61 F.3d 1113 (1995); *see also Carter v. M/V American Merlin*, 991 F. Supp. 853, 855 (S.D. Tex. 1998)(Where Texan hurt outside the state, "specific jurisdiction may have existed had Plaintiff lived in Texas when he was hired, and had he been recruited by Defendant in Texas."). The court found that, "[t]he fact that the injury did not occur during the hiring process itself did not prevent the assertion of specific jurisdiction based on this contact, nor should it in this case.") *Id.* (citing *Coats*, 5 F.3d at 884).

Defendants cite to three cases where a contract was negotiated and formed with only one party in the forum state. *See Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 772 (5th Cir. 1986); *Stuart v. Spademan*, 772 F.2d 1185, 1192-94 (5th Cir. 1985); *Patterson v. Dietze, Inc.*, 764 F.2d 1145, (5th Cir. 1985). In all three instances, the defendant never set foot in the forum state at the time of contract negotiation and/or formation and, in *Patterson* and *Stuart*, it was the resident plaintiff that initiated the business relationship. *Id.* In contrast, both Sheikh Issa and Nabulsi were present in Texas at the time their

46

contract was formed and it was Sheika Issa who recruited, or solicited, Nabulsi while both were in Texas.

In summary, this case is based on a contract formed in Houston and substantial business operations in Houston. The Court should exercise specific jurisdiction over Sheikh Issa.

### C.    The Court Has General Jurisdiction Over Sheikh Issa

It is well-settled that "[g]eneral jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 717 (5th Cir.1999), *cert. denied,* 531 U.S. 917 (2000). "The determination of what period is reasonable in the context of each case should be left to the court's discretion." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569-70 (2d. Cir. 2006) cert. denied, 519 U.S. 1007 (1996). For general jurisdiction purposes, the court does not view each contact in isolation. *Access Telecom, Inc.*, 197 F.3d at 717 ("In determining whether nonresident defendant's contacts with the forum state are sufficient to establish general personal jurisdiction, contacts must be examined "in toto" rather than examining each contact in isolation from the others.").

Aside from his many business contacts which create specific jurisdiction, Sheikh Issa has spent millions upon millions of dollars in Houston and in the United States. He has entered into contract in Houston with Houston companies and other United States. He has spent, by his own admission, an average of three months per year in Houston from 1994 to 2004. During this time, he brought his entire family and staff to Houston and set up an office here.    He traveled from Houston to other locations using Houston travel

agents, Houston-based airlines, and a Houston jet charter service. He has visited doctors in Houston at least 74 times, with the vast majority of the visits coming within five years from when this suit was filed. He has ordered goods from Houston and U.S. companies and had them shipped to him in Abu Dhabi. He has spent millions of dollars here. He has used Houston shipping companies to do this. When he did not pay one of those companies, they sued him in Houston court, he exercised his right to remove the case to federal court, then settled the case in a settlement agreement that called for the application of Texas law.

In sum, he has purposely engaged in conduct directed toward Texas "such that [it] should reasonably anticipate being haled into court" in Texas. *Burger King*, 471 U.S. at 474. He should expect that if, his partner, any of their business partners, any of the service providers or any of his doctors, had a legal dispute with him, they would of course sue him in Houston, as one of them did. If Sheikh Issa is not subject to the personal jurisdiction of this Court under a general jurisdiction analysis, then no person, aside from full time residents of this State, are subject to the jurisdiction of this Court. General jurisdiction over Sheikh Issa has been established.

Again, one is hard pressed to find a defendant with the litany of substantial, continuous and systematic contacts that Sheikh Issa has with Texas and the United States, who would even try to make an argument that general jurisdiction does not apply. Examples of cases finding general jurisdiction show contacts much milder than those found here. In one case, the court held that it could exercise general personal jurisdiction over a furniture company in North Carolina. *Mieczkowski v. Masco Corp.*, 997 F.Supp 782, 788 (E.D. Tex. 1998). Sales in Texas accounted for only 3.2% of the company's

gross revenue over the prior four years and amounted to $5.7 million in the previous six years. *Id.* at 785. Looking at these traditional business contacts in conjunction with the defendant's interactive website, the court determined that "the contacts the defendant maintains with the State of Texas are such that it should be reasonably expect to be haled into court here." *Id.* at 788, *citing World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 297 (1980). That company did not relocate its operations to Texas for three months, as Sheikh Issa did here.

Indeed, this case is possibly closest to one of the seminal cases on general personal jurisdiction, *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952). In *Perkins*, the defendant relocated its operations from the Philippines to Ohio while the Japanese occupied the islands during World War II. *Id.* at 447. From Ohio, the president performed many functions on behalf of the defendant company, including maintaining office files, paying the his own salary and that of the two secretaries and keeping up correspondence on behalf of the company and its employees. *Id.* at 447-48. Based on these facts, the Supreme Court held that Ohio courts exercising general personal jurisdiction over the foreign corporation would not violate the Due Process Clause. *Id.* at 438. Similarly, Sheikh Issa would relocate his entire operations to the United States, and primarily in Texas, for three months every year from 1994 to 2004 (except for 2000). What defendant characterizes as mere "visits for tourism and medical services," were actually major endeavors. Sheikh Issa would relocate his entire family and bring a number of employees with him. He dedicated a room to conducting business and did extensive business here. Indeed, Houston became his headquarters for one-fourth of the

year for ten years.   And, unlike the defendant in *Perkins,* which was essentially a refugee of war, Sheikh Issa would voluntarily relocate to Texas each year.

*Helicopteros*, which Shiekh Issa relies on heavily, presented a much different set of facts than found here.  In *Helicopteros*, the defendant's chief executive only made one trip to Texas to negotiate a contract during the relevant time period.  *Helicopteros*, 466 U.S. at 416.  By contrast, Sheikh Issa spent three months per year for ten years in Houston.  The defendant sent employees on short-term purchasing and training trips. Sheikh Issa brought his entire family and employees to Texas for months at a time. General jurisdiction presents a different set of facts for each case.  None of the cases cited by Sheikh Issa come remotely close to the types of contacts he made with this forum over the course of ten years.

### D.    Fair Play and Substantial Justice Requirement is Met

Once a court has found that minimum contacts exist, "[o]nly in rare cases...will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex.1991).  Indeed, once minimum contacts are established, a defendant must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

There will be limited burden to Sheikh to have this case litigated in Texas.  He has traveled to Houston for months at a time in the past.  Aside from those records in Plaintiffs' possession, Sheikh Issa has all of the relevant business records in his possession and can produce them to Plaintiffs and bring those documents to trial.  The

key witnesses will be Plaintiffs and Sheikh Issa. The remaining witnesses will be Nabulsi's staff, who have been deported from the U.A.E. and cannot return, (and whose depositions will have to be taken in foreign countries) and police officers in the U.A.E., over whom Sheikh Issa has control.

Therefore, the burden of litigating here is negligible to the Sheikh Issa. On the other hand, dismissal will work against Plaintiffs' interest in convenient relief and the judicial system's interest in "efficient resolution of controversies." As set forth below, if this case is dismissed, Plaintiffs' only choice of forum will be the U.A.E.—a forum that Bassam Nabulsi is barred from entering and the forum in which he was improperly jailed and tortured by the government at the request of Sheikh Issa.

Plaintiffs have a strong interest in having this case tried in their home State and Judicial District, and country, as soon as possible. Dismissal will obviously work against that.

The Judicial System's interest in the efficient resolution of controversies will also be frustrated by dismissal. Dismissal would hardly be efficient, aside from the fact that it would effectively terminate Plaintiffs' claims. Further, "Texas has a strong interest in protecting the health and safety of its citizens, even when they go to work in a neighboring state." *Potts v. Cameron Offshore Boats, Inc.*, 401 F. Supp. 2d 733, 738 (S.D. Tex. 2005).

Plaintiffs have met their burden of showing a prima facie case of specific and general jurisdiction here. This is simply not the "rare" case where the exercise of jurisdiction does not comport with fair play and substantial justice. Sheikh Issa has failed

to make a "compelling case that the presence of some consideration would render jurisdiction unreasonable." Therefore, Sheikh Issa's motion should be denied.

## VIII.   THE U.A.E. IS NOT AN ADEQUATE ALTERNATIVE FORUM.

Sheikh Issa also moves to dismiss based on the doctrine of *forum non conveniens* and contends that the U.A.E. provides an adequate alternative forum for this dispute and that the various public and private factors support dismissal on this basis. Nothing could be further from the truth.

The doctrine of *forum non conveniens* derives from the proposition that "[i]n rare circumstances, federal courts can relinquish their jurisdiction in favor of another forum." *Quackenbush v. Allstate Ins. Co.*, 116 S.Ct. 1712, 1724 (1996). Pursuant to this doctrine, a court may dismiss a case in favor of a foreign forum if the defendant establishes that the convenience of the parties and the court, coupled with the interests of justice, indicate that the lawsuit is better suited for adjudication elsewhere. *See Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir.2001).

Federal courts employ a two-part analysis when applying the *forum non conveniens* doctrine in the international context. *See Piper Aircraft v. Reyno,* 102 S.Ct. 252, 265-66 (1981). The first step involves a determination of whether an adequate and available foreign forum exists. *See Sydow v. Acheson & Co.*, 81 F.Supp.2d 758, 768 (S.D.Tex.2000). Next, if an adequate alternative forum is available, the court must decide whether "certain private and public interest factors weigh in favor of dismissal." *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 424 (5th Cir.2001).

"Unless the balance of these factors is **strongly** in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Torreblanca de Aguilar v. Boeing*

*Co.*, 806 F.Supp. 139, 143 (E.D. Tex. 1992)(citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947))(emphasis added).

The Supreme Court has declined to fashion the exact circumstances that would "justify or require either grant or denial of remedy." *Piper*, 454 U.S. at 249. Consequently, a district court's inquiry is **highly fact-specific**. *See id.* ("'Each case turns on its facts.'")(quoting *Williams v. Green Bay & W.R. Co.*, 326 U.S. 549, 557 (1946)); *see also Tech. Dev. Co. v. Onischenko*, 174 Fed.Appx. 117, 121 (3d Cir.2006)(unpub.)("The inquiry conducted by the court must be detailed and fact-specific, since *forum non conveniens* remains an exceptional tool to be employed sparingly.")

### A.    The U.A.E. is Not an Adequate Alternative Forum

The alternative forum is adequate as long as the parties will be treated fairly and will not be deprived of all remedies there. *See Piper*, 102 S.Ct. at 265 n. 22. An alternative forum may be inadequate if "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper*, 454 U.S. at 254. For example, an alternative forum is inadequate if the plaintiff demonstrates significant legal or political obstacles to conducting the litigation in the alternative forum. *See Menendez Rodriguez v. Pan Am Life Ins. Co.*, 311 F.2d 429, 433 (5th Cir.1962)(vacated on other grounds, 376 U.S. 779 (1964)); *see also Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 393-94 (5th Cir. 1983)(if "conditions in the foreign forum otherwise made known to the court, plainly demonstrate that the plaintiffs are highly unlikely to obtain basic justice therein", alternative forum is not adequate).

The following are just some of the cases in which a court found a forum inadequate because of safety concerns presented to the plaintiff:

In *Menendez Rodriguez v. Pan Am Life Ins. Co.*, 311 F.2d 429, 433 (5th Cir.1962)(vacated on other grounds, 376 U.S. 779 (1964)), the Fifth Circuit found that Castro's Cuba was not an alternative adequate forum for Cuban political refugees.

In *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854 (S.D.N.Y.1983) *aff'd without opinion*, 767 F.2d 908 (2d Cir.1985), the plaintiff brought tort claims against a U.S. company involving activities in Iran. The court denied the defendant's *forum non conveniens* motion, finding that the plaintiff would be executed were he to attempt to litigate in post-revolutionary Iran.

In *Doe v. Exxon Mobil Corp.*, 393 F.Supp.2d 20, 29 (D.D.C. 2005), a court refused to dismiss on *forum non conveniens* grounds where plaintiffs brought suit against Exxon on claims that Exxon aided and abetted the Indonesian government in committing civil rights abuses against the plaintiffs. The court found that the plaintiffs demonstrated that litigating their claims in Indonesia would pose a serious risk to their safety. *See id.*

In *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 106 (2d Cir. 2000), Nigerian émigrés sued two foreign holding companies, under the Alien Tort Claims Act (ATCA) and other laws, alleging that companies participated in human rights violations against them. The trial court had dismissed the case on *forum non conveniens* grounds in favor of a British forum.[19] The Second Circuit reversed, finding that:

> One of the difficulties that confront victims of torture under color of a nation's law is the enormous difficulty of bringing suits to vindicate such abuses. Most

---

[19] The court did not find British courts an inadequate forum but reversed because of considerations of: (1) a United States resident plaintiff's choice of forum, (2) the interests of the United States in furnishing a forum to litigate claims of violations of the international standards of the law of human rights, and (3) the factors that led the district court to dismiss in favor of a British forum were not particularly compelling.

likely, the victims cannot sue in the place where the torture occurred. Indeed, in many instances, the victim would be endangered merely by returning to that place. It is not easy to bring such suits in the courts of another nation. Courts are often inhospitable. Such suits are generally time consuming, burdensome, and difficult to administer. In addition, because they assert outrageous conduct on the part of another nation, such suits may embarrass the government of the nation in whose courts they are brought. Finally, because characteristically neither the plaintiffs nor the defendants are ostensibly either protected or governed by the domestic law of the forum nation, courts often regard such suits as "not our business."

The new formulations of the Torture Victim Protection Act [under which Plaintiffs also assert here] convey the message that torture committed under color of law of a foreign nation in violation of international law is "our business," as such conduct not only violates the standards of international law but also as a consequence violates our domestic law. ... If in cases of torture in violation of international law our courts exercise their jurisdiction conferred by the 1789 Act only for as long as it takes to dismiss the case for *forum non conveniens,* we will have done little to enforce the standards of the law of nations.

*Id.* at 106.

In *Abiola v. Abubakar*, 267 F.Supp.2d 907, 907-908 (N.D. Ill. 2003), Nigerian nationals, alleging they suffered human rights abuses in that country, sued a <u>former</u> head of state under Alien Tort Claims Act (ATCA).  The plaintiffs contended that the Nigerian courts had been complicit in the abuses. *See id.* at 918.  The court, denying defendant's *forum non conveniens* motion, noted that, "a motion for dismissal on *forum non conveniens* grounds raises special concerns when the claims against the defendant are brought under the ATCA for torture and other human rights abuses." *Id.*  "Dismissal 'can represent a huge setback in a plaintiff's efforts to seek reparations for acts of torture' due to "the enormous difficulty of bringing suits to vindicate such abuses.'" *Id.* (quoting *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d at 106.)

In *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D. N.Y. 2003), current and former residents of Sudan brought a class action under the Alien Tort Claims Act, alleging that a Canadian energy company collaborated with the

Sudanese government in a policy of ethnically cleansing civilians. The defendant moved to dismiss on *forum non conveniens* grounds. The court, citing *Wiwa v. Royal Dutch Petroleum*, found that *forum non conveniens* dismissal should rarely be applied in cases involving torture claims. *See id.* at 335. Denying the motion, the court also noted that, "it would be perverse, to say the least, to require plaintiffs to bring this suit in the courts of the very nation that has allegedly been conducting genocidal activities to try to eliminate them." *Id.* at 336.

In *Cabiri v. Assasie-Gyimah*, 921 F.Supp. 1189, 1199 (S.D.N.Y.1996), a resident of Ghana brought suit against a Ghanaian security officer under the Alien Tort Claims Act and also the Torture Victim Protection Act (as Plaintiffs do here) for alleged acts of torture. The court denied the defendant's *forum non conveniens* motion, finding that the "plaintiff is highly unlikely to obtain justice in the Ghanaian courts, and that to force plaintiff to bring this action in Ghana would unnecessarily put him in harm's way, or, also unacceptable, would mean an end to the action altogether."

According to the U.S. State Department, in the U.A.E., the constitution provides for an independent judiciary; however, in practice it was not independent, as decisions were subject to review by the political leadership. *See* Country Reports on Human Rights Practices, 2007, United Arab Emirates, Released by the U.S. State Department's Bureau of Democracy, Human Rights, and Labor, March 11, 2008, at p. 17, available at http://www.state.gov/g/drl/rls/hrrpt/2007/100608.htm. Plaintiffs' experience with the judicial system of the U.A.E. reinforces this. Here, we know the following:

- Sheikh Issa wrecked his car and was shooting an automatic rifle in the streets of Abu Dhabi. Instead of being arrested, he threatened the police and then complained to his brother about the police. *See* B. Nabulsi Aff., at ¶ 42.

- Sheikh Issa tortured an Afghani national in the U.A.E., with the assistance of the police. The Afghani man reported the torture to the police, neither Sheikh Issa nor the police officer were arrested, charged or convicted. *See* B. Nabulsi Aff., at ¶ 43-45; G. Naboulsi Dec., at p. 2.

- Sheikh Issa tortured several Sudanese men in the U.A.E., with the assistance of the police. *See* B. Nabulsi Aff., at ¶47; G. Naboulsi Dec., at p. 2.

- Sheikh Issa's expert says that this type of torture should be punished in the U.A.E. *See* Ahnish Deposition, at p. 151.

- Sheikh Issa has never been arrested in the U.A.E. for anything. *See* Sheikh Issa Deposition, at p. 64.

- Sheikh Issa used the police to arrest members of Bassam Nabulsi's staff, to then jail them and deport them, although no charges were ever made. *See* B. Nabulsi Aff. at 54; Wissam El-Dabel Dec. at pp. 1-2.

- Sheikh Issa had the police arrest and jail Bassam Nabulsi, had the police torture Bassam Nabulsi, and had the prosecutor charge Bassam Nabulsi on fraudulent charges. *See* B. Nabulsi Aff., at ¶ 1.

- It was evident by the words of the police and prosecutor that Sheikh Issa was behind all of this—even the U.S. Embassy staff acknowledged that the charges were made because of a personal dispute with Sheikh Issa. *See* B. Nabulsi Aff., at ¶ 58-63; R. Nabulsi Aff., at ¶10, 11.

- Bassam Nabulsi is not even allowed to return to the U.A.E. *See* B. Nabulsi Aff., at ¶ 65.

- Shiekh Issa's legal expert acknowledges that the partnership at issue would not be recognized by U.A.E. courts. *See* Ahnish Deposition, at p. 188, 198.

- Sheikh Issa's legal expert acknowledges that, to prove his case, he must give live testimony. He could ask the judge to allow videotaped deposition testimony but he has never heard of that being done, and acknowledges that, but the judge has discretion to refuse it. *See* Ahnish Deposition, at p. 173, 177-179.

- At his deposition, Sheikh Issa asserted the protections of the Fifth Amendment to the U.S. Constitution in response to all questions about his torture of others, whether police were involved in the torture, and the arrest, prosecution and torture of Nabulsi. *See* Sheikh Issa Deposition. at pp. 68-69, 71, 77-78. The Court can make its own inference that this amounts to an admission, or at minimum, a failure to deny the claims. "[T]he prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment

'does not preclude the inference where the privilege is claimed by a party to a civil cause.'" *Baxter v. Palmigiano*, 425 U.S. 308, (1976)(*citing* 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961)).

This lawsuit is closely analogous to those cases involving a plaintiff bringing suit against a foreign country or official for civil rights abuses, or against a private company that aided and abetted a foreign country in doing so. Because he is royalty, Sheikh Issa enjoys unfettered ability to torture those out of his favor, with the help of the police. Sheikh Issa is essentially above the law in the U.A.E., because the legal system, with full knowledge of his activities, took no action whatsoever against him. Sheikh Issa, had Bassam Nabulsi arrested, tortured and deported—by the government. Sheikh Issa, as one can see in the pictures, has tortured others. Bassam Nabulsi is not allowed into the U.A.E. and could not give live testimony to support his claim, if this case had to be pursued in the U.A.E. Further, Plaintiffs' breach of contract and related claims will not be recognized in a U.A.E. court. The U.A.E. is clearly not an adequate available forum and Sheikh Issa has failed to meet his considerable burden of showing that it is.

**B.      Private and Public Factors Do Not Favor Dismissal.**

Because the U.A.E. is quite obviously not an adequate alternative forum, the Court need not consider public and private factors. But, they are discussed in abundance of caution.

### 1.      Private Factors

The private factors to be considered in a *forum non conveniens* analysis relate to the convenience of the parties, and include: the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; possibility of viewing the premises, if such

viewing would be appropriate to the action; other practical problems that make a trial of a case easy, expeditious, and inexpensive; enforceability of judgment; and whether the plaintiff has sought to vex, harass, or oppress the defendant. *See Karim*, 265 F.3d at 268 n. 14 (citations omitted).

Again, the key witnesses are Plaintiffs and Sheikh Issa. Other witnesses are located in Houston, the State of Georgia, and the U.A.E. The witnesses in the U.A.E. are all under Sheikh Issa's control and can be deposed by video for presentation in court here. On the other hand, one of the key witnesses, Bassam Nabulsi, is not allowed to enter the U.A.E. There is no such restriction on Sheikh Issa in the U.S. and he has routinely traveled here in the past. The key evidence will involve documents that are in both parties' custody. Trial here is will be as "easy, expeditious and inexpensive" as it would in the U.A.E., and substantially less expensive for Plaintiffs. Plaintiffs have filed the case here because they live here, because a substantial portion of the events at issue occurred here and because they have no ability to bring a case in the U.A.E. It is unclear whether Sheikh Issa even still lives in the U.A.E., as he has been living in Germany since September 1, 2008, and does not know when he will return. *See* Issa Deposition, at 41, 44. The private factors are strongly in favor of denying Sheikh Issa's Motion.

2.    Public Factors

The "public interest" factors include: administrative difficulties; reasonableness of imposing jury duty on the people of the community; holding the trial in the view of those affected; and the local interest in having localized controversies decided at home. *See Karim*, 265 F.3d at 268 n. 14 (citations omitted).

The people of the State of Texas have a strong interest in deciding cases like this in this State. This kind of case is exactly why we have courts, and why we need courts, in this country or anywhere else. The public factors are strongly in favor of denying Sheikh Issa's motion.

## IX.　**PRAYER**

Wherefore, Plaintiffs respectfully request that the Court deny Sheikh Issa's Motion to Dismiss and, in the alternative, if the Court finds that Plaintiffs' service on Sheikh Issa to date is not effective, that the Court permit Plaintiffs to serve Sheikh Issa by alternative means, as set forth herein.

Respectfully submitted,

**THE BUZBEE LAW FIRM**

By: */s/ Anthony G. Buzbee*
　　Anthony G. Buzbee
　　State Bar No. 24001820
　　Federal Bar No. 22679
　　JPMorgan Chase Tower
　　600 Travis, Suite 6850
　　Houston, Texas 77002
　　Tel: (713) 223-5393
　　Fax: (713) 223-5909

OF COUNSEL:
THE AZEM FIRM
Samer Al-Azem
State Bar No. 00793240
2425 West Loop South, Suite 200
Houston, Texas 77027
Tel: (713) 335-5527
Fax: (713) 528-7247

ATTORNEYS FOR PLAINTIFFS
BASSAM NABULSI, AND HIS WIFE,
RIMA NABULSI

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document will be served or has been served on all interested parties in accordance with the Federal Rules of Civil Procedure on the *19th day of December, 2008*.  Service on E-Filing Users will be automatically accomplished through the Notice of Electronic Filing; non-Filing Users will be served by certified mail, return receipt requested and/or via facsimile.


*/s/ Tony Buzbee*
Tony Buzbee