**IN THE UNITED STATE DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| BASSAM NABULSI, AND HIS WIFE, RIMA NABULSI, | § § § | |
| Plaintiffs | § | **C.A. NO. H-06-02683** |
| | § | |
| V. | § | |
| | § | |
| H.H. SHEIKH ISSA BIN ZAYED AL NAHYAN, et al, | § § | **JURY TRIAL REQUESTED** |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND
ALTERNATIVE MOTION FOR ALTERNATIVE SERVICE**

THE BUZBEE LAW FIRM
Anthony G. Buzbee
State Bar No. 24001820
Federal Bar No. 22679
JPMorgan Chase Tower
600 Travis, Suite 7300
Houston, Texas 77002
Tel:  (713) 223-5393
Fax: (713) 223-5909

Samer Al-Azem
State Bar  No. 00793240
2425 West Loop South, Suite 200
Houston, Texas 77027
Tel: (713) 335-5527
Fax: (713) 528-7247

ATTORNEYS FOR PLAINTIFFS
BASSAM NABULSI, AND HIS WIFE,
RIMA NABULSI

**TABLE OF CONTENTS**

| Section | Page |
|---|---|
| I.   Summary of Response | 9 |
| A.  Case Overview | 9 |
| B.  Personal Jurisdiction | 10 |
| C.  Forum Selection Clause | 12 |
| D.  *Forum Non Conveniens* | 13 |
| E.  Service | 13 |
| II.  Procedural Background | 13 |
| III. Standard of Review | 16 |
| A.  Jurisdiction | 16 |
| B.  Forum Selection | 16 |
| C.  *Forum Non Conveniens* | 16 |
| D.  Service | 16 |
| IV. Factual Background | 17 |
| V.  Sheikh Issa's Misunderstandings and Misrepresentations | 31 |
| A.  Sheikh Issa Recently Filed His Motion | 31 |
| B.  Misrepresentations | 31 |
| VI. Sheikh Issa is Subject to the Jurisdiction of this Court | 33 |
| A.  Jurisdiction Overview | 34 |
| B.  The Court Has General Jurisdiction Over Sheikh Issa | 39 |
| C.  The Court Has Specific Jurisdiction Over Sheikh Issa | 46 |
| 1.  Contract Claims | 48 |
| 2.  Breach of Fiduciary Duty Claims | 49 |
| 3.  Tort Claims | 50 |
| D.  Fair Play and Substantial Justice Requirement is Met | 51 |
| VII.  The Court Should Not Enforce the Forum Selection Clause | 53 |
| VIII. *Forum Non Conveniens* Dismissal is Not Warranted | 56 |
| A.  The U.A.E. is Not an Adequate Alternative Forum | 58 |
| B.  Private and Public Factors Do Not Favor Dismissal | 68 |
| 1.  Private Factors | 68 |
| 2.  Public Factors | 69 |
| IX. Sheikh Issa Has Been Served | 70 |
| X.  Alternative Motion for Alternative Service Under Fed. R. Civ. P. 4(f)(3) | 79 |
| XI. Conclusion and Prayer | 83 |

## TABLE OF AUTHORITIES

| Statutes and Rules | Page |
|---|---|
| 28 U.S.C. §1332 | 15 |
| 28 U.S.C. § 1350 | 15 |
| FED. R CIV. P. 4(f)(2)(A) | 71, 75, 76 |
| Fed. R. Civ. P. 4(f)(2)(C)(i) | 71, 75, 81 |
| FED. R. CIV. P. 4(f)(2)(C)(ii) | 13, 81 |
| FED. R. CIV. P. 4(f)(3) | 14, 79, 81, 82 |
| FED. R. CIV. P. 4(k)(2) | 34, 37, 37, 38, 42, 45 |
| FED. R. CIV. P. 12(b)(1) | 54 |
| FED. R. CIV. P. 12(b)(3) | 54 |
| TEX. CIV. PRAC. & REM. CODE § 17.042 | 34 |

| Cases | Page |
|---|---|
| *Abiaad v. Gen. Motors Corp.*, 538 F.Supp. 537 (E.D. Pa. 1982) | 61 |
| *Abiola v. Abubakar*, 267 F.Supp.2d 907 (N.D. Ill. 2003) | 60 |
| *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694 (5th Cir.1999), *cert. denied,* 531 U.S. 917 (2000) | 39 |
| *Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d 1174 (9th Cir. 2004) | 38 |
| *Adams v. Unione Mediterranean Di Sicurta*, 2004 WL 624763 (5th Cir. 2004) | 38, 42 |
| *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784 (5th Cir. 1990) | 36 |
| *Baker v. Putnal*, 75 F.3d 190 (5th Cir.1996) | 70 |
| *Ballard v. Savage*, 65 F.3d 1495 (9th Cir.1995) | 37 |
| *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,* 2006 WL 1643202 (S.D.N.Y. 2006) | 80 |
| *Baxter v. Palmigiano*, 425 U.S. 308 (1976) | 63 |
| *Bigham v. Envirocare of Utah, Inc.*, 123 F.Supp.2d 1046 (S.D. Tex. 2000) | 54 |
| *Bise v. Roehrig Maritime, L.L.C.*, 2007 WL 895839 (S.D. Tex. 2007) | 42 |
| *BP Products North America, Inc. v. Dag*ra, 232 F.R.D. 263 (E.D.Va. 2005) | 80 |
| *Braspetro Oil Services Co. v. Modec (USA), Inc.*, 240 Fed.Appx. 612 (5th Cir. 2007) | 54, 55 |
| *Brazosport Bank v. Oak Park Townhomes,* 889 S.W.2d 676 (Tex. App.—Houston [14th Dist.] 1994, write denied) | 49 |
| *The Bremen v. Zapata Off-Shore Co.*, 499 U.S. 585 (1991) | 53 |
| *Brunel Corp. v. Turbo Research, Inc.*, 2003 WL 144976 (N.D. Tex. 2003) | 42 |
| *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) | 35, 36, 37, 41 |
| *Cabiri v. Assasie-Gyimah*, 921 F.Supp. 1189 (S.D.N.Y.1996) | 60 |
| *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991) | 53 |
| *Carter v. M/V American Merlin*, 991 F. Supp. 853 (S.D. Tex. 1998) | 50, 51 |
| *Coats v. Penrod Drilling Corp.*, 5 F.3d 877 (5th Cir. 1993) | 50, 51 |
| *Colwell Realty Investments, Inc. v. Triple T Inns of Arizona, Inc.*, 785 F.2d 1330 | 35 |

| | |
|---|---|
| (5th Cir. 1986) | |
| *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123 | 55 |
| *Cosmetech Int'l, LLC v. Der Kwei Enterprise and Co., Ltd.*, 943 F.Supp. 311 (S.D.N.Y. 1996) | 76 |
| *Doe v. Exxon Mobil Corp.*, 393 F.Supp.2d 20 (D.D.C. 2005) | 59 |
| *D.R.I., Inc. v. Dennis*, 2004 WL 1237511 (S.D.N.Y. 2004) | 80 |
| *Ehrenfeld v. bin Mahfouz*, 2005 WL 696769 (S.D.N.Y. 2005) | 80 |
| *Enviro Petroleum, Inc. v. Kondur Petroleum*, 79 F.Supp.2d 720 (S.D. Tex. 1999) | 49 |
| *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997) | 38 |
| *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 2005 WL 1123755 (S.D.N.Y. 2005) | 79, 80 |
| *Forum Fin. Group, LLC v. President and Fellows of Harvard College*, 199 F.R.D. 22 (D.Me. 2001) | 80 |
| *Freudensprung v. Offshore Technical Servs., Inc.*, 398 F.3d 327 (5th Cir. 2004) | 37, 46, 47 |
| *Ginter ex. rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439 (5th Cir. 2008) | 55 |
| *Gorman v. Grand Casino of Louisiana, Inc.-Coushatta*, 1 F.Supp.2d 656 (E.D. Tex. 1998) | 43 |
| *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223 (Tex.1991) | 51 |
| *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) | 57 |
| *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201 (5th Cir 1996) | 46 |
| *Guyton v. Pronav Ship Mgmt., Inc.*, 139 F. Supp. 2d 815 (S.D. Tex. 2001) | 50 |
| *Hall v. Envtl. Chem. Corp.*, 64 F. Supp. 2d 638 (S.D. Tex. 1999) | 50 |
| *Haynesworth v. Corporation*, 121 F.3d 956 (5th Cir. 1997) | 53, 54 |
| *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) | 36, 44, 45 |
| *Henderson v. United States*, 116 S.Ct. 1638 (1996) | 70 |
| *Hughes v. St. David's Support Corp.*, 944 S.W.2d 723 (Tex. App.—Austin 1997, writ denied) | 47 |

| | |
|---|---|
| *In re Cyrus II Partnership*, 392 B.R. 248 (Bkrtcy. S.D.Tex. 2008) | 71 |
| *In re Int'l Telemedia Assoc., Inc.*, 245 B.R. 713 (N.D.Ga.2000) | 80 |
| *Inc21.com Corp. v. Flora*, 2008 WL 5130415 (N.D. Cal. 2008) | 75 |
| *International Controls Corp. v. Vesco*, 593 F.2d 166 (2nd Cir. 1979) | 80 |
| *International Shoe Co. v. Washington*, 326 U.S. 310 (1945) | 35, 36 |
| *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir.2001) | 38 |
| *IUE AFL-CIO Pension Fund v. Herrmann*, 9F.3d 1049 (2d Cir. 1993) | 38 |
| *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 603 (5th Cir. 2008) | 36 |
| *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061 (5th Cir. 1992) | 34 |
| *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258 (5th Cir.2001) | 56, 68, 69 |
| *Levin v. Ruby Trading Corp.*, 248 F.Supp. 537 (S.D.N.Y. 1965) | 80 |
| *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898 (5th Cir. 2005) | 54 |
| *Lindsey v. United States R.R. Ret. Bd.*, 101 F.3d 444 (5th Cir.1996) | 16 |
| *MacPhail v. Oceaneering International*, 302 F.3d 274 (5th Cir. 2002) | 16 |
| *MBI Group, Inc. v. Credit Foncier Du Cameroun*, 558 F.Supp.2d 21 (D.D.C. 2008) | 61 |
| *McCaskey v. Continental Airlines, Inc.*, 133 F.Supp.2d 514 (S.D. Tex. 2001) | 21 |
| *McGee v. International Life Ins. Co.*, 355 U.S. 220 (1957) | 52 |
| *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403 (5th Cir.2001) | 57 |
| *Menendez Rodriguez v. Pan Am Life Ins. Co.*, 311 F.2d 429 (5th Cir.1962) | 58 |
| *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d. Cir. 2006) | 39 |
| *Mieczkowski v. Masco Corp.*, 997 F.Supp 782 (E.D. Tex. 1998) | 43 |
| *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003 (5th Cir. 1982) | 35 |
| *Modern Computer Corp. v. Ma*, 862 F.Supp. 938 (E.D.N.Y. 1994) | 76 |
| *Muprhy v. Schneider Nat'l, Inc.*, 362 F.3d 1133 (9th Cir. 2004) | 94 |
| *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) | 70, 79, 82 |

| | |
|---|---|
| *New England Merchs., Nat'l Bank v. Iran Power Generation & Transmission Co.*, 495 F.Supp. 73 (S.D.N.Y.1980) | 80 |
| *Nikbin v. Islamic Republic of Iran*, 471 F.Supp.2d 53 (D.D.C. 2007) | 38 |
| *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1 (D.C.Cir. 1977) | 38 |
| *Omni Capital Intern. v. Rudolf Wolff & Co., Ltd.*, 108 S.Ct. 404 (1987) | 70 |
| *Oyuela v. Seacor Marine (Nigeria), Inc.*, 290 F.Supp.2d 713 (E.D. La. 2003) | 43 |
| *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952) | 44 |
| *Piper Aircraft Co. v. Reyno*, 454 U.S. 233 (1981) | 16, 57, 58 |
| *Polythane Systems v. Marine Ventures Inter.*, 993 F.2d 1201 (5th Cir. 1993) | 35 |
| *Potts v. Cameron Offshore Boats, Inc.*, 401 F. Supp. 2d 733 (S.D. Tex. 2005) | 53 |
| *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D. N.Y. 2003) | 60 |
| *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) | 56 |
| *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854 (S.D.N.Y.1983) *aff'd without opinion*, 767 F.2d 908 (2d Cir.1985) | 58 |
| *Retractable Technologies, Inc. v. Occupational & Medical Innovations, Ltd.*, 253 F.R.D. 404 (E.D. Tex. 2008) | 75 |
| *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir.2002) | 70, 79, 80, 81 |
| *Robinson Eng'g Co. Ltd. Pension Plan & Trust v. George,* 223 F.3d 445 (7th Cir. 2000) | 38 |
| *Robinson v. Penn Cent. Co.,* 484 F.2d 553 (3d Cir. 1973) | 38 |
| *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415 (5th Cir.1993) | 16, 34, 35, 37, 46 |
| *Ryan v. Brunswick Corp.*, 2002 WL 1628933 (W.D.N.Y. 2002) | 81 |
| *S.E.C. v. Tome*, 833 F.2d 1086 (2nd Cir. 1987) | 80 |
| *Schlobohm v. Schapiro*, 784 S.W.2d 355 (Tex. 1990) | 34 |
| *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266 (5th Cir. 2006) | 47 |
| *Smith v. Islamic Emirate*, 2001 WL 1658211 (S.D.N.Y. 2001) | 80 |
| *Submersible Sys., Inc. v. Perforadora Central, S.A.*, 249 F.3d 413 (5th Cir. 2001) | 37, 45 |

| | |
|---|---|
| *Sydow v. Acheson & Co.*, 81 F.Supp.2d 758 (S.D.Tex.2000) | 57 |
| *Tech. Dev. Co. v. Onischenko*, 174 Fed.Appx. 117 (3d Cir.2006) | 57 |
| *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162 (5th Cir. 1985) | 36 |
| *Travis v. Anthes Imperial Ltd.,* 473 F.2d 515 (8th Cir. 1973) | 38 |
| *U.S. v. Botefuhr*, 309 F.3d 1263 (10th Cir. 2002) | 38 |
| *Vaz Borralho v. Keydril Co.*, 696 F.2d 379 (5th Cir. 1983) | 58 |
| *Walter v. Sealift, Inc.*, 35 F.Supp.2d 532 (S.D. Tex. 1999) | 43 |
| *Williams v. Adver. Sex LLC*, 231 F.R.D. 483 (N.D.W.Va.2005) | 80 |
| *Williams v. Green Bay & W.R. Co.*, 326 U.S. 549 (1946) | 57 |
| *Williams-Sonoma Inc. v. Friendfinder Inc.*, 2007 WL 1140639 (N.D.Cal. 2007) | 80 |
| *Wilson v. Belin*, 20 F.3d 644 (5th Cir. 1994) | 35, 36 |
| *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) | 59, 60 |
| *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717 (5th Cir.1996) | 37 |
| *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) | 45 |
| **Other Materials** | **Page** |
| Black's Law Dictionary | 36 |
| Gary N. Horlick, A Practical Guide to Service of United States Process Abroad, 14 Int'l Law, 637, 640 (1980) | 76 |
| 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1083 (3d ed.2002) | 71 |
| 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1352 (3d ed.2002) | 54 |
| 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961) | 63 |

Plaintiffs, Bassam and Rima Nabulsi ("Plaintiffs"), respond to Defendant, Sheikh Issa bin Zayed Al Nahyan's ("Sheikh Issa" or "Defendant"), Motion to Dismiss and, in support, show the following:

## I.    SUMMARY OF RESPONSE

### A.    <u>Case Overview</u>

Sheikh Issa is a member of the Ruling Family of Abu Dhabi, one of the Emirates making up the United Arab Emirates ("U.A.E."). Sheikh Issa is "connected", for lack of a better term: One brother is the Crown Prince of Abu Dhabi and Deputy Supreme Commander of the U.A.E. armed forces; another is the President of the U.A.E.; another is the Minister of Interior, which is in charge of the police force; another is the Minister of Foreign Affairs; another is the Minister of Public Works; and two others serve as Deputy Prime Ministers.

Sheikh Issa moved his family and employees to Houston for, on average, three months, every year between 1994 and 2004, except the year 2000. He conducted extensive business in Houston, saw doctors in Houston, and spent vast sums of money in Houston, as well as the United States. He entered into a partnership agreement with United States citizen, Bassam Nabulsi, in Houston and that partnership forms the basis of the majority of the claims in this suit. Later in their relationship, Sheikh Issa recruited Mr. Nabulsi to move to the U.A.E., as part of their partnership.

When Mr. Nabulsi fell into disfavor with Sheikh Issa, Sheikh Issa froze him out of all of their businesses, had him arrested, tortured and tried for no good reason, other than Sheikh Issa's desire to retrieve three videotapes showing Sheikh Issa torturing other people.

As the Court will see, Sheikh Issa is a man completely out of control and above the law in his home country. His grotesque personal whims are carried out with the help of the police, the court system and his brothers, who run the country.

    **B**.    **Personal Jurisdiction**

Sheikh Issa and Bassam Nabulsi were business partners. The partnership was formed in Houston, Texas, as a result of Sheikh Issa's numerous travels to Houston. With Sheikh Issa's capital, and Mr. Nabulsi's skill and efforts, the partners earned profits exceeding tens of millions of dollars.

The partnership's business activities were focused in Houston, Texas, as well as the U.A.E., and other countries. While in Houston, and throughout the world, Mr. Nabulsi acted as Sheikh Issa's agent. The partners, on behalf of the partnership, sought business opportunities in Texas, with Texas companies. Sheikh Issa traveled to Houston, Texas in the years 1994, 1995, 1996, 1997, 1998, 1999, 2001, 2002, 2003, and 2004 for two and a half to three months per year.[1] The purpose of these trips was, in part, to conduct business.

During each of his repeated, extended visits to Texas, Sheikh Issa, his family, large entourage, and employees set up residence at the Four Seasons Hotel in Houston. During these Texas visits, Sheikh Issa hired off-duty Houston police officers as security, and used local limousine services to travel to numerous Houston area restaurants and attractions. The costs associated with these services amounted to several million dollars.

While in Texas, Sheikh Issa traded extensively with Houston retail establishments. Sheikh Issa used Houston shipping companies to ship the goods he purchased in Texas back to the U.A.E. One of the shipping companies sued Sheikh Issa

---

[1] Sheikh Issa would customarily spend at least half of each year outside the U.A.E.

in Houston.  Sheikh Issa, through his Houston attorneys, removed the case to federal court and the court found that Sheikh Issa had properly been served in Houston.  Sheikh Issa settled that suit in Texas, and the resulting settlement agreement called for the application of Texas law.

During several of his extended visits to Houston, Sheikh Issa received extensive medical care at St. Luke's Hospital, and was also personally treated by Houston physicians.  Even now, despite all that has occurred in this case, Sheikh Issa is still being treated by Houston doctors; however, rather than flying to Houston, he now flies the doctors to Abu Dhabi. Additionally, Sheikh Issa traveled from Houston for extended stays in California and Las Vegas.  Sheikh Issa also routinely traveled between Houston and Cancun, Mexico on either commercial or private flights, purchased in Texas from Texas companies.

Sheikh Issa has personally entered into contracts with several United States companies, many of which arose from his many travels to the United States.  Sheikh Issa, and companies that he owns, engaged in extensive business activities in Texas and the United States.  Further, Sheikh Issa's agents—Mr. Nabulsi and others--pursued business opportunities in Texas and in the United States, on behalf of Sheikh Issa, and with his knowledge and consent.

Due to the fact that the claims at issue in this case arose out of, or relate to, contacts with the State of Texas, due to the fact that Sheikh Issa formed a partnership in Texas that was to be carried out, in part, in Texas, due to the fact that Sheikh Issa had agents in Texas who conducted business on his behalf in Texas, and due to Sheikh Issa's

systematic and continuous contacts within both Texas and the United States, this Court has personal jurisdiction over Sheikh Issa under both general and specific jurisdiction.

### C.    Forum Selection Clause

The forum selection clause should not be enforced because enforcement would be unreasonable and unjust, in light of the allegations made in this case. Further, a condition precedent of the forum selection clause is that disputes shall first be settled amicably, which assumes that the parties will first negotiate in good faith. Considering that Sheikh Issa never negotiated at all with Mr. Nabulsi and, instead, had him arrested, tortured, tried and deported, this condition was not satisfied. Lastly, the forum selection clause is contained in the corporate documents for only one of the entities created by the partnership--IBA. In the unlikely event that the Court finds the forum selection clause valid and enforceable, only those claims that relate to the businesses involved with IBA are subject to the clause.

### D.    *Forum Non Conveniens*

After Sheikh Issa spent months at a time in Houston for years on end, entered into a partnership with Mr. Nabulsi, and then recruited Mr. Nabulsi to move with his family to the U.A.E., Mr. Nabulsi fell out of favor with Sheikh Issa. Specifically, after his father died, Sheikh Issa began to engage in deplorable behavior, including performing gruesome torture sessions, aided by the Abu Dhabi police. Mr. Nabulsi condemned this behavior and implored Sheikh Issa to stop.

Instead of stopping his behavior, Sheikh Issa turned his attention to Mr. Nabulsi. With the help of his brothers, members of the Ruling Family of Abu Dhabi, Sheikh Issa used the police and prosecutors as his personal score-settlers. The police arrested Mr.

Nabulsi and tortured him for months. The police also arrested Mr. Nabulsi's staff. The prosecutor's office presented fraudulent charges to the court. Ultimately, Mr. Nabulsi was vindicated of all but a minor charge, but was summarily deported from the U.A.E. and is not allowed to ever return.

There is no possible way that the U.A.E. presents an adequate alternative forum for this dispute. Application of the public and private factors also call for the motion to be dismissed.

### E.    Service

Sheikh Issa was properly served with citation.   The method of service in which Sheikh Issa was served is not prohibited, and is instead permitted, in the U.A.E., for cases which originate in the U.A.E. Therefore, the U.A.E. does not prohibit service in the method and manner in which he was served here.

## II.    PROCEDURAL BACKGROUND

Plaintiffs originally filed this case on August 16, 2006, against Sheikh Issa, Sheikh Mohammed Bin Zayed Al Nahyan ("Sheikh Mohammed") Sheikh Abdulla Bin Zayed Al Nahyan ("Sheikh Abdulla"), Sheikh Saif Bin Zayed Al Nahyan ("Sheikh Saif"), Sheikh Nasser Bin Zayed Al Nahyan ("Sheikh Nasser") and the Partnership of the Royal Family Bin Zayed Al Nayhan (the "Partnership").

On November 20, 2006, the Court ordered service by mail on all defendants pursuant to FED. R. CIV. P. 4(f)(2)(C)(ii). (Docket Entry No. 7).  On December 22, 2006, the Court mailed registered packages containing the summons and complaint, return receipt requested, to each of the Defendants at addresses supplied by the Plaintiffs. (Unnumbered entry on Clerk's docket sheet for December 22, 2006).

The package to Sheikh Mohammed came back to the Court signed and, on March 30, 2007, Sheikh Mohammend filed a Motion to Dismiss for lack of subject matter jurisdiction, claiming sovereign immunity, and lack of personal jurisdiction. (Docket Entry No. 15)

On May 3, 2007, Plainitffs filed a motion for alternative service, pursuant to FED. R. CIV. P. 4(f)(3), seeking an order directing Sheikh Mohammed to serve the other defendants and, alternatively, seeking leave to serve Sheikh Issa, Sheikh Nasser, Sheikh Saif, Sheikd Abdullah and the Parntership by regular mail and overnight delivery service. (Docket Entry No. 20).

On July 19, 2007, the Court granted Sheikh Mohammed's Motion to Dismiss, on foreign sovereign immunity grounds. Alternatively, the Court granted the motion on personal jurisdiction grounds, finding that Plaintiffs had not made sufficient jurisdictional allegations against Sheikh Mohammed[2]. The Court's Order also found that Plaintiffs' previous motion for alternative service was rendered moot. (Docket Entry No. 39).

On July 20, 2007, the Court received a receipt for the registered mail sent to Sheikh Issa. (Docket Entry No. 40). However, the receipt was not signed.

At a hearing on August 17, 2007, Plaintiffs notified the Court that they believed their motion for substitute service was not fully moot because they had sought alternative service based on regular mail, overnight delivery, electronic mail and facsimile.

On October 9, 2007, the Court denied Plaintiffs' motion for alternative service without prejudice and directed Plaintiffs that any future motions for alternative service

---

[2] Sheikh Issa repeatedly invokes the Court's ruling on Sheikh Mohammed's motion to dismiss. Suffice it to say that Sheikh Mohammed's contacts with Texas and the U.S. have no relevance to Sheikh Issa's Motion.

should include a prima facie showing of minimum contacts needed to establish personal jurisdiction over each defendant.  (Docket Entry No. 42).

On April 2, 2008, Plaintiffs submitted their Second Motion for Service by Mail. (Docket Entry No. 44).  On April 29, 2008, The Court denied the motion, finding that Plaintiffs had failed to show that service by mail was not prohibited by U.A.E. law and that a second attempt at serving defendants by mail was likely to succeed.  (Docket Entry No. 46).

On June 16, 2008, Plaintiffs filed their Second Amended Complaint, asserting claims against Sheikh Issa only.   (Docket Entry No. 50).  Plaintiffs moved to dismiss Sheikhs Abdulla, Saif, Nasser and the Partnership and on June 27, 2008, the Court entered an order of nonsuit as to these defendants.  (Docket Entry No. 55)

On June 19, 2008, Plaintiffs served Sheikh Issa in Abu Dhabi, U.A.E.  The return of service was filed on June 23, 2008.   (Docket Entry No. 51).

Thus, as it stands, Plaintiffs now bring claims against Sheikh Issa only, asserting claims of breach of contract, conversion, breach of fiduciary duty, torture, intentional infliction of emotional distress and malicious prosecution.   Plaintiffs assert diversity jurisdiction under 28 U.S.C. §1332 and federal question jurisdiction under 28 U.S.C. § 1350.

On August 8, 2008, after being served in Abu Dhabi, Sheikh Issa filed a Motion to Dismiss on three grounds: (1) Improper Service, (2) Lack of Personal Jurisdiction, and/or (3) *Forum Non Conveniens*.   On March 5, 2008, Sheikh Issa filed a new Motion to Dismiss, now asserting four grounds: (1) Lack of Personal Jurisdiction, (2)

Enforcement of Contractual Forum Selection Clause, (3) *Forum Non Conveniens,* and (4) Improper Service.

## III.    STANDARD OF REVIEW

### A.    Jurisdiction

"Absent any dispute as to the relevant facts, the issue of whether personal jurisdiction may be exercised over a nonresident defendant is a question of law to be determined *de novo* by this Court." *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 418 (5th Cir.1993). "

### B.    Forum Selection Clause

"The enforcement of a forum selection clause is an issue of law, and [the Fifth Circuit] review[s] the district court's conclusions of law *de novo*."  *MacPhail v. Oceaneering Int'l,* 302 F.3d 274, 278 (5th Cir. 2002).  The Fifth Circuit reviews "*de novo* a district court's determination that a contract clause is unenforceable based on public policy grounds." *Id.*

### C.    Forum Non Conveniens

A district court's dismissal for *forum non conveniens* is reviewed by a court of appeal for an abuse of discretion. *Piper Aircraft Co. v. Reyno*, 454 U.S. 233, 257 (1981).

### D.    Service

The Fifth Circuit reviews an order quashing service and granting dismissal for failure to effect timely service of process for an abuse of discretion. *Lindsey v. United States R.R. Ret. Bd.,* 101 F.3d 444, 445 (5th Cir.1996).

IV.    **FACTUAL BACKGROUND**

Plaintiffs, Bassam Nabulsi and his wife Rima Nabulsi, are individuals and citizens of the United States and of the State of Texas.  Affidavit of Bassam Nabulsi, at ¶ 2, 4, attached as **Exhibit A**; Affidavit of Rima Nabulsi, at ¶ 4, attached as **Exhibit B**.  Bassam Nabulsi was born and raised in Lebanon and moved to the United States on a student visa in 1979.  B. Nabulsi Aff., at ¶ 2.  He has lived in Texas since 1980.  *Id.*, at ¶ 2. He became an American citizen in 1991.  *Id.*, at ¶ 4.  Rima Nabulsi was born and raised in Syria.  R. Nabulsi Aff., at ¶ 2.  She moved to the United States in 1984 and has resided in Houston since 1984.  *Id.*, at ¶ 2.

Defendant, Sheikh Issa, is a member of the Royal Family of Abu Dhabi. Deposition of Sheikh Issa, at p. 13, attached as **Exhibit C**.[3]  He is the son of H.H. Sheikh Zayed bin Sultan Al Nahyan, the late ruler of the U.A.E.   Although he is a member of the royal family, Sheikh Issa holds no official position in the U.A.E. or Abu Dhabi governments.  Sheikh Issa has not lived in the U.A.E. since September 1, 2008, having moved to Germany.  Sheikh Issa Depo., at p. 41.

In the early 1990s, Mr. Nabulsi, who is fluent in the Arabic language, was operating a Houston, Texas, company (Gulf Medical Services or "GMS") which served as a concierge of sorts to Middle Eastern nationals seeking medical care and other services in Houston.  B. Nabulsi Aff., at ¶ 5.  Among Mr. Nabulsi's many clients were members of the Royal Family of Abu Dhabi.  *Id.*  With Mr. Nabulsi's assistance, over a ten year period, Sheikh Issa came at least once yearly to Houston and he and his entourage set up residence at the Houston Four Seasons Hotel.  *Id.*, at ¶ 36.  These trips were expensive.  By way of example, the Four Season bills from a 2002 and 2003 trip to

---

[3] Pursuant to the Court's order, Sheikh Issa's deposition is filed under seal.

Houston totaled $333,891.35 and $973,686.53.  *Id.*    These bills were typical and customary for Sheikh Issa's and his entourage's annual trips to Houston.  *Id.*   By Sheikh Issa's own admission, his average stay in Houston was two to two and one-half months. Sheikh Issa Depo, at p. 44.

The purpose of each Houston trip was, in part, to conduct business.  Indeed, Sheikh Issa brought his entire family and entourage with him and set up residence in Houston.  B. Nabulsi Aff., at ¶ 36.  He set up a specific room and fax line at the Four Seasons, solely dedicated to business operations.  *Id.*; Deposition of Mohammed Taghizedeh, at pp. 43-44, attached as **Exhibit D**; Declaration of Ghassan Naboulsi, at ¶ 3, attached as **Exhibit E.**

The purpose of the trips was also to obtain medical care and to purchase goods and services in Texas, not available in the U.A.E.   Based on the limited records that he was able to recover after being summarily deported from the U.A.E., we know that Sheikh Issa saw doctors in Houston at least seventy-four separate times, including having two surgeries, between March 20, 1995 and August 19, 2004.  Sheikh Issa admits to extensive medical visits in Houston and two surgeries.   Sheikh Issa's Deposition, at p. 29. To this day, Sheikh Issa is still undergoing treatment from Houston doctors. However, to avoid being served in Houston, he instead flies his doctors to Abu Dhabi for treatment.

During each visit to Houston, Sheikh Issa took side trips to California and Las Vegas, lasting as long as thirty days.   B. Nabulsi Aff., at ¶¶ 12, 39.   Sheikh Issa also routinely traveled from Houston to Cancun, Mexico.  These trips, which Sheikh Issa paid

for, were made on Houston-based Continental Airlines, or charter jets, chartered from Houston. *Id.*, at ¶ 26.

In the course of his Houston visits, Sheikh Issa purchased numerous items, primarily from Houston vendors. Documents produced by Sheikh Issa reflect that he spent $560,544.48 in 156 different transactions between March 7, 2001 and November 12, 2004 alone. **Exhibit A-8**.

During Sheikh Issa's visits to Houston, Mr. Nabulsi and GMS provided for most of Sheikh Issa's needs. This included arranging all hotel arrangements, security (primarily provided by Houston Police officers), transportation, and translation services. B. Nabulsi Aff., at ¶¶ 6, 12. At first, GMS was instructed to submit its bills to the U.A.E. Embassy. *Id., at* ¶ 5. Later, GMS was instructed to submit these bills to Alamanda, Ltd., a Florida company that had been set up by Sheikh Issa's father to pay travel and other expenses of the Royal Family when they were in the United States.[4] *Id.* A partial list of the services provided and bills incurred shows that GMS billed Alamanda $705,961.66 for services provided to Sheikh Issa in Houston between March 6, 2001 and September 2, 2003. *Id.,* at ¶ 15.

Over the course of many visits, Sheikh Issa and Mr. Nabulsi developed a personal relationship. *Id.,* at ¶ 6. Indeed, during Sheikh Issa's Houston visits in 1995 and 1996, Sheikh Issa personally began an aggressive campaign to recruit Mr. Nabulsi to work for him full time. *Id.,* at ¶¶ 6, 10. In response to Sheikh Issa's repeated requests, Mr. Nabulsi refused, stating that he was instead willing to work "with" Sheikh Issa, but not "for" Sheikh Issa. *Id.*, at ¶ 10. During this 1997 visit to Houston, Sheikh Issa and Mr.

---

[4] Plaintiffs' sent a subpoena to Alamanda for all records relating to Sheikh Issa's temporary relocation to the United States. Alamanda responded that all records had been shipped back to the U.A.E. *See* **Exhibit F.** Sheikh Issa produced none of these documents in response to Plaintiffs' discovery requests.

Nabulsi finally agreed to become partners; they sealed the agreement with a handshake. *Id.*, at ¶ 10. The partners agreed that Mr. Nabulsi would provide the "sweat" equity, and Sheikh Issa would provide financing or capital for any project or opportunity the partners mutually agreed the partnership would pursue. *Id*. The partners further agreed that they would split profits from any venture on a 50/50 basis. *Id.* It was further agreed that, because of the partners' associations and connections in both Texas and Abu Dhabi, the partnership would focus its efforts to find business opportunities in these two areas. Pursuant to the partnership, Nabulsi later managed all of Sheikh Issa's assets and holdings, including his ranches, his buildings, and the companies, Western General Trading and Western General International, among others. *Id.*, at ¶ 28. Again, the partners agreed that any profits from these partnership ventures would be split on a 50/50 basis. *Id.,* at ¶ 27. The partners also formed at least one new entity to further their partnership, IBA Co. L.L.C. ("IBA"). *Id.*, at ¶ 14. To be clear, there is no doubt that the partners intended to create a partnership. *Id.*, at ¶ 10. They agreed to each receive a right of the profits and responsibility for the debts and responsibilities of the partnership. *Id.* They each agreed to participate in the control of the partnership and to contribute money and effort for the partnership. *Id.* They held themselves out to others as "partners." *Id.*

Although Sheikh Issa was actively involved in their businesses, to further assist Mr. Nabulsi in performing the day to day operations of the partnership, Sheikh Issa ultimately gave Mr. Nabulsi power of attorney over all of his affairs, both business and private. *Id.,* at ¶ 31. To be clear, the execution of the powers of attorney was not the beginning of the partnership. *Id.*

Pursuant to the partnership agreement, Mr. Nabulsi thereafter began "splitting" his time in both Houston and Abu Dhabi, pursuing business deals and opportunities in both areas for the partnership, as well as managing those business activities already in place at the time of the partnership formation. *Id.*, at ¶ 12-33. Mr. Nabulsi ultimately moved to Abu Dhabi in 2002, but continued to visit Houston regularly with Sheikh Issa, as well as maintain a business office, now for the partnership, in Houston, Texas. *Id.,* at ¶¶ 12, 27. In each of the Houston visits, Mr. Nabulsi and Sheikh Issa, as partners, held business meetings in Houston and sought out Texas and United States opportunities for the partnership and entities formed pursuant to the partnership. *Id.*, at ¶ 16; Affidavit of Mohammed Taghizadeh, at ¶¶ 22, 24, attached as **Exhibit G**.

As demonstrated, Mr. Nabulsi and Sheikh Issa pursued various business opportunities for the partnership in Texas, with Texas companies and with other U.S. companies. B. Nabulsi Aff., at ¶ 37. One such opportunity involved extensive visits and negotiations by Mr. Nabulsi on the partnership's behalf, in Houston, with a Houston based oil company, Richfield Petroleum. *Id.*, at ¶ 17; Taghizadeh Aff. at ¶ 12. Mr. Nabulsi and Sheikh Issa, pursuant to their partnership, also met and negotiated with several Texas entities in an effort to acquire at least two refineries in Texas. B. Nabulsi Aff., at ¶ 17; Taghizadeh Aff. at ¶¶ 21, 26. Mr. Taghizadeh, as an agent of the partners, hired a Houston engineering firm to produce drawings for a proposed refinery. Taghizedeh Depo., at p.p. 13-14. Mr. Nabulsi also negotiated a letter of credit arrangement with a United States company on behalf of the individual partners. B. Nabulsi Aff. at ¶ 16. Sheikh Issa personally entered into contracts with U.S. Companies.

B. Nabulsi Aff. at ¶ 11.  Sheikh Issa also met with a Houston congresswoman to discuss business relations between Houston companies and U.A.E. companies.  *Id.* at ¶ 37.

Particularly, after his father's death in November 2004, Sheikh Issa began to demonstrate increasingly bizarre and immoral behavior.  *Id.*, at ¶ 41.  Mr. Nabulsi tried to intervene with Sheikh Issa to get him to stop.  *Id.*  Indeed, Mr. Nabulsi later learned that Sheikh Issa's brothers, who ran the country, expected Mr. Nabulsi to keep Sheikh Issa in check.  *Id.,* at ¶ 42.  In his efforts to "corral" Sheikh Issa, Mr. Nabulsi would periodically send Sheikh Issa excerpts from the Quran.  *Id.,* at ¶ 41.  This did not sit well with Sheikh Issa and only alienated Sheikh Issa from Bassam Nabulsi even more.[5]  *Id.*

As an example of Sheikh Issa's increasingly bizarre behavior, one night Bassam and Rima Nabulsi, and their son, were driving to get dinner when Sheikh Issa wrecked his car in front of them.  *Id.*, at ¶ 42.  Sheikh Issa exited the car with an automatic rifle, then returned to his car and drove off, with several police officers in pursuit.  *Id.*  The Nabulsis followed behind, worried what might happen.  *Id.*  Sheikh Issa then pulled over, threw his gun out the car window and berated the officers.  *Id.*  Later, Bassam Nabulsi saw Sheikh Issa and his brother, at Sheikh Saif's (the chief of police) house, complaining about the treatment of the officers because they had the nerve to follow Sheikh Issa's car.  *Id.*  Bassam Nabulsi later learned that Sheikh Saif was displeased with Mr. Nabulsi for not controlling Sheikh Issa's behavior.  *Id.*  Of course, it apparently never occurred to the Royal Family that Sheikh Issa should be prosecuted just like any other citizen.

More concerning, at around that time, Sheikh Issa began a habit and custom of torturing his employees or anyone else with whom he disapproved.  *Id.,* at ¶ 43.  Over

---

[5] Sheikh Issa's lawyers initially tried to claim that Mr. Nabulsi is a "radical Muslim" simply because he is an observant Muslim, and that this was the reason for his ultimate deportation from the U.A.E. However, since the facts have demonstrated that to be untrue, they have dropped that line of attack, for now.

time, these torture activities grew into full blown sessions, which were brutal, vicious, and bloody. *Id.* As his degeneracy increased, Sheikh Issa wanted such torture sessions videotaped, so he (and he believed, others) could enjoy viewing them later. *Id.* When he finally learned of it, Mr. Nabulsi disapproved vehemently with Sheikh Issa's behavior, never took part or personally observed in such conduct, and once he learned that it was happening, constantly attempted to steer Sheikh Issa away from this behavior.  *Id.*

One of Sheikh Issa's many torture victims was Mohammed Shah Poor, an Afghan who did business with Sheikh Issa. G. Naboulsi Dec., at ¶¶ 6-8.  Upon learning of Mr. Poor's alleged misdeeds, Sheikh Issa summoned Mr. Poor to his ranch in the U.A.E., under the guise of talking business.  *Id.* As Mr. Poor's family waited at the gate of the ranch, Mr. Poor entered the grounds and was taken into custody by the Abu Dhabi police. *Id.* Sheikh Issa ordered one of his personal assistants to videotape the session and told him that he would be tortured himself if he refused to do so.  *Id.* With the aid of the Abu Dhabi police, Sheikh Issa proceeded to personally torture Mr. Poor for more than forty-five minutes.  *Id.*; B. Nabulsi Aff., at ¶ 41.  The torture involved shooting an M-16 into the ground in front of where Mr. Poor was kneeling, stuffing sand into his mouth, sticking nails repeatedly into his buttocks, whipping him with a board containing nails, repeatedly kicking his head, whipping his buttocks until they bled, pouring salt onto his wounds, pouring lighter fluid onto his scrotum and lighting it on fire, sticking a cattle prod up his anus and on his genitals, and running over him with Sheikh Issa's Mercedes SUV.  G. Naboulsi Dec., at ¶ 7.[6]

---

[6] Still shots from the video are attached as Exhibits A-D of the Declaration of G. Naboulsi and Exhibits 29 and 30 of the affidavit of B. Nabulsi.

Immediately after the torture session, Mr. Nabulsi, who was away on business, received a frantic call from Abu Dhabi during which Mr. Nabulsi learned that not only had Sheikh Issa tortured Mr. Poor, but he was also refusing to allow the injured and bleeding victim to be taken to the hospital.  B. Nabulsi Aff., at ¶ 44.  Fearing that Mr. Poor might die, Mr. Nabulsi spoke to Sheikh Issa by phone.  *Id.*  During that call, Mr. Nabulsi pleaded with Sheikh Issa to allow Mr. Poor to be taken to the hospital.  *Id.*  Sheikh Issa ultimately conceded to Mr. Nabulsi's frantic requests.  *Id.*

Mr. Poor survived the ordeal and later filed a claim with the Abu Dhabi police against Sheikh Issa and the police officers involved.  *Id.*, at ¶ 45.  However, no action was taken on this claim.  *Id.*  Indeed, when Ghassan Naboulsi advised Sheikh Issa that the police wanted to question him, Sheikh Issa said that he would take care of it.  G. Naboulsi Dec., at ¶ 8.  He apparently did so, because Ghassan Naboulsi did not hear from the police again.  *Id.*

When Mr. Nabulsi returned from his trip, Sheikh Issa summoned him to his palace and showed him the video of the torture of Mr. Poor.  *Id.,* at ¶ 46.  Mr. Nabulsi was sickened by the video and told Sheikh Issa that he must not be a God-fearing man to do such things. *Id.* Nabulsi's mistake was making this statement in the presence of others, which outraged Sheikh Issa.

In addition to the session involving Mr. Poor, Sheikh Issa had also tortured several Sudanese men, with the aid of the Abu Dhabi police, and had that session videotaped as well.  G. Naboulsi Dec., ¶¶ 9, 10.

As personal and business manager for Sheikh Issa, as well as business partner, Bassam Nabulsi maintained all important business and personal items for Sheikh Issa,

including the videotapes containing the recorded torture session which Sheikh Issa had given to Mr. Nabulsi. B. Nabulsi Aff., at ¶ 47.

As the relationship between the partners deteriorated, Sheikh Issa became desperate to retrieve the torture tapes. *Id.,* at ¶ 48. In his efforts to retrieve the tapes, Sheikh Issa first shut Mr. Nabulsi out from all of their joint businesses. *Id.* Sheikh Issa had the businesses repeatedly audited but the audits found no wrongdoing. *Id.* Sheikh Issa later had Mr. Nabulsi's office staff held under house arrest with the assistance of the Abu Dhabi police. *Id.* at ¶ 54; R. Nabulsi Aff. at ¶ 7; Declaration of Wissam El Debel, at p. 1, attached as **Exhibit H.** The police continually implored the staff to give false statements that Mr. Nabulsi had stolen money from Sheikh Issa, but they refused. R. Nabulsi Aff. at ¶ 7; El Debel Dec., at p. 1. Sheikh Issa then had the staff arrested, jailed, and later threatened with deportation from the country. El Debel Dec., at p. 1.

Ultimately, Sheikh Issa had Mr. Nabulsi arrested on April 6, 2005. B. Nabulsi Aff., at ¶ 49. After his arrest, Mr. Nabulsi was held without charges for several days, during which time he was tortured. *Id.* Rima Nabulsi contacted the United States Embassy, who inquired to the U.A.E. government about the whereabouts of Bassam Nabulsi. *See* R. Nabulsi Aff., at ¶ 9. The police repeatedly told Mrs. Nabulsi and the U.S. Embassy staff that this was a private matter between Sheikh Issa and Bassam Nabulsi. *Id.,* at ¶ 10. The U.S. Embassy staff strongly encouraged the Nabulsis to write a letter to Sheikh Issa, pleading for his release, and offered to take it to Sheikh Issa. B. Nabulsi Aff., at ¶ 58.

All throughout his incarceration, the police repeatedly told Bassam Nabulsi that, if he would just return the tapes, he would be released. *Id.,* at ¶ 63.

The police department[7], under the direction of Sheikh Issa, then thoroughly searched Mr. Nabulsi's residence in an effort to find the torture tapes. *See* R. Nabulsi Aff., at ¶ 10; B. Nabulsi Aff., at ¶ 56. Further, the police searched all of Mr. Nabulsi's computers, along with any devices that might contain evidence of Sheikh Issa's involvement in the torture sessions. R. Nabulsi Aff., at ¶ 10. At the end of the search, the officer in charge told Rima Nabulsi that this was all happening because Sheikh Issa was mad at Bassam Nabulsi and once the Sheikh had "vented," this would be over. *Id.*, at ¶ 10.

After being held for several days with no charges lodged against him, the police then created charges of marijuana possession against Mr. Nabulsi. B. Nabulsi Aff., at ¶ 59. Of course, the search of Mr. Nabulsi's home revealed no marijuana, and the test performed on Mr. Nabulsi's urine was also negative for any type of drug use. *Id.* Later, the police and public prosecutor, a member of the judiciary, then fabricated new charges that Mr. Nabulsi was in possession of, and was distributing prescription drugs that were found in his home. *Id.* However, Mr. Nabulsi was able to obtain letters from his Houston physician, making it clear that the medications in Mr. Nabulsi's possession were properly prescribed to him by Houston physicians. *Id.* Mr. Nabulsi was also able to obtain a letter from this same Houston physician stating that the prescription medications primarily at issue were in fact prescribed by a Houston doctor, to Sheikh Issa. *Id.* The court system, the presiding judge, and the police refused to consider this information. *Id.*

Mr. Nabulsi was kept incarcerated for approximately two and a half months, primarily in a maximum security prison in which he suffered considerable abuse and

---

[7] The Abu Dhabi police department falls under the direction of the Interior Department, which is headed by Sheikh Issa's brother, Sheikh Saif.

torture. *Id.,* at ¶ 60. He was strip searched, jailers penetrated his rectum, he was denied medication, he was mocked for engaging in his Muslim prayer ritual, and he was placed in cells with criminals from countries not amenable to the U.S., who were told that Mr. Nabulsi was an American. *Id.,* at ¶¶ 53, 60, 62. The jailers would also force Mr. Nabulsi to undress and pose for pictures for Sheikh Issa while Mr. Nabulsi was bent over with his legs spread and genitalia exposed. *Id.,* at ¶ 61. The arresting officer repeatedly threatened to injure and rape Mrs. Nabulsi. *Id.,* at ¶ 52.

During his incarceration, the Abu Dhabi police, at the direction of Sheikh Issa, asked repeatedly about the location of the torture tapes, and repeatedly told Mr. Nabulsi that he would be killed. *Id.,* at ¶ 60.

Meanwhile, Rima Nabulsi was making every possible attempt to have her husband released. In response to her repeated inquiries to the United States Embassy in the U.A.E., Mrs. Nabulsi was repeatedly advised, in no uncertain terms, that that United States Embassy could not do anything to secure the release of Mr. Nabulsi because this was not a governmental matter but, instead, was a personal matter between Mr. Nabulsi and Sheikh Issa. R. Nabulsi Aff., at ¶ 11. They encouraged her to try to talk to Sheikh Issa and ask for his clemency. *Id.* Taking this advice, she tried many times to talk to Sheikh Issa, but he refused to see her. *Id.*

Ultimately, Rima Nabulsi was put into contact with an American adviser to the Crown Prince of Abu Dhabi. *Id.,* at ¶ 13. She pleaded with him to ask the Crown Prince to ensure that her husband was treated fairly and had a fair trial. *Id.* Within days, she learned that the Crown Prince would do that, provided that she agreed that, once the trial was over, she, her husband, and her family would leave the country and never contact

Sheikh Issa again.  *See id.*  Rima Nabulsi agreed to this.  *Id.*, at ¶ 13.  She sent her children and mother back to the United States and made the necessary preparations so that she and her husband could leave the U.A.E. as soon as the trial was over.  *Id.,* ¶ 13.

Shortly thereafter, Mr. Nabulsi's charges came to trial.  Mr. Nabulsi was acquitted of the trumped up charges of possession of marijuana.  B. Nabulsi Aff., at ¶ 64.  He was also acquitted of narcotics possession and distribution.  *Id.* Despite the fact that Mr. Nabulsi was able to provide the U.A.E. court with the requisite properly authenticated medical prescriptions from duly licensed Texas physicians for the medications at issue, Mr. Nabulsi was nevertheless ordered to pay a token fine for something he was never formally charged with—holding prescription medications without proper permission to do so.  *Id;*  R. Nabulsi Aff., at ¶ 14.

Still, although he paid the fine and the court had ordered his release, Mr. Nabulsi was sent back to jail where he stayed for fifteen additional days, after which he was taken directly to the airport and deported, with no advance notice or hearing, upon orders of the Minister of Interior, Sheikh Issa's brother.  B. Nabulsi Aff., at ¶ 65; R. Nabulsi Aff., at ¶ 15.  Mr. Nabulsi's deportation deprived him of any opportunity to seek redress or to collect the massive debt owed him by Sheikh Issa as a result of their partnership and the various businesses it formed and managed.  B. Nabulsi Aff., at ¶ 65.  Further, nearly all of the Nabulsi possessions and money were left in the U.A.E. because Plaintiffs were not able to retrieve them after Mr. Nabulsi was deported.  *Id*.

As stated, this case was initiated on August 16, 2006. Various attempts to serve Sheikh Issa were undertaken; all were unsuccessful. However, on June 4, 2008, Plaintiffs obtained new service documents from the Court.  (Unnumbered Docket Entry dated June

4, 2008).    Plaintiffs' process server had an affiliate in the U.A.E. mail the service documents to Sheikh Issa at his last known address, P.O. Box 464, Abu Dhabi, U.A.E. Declaration of Nelson Tucker, at ¶ 5, Docket Entry No. 51, and attached as **Exhibit I**.  To make sure that service was effectuated, Plaintiffs' process server then traveled to Dubai, U.A.E. for the purpose of serving Sheikh Issa.  *Id.,* at ¶ 7.  On June 19, 2008, the process server attempted service on Sheikh Issa at his business address of Emirates Towers Office Building, 45th Floor, Sheikh Zayed Road, Dubai, UAE. *Id.,* at ¶ 8.    He was advised by the security guard that the Defendant had moved his offices.  *Id.*

On June 19, 2008, at 1:45 p.m., the process server called the telephone number provided for Sheikh Issa, +1971043366661. *Id.* at ¶ 9.    The phone was answered as "Pearl Properties." *Id.*  Sheikh Issa has admitted in his Motion to Dismiss that he owns Pearl Properties.  Defendant's Original Motion to Dismiss, at p. 5.   The process server inquired if Sheikh Issa was available and the receptionist advised the process server that Sheikh Issa was not in the office but that his Business Manager could assist him.  Tucker Dec., at ¶ 9.

On June 19, 2008, the process server went to serve Sheikh Issa at his current business address of Pearl Properties, Oud Medha Road at 10th Street, First Floor, Dubai, U.A.E.  *See id.* at ¶ 10.  The process server was advised by the receptionist that Sheikh Issa was not in the office.  *See id.*  The process server inquired if the Defendant's Business Manager, Saif Al Swuidi, was present.  *See id.*   Sheikh Issa has admitted in a previous Motion for Protection that Mr. Al Swuidi is his business manager.  Motion for Protection, Docket Entry No. 68, at p. 1.  Further, Sheikh Issa has produced a Power of Attorney that shows that Sheikh Issa owns Pearl Properties and that Mr. Al Swuidi is his

business manager.  *See* General Power of Attorney to Saif Al Swuidi, attached as **Exhibit J.**

The receptionist called an unknown party on the intercom and advised the process server that Saif al Swuidi would be right out.   Tucker Dec., at ¶ 10.  On June 19, 2008, at 1:50 p.m., an individual by the name of Ismail Alabras came out and identified himself as an assistant to Sheikh Issa.   *Id.* Mr. Alabras stated to the process server that he was employed by Sheikh Issa.  *Id.,* at ¶ 11.  He further advised the process server that Sheikh Issa was not currently in the office.  *Id.*  The process server advised Mr. Alabras as to the general nature of the papers and Mr. Alabras agreed to accept them on behalf of Sheikh Issa.  *Id.* Mr. Alabras appeared to be over the age of eighteen years and spoke fluent English. *Id.*  Mr. Alabras represented to the process server that he agreed to accept the papers on behalf of Sheikh Issa and agreed to provide the papers to Sheikh Issa.  *Id.*

On June 19, 2008, the process server mailed a copy of the service documents to Sheikh Issa at the same address where the documents were left.  *Id.,* at ¶ 12.  The mailing was done in Dubai, U.A.E.  *Id.* The process server also mailed copies of the service documents to Sheikh Issa at his business addresses. *See id.* at ¶ 14. Further, on August 13, 2008, Plaintiffs personally delivered a copy of the Complaint and Summons to Sheikh Issa's current counsel. (Docket Entry No. 123). Plaintiffs incurred more than $30,000 in expenses in order to serve Sheikh Issa. Tucker Dec., at ¶ 6.

## ARGUMENT AND AUTHORITIES

### V.    SHEIKH ISSA'S MISUNDERSTANDINGS AND MISREPRESENTATIONS

As a threshold matter, Plaintiffs want to make very clear that either Sheikh Issa or his attorneys appear to misunderstand where this case sits procedurally at this point. They have also made numerous misrepresentations to the Court about the facts, some of which can be attributed to zealous advocacy, and some of which cannot.

#### A.    Sheikh Issa Recently Filed His Motion

Throughout his Motion, Sheikh Issa repeatedly complains that Plaintiffs have "offered no evidence" or have offered "inadmissible evidence" in support of their legal positions.   These complaints obviously miss the fact that, until right now, Plaintiffs have not offered any evidence in support of any position with respect to Defendant's pending Motion to Dismiss—because that Motion was filed twenty days ago.

#### B.    Misrepresentations

First, throughout his Motion, Sheikh Issa repeatedly references Plaintiffs' alleged "new" claim that Mr. Nabulsi and Sheikh Issa entered into an oral partnership agreement in Houston in 1997, and that all of the later activities sprung from that agreement.   As the Court knows, Sheikh Issa has made that argument before, in opposing Plaintiffs' Motion for Leave to file their Third Amended Complaint.   In response, Plaintiffs demonstrated that these allegations were not new and that Sheikh Issa's lawyers acknowledged in open court that they knew that this was the nature of Plaintiffs' allegations. (Docket Entry No. 118).   As argued previously, likewise this Honorable Court acknowledged its understanding of the nature of Plaintiffs' allegations.   *Id.*

Second, throughout his Motion, Sheikh Issa seizes upon a three-line portion of Mr. Nabulsi's deposition in which he says that their partnership did not "materialize" until Sheikh Issa granted him extensive powers of attorney in 2003. Sheikh Issa trumpets these three lines and argues that the partnership was really not created until 2003.[8] However, Sheikh Issa completely ignores any discussion of the remainder of Mr. Nabulsi's deposition wherein Mr. Nabulsi reiterates (again and again) that the original agreement was entered into in 1997 (despite repeated attempts by Sheikh Issa's counsel to have him say otherwise), that it subsumed and included IBA and other businesses, as well as business activities that were not part of any formal corporate entity. See Deposition of Bassam Nabulsi, at pp. 46-47, 74-79, 131-33, attached as **Exhibit K.** The full context of Mr. Nabulsi's testimony, his affidavit, and the affidavit and deposition of Mohammed Taghizadeh demonstrate clearly that the partnership agreement was operational in 1997 and that the partners conducted extensive business from 1997 until 2003, even though Mr. Nabulsi did not have the powers of attorney. As he explains in his affidavit, the reasons for Mr. Nabulsi's use of the word "materialize" is because it had been difficult for him to operate as Sheikh Issa's partner without written confirmation, such as a power of attorney, even though Sheikh Issa readily and often advised others that he and Mr. Nabulsi were partners. B. Nabulsi Aff., at ¶ 31.

Sheikh Issa's extrapolation from this three-line excerpt that Mr. Nabulsi "did not have a right of control [of the verbal partnership] until 2003" (Defendant's Motion, at p. 26) is not only contrary to Mr. Nabulsi's deposition as a whole, it is contrary to the affidavits, documentation, and other depositions. Most concerning, this argument, based

---

[8] Although, at the same time, Sheikh Issa repeatedly attempts to have the Court enforce provisions in the IBA agreement which was created well before 2003.

on a three-line excerpt, borders closely upon blatant attempt to mislead, that is difficult to chalk off as zealous advocacy.

Along these lines, although the Court should accept Plaintiffs' evidence as true, especially that evidence that is completely uncontroverted, Sheikh Issa asks the Court to transform into a psychologist and determine what Mr. Nabulsi was really thinking when he testified in his affidavit and deposition. Sheikh Issa also asks the Court to become an Arabic-English translator and linguist in this effort. Obviously, Mr. Nabulsi knows what he means when he says the partners agreed to a partnership agreement in 1997.

Third, Sheikh Issa repeatedly argues that the parties' partnership agreement was formalized into IBA and that the IBA entity reflects the one and only business relationship between Sheikh Issa and Mr. Nabulsi. Again, Mr. Nabulsi's deposition testimony, affidavit and documents attached to the affidavit, and the deposition and affidavit of Mr. Taghizadeh make it clear that the partners conducted extensive business outside of IBA. Indeed, the one partnership profit payment made by Sheikh Issa to Mr. Nabulsi was for businesses outside of IBA. B. Nabulsi Aff., at ¶ 33. Most telling is the fact that, when asked, Sheikh Issa **_did not_** deny that he and Mr. Nabulsi did business outside of IBA. In response to a direct question on this subject, Sheikh Issa instead responded that he did not remember. Sheikh Issa Depo, at p. 49. Sheikh Issa's attorney re-affirmed the response. *Id.*

## VI.    SHEIKH ISSA IS SUBJECT TO THE JURISDICTION OF THIS COURT.

Sheikh Issa contends that his contacts with the U.S. and Texas do not rise to the level that would permit this Court to exercise general jurisdiction over him and, also, that the Court does not have specific jurisdiction over this dispute. However, Sheikh Issa

engaged in extensive business in Texas and the U.S.  He appointed agents to act on his behalf, who conducted extensive business on his behalf, in Houston.  He spent months on end in Houston and spent millions of dollars here.

Further, the partnership at issue was formed in Texas by Sheikh Issa and a Houston resident.  It largely operated out of Houston for five of its seven and a half years of existence.  Also, Sheikh Issa recruited Mr. Nabulsi to move his family from Houston to Abu Dhabi as part of this partnership.  Specific and general jurisdiction have certainly been established.

### A.     Jurisdiction Overview

In federal court, for cases not involving Rule 4(k)(2), personal jurisdiction over a nonresident defendant is proper if: 1) the defendant is amenable to service of process under the forum state's long-arm statute; and 2) the exercise of jurisdiction over the defendant is consistent with due process.  *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992).  The Texas long-arm statute authorizes service of process on a nonresident defendant if the defendant is determined to be "doing business" in Texas. TEX. CIV. PRAC. & REM. CODE § 17.042.  The statute lists three activities that constitute "doing business": (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. *Id.*  This list is not exclusive, however, and the statute's "doing business" requirement is limited only by the requirements of federal due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990).  Because the phrase "doing business" has been interpreted to reach as far as the United States Constitution permits,

the jurisdictional inquiry collapses into a single due-process inquiry. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993).

Determining whether or not a court may exercise personal jurisdiction over a defendant is a fact-specific inquiry "in which the Supreme Court has accepted a 'highly realistic' approach over a mechanical or talismanic analyses." *Colwell Realty Investments, Inc. v. Triple T Inns of Arizona, Inc.*, 785 F.2d 1330, 1334 (5th Cir. 1986) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478-79 (1985); *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982). Further, "[d]eterminations regarding the exercise of personal jurisdiction over non-resident defendants must be made on a case-by-case basis." *Polythane Systems v. Marina Ventures Inter.*, 993 F.2d 1201, 1206 (5th Cir. 1993).

Whether the exercise of personal jurisdiction over a defendant is consistent with the Due Process Clause of the United States Constitution likewise requires a two-prong inquiry. First, the Court must conclude that the defendant has had "minimum contacts" with Texas. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Second, the Court must determine that requiring the defendant to litigate in Texas does not offend "traditional notions of fair play and substantial justice." *Id.*; *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994). The "minimum contacts" aspect of due process can be satisfied by either finding specific jurisdiction or general jurisdiction. *Wilson*, 20 F.3d at 647. If the conduct of a defendant that supports personal jurisdiction is related to a stated cause of action, personal jurisdiction is known as "specific jurisdiction." *Ruston Gas Turbines*, 9 F.3d at 418-19. The minimum contacts prong for specific jurisdiction can be satisfied by a single act if the nonresident defendant "purposefully avails itself of the privilege of

conducting activities in the forum state, thus invoking the benefit and protection of its laws." *Burger King*, 471 U.S. at 475 (holding that a defendant establishes minimum contacts by purposely engaging in conduct directed toward the forum state "such that the [defendant] should reasonably anticipate being haled into court there.")

Alternatively, if a defendant has insufficient contacts related to the stated cause of action to support specific jurisdiction, contacts unrelated to the cause of action may confer general jurisdiction. These contacts must be both "continuous and systematic" and "substantial." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984); *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 603, 609 (5th Cir. 2008).

In the context of a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the Court's personal jurisdiction over the defendant. *See Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994). However, it is sufficient to make a prima facie[9] showing of jurisdiction. *See Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 785 (5th Cir. 1990). "The allegations of the complaint, except insofar as controverted by opposing affidavits, must be taken as true, and all conflicts in the facts must be resolved in favor of the plaintiffs for purposes of determining whether a prima facie case for personal jurisdiction has been established." *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985).

After finding that sufficient contacts exist, the Court next examines whether requiring a defendant to defend a suit in Texas would satisfy "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316. In determining the

---

[9] "Prima Facie" has two (2) definitions in Black's Law Dictionary: 1. "Sufficient to establish a fact or raise a presumption unless disproved or rebutted." 2. As an adjective, "at first sight; on first appearance but subject to further evidence or information."

fundamental fairness issue, the Court must examine five factors: the defendant's burden; the forum state's interests; the Plaintiff's interest in convenient and effective relief; the judicial system's interest in efficient resolution of controversies; and the states' shared interest in furthering fundamental social policies. *See Ruston Gas Turbines*, 9 F.3d at 421.   An otherwise valid exercise of personal jurisdiction is presumed to be reasonable. *See Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir.1995).   Thus, once the plaintiff has made a prima facie showing of a defendant's minimum contacts with the forum state, the burden shifts back to the defendant to present a <u>compelling case</u> that the exercise of personal jurisdiction would not comport with fair play and substantial justice. *Burger King Corp.*, 471 U.S. at 477; *Freudensprung v. Offshore Technical Servs., Inc.*, 398 F.3d 327, 343(5th Cir. 2004)(internal citations omitted).

Rule 4(k)(2), also applies here.  That rule provides states:

If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Rule 4(k)(2) authorizes personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state. *See World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717 720 (5th Cir.1996) (emphasis omitted). "The due process required in federal cases governed by Rule 4(k)(2) is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment." *Submersible Sys., Inc. v. Perforadora Central, S.A.*, 249 F.3d 413, 420

(5th Cir. 2001). The last sentence of Rule 4(k)(2) provides that the rule only applies if the defendant is not subject to jurisdiction in any state. However, the Fifth Circuit has found that, so long as a defendant does not concede to jurisdiction in another state, a court may use Rule 4(k)(2) to confer jurisdiction. *See Adams v. Unione Mediterranean Di Sicurta*, 2004 WL 624763, *4 (5th Cir. 2004)(citing *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir.2001). Sheikh Issa has not conceded to jurisdiction in any other state.

While Rule 4(k)(2) applies only to claims arising under federal law, the court has "discretion to exercise 'pendent personal jurisdiction' over … [state law claims] that arise out of common nucleus of operative facts" with the federal law cause of action. *See Nikbin v. Islamic Republic of Iran*, 471 F.Supp.2d 53, 71 n. 16 (D.D.C. 2007), citing *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 4-5 (D.C. Cir. 1977). Pendent personal jurisdiction has adopted by every circuit court that has addressed the issue. *See Robinson v. Penn Cent. Co.,* 484 F.2d 553, 555-56 (3d Cir. 1973); *Travis v. Anthes Imperial Ltd.,* 473 F.2d 515, 529-30 (8th Cir. 1973); *Oetiker*, 556 F.2d at 4-5; *IUE AFL-CIO Pension Fund v. Herrmann,* 9F.3d 1049, 1056 (2d Cir. 1993); *ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 628-29 (4th Cir. 1997); *Robinson Eng'g Co. Ltd. Pension Plan & Trust v. George,* 223 F.3d 445, 449 (7th Cir. 2000); *U.S. v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002); *Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d 1174, 1181 (9th Cir. 2004).

Under either a Rule 4(k)(2) "nationwide contacts" analysis or a Texas long-arm jurisdictional analysis, Sheikh Issa's extensive contacts establish general jurisdiction here over both Sheikh Issa and all of Plaintiffs' claims. Further, because the contract at issue

in this lawsuit was formed in Houston and was, in large part, carried out in Houston, and because Sheikh Issa recruited the Nabulsi to Abu Dhabi, specific jurisdiction exists in this case as well.

### B.    The Court Has General Jurisdiction Over Sheikh Issa

The Plaintiffs and their counsel in this case realize that courts do not often find personal jurisdiction based on a general jurisdiction theory. However, despite the numerous cases that refuse to find sufficient general jurisdiction contacts, it is undisputable that there simply is no reported case where a court has confronted such longstanding, extensive, meaningful, systematic and continuous contacts as are present in this particular case. Furthermore, perhaps more importantly, in the cases where general jurisdiction was found, the forum contacts were nowhere near those extant here. Plaintiffs understand from its comments that this Honorable Court is skeptical about the imposition of general jurisdiction in this case. Plaintiffs submit, however, that if there exists in this Circuit such a thing as the imposition of personal jurisdiction based on a general jurisdiction theory, the facts of this case cry out for such here.

It is well-settled that "[g]eneral jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 717 (5th Cir.1999), *cert. denied,* 531 U.S. 917 (2000).  "The determination of what period is reasonable in the context of each case should be left to the court's discretion." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569-70 (2nd Cir. 2006), *cert. denied*, 519 U.S. 1007 (1996).  For general jurisdiction purposes, the court does not view each contact in isolation.  *Access Telecom, Inc.*, 197 F.3d at 717 ("In determining

whether a nonresident defendant's contacts with the forum state are sufficient to establish general personal jurisdiction, contacts must be examined 'in toto' rather than examining each contact in isolation from the others.").   However, in his Motion, Sheikh Issa's lawyers argue that the Court should do just that, by dividing them up into "vacation" contacts, personal business contacts, and agent's business contacts.

A proper analysis, pursuant to Fifth Circuit's requirements, views the following contacts *in toto*:

- Sheikh Issa has spent millions of dollars in Houston and in the United States.

- In his individual capacity, he has entered into contracts in Houston with Houston companies and other United States companies.

- He has spent, by his own admission, an average of three months per year in Houston from 1994 to 2004 (aside from 2000).  During this time, he brought his entire family and staff to Houston and set up an office here, essentially moving his residence to Houston for these periods.

- During these Texas visits, he hired off-duty Houston police officers as security, and used local limousine services, to travel to numerous Houston area restaurants and attractions.

- He traveled from Houston to other locations using Houston travel agents, Houston-based airlines, and a Houston jet charter service.

- He visited doctors in Houston at least seventy-four times, with the vast majority of the visits coming in the five year period before this suit was filed. He has a longstanding relationship with his Houston doctors; even today he flies his doctors to Abu Dhabi for treatment.

- He ordered voluminous goods from Houston and United States companies and had them shipped to him in Abu Dhabi.  He has used Houston shipping companies to do this.

- When he did not pay one of those shipping companies, they sued him in Houston court; he exercised his right to remove the case to federal court; then settled the case in a settlement agreement that called for the application of Texas law and consented to his jurisdiction in Texas.

- Sheikh Issa entered into a partnership agreement with a Houston resident, Mr. Nabulsi, in Houston. That agreement was to be performed, in large part, in Texas.

- Mr. Nabulsi, a Houston resident, acted as Sheikh Issa's agent in Houston.

- The partners sought business opportunities in Texas, with Texas companies.

- While in Houston, he personally began an aggressive campaign to recruit Mr. Nabulsi to work for him full time.  Ultimately, he convinced Mr. Nabulsi to move from Houston to Abu Dhabi.

Sheikh Issa's lawyers have twice said that they do not contest these jurisdictional allegations and they do not do so in their Motion.  *See* Sheikh Issa's Motion for a Protective Order and Response to Plaintiffs' Motion to Compel (Docket Entry No. 68), at p. 7;  Transcript from October 1, 2008, hearing, at p. 17, Lines 4-5, relevant portion attached as **Exhibit L**.

After examining these contacts "*in toto*," it is obvious that these contacts meet the "minimum contacts" standard, and were "continuous and systematic" and "substantial." Sheikh Issa has purposely engaged in conduct directed toward Texas "such that [he] should reasonably anticipate being haled into court" in Texas.  *Burger King*, 471 U.S. at 474.  He should expect that if, his partner, any of their business partners, any of the service providers or any of his doctors had a legal dispute with him, they would of course sue him in Houston, as one of them did.   He did not carefully structure his business or personal operations such that he would avoid being subject to suit in Texas—in fact, he came to Texas for several months a year for ten years, did business here, spent money here, and hired Mr. Nabulsi here.  If Sheikh Issa is not subject to the personal jurisdiction of this Court under a general jurisdiction analysis, then no person, aside from full-time residents of this State, are subject to the jurisdiction of this Court.

Sheikh Issa's lawyers state that despite a diligent search, they have not found any cases in which a court found that the contacts of the character and quality of the ones here gave rise to general jurisdiction. In one sense, that is understandable—because courts in this Circuit have routinely found general jurisdiction on much lighter contacts than those found here.

In *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651-52 (5th Cir. 2004), the Fifth Circuit, applying a Rule 4(k)(2) analysis, found general jurisdiction where the defendant insured 260 shipments to the U.S. over a seven year period, paid 155 claims to U.S. companies over a four year period and employed numerous claims adjusters, surveyors, and other representatives in the U.S. The court noted that this level of activity in the U.S. made it foreseeable that the defendant was subject to suit in the U.S. *Id.* at 652.

In *Bise v. Roehrig Maritime, L.L.C.*, 2007 WL 895839, *3 (S.D. Tex. 2007), the district court found general jurisdiction where the defendant's vessels made port calls in Texas nineteen times over a five year period and entered into one contract with a Texas shipyard.

In *Brunel Corp. v. Turbo Research, Inc.*, 2003 WL 144976, *4 (N.D. Tex. 2003), the district court found general jurisdiction where the defendant ordered components from a Texas business, procured sales agent agreements regarding Texas businesses, attended a Texas trade show sponsored by Texas A&M for the "last few years," had a listing in a national business directory, made visits to Texas utilities "two years ago," discussed "potential" business with a Texas company and sent one proposal to a Texas

company that year.   Importantly, there was no evidence that the defendant actually made any profit in Texas, much less set foot in Texas, aside from a handful of times.

In *Oyuela v. Seacor Marine (Nigeria), Inc.*, 290 F.Supp. 713, 720-21 (E.D. La. 2003), the district court found general jurisdiction where the defendant had an officer in Louisiana, paid its employees through a Louisiana affiliate, and used an affiliate as a "go between" on personnel matters for its employees.

In *Walter v. Sealift, Inc.*, 35 F.Supp2d 532, 534-35 (S.D. Tex. 1999), the district court found general jurisdiction over a defendant who chartered a vessel that had called on the Port of Houston three or four times per year over the course of five years and which had sent employees to meet the vessel to arrange for the provision of repairs, supplies and crew members in Texas.

In *Gorman v. Grand Casino of Louisiana, Inc.-Coushatta*, 1 F.Supp.2d 656, 658-59 (E.D. Tex. 1998), the district court found general jurisdiction where the defendant had targeted its advertising at Texas.   The court noted that, by directing its advertising at Texas, it had sufficiently invoked the benefits and protections of Texas law such that it consented to be sued in Texas on any claim.   *Id*. at 659.

In *Mieczkowski v. Masco Corp.*, 997 F.Supp 782, 785 (E.D. Tex. 1998), the district court found general jurisdiction over a furniture company in North Carolina where sales in Texas accounted for only 3.2% of the company's gross revenue over the prior four years and totaled $5.7 million over the previous six years, and where the defendant had a website that attracted site visitors from Texas.

The above cases did not involve the volume of systematic and continuous forum contacts as are present in this case. However, the one case that comes close is one of the

seminal cases on general personal jurisdiction, *Perkins v. Benguet Consol. Min. Co.*, 342 U.S. 437 (1952). In *Perkins*, the defendant relocated its operations from the Philippines to Ohio, while the Japanese occupied the Philippines during World War II. *Id*. at 447. From Ohio, the president performed many functions on behalf of the defendant company, including maintaining office files, paying the his own salary and that of the two secretaries and keeping up correspondence on behalf of the company and its employees. *Id*. at 447-48. Based on these facts, the Supreme Court held that Ohio court's exercise of general personal jurisdiction over the foreign corporation would not violate the Due Process Clause. *Id*. at 438. Similarly, Sheikh Issa would relocate his entire operations to the United States, and primarily to Texas, for three months every year from 1994 to 2004 (except for 2000). What his attorneys characterize as mere "visits for tourism and medical services," were actually major endeavors. Sheikh Issa would relocate his entire family and a number of employees to Houston. He dedicated a room to conducting business and did extensive business here. Indeed, Houston became his headquarters for one-fourth of the year, for a ten year period. And, unlike the defendant in *Perkins,* which was essentially a refugee from his home country, Sheikh Issa voluntarily relocated to Texas each year.

*Helicopteros*, which Sheikh Issa relies on heavily in his Motion, presented a much different set of facts than found here. In *Helicopteros*, the defendant's chief executive only made **one** trip to Texas to negotiate a contract during the relevant time period. By contrast, Sheikh Issa spent almost three months per year for ten years in Houston. In *Helicopteros*, the defendant only sent certain employees on short-term purchasing and

training trips. By contrast, Sheikh Issa brought his entire family, entourage, and many employees to Texas for months at a time.

In the other case which relied upon by Sheikh Issa, *Submersible Systems, Inc., v. Peforadora Central, S.A. de C.V.*, 249 F.3d 413 (5th Cir. 2001), the Fifth Circuit examined the defendant's Mississippi contacts under the Mississippi long-arm statute, and its national contacts under Rule 4(k)(2). The court found no general jurisdiction under Mississippi law because the defendant had only constructed a drilling rig in a Mississippi shipyard and also found that the contacts were less than those presented in *Helicopteros*. *Id.* at. 420. The court also looked at the defendant's national contacts and found "very few." Specifically, the defendant had an account at a Texas bank, had sent some employees to a trade conference in Houston, had bought unspecified parts in the U.S., and its vessels called on U.S. ports an undetermined number of times. *Id.* at 421. The court found that these contacts were not continuous or systematic and were, at best, sporadic. *Id.*

Sheikh Issa's contacts with Texas and the U.S. are much more continuous, systematic, and substantial than those in *Helicopteros* and *Submersible Systems*.

The Supreme Court has made it clear that due process "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit" and looks to "whether a defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Considering his extensive, systematic, and longstanding contacts with Texas, there is no

reasonable basis to contend that Sheikh Issa could not anticipate being haled into court here, in Texas.

### C.    The Court Has Specific Jurisdiction Over Sheikh Issa

As general jurisdiction is established, the Court need not examine whether it can exercise specific jurisdiction over Sheikh Issa. However, Plaintiffs will address that issue as well.

A court may exercise specific jurisdiction when (1) the non-resident defendant purposely availed himself of the privileges of conducting activities in the forum state; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state. *Freudensprung v. Offshore Tech. Serv.*, 379 F.3d 327 (5th Cir. 2004). To determine whether specific jurisdiction exists, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.,* 85 F.3d 201, 205 (5th Cir. 1996). The non-resident's purposeful availment must be such that the defendant should reasonably anticipate being haled into court in the forum state. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993).

Sheikh Issa entered into a contract with a Houston resident in Houston in 1997. For the next seven years, the two partners to the contract, Sheikh Issa and Mr. Nabulsi, conducted business, in person, in Houston, for three months out of the year, on average. As part of this partnership, Sheikh Issa appointed Mr. Nabulsi to serve as his agent to pursue business opportunities in the U.S. and Mr. Nabulsi did so. A substantial part of this work was done while Bassam Nabulsi was in Houston. Also, as part of this

partnership contract, Sheikh Issa entered into other contracts in Houston, in his personal

capacity and on behalf of businesses that were created as part of the partnership.   Sheikh

Issa recruited a Houston resident to work with him, while they were both in Houston.

Sheikh Issa relies heavily on *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266

(5th Cir. 2006) for the proposition that the court must find specific jurisdiction over each

claim.  Specifically, the opinion says:

> If a defendant does not have enough contacts to justify the exercise of
> general jurisdiction, the Due Process Clause prohibits the exercise of
> jurisdiction over any claim that does not arise out of or result from the
> defendant's forum contacts.
> …
> If a plaintiff's claims relate to different forum contacts of the
> defendant, specific jurisdiction must be established for each claim."

Id. at 274, 275.

Sheikh Issa then contends that the Court should break up the claims into

"contract" claims and "tort" claims.  Sheikh Issa simply disregards and ignores Plaintiffs'

breach of fiduciary claims.

As stated, Sheikh Issa has enough contacts to justify the exercise of general

jurisdiction over him. Additionally, all of the claims in this suite "arise out of" and most

certainly "result from" are related to Sheikh Issa's forum contacts.  (The phrases "relate

to," as used in the *Freudensprung* case, or "result from," as used in the *Seiferth* case, are

important phrases that should not be ignored in this analysis.) The fact is, this lawsuit

would have never come to be had Sheikh Issa not traveled to Houston many times,

encouraged Mr. Nabulsi to enter into a partnership agreement with him, and recruited Mr.

Nabulsi (in Houston) to move from Houston to Abu Dhabi.  Regardless of which phrase

you focus on, all claims in this case arise from, relate to, and result from Sheikh Issa's Texas activities.

1.        Contract Claims

As noted above, on this point, Sheikh Issa enters into his refrain that 1) the partnership agreement was converted into the IBA corporate entity or, if the Court does not buy that (since it conflicts with Mr. Nabulsi's and Mr. Taghizadeh's testimony and is unsupported by any evidence from Sheikh Issa himself), then the contract was really not in existence until 2003 when Sheikh Issa executed the powers of attorney.   Obviously, Sheikh Issa hopes that, if he says it enough times, it will be true. He also apparently hopes this Court will ignore the clear case law requiring all factual disputes to be resolved in favor of the Plaintiffs.

Again, the contract at issue in this case was created in Houston.  Sheikh Issa has not denied that and he has already stipulated to Plaintiffs' jurisdictional allegations.  IBA was a part of the partnership agreement but certainly not the only part of it.  And, the members of IBA did extensive business in Texas well after IBA was started, which had nothing to do with IBA.  The partnership did extensive business in Texas and other places long before the powers of attorney were ever executed.  All of the contract claims in this case either arise from, or relate to, the 1997 partnership agreement created in Houston and which, incidentally, came about at the insistence of Sheikh Issa.  Sheikh Issa came to Houston, enticed a Houston man to enter into a partnership with him and engaged in that partnership business in Texas.   Whether you say they arise from, relate to, or resulted from Sheikh Issa's Texas activities, there is no doubt the Court has specific jurisdiction over the contract claims.

This case presents similar facts to those found in *Enviro Petroleum, Inc. v. Kondur Petroleum*, 79 F.Supp.2d 720, 724-25 (S.D. Tex. 1999). In *Enviro Petroleum*, the district court found that it could exercise specific personal jurisdiction over Indonesian defendants because, like here, they actively sought a contract in Texas with a Texas-based company and negotiated a contract that called for a significant part of the contract to be performed in Texas. While the subject refinery was to be constructed in Texas and the plaintiff intended to fulfill its obligations of project oversight and managing the refinery from Houston, the refinery was ultimately to be located in Kazakhstan. *Id.* at 724.

2.    Breach of Fiduciary Duty Claims

In his Motion to Dismiss, Sheikh Issa claims that Plaintiffs have not appropriately pled a breach of fiduciary claim. Sheikh Issa thus does not bother to discuss how or why the Court cannot exercise specific jurisdiction over those claims. One imagines that Sheikh Issa had to lodge an argument, no matter how weak, on every one of Plaintiffs' claims and this was the best he could do here.

In their Third Amended Complaint, Plaintiffs plead a breach of fiduciary claim—that Sheikh Issa owed Mr. Nabulsi a fiduciary duty as his partner and that the conduct described in the factual summary of the Complaint demonstrated that. That factual summary discussed how Sheikh Issa and Mr. Nabulsi entered into a partnership agreement in Houston, Sheikh Issa recruited his partner to move from Houston to Abu Dhabi, and Sheikh Issa had his partner,[10] Mr. Nabulsi, arrested, tortured, tried, and deported, had all of his records and computers seized, took partnership assets for himself,

---

[10] It is well established under Texas law that partners are charged with a fiduciary duty. *Hughes v. St. David's Support Corp.*, 944 S.W.2d 423, 425 (Tex. App.-Austin 1997, writ denied); *Brazosport Bank v. Oak Park Townhouses,* 889 S.W.2d 676, 683 (Tex. App.-Houston [14th Dist.] 1994, writ denied).

and took steps to compromise the partnership assets —all as part of a strategy to retrieve some videotapes from Mr. Nabulsi.   These are certainly not conclusory allegations; they are instead factual assertions, all of which are true.

3.    Tort Claims

Sheikh Issa contends that the tort claims happened in Abu Dhabi and therefore specific jurisdiction is not present.   However, this case is analogous to cases in which out of state defendants solicited Texans to work for them, as Sheikh Issa did here.

In *Hall v. Envtl. Chem. Corp*., 64 F. Supp. 2d 638, 642 (S.D. Tex. 1999), the defendant's agent called the plaintiff, a Texan, to recruit him for out-of-state employment.   The recruitment resulted in the plaintiff accepting employment with the defendant. *See id.*  The plaintiff was injured in a remote area of the Pacific Ocean.  *See id.* at 643.   The court found specific jurisdiction over the claims in the lawsuit because the defendant had purposely availed itself of the forum by the single act of recruiting the plaintiff in Texas. *Id*.   It did not matter that the negligence had occurred and damages were suffered away from Texas.

In *Guyton v. Pronav Ship Mgmt., Inc*., 139 F. Supp. 2d 815, 818 (S.D. Tex. 2001), the district court found that the defendant's recruitment of the plaintiff in Texas, through plaintiff's union, satisfied specific jurisdiction.   The plaintiff was injured on the seas between Japan and Indonesia, but the court concluded that the recruitment and hiring of the plaintiff was "sufficiently related to Plaintiff's cause of action to support specific jurisdiction." *Id*. at 820 (citing *Coats v. Penrod Drilling Corp*., 5 F.3d 877, 884 (5th Cir. 1993), *reh'g granted*, 20 F.3d 614 (1994), *relevant part reinstated*, 61 F.3d 1113 (1995); *see also Carter v. M/V American Merlin*, 991 F. Supp. 853, 855 (S.D. Tex. 1998)(Where

49

Texan hurt outside the state, "specific jurisdiction may have existed had Plaintiff lived in Texas when he was hired, and had he been recruited by Defendant in Texas."). The court found that, "[t]he fact that the injury did not occur during the hiring process itself did not prevent the assertion of specific jurisdiction based on this contact, nor should it in this case." *Id.* (citing *Coats*, 5 F.3d at 884).

Here, Sheikh Issa recruited Mr. Nabulsi to move with him and his family to Abu Dhabi. As with all of these recruitment cases, the tortious activity took place and the damage was suffered far away with Texas. But the key thing was the defendant had recruited a Texan and, therefore, could reasonably expect to be haled into court in Texas. The same principles hold true here.

### D.    Fair Play and Substantial Justice Requirement is Met

Once a court has found that minimum contacts exist, "[o]nly in <u>rare cases</u> . . .will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex.1991)(citing *Burger King*, 471 U.S. at 477-78). Indeed, once minimum contacts are established, a defendant must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

There will be limited burden to Sheikh Issa to have this case litigated in Texas. He has traveled to Houston for months at a time in the past—every year for a ten year period. He has managed to bring his entire family and staff with him on these visits. Given his travels here, and his obvious fondness for this area, trial in Houston will be

absolutely no burden to Sheikh Issa.[11]  Aside from those records in Plaintiffs' possession, Sheikh Issa has all of the relevant business records in his possession and can produce them to Plaintiffs and bring those documents to trial.  The key witnesses will be Plaintiffs and Sheikh Issa. The remaining witnesses will be Mr. Nabulsi's former staff, who have been deported from the U.A.E. and cannot return, (and whose depositions will have to be taken in foreign countries) and police officers in the U.A.E., over whom Sheikh Issa has control.

Therefore, the burden of litigating here is negligible to Sheikh Issa.  On the other hand, dismissal will work against Plaintiffs' interest in convenient relief and the judicial system's interest in "efficient resolution of controversies."  As set forth below, if this case is dismissed, Plaintiffs' only choice of forum will be the U.A.E.—a forum that Mr. Nabulsi is barred from entering and the forum in which he was improperly jailed and tortured by the government at the request of Sheikh Issa.

Plaintiffs have a strong interest in having this case tried in their home state, Judicial District, and country, as soon as possible.  Dismissal will obviously work against that.

The Judicial System's interest in the efficient resolution of controversies will also be frustrated by dismissal.  Dismissal would hardly be efficient, aside from the fact that it would effectively terminate Plaintiffs' claims.  Further, "Texas has a strong interest in protecting the health and safety of its citizens, even when they go to work in a

---

[11]   More than fifty years ago, the Supreme Court noted that "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity." *McGee v. International Life Ins. Co*, 355 U.S. 220, 223 (1957)

neighboring state." *Potts v. Cameron Offshore Boats, Inc.*, 401 F. Supp. 2d 733, 738 (S.D. Tex. 2005).

Plaintiffs have met their burden of showing a prima facie case of general and specific jurisdiction here. This is simply not the "rare" case where the exercise of jurisdiction does not comport with fair play and substantial justice. Sheikh Issa has failed to make a "compelling case that the presence of some consideration would render jurisdiction unreasonable." Therefore, Sheikh Issa's motion should be denied on this ground.

## VII. THE COURT SHOULD NOT ENFORCE THE FORUM SELECTION CLAUSE.

"Forum selection clauses, although not historically favored, are *prima facie* valid." *Carnival Cruise Lines, Inc. v Shute*, 499 U.S. 585, 589 (1991)(quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9-10 (1972)). Generally, forum selection clauses will be enforced unless the forum selection clause is unfair and unreasonable. *See id.* The Supreme Court has established four bases for concluding that a forum selection clause is unreasonable: 1) the incorporation of the forum selection clause into the agreement was the result of fraud or overreaching; 2) the party seeking to escape enforcement "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; 3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or 4) enforcement of the forum selection clause would contravene a strong public policy of the forum state. *Haynsworth v. Corporation*, 121 F.3d 956, 963 (5th Cir. 1997)(citing *Carnival Cruise Lines*, 499 U.S. at 595 and *Bremen,* 407 U.S. at 12-13.)

Federal law applies to determine the enforceability of forum selection clauses in both diversity and federal question cases. *See id. at* 962.

In the Fifth Circuit, a motion to dismiss based on a forum selection clause is properly brought under Rule 12(b)(3) (improper venue). S*ee Lim v. Offshore Specialty Fabricators, Inc*., 404 F.3d 898, 901-02 (5th Cir.2005) ( "Because our court has accepted Rule 12(b)(3) as a proper method for seeking dismissal based on a forum selection clause, we need not decide whether a Rule 12(b)(1) motion would be appropriate") (citations omitted).

On a Rule 12(b)(3) motion to dismiss for improper venue, the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff. *Braspetro Oil Services Co. v. Modec (USA), Inc*., 240 Fed.Appx. 612, 616 (5th Cir. 2007)(citing *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir.2004) and 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1352 (3d ed.2004)); *McCaskey v. Continental Airlines Inc.*, 133 F.Supp.2d 514, 523 (S.D.Tex.2001); *Bigham v. Envirocare of Utah, Inc*., 123 F.Supp.2d 1046, 1048 (S.D.Tex.2000).

The clause at issue, which only appears in the documents related to the IBA entity, states that "all arising disputes shall be settled amicably, failing which they shall be referred to Abu Dhabi various courts." *See* Defendant's Motion, Ex. 4.   A condition precedent to referral of disputes to Abu Dhabi courts is that they first be "settled amicably."   Obviously, the intent of the provision is that the parties' shall first negotiate any disputes relating to this agreement in "amicably" or in good faith.   However, the evidence is clear that Sheikh Issa never negotiated any disputes with Mr. Nabulsi at all,

much less "amicably" or in good faith.  Sheikh Issa's "negotiations" involved having Mr. Nabulsi arrested, tortured, prosecuted and deported.  Because this condition precedent failed, the remainder of the clause is unenforceable.

Second, as set forth below in the *forum non conveniens* discussion, if the clause is enforced, the Nabulsis "will for all practical purposes be deprived of [their] day in court" because of the grave inconvenience and unfairness of trial in the U.A.E.; the application of U.A.E. law will deprive the Plaintiffs of a remedy; and enforcement of the forum selection clause would contravene a strong public policy of Texas.

Finally, if the Court is inclined to enforce the clause, it should do so on a limited basis.  The clause at issue is found in a document involving one company, IBA. However, the evidence shows that the parties did business outside of IBA and therefore business done outside of IBA does not constitute "arising disputes" from the IBA agreement.  And of course, Plaintiffs' tort claims are not "arising disputes" from the IBA agreement.  The Fifth Circuit recently reiterated that it has foresworn "slavish adherence to a contract/tort distinction [with respect to a forum selection clause]; to hold to the contrary would allow a litigant to avoid a forum-selection clause with 'artful pleading.'" *Ginter ex. rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 444 (5th Cir.2008). The court called for a common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims.  *Id.* at 444-45.  Courts have found that the term "arising" is generally interpreted as indicating a causal connection. *Braspetro Oil Services Co. v. Modec (USA), Inc.*, 240 Fed.Appx. 612, 616 (5th Cir.  2007)(citing *Coregis Ins. Co. v. Am. Health Found., Inc.,* 241 F.3d 123, 128 (2d Cir.2001)).

Here, there is no doubt that the IBA agreement, and its forum selection clause, only covered IBA business. As stated, the partners did extensive business outside of IBA and there is no indication that they intended for non-IBA disputes to be covered by this clause. In fact, the partnership did business through various different entities as well as outside any of any entity structure. None of these other entities had contracts containing forum selection clauses. Further, there is no way that either party intended for tort claims like those asserted here were to be covered under this clause. Last, Mrs. Nabulsi was not a party to this contract and her claims do not fall under the clause. Common sense dictates that, if the Court is inclined to enforce the clause, it should do so for only IBA related contract disputes and only for Mr. Nabulsi's claims involving IBA.

## VIII.   *FORUM NON CONVENIENS* DISMISSAL IS NOT WARRANTED.

Sheikh Issa also moves to dismiss based on the doctrine of *forum non conveniens* and contends that 1) the U.A.E. provides an adequate alternative forum for this dispute and 2) the various public and private factors support dismissal on this basis. Nothing could be further from the truth.

The doctrine of *forum non conveniens* derives from the proposition that "[i]n **rare** circumstances, federal courts can relinquish their jurisdiction in favor of another forum." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 722 (1996)(emphasis added). Pursuant to this doctrine, a court may dismiss a case in favor of a foreign forum if the defendant establishes that the convenience of the parties and the court, coupled with the interests of justice, indicate that the lawsuit is better suited for adjudication elsewhere. *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir. 2001).

Federal courts employ a two-part analysis when applying the *forum non conveniens* doctrine in the international context. *Piper Aircraft v. Reyno,* 454 U.S. 235, 255-56 (1981). The first step involves a determination of whether an adequate and available foreign forum exists. *Sydow v. Acheson & Co.*, 81 F.Supp.2d 758, 768 (S.D.Tex. 2000). Next, if an adequate alternative forum is available, the court must decide whether "certain private and public interest factors weigh in favor of dismissal." *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 424 (5th Cir. 2001).

Generally, there is a strong presumption in favor of the plaintiff's choice of forum. *See Piper*, 454 U.S. at 250. **"**Unless the balance is **strongly** in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)(emphasis added). Deference to the plaintiff's forum become stronger where the plaintiff is an American citizen (as both Plaintiffs are), especially in cases in which the underlying claims arose under United State law or seek to enforce or promote significant American policy interests. *Piper,* 454 U.S. at 256.

The Supreme Court has declined to fashion the exact circumstances that would "justify or require either grant or denial of remedy." *Piper*, 454 U.S. at 249. Consequently, a district court's inquiry is highly fact-specific. *Id.* ("'Each case turns on its facts.'")(quoting *Williams v. Green Bay & W.R. Co.*, 326 U.S. 549, 557 (1946)); *see also Tech. Dev. Co. v. Onischenko*, 174 Fed.Appx. 117, 121 (3d Cir.2006)(unpub.)("The inquiry conducted by the court must be detailed and fact-specific, since *forum non conveniens* remains an exceptional tool to be employed sparingly.")

A.    **The U.A.E. is Not an Adequate Alternative Forum.**

The alternative forum is adequate as long as the parties will be treated fairly and will not be deprived of all remedies there. *See Piper*, 454 U.S. at 254, n. 22. An alternative forum may be inadequate if "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper*, 454 U.S. at 254. For example, an alternative forum is inadequate if the plaintiff demonstrates significant legal or political obstacles to conducting the litigation in the alternative forum. *Menendez Rodriguez v. Pan Am Life Ins. Co.*, 311 F.2d 429, 433 (5th Cir.1962)(vacated on other grounds, 376 U.S. 779 (1964)); *see also Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 393-94 (5th Cir. 1983)(if "conditions in the foreign forum otherwise made known to the court, plainly demonstrate that the plaintiffs are highly unlikely to obtain basic justice therein", alternative forum is not adequate).

The following are just some of the cases in which a court found a forum inadequate because of safety concerns presented to the plaintiff:

In *Menendez Rodriguez v. Pan Am Life Ins. Co.*, 311 F.2d 429, 433 (5th Cir.1962)(vacated on other grounds, 376 U.S. 779 (1964)), the Fifth Circuit found that Castro's Cuba was not an alternative adequate forum for Cuban political refugees.

In *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854 (S.D.N.Y.1983) *aff'd without opinion*, 767 F.2d 908 (2d Cir.1985), the plaintiff brought tort claims against a U.S. company involving activities in Iran.  The court denied the defendant's *forum non conveniens* motion, finding that the plaintiff would be executed were he to attempt to litigate in post-revolutionary Iran.

In *Doe v. Exxon Mobil Corp.*, 393 F.Supp.2d 20, 29 (D.D.C. 2005), a court refused to dismiss on *forum non conveniens* grounds where plaintiffs brought suit against Exxon on claims that Exxon aided and abetted the Indonesian government in committing civil rights abuses against the plaintiffs. The court found that the plaintiffs demonstrated that litigating their claims in Indonesia would pose a serious risk to their safety. *See id.*

In *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 106 (2d Cir. 2000), Nigerian émigrés sued two foreign holding companies, under the Alien Tort Claims Act (ATCA) and other laws, alleging that companies participated in human rights violations against them. The trial court had dismissed the case on *forum non conveniens* grounds in favor of a British forum.[12] The Second Circuit reversed, finding that:

> One of the difficulties that confront victims of torture under color of a nation's law is the enormous difficulty of bringing suits to vindicate such abuses. Most likely, the victims cannot sue in the place where the torture occurred. Indeed, in many instances, the victim would be endangered merely by returning to that place. It is not easy to bring such suits in the courts of another nation. Courts are often inhospitable. Such suits are generally time consuming, burdensome, and difficult to administer. In addition, because they assert outrageous conduct on the part of another nation, such suits may embarrass the government of the nation in whose courts they are brought. Finally, because characteristically neither the plaintiffs nor the defendants are ostensibly either protected or governed by the domestic law of the forum nation, courts often regard such suits as "not our business."

> The new formulations of the Torture Victim Protection Act [under which Plaintiffs also assert here] convey the message that torture committed under color of law of a foreign nation in violation of international law is "our business," as such conduct not only violates the standards of international law but also as a consequence violates our domestic law. ... If in cases of torture in violation of international law our courts exercise their jurisdiction conferred by the 1789 Act only for as long as it takes to dismiss the case for *forum non conveniens,* we will have done little to enforce the standards of the law of nations.

---

[12] The court did not find British courts an inadequate forum but reversed because of considerations of: (1) a United States resident plaintiff's choice of forum, (2) the interests of the United States in furnishing a forum to litigate claims of violations of the international standards of the law of human rights, and (3) the factors that led the district court to dismiss in favor of a British forum were not particularly compelling.

*Id.* at 106.

In *Abiola v. Abubakar*, 267 F.Supp.2d 907, 907-908 (N.D. Ill. 2003), Nigerian nationals, alleging they suffered human rights abuses in that country, sued a <u>former</u> head of state under Alien Tort Claims Act (ATCA). The plaintiffs contended that the Nigerian courts had been complicit in the abuses. *See id.* at 918. The court, denying defendant's *forum non conveniens* motion, noted that, "a motion for dismissal on *forum non conveniens* grounds raises special concerns when the claims against the defendant are brought under the ATCA for torture and other human rights abuses." *Id.* "Dismissal 'can represent a huge setback in a plaintiff's efforts to seek reparations for acts of torture' due to "the enormous difficulty of bringing suits to vindicate such abuses.'" *Id.* (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d at 106.)

In *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 244 F.Supp.2d 289 (S.D. N.Y. 2003), current and former residents of Sudan brought a class action under the Alien Tort Claims Act, alleging that a Canadian energy company collaborated with the Sudanese government in a policy of ethnically cleansing civilians. The defendant moved to dismiss on *forum non conveniens* grounds. The court, citing *Wiwa v. Royal Dutch Petroleum*, found that *forum non conveniens* dismissal should rarely be applied in cases involving torture claims. *See id.* at 335. Denying the motion, the court also noted that, "it would be perverse, to say the least, to require plaintiffs to bring this suit in the courts of the very nation that has allegedly been conducting genocidal activities to try to eliminate them." *Id.* at 336.

In *Cabiri v. Assasie-Gyimah*, 921 F.Supp. 1189, 1199 (S.D.N.Y.1996), a resident of Ghana brought suit against a Ghanaian security officer under the Alien Tort Claims

Act and also the Torture Victim Protection Act (as Plaintiffs do here) for alleged acts of torture. The court denied the defendant's *forum non conveniens* motion, finding that the "plaintiff is highly unlikely to obtain justice in the Ghanaian courts, and that to force plaintiff to bring this action in Ghana would unnecessarily put him in harm's way, or, also unacceptable, would mean an end to the action altogether."

The case relied on heavily by Sheikh Issa is very different from this case. *MBI Group, Inc. v. Credit Foncier Du Cameroun*, 558 F.Supp.2d 21 (D.D.C. 2008) involved a business dispute between a U.S. company and a Cameroon company that was majority-owned by the government of Cameroon.   Credit Foncier moved to dismiss on a variety of grounds, including forum non conveniens.   In response, MBI alleged that one of its shareholders had been harassed by the Cameroon government for making bribery allegations relating to the business dispute.   The district court rejected these arguments, finding that any harassment was directed at the one shareholder, not the plaintiff company, and there was no evidence that the company or any of its other employees would be in jeopardy if compelled to litigate in Cameroon.   That is not the case here.

Further, in the one case that dismissed a case on *forum non conveniens* grounds in favor of Abu Dhabi courts, Sheikh Issa acknowledges that the plaintiffs produced no support for their contention that Abu Dhabi courts were inadequate.   *Abiaad v. Gen. Motors Corp.*, 538 F.Supp. 537, 540 (E.D. Pa. 1982).

According to the U.S. State Department, in the U.A.E., the constitution provides for an independent judiciary; however, in practice, it was not independent, as decisions were subject to review by the political leadership.  *See* Country Reports on Human Rights

Practices, 2008, United Arab Emirates, Released by the U.S. State Department's Bureau

of Democracy, Human Rights, and Labor, February 25, 2009, attached as **Exhibit M.**

Plaintiffs' experience with the judicial system of the U.A.E. reinforces this. Here,

we know the following:

- Sheikh Issa wrecked his car and was shooting an automatic rifle in the streets of Abu Dhabi. Instead of being arrested, he threatened the police and then complained to his brother about the police.

- Sheikh Issa tortured an Afghani national in the U.A.E., with the assistance of the police. The Afghani man reported the torture to the police, neither Sheikh Issa nor the police officer were arrested, charged or convicted. When Sheikh Issa's assistant was approached by the police to question him, Sheikh Issa vowed to "take care of it" and he did.

- Sheikh Issa tortured several Sudanese men in the U.A.E., with the assistance of the police.

- Sheikh Issa's expert says that this type of torture should be punished in the U.A.E. Ahnish Deposition, at p. 151, attached as **Exhibit N**.

- Sheikh Issa has never been arrested in the U.A.E. for anything. Sheikh Issa Deposition, at p. 64.

- Sheikh Issa used the police to arrest members of Bassam Nabulsi's staff, to then jail them and deport them, although no charges were ever made.

- Sheikh Issa had the police arrest and jail Bassam Nabulsi, had the police torture[13] Bassam Nabulsi, and had the prosecutor charge Bassam Nabulsi on fraudulent charges.

- It was evident by the words of the police and prosecutor that Sheikh Issa was behind all of this—even the U.S. Embassy staff acknowledged that the charges were made because of a personal dispute with Sheikh Issa.

---

[13] In prior pleadings, Sheikh Issa's counsel advised that they were going to immediately investigate and "actively seek information" to rebut this claim. *See* Defendant's Response to Plaintiff's Motion for Leave to file Third Amended Complaint, at p. 2, fn.1(Docket Entry No. 111). To date, we have seen no such information.

- Bassam Nabulsi is not even allowed to return to the U.A.E.[14]

- Shiekh Issa's legal expert acknowledges that the partnership at issue would not be recognized by U.A.E. courts.  Ahnish Deposition, at p. 188, 198.

- Shiekh Issa's legal expert acknowledges that, to prove his case, he must give live testimony.  He could ask the judge to allow videotaped deposition testimony but he has never heard of that being done, and acknowledges that, but the judge has discretion to refuse it.  Ahnish Deposition, at p. 173, 177-179.[15]

- At his deposition, Sheikh Issa asserted the protections of the Fifth Amendment to the U.S. Constitution in response to all questions about his torture of others, whether police were involved in the torture, and the arrest, prosecution and torture of Nabulsi.  *See* Sheikh Issa Deposition., at pp. 68-69, 71, 77-78.   The Court can make its own inference that this amounts to an admission, or at minimum, a failure to deny the claims.  "[T]he prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause.'" *Baxter v. Palmigiano*, 425 U.S. 308, (1976)(*citing* 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961)).   In any event, Sheikh Issa has not disputed any of these claims.

There is overwhelming evidence that the U.A.E. judiciary system is not independent and is influenced by political leaders, just as the U.S. State Department says it is.   Sheikh Issa had Mr. Nabulsi arrested on charges of marijuana possession.  The resulting investigation showed no evidence of the charges and they were dropped.  The investigation did show that Mr. Nabulsi did possess properly prescribed medication-- most of which was prescribed to Sheikh Issa.   However, he was convicted of not reporting the medication to authorities.  The affidavits of Mr. Nabulsi, Mrs. Nabulsi and Wissam El Debel show that Sheikh Issa and his family were intimately involved with the

---

[14] Sheikh Issa contends that his counsel has repeatedly offered Mr. Nabulsi the ability to return to the U.A.E. for a trial.  If Sheikh Issa has no control or influence whatsoever over the government, it is strange this his lawyers would think they have the ability to make this offer.  However, since they have represented to the Court that they can make this offer, it only demonstrates the control Sheikh Issa has over the government.  In any event, it would be unwise for Mr. Nabulsi to return to the U.A.E. for the reasons set forth herein.

[15] Of course, in his Motion, Sheikh Issa says that his expert said Mr. Nabulsi "could" offer evidence via video deposition, however the testimony of their own expert shows otherwise.

arrest, prosecution and deportation of Mr. Nabulsi.   Mr. Nabulsi was deported, but the deportation documents made no mention of the prescription drug conviction, only that he was deported for the safety of the country—by order of Sheikh Issa's brother.   *See* **Exhibit O**.   As the Court will recall, Sheikh Issa's lawyers initially spent a good deal of time attempting to prove that Mr. Nabulsi was a "radical Muslim" and was properly deported because he presented a threat to the country.   However, since the evidence has simply not borne that out, they now claim that Mr. Nabulsi was really deported because of the drug charge—although the deportation documents mention no such thing.   This reaffirms that Sheikh Issa has incredible control over the judicial system.

As the Court has observed, Sheikh Issa's control over the police is relevant to this analysis.   Transcript from November 3, 2008 hearing, at pp. 3-4, attached as **Exhibit P**. Sheikh Issa's claim that there is "no evidence" that he controls the police[16] is entirely meritless, and he and his lawyers know this.   The affidavits clearly establish that Sheikh Issa had complete control over the police, whose chief is his brother.   Plaintiffs also are filing, under seal, small portions of the videos showing Sheikh Issa directing the police in his torture sessions.   *See* **Exhibit Q.**   These videos make it perfectly clear that the police do whatever Sheikh Issa says, whenever he says. The entire video collection has been previously produced to Sheikh Issa's counsel in response to a discovery request, so they should know better than to make such a frivolous allegation.

---

[16] Further, the alleged "facts" that Sheikh Issa alleges to now show that he has no control over the police actually support it.   *See* Defendant's Motion at p. 43, fn 25.   He was not arrested, even though he was driving erratically and firing off an automatic weapon from his car, and instead yelled at his brother for the police even having the nerve to pull him over.   He had the police cancel their contract with IBA.   Ordinary citizens do not have such power.   And, it should come as no surprise that Mr. Nabulsi's jailers did not keep records of all of the torture they were committing against Mr. Nabulsi.

Also, if this case is dismissed, Plaintiffs will have no ability to bring the case in the U.A.E.  They do not have the financial resources to bring a case in the U.A.E. Further, Plaintiffs' partnership claims will not be recognized in a U.A.E. court. Amazingly, Sheikh Issa argues, on one hand, that the U.A.E. court could apply Texas law (Defendant's Motion, at p. 46) but then a few pages later, argues that the U.A.E. court must apply only U.A.E. law to the dispute (Defendant's Motion, at p. 54).   The bottom line is that his own expert says that U.A.E. law will not recognize the verbal partnership between the parties.  Ahnish Deposition, at p. 188, 198.

Mr. Nabulsi is not allowed into the U.A.E. and could not give live testimony to support his claim, if this case had to be pursued in the U.A.E.  Even if Mr. Nabulsi were allowed back into the U.A.E. for the trial, Sheikh Issa' lawyers have launched a shot across Mr. Nabulsi's and his counsel's bow by dropping a footnote in their response discussing some of the criminal laws in the U.A.E.  Specifically, at page 46, fn. 26, they list several U.A.E. criminal laws which do not apply to the alleged conduct of Sheikh Issa, but could apply to Mr. Nabulsi and/or his counsel.  Notably, they mention two criminal offenses in the U.A.E., obviously to intimidate or scare the Plaintiffs: 1) notifying authorities of a crime knowing that it has not been committed and 2) disgracing the honor or modesty of another person by means of publicity.  Plaintiffs make no claim that Sheikh Issa has improperly notified authorities of crime that has not been committed or using publicity to disgrace the honor of another.  However, as this Court knows full well, Sheikh Issa and his counsel have repeatedly complained of publicity with this case and have even tried to sanction Mr. Nabulsi and their counsel for this.    Thus, this footnote can only be read as a direct threat to Mr. Nabulsi and his counsel that they will

be arrested if they go to the U.A.E. for a trial.[17]  There is no other reason for the inclusion of the footnote.  Perhaps it was intended to be a joke of some sort but anyone who has heard the allegations of the Plaintiffs in this case, put in the context of the videos and what can occur in Abu Dhabi, should have good sense enough to know that this case is no laughing matter.

Also, Sheikh Issa's claim that Mr. Nabulsi chose to move to the U.A.E. and therefore cannot now complain of the U.A.E. legal system, has no bearing on the analysis.  The question is whether the U.A.E. presents an adequate and available forum.  No court has ever found that a forum may be inadequate but, because the Plaintiff chose to go there, he cannot complain.  Sheikh Issa offers no legal support for this argument.  This is because the question is solely whether the forum is adequate.

Also, the three cases cited by Sheikh Issa's legal expert as involving members of the U.A.E. royal family are notably vague.  In a country in which the royal family dominates the economic structure, it is amazing that there are only three. None of the three show that any plaintiff has collected on a judgment against a member of the royal family.  One is discussed in the passive voice so there are no details about the plaintiff or the nature of the claims.  No information was provided about whether the plaintiffs or their lawyers were harassed.   The more likely outcome is the one encountered by Mr. Taghizadeh when he tried to bring suit against Sheikh Issa in the U.A.E.  He retained a lawyer, but when the lawyer learned that he would be suing Sheikh Issa, he refused to handle the case for fear of losing his license or worse.  Taghizadeh Deposition, at pp. 9-10.

---

[17] Mohammed Tagizadeh, who provided an affidavit used in Plaintiff's Response to the first Motion to Dismiss can relate. After the affidavit was filed, he immediately endured around the clock stalking from Shiekh Issa's investigators.  Taghizadeh Deposition, at pp. 18-29.

Suffice it to say that a listing of three cases against a family estimated to be worth over $20 billion is not persuasive evidence that Sheikh Issa will be required to answer for his conduct in an Abu Dhabi court, especially in light of the particular allegations made by the Plaintiffs. Indeed, if there is any doubt that the courts of Abu Dhabi are simply not available nor adequate for this type of dispute, one need only consider that not once has Sheikh Issa been asked to account for his torturous conduct, even though very high ranking officials within the government, including his brother the Crown Prince and his brother the police chief, are well aware of such conduct.

Last, Sheikh Issa suggest that the Court can keep this case open while the parties go to the U.A.E. to see if the U.A.E. courts really will be fair to Mr. Nabulsi (and that he and his counsel will not be harassed and possibly arrested and tried on violations of the U.A.E. laws Sheikh Issa has cited). Sheikh Issa further suggests that this Court can hold this case open,[18] in the event the Plaintiffs get a judgment, to see if Plaintiffs can collect on that judgment. This argument is sufficiently silly that it warrants no thoughtful analysis, other than this: in light of the abuse received by Mr. Nabulsi and his family, the allegations in this case and who they are being made against, and the shocking conduct demonstrated by Sheikh Issa in the various videos, only a fool would attempt to pursue this case in Abu Dhabi. At best, it would delay the case for years and would present extraordinary and unnecessary costs to Plaintiffs which they cannot afford. This is clearly why Sheikh Issa makes the request.

The U.A.E. is clearly not an adequate available forum and Sheikh Issa has failed to meet his considerable burden of showing that it is.

---

[18] Notwithstanding his previous complaints about how long this case has been pending.

**B.    Private and Public Factors Do Not Favor Dismissal.**

Because the U.A.E. is quite obviously not an adequate alternative forum, the Court need not consider public and private factors. But, they are discussed in an abundance of caution.

    1.    Private Factors

The private factors to be considered in a *forum non conveniens* analysis relate to the convenience of the parties, and include: the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; possibility of viewing the premises, if such viewing would be appropriate to the action; other practical problems that make a trial of a case easy, expeditious, and inexpensive; enforceability of judgment; and whether the plaintiff has sought to vex, harass, or oppress the defendant. *See Karim*, 265 F.3d at 268 n. 14 (citations omitted).

Again, the key witnesses are Plaintiffs and Sheikh Issa. Other witnesses are located in Houston, the State of Georgia, Lebanon, and the U.A.E. The witnesses in the U.A.E. are all under Sheikh Issa's control and can be deposed by video for presentation in court here. On the other hand, one of the key witnesses, Bassam Nabulsi, is not allowed to enter the U.A.E. There is no such restriction on Sheikh Issa in the U.S. and he has routinely traveled here in the past. The key evidence will involve documents that are in both parties' custody. Trial here will be as "easy, expeditious and inexpensive" as it would in the U.A.E., and substantially less expensive for Plaintiffs. Plaintiffs have filed the case here because they live here (and lived here long before their introduction to Sheikh Issa), because a substantial portion of the events at issue occurred here and

because they have no ability to bring a case in the U.A.E.   Documents will have to be translated and translators will have to be used, regardless of where this case is tried. Further, it is unclear whether Sheikh Issa even still lives in the U.A.E., as he has been living in Germany since September 1, 2008, and does not know when he will return.  *See* Issa Deposition, at 41, 44.  The private factors are strongly in favor of denying Sheikh Issa's Motion.

2.    Public Factors

The "public interest" factors include: administrative difficulties; reasonableness of imposing jury duty on the people of the community; holding the trial in the view of those affected; and the local interest in having localized controversies decided at home. *See Karim*, 265 F.3d at 268 n. 14 (citations omitted).

The people of the State of Texas have a strong interest in deciding cases like this in this state.  The partnership at issue was created in Texas. Much of its business was conducted here. A Texan was enticed to work for Sheikh Issa, and ultimately was tortured by Issa. This kind of case is exactly why we have courts, and why we need courts, in this country and anywhere else. The public factors are strongly in favor of denying Sheikh Issa's motion.

Denying Sheikh Issa's motion on *forum non conveniens* grounds does not require the Court to cast judgment on the U.A.E. court system.  The reality is that Sheikh Issa carries a strong burden to show that this case is more appropriately tried in the U.A.E. rather than the U.S.  In light of the allegations, which he denies, it is simply a burden that he cannot meet.

### IX.    SHEIKH ISSA HAS BEEN SERVED.

Sheikh Issa moves to dismiss, arguing that the process server who served Sheikh Issa's agent with the lawsuit is not authorized under U.A.E. law to serve process; the agent who was served with the lawsuit is not really an agent of Sheikh Issa; Sheikh Issa has never even seen the lawsuit; and the service had other allegedly fatal flaws.

In considering a motion to dismiss, the court must accept as true all well-pleaded facts and must draw all reasonable inferences from those allegations in the plaintiff's favor. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996). Presuming that venue, personal jurisdiction and subject matter jurisdiction are satisfied, there must be authorization to serve summons in a particular case. *Omni Capital Intern. v. Rudolf Wolff & Co., Ltd.*, 108 S.Ct. 404, 409 (1987). Constitutional due process requires that service of process be reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950); *Henderson v. United States*, 116 S.Ct. 1638 (1996)("[T]he core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections.")

The Constitution itself does not specify or require any particular means of service of process, only that the method selected be reasonably calculated to provide notice and an opportunity to respond. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1017 (9th Cir.2002). "The general attitude of the federal courts is that the provisions of Federal Rule 4 should be liberally construed in the interest of doing substantial justice and that the propriety of service in each case should turn on its own facts within the limits of the

flexibility provided by the rule itself. This is consistent with the modern conception of service of process as primarily a notice-giving device." *In re Cyrus II Partnership* 392 B.R. 248, 257 (Bkrtcy. S.D.Tex. 2008)(quoting 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1083 (3d ed.2002))[19].

Sheikh Issa was properly served, pursuant to FED. R CIV. P. 4(f)(2)(A).  That rule provides:

> "[u]nless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States….if there is no internationally agreed means, or if an international agreement allows but does not specify other means, *by a method[20] that is reasonably calculated to give notice…as prescribed[21] by the foreign country's law for service in that country in an action in its courts of general jurisdiction.*" (Italics added)

The method of service of process used by Plaintiffs in this case is consistent with FED. R CIV. P. 4(f)(2)(A) in that the method used is in fact prescribed by the laws of the U.A.E.

Further, Sheikh Issa was also properly served, pursuant to FED. R CIV. P. 4(f)(2)(C)(i).  That rule provides:

> "[u]nless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States…unless prohibited by the foreign country's law, by delivering a copy of the summons and of the complaint to the individual personally.

The method of service of process used by Plaintiffs in this case is consistent with FED. R CIV. P. 4(f)(2)(C)(i) in that the method used is not prohibited by the laws of the

---

[19]  The court found that service does not have to be perfect to be effective, particularly when the party served had notice of the suit.  *See id.* at 26.

[20]  Webster's defines "method" as: "a procedure or process for attaining an object."  Merriam-Wesbter's Online Dictionary.

[21]  Webster's defines "prescribe" in the transitive verb form as it is used here, as "to lay down as a guide, direction, or rule of action." Merriam-Wesbter's Online Dictionary.

U.A.E. and, in the U.A.E., personal service on a person like Sheikh Issa can be made through agents.

As set out in Plaintiffs' expert report, the service on Sheikh Issa's agent, while present at Sheikh Issa's business premises, is a lawful method of serving process on Sheikh Issa, under U.A.E. law and Islamic law. *See* Declaration of Professor L. Ali Kahn, at ¶ 2, attached as **Exhibit R**.

Further, Plaintiffs' process server qualifies as an expert on service. He has authored three books on service of process and regularly teaches a college course on service, has trained 1700 process servers over the past 24 years, and has supervised the service of approximately 100 papers in the U.A.E. Tucker Dec., at ¶ 1. He has used mail or personal service (including personal service through agents) in his serving papers in the U.A.E. *Id.,* at ¶ 2. He states that service that he effected on Sheikh Issa has been properly made on Sheikh Issa. *Id.,* at ¶ 13.

There are no agreements between the United States and the U.A.E. regarding service of process. Thus, the question is whether the service was reasonably calculated to give notice and is it prescribed in the U.A.E. for cases in its courts of general jurisdiction. Service here passes both tests.

According to Plaintiffs' expert, along with the application of common sense, the efforts made to serve Sheikh Issa were reasonably calculated to give notice to Sheikh Issa of the suit. Khan Dec., at ¶ 2. In addition to the numerous mailings to Sheikh Issa, and the return of the receipt of the copy mailed to him by the Court, the serving of his assistant at Sheikh Issa's place of business was reasonably calculated to give Sheikh Issa notice of the suit. Probably the best evidence that the service was reasonably calculated

to give Sheikh Issa notice is the fact that his U.S. lawyers (there are actually almost thirty of them) made an appearance in the case thirteen days after service was effected. Further, Sheikh Issa's expert's records show that he reviewed a copy of the summons on July 2, 2008.  *See* Billing Records from Expert, attached as **Exhibit S**.

Also, by Sheikh Issa's expert's own admission, service in this manner is prescribed under U.A.E. law.  Generally, service is allowed in the U.A.E. only through the court clerk when a case is originated in a U.A.E. court, or when the U.A.E. has agreed to service through a treaty or convention. Ahnish Deposition, at p. 48, 50; Kahn Dec., at ¶ 8.  Neither applies here.  In his report, Sheikh Issa's expert (who has represented Sheikh Issa's family many times and whose law partners was recently named Minister of Justice)[22] tried to claim that there actually are private process servers who are able to serve lawsuits from out of the country, and that Plaintiffs' process server simply did not qualify.  Ahnish Deposition, at p. 48.  It is troubling that, had this Court not allowed his deposition, this Court would have been left with the sworn affidavit testimony of Mr. Ahnish—which was grossly misleading, and in some respects, patently false. Indeed, in deposition, Mr. Ahnish conceded that 1) only the Abu Dhabi courts can effect service and they will only effect service of lawsuits that originate in Abu Dhabi courts and 2) that the "private process server" option described in his report has not yet been implemented, and is thus not an available option.  *Id.*, at p. 72.   Thus, if one were to adhere to the "expert analysis" of Mr. Ahnish, service on a case that originates in the U.S. could never be

---

[22] Ahnish Deposition, at p. 8, 12.

effectuated in the U.A.E.[23] In other words, according to Ahnish's logic, the only way to serve someone with process in the U.A.E. is to sue them there.

Obviously, the drafters of Rule 4 did not intend that service could never be permitted in a foreign country. Otherwise, they would not have written the rule in the first place as it is specifically designed for service of U.S. cases outside of the U.S. Every country has their own rules for service of cases originating in their countries, which are reserved only for cases originating in their countries. Indeed, Sheikh Issa's own legal expert finally conceded that the U.A.E. does not have any law that specifically prohibits service like that made here, Ahnish Deposition, at p. 64, nor does the U.A.E. prohibit service of suits from outside the country. *Id.*, at p. 62. However, according to Ahnish, the U.A.E. does ban service of process by registered mail. *Id.*, at p. 44.

Plaintiffs' expert on U.A.E. and Islamic law and Plaintiff's process server expert both state that service here is prescribed by the U.A.E. and proper. Tucker Dec., at ¶ 13; Khan Dec. at ¶ 2. Sheikh Issa's expert, Mr. Ahnish, acknowledges that the purpose of service of process in the U.A.E. is the same as the purpose of service of process in the U.S.—to make an individual aware of a dispute so he can defend himself. Ahnish Deposition, at pp. 17-18. He goes on to state that an Abu Dhabi judge can, in his discretion, authorize service despite technical or procedural errors, so long as this purpose is accomplished. *Id.*, at pp. 100-102**.** Ahnish goes on to concede that, in the U.A.E., when the court determines that a person is avoiding personal service, the court can order

---

[23] The expert claims that service of a U.S. suit could be effected through diplomatic channels. *See id.* at p. 52. However, he acknowledges that there is no formal process for doing this and it is a matter of discretion. A plaintiff who attempts this drawn-out process and does not receive the "courtesy" of service from the U.A.E. has no avenue for relief to challenge its refusal to serve. *Id.*, at p. 58. Plaintiffs' legal expert adds that there is no such procedure and that the UAE and the U.K. have a formal treaty that calls for service through diplomatic channels. Khan Dec., at ¶ 8. If there were really was a diplomatic channel option for service between the U.S. and U.A.E., there would be a treaty. It is undisputed that there is not.

service by alternative means.  Ahnish Deposition, at p. 118.   Notably, service by posting at the home or residence, or through an agent, or even service by publication, are allowed. *Id.* at pp. 107, 109.   Specifically, he acknowledges that the court can allow service by leaving service documents with a person at a place of business, while confirming that the person it is being left with, and that the individual to be served, both work at the business.  *Id.* Ahnish further acknowledges that he could himself be served through his receptionist if the process server confirmed that he worked at his firm and his receptionist did too.  *Id.* at pp. 111-112 (strikingly similar to the service effected in this case).  He goes on to admit that the court can even deem that a party has been served when the court finds that the party is avoiding service.  *Id.* at pp. 115-116.

Common sense tells us that the drafters of Rule 4 intended for service under Rule 4(f)(2)(a) and 4(f)(2)(C)(i) to meet the general methods of service available in the country of service.  The case law supports this common sense approach to Rule 4(f).  In *Inc21.com Corp. v. Flora*, 2008 WL 5130415, *5-6 (N.D. Cal. 2008), the plaintiff had served the defendant by publication in the Philippines.  The plaintiff cited a Philippine law that allowed service by publication.  While the summons and order for publication were not issued by the Philippine court, the district court nonetheless found that this manner of service was effective for the U.S. case because the method of service was in fact "prescribed" by Philippine law and consistent with American law and that the notice was reasonably calculated to apprise the defendant of the lawsuit.

In *Retractable Technologies, Inc. v. Occupational & Medical Innovations, Ltd.*, 253 F.R.D. 404 (E.D. Tex. 2008), the plaintiff served an Australian defendant by private process server in Australia.   The Court noted that "Rule 4(f)(2)(A) incorporates,

generally, the service rules of a foreign country as they apply to citizens of that country. A foreign jurisdiction's service rules do not need to contain a special provision applicable to foreign litigants for Rule 4(f)(2)(A) to incorporate the foreign law." *Id.* at 405-406 (citing Gary N. Horlick, A Practical Guide to Service of United States Process Abroad, 14 Int'l Law, 637, 640 (1980)("substituted service in Italy by delivery to the concierge of the building where the person to be served lives, as long as the method of service is likely to give the actual notice required by United States due process concepts.")   The court noted that "[t]he Australian Federal Court Rules have no specific provision dealing with foreign process being served in Australia,[24]" just as is the case with the U.A.E.   *Id.* at 406.   The court concluded that Australian law allowed for service by private process servers in cases originated in those courts, and therefore, service of a foreign suit by a private process was effective as well. *See id.* at 407.

In *Modern Computer Corp. v. Ma*, 862 F.Supp. 938, 946 (E.D.N.Y. 1994), the plaintiff had served the defendant, a Taiwanese individual, via registered mail in Taiwan. Among other things, the defendant argued that service was improper because Taiwanese law restricted service in that country to clerks of court.  The court rejected the argument and found that service was proper under Taiwanese law.  Similarly, in *Cosmetech Int'l, LLC v. Der Kwei Enterprise and Co., Ltd.*, 943 F.Supp. 311, 316 (S.D.N.Y. 1996), the court also found service by private process to be proper in Taiwan.

Here, Plaintiffs' process server served Sheikh Issa, via a man who worked at Sheikh Issa's office, who indicated that he was the Sheikh's assistant.  It is clear that this method and manner of service are prescribed under U.A.E. law.   In addition to the fact

---

[24]   Later in the opinion, the court did note a government report that suggested that service of foreign suits could be served by private process servers.

that Sheikh Issa was served through his employee at his office, the repeated mailings to Sheikh Issa, the fact that his expert was reviewing a copy of the summons to prepare his expert report days after Sheikh Issa was served, and the fact that Sheikh Issa appeared in this case thirteen days after service confirm that service was reasonably calculated to give him notice of the suit and, in fact, did so.

Sheikh Issa also claims that the citation did not provide a proper "notification document." First, as Sheikh Issa's expert acknowledged, the "notification document" they reference must be issued by a court and only for cases originating in U.A.E. courts. Ahnish Deposition, at p. 83. It cannot be obtained, except from those courts. *Id.* Again, had the drafters of Rule 4 intended for service to only be accomplished with such a document that could only be obtained from the foreign court, and only when one files a suit in the foreign court, they would not have created Rule 4(f) in the first place. Second, this Court can compare its citation and return of service to the requirements of a "notification document"[25] and see that the citation meets every requirement: it gives the date and time of notification, it gives information about the party giving service, it gives information about the party being served, it gives information about the "Notification Officer" or process server, it provides the subject of the notification and it provides for the name of the person being served or the reason for refusing such refusal. This Court's citation and service documents clearly track the requirements of a "notification document."

Sheikh Issa also claims that Ismael Alabras[26] is not his agent. The testimony of Plaintiffs' process server shows otherwise, specifically that Alabras is employed by

---

[25] Ahnish Deposition, at p. 79.

Sheikh Issa. Tucker Dec., at p. 11.   Further, like the situation with Ahnish, Mr. Alabras's affidavit varied considerably from his deposition testimony.  It is most important to note that Mr. Alabras is not a citizen of the U.A.E. and his visa is sponsored by Sheikh Issa. Alabras Deposition, at pp. 23, 37, 38, attached as **Exhibit T**.   Based on Sheikh Issa's deporting of employees who fell out of favor with him in the past, Sheikh Issa holds considerable control over this witness.   Mr. Alabras says he was provided with the affidavit by one of Sheikh Issa's lawyers. *Id.* at p. 7-8.   He says he made changes to the affidavit before signing it. *Id.,* at p. 8.   However, the affidavit has his name mis-spelled, ***three times***. *Id.,* at p. 23.   Also, his affidavit swears that Sheikh Issa owns Pearl Properties, but in his deposition, Mr. Alabras hotly denies that he does not know who owns Pearl Properties.  *Id.*, at p. 25. He does know, however, that Sheikh Issa's name appears on Alabras passport as his sponsor, although this only came out after he was asked to show Plaintiffs' counsel a copy of his passport—this information was not included, for some reason, in Alabras' affidavit.

Mr. Alabras ultimately acknowledges that he works for Mr. Swaidi, who Sheikh Issa has admitted is his business manager, who holds power of attorney to manage Sheikh Issa's affairs and works at the offices of Pearl Properties, which Shiekh Issa admits to owning.  *Id. at* 14; Docket Entry No. 68, at p. 1; Docket Entry No. 61, at p. 5.  Mr. Alabars admits that he received the package from the process server.  *See id.*  As Sheikh Issa's own expert acknowledges, service in this manner is proper in the U.A.E.

There is no doubt that Sheikh Issa has notice of the lawsuit, as he has retained top flight attorneys (from two firms) to represent him.  Obviously, the manner used to give

him notice was not only reasonable, but was effective.  Sheikh Issa has been properly served.

## X.    ALTERNATIVE MOTION FOR ALTERNATIVE SERVICE UNDER FED. R. CIV. P. 4(f)(3).

If the Court determines that service has not been properly effected, Plaintiffs seek an order of alternative service pursuant to Rule 4(f)(3).  Rule 4(f)(3) provides:

> Unless federal law provides otherwise, an individual - other than a minor, an incompetent person, or a person whose waiver has been filed - may be served at a place not within any judicial district of the United States…by other means not prohibited by international agreement, as the court orders.

To qualify for alternative service, the plaintiff must demonstrate that the proposed method of alternative service comport with the constitutional notions of due process.  *Rio Properties, Inc.* 284 F.3d 1007, 1017 (9th Cir.2002). The Constitution itself does not specify or require any particular means of service of process, only that the method selected be "reasonably calculated under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313-14 (1950); *Rio Properties*, 284 F.3d 1017.

Under the plain language of Rule 4(f)(3), service of process must be directed by the court, and must not be prohibited by any international agreement. *Rio Properties, Inc.,* 284 F.3d at 1014. There are no other limitations within the rule. *Id.* In fact, the court may order service under Rule 4(f)(3) that does not comply with the laws of the foreign country. *Id.*; *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 2005 WL 1123755, *4 (S.D.N.Y. 2005).

By design, Rule 4(f)(3) was "adopted in order to provide flexibility and discretion to the federal courts in dealing with questions of alternative methods of service of process in foreign countries." *In re Int'l Telemedia Assoc., Inc.,* 245 B.R. 713 (N.D.Ga.2000). Federal courts have traditionally incorporated advances in telecommunications technology to methods of notice giving. *New England Merchs., Nat'l Bank v. Iran Power Generation & Transmission Co.*, 495 F.Supp. 73, 81 (S.D.N.Y.1980).

Applying Rule 4(f)(3), courts have authorized several alternative methods of service, including service by publication, ordinary mail, mail to the defendant's last known address, delivery to the defendant's attorney, delivery to the defendant's United States subsidiary, telex, and, increasingly, e-mail. **By E-mail**: *Rio Properties*, 284 F .3d at 1016; *Williams-Sonoma Inc. v. Friendfinder Inc*., 2007 WL 1140639, at *2-3 (N.D.Cal. 2007); *Williams v. Adver. Sex LLC*, 231 F.R.D. 483, 488 (N.D.W.Va.2005); *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,* , 2006 WL 1643202 (S.D.N.Y. 2006); *Export-Import Bank*, 2005 WL 1123755; *D.R.I., Inc. v. Dennis*, 2004 WL 1237511 (S.D.N.Y. 2004); **Through Attorney**: *Ehrenfeld v. bin Mahfouz*, 2005 WL 696769, *3 (S.D.N.Y. 2005); *BP Products North America, Inc. v. Dagra*, 232 F.R.D. 263, 265 (E.D.Va. 2005); *Forum Fin. Group, LLC v. President and Fellows of Harvard College*, 199 F.R.D. 22, 23 (D.Me. 2001); *Levin v. Ruby Trading Corp*., 248 F.Supp. 537 (S.D.N.Y. 1965); **By Publicaton**: *S.E.C. v. Tome*, 833 F.2d 1086, 1094 (2nd Cir. 1987); *Smith v. Islamic Emirate*, 2001 WL 1658211 (S.D.N.Y. 2001); **Sent to Last Known Address**: *International Controls Corp. v. Vesco*, 593 F.2d 166, 176-78 (2nd Cir. 1979); **Telex**: *New England Merch*., 495 F. Supp. at 80.

Rule 4(f)(3) stands on its own. *Rio Properties*, 284 F.3d at 1015. There is no requirement that a plaintiff attempt service under either Rule 4(f)(1) or Rule 4(f)(2), before moving for leave to serve under Rule 4(f)(3). *See id.* "[S]ervice of process under Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief.' It is merely one means among several which enables service of process on an international defendant." *Id*. As a result, the task of determining when the particularities and necessities of a given case require alternate service of process rests within the sound discretion of the district court. *See id.*  At the same time, the court may require the plaintiff to show that reasonable efforts to serve the defendant have already been made, "to prevent parties from whimsically seeking alternative means of service and thereby increasing the workloads of the court." *Ryan v. Brunswick Corp.*, 2002 WL 1628933, *2 (W.D.N.Y. 2002).

Plaintiffs have previously provided the Court with evidence about their prior efforts to serve Shiekh Issa.  They, and the court, have mailed service documents to him several times.   They sought to enlist the help of 32 different law firms in the U.A.E. (including, unbeknownst to them at the time, Sheikh Issa's legal expert).   *See* Correspondence to U.A.E. firms and summary, attached as **Exhibit U**.   Every one of those firms either rejected the request or did not respond.  *See id.*   Plaintiffs sent a copy of the service documents to the U.A.E. Ministry of Justice with a request to serve Shiekh Issa, but there has been no response.[27]  *See* Correspondence to U.A.E. Ministry of Justice, attached as **Exhibit V**.   Plaintiffs spent $30,000.00 to pay an expert international private process server to travel to the U.A.E. to serve Sheikh Issa's employee at his office.

---

[27] A committee appointed by the U.A.E. Minister of Justice, who is appointed by Sheikh Issa's brother, is the sole authority for granting licenses to practice law in the U.A.E.  *See* Ahnish Deposition, at p.  7.

Plaintiffs also personally served Shiekh Issa's attorney in charge in this case. Plaintiffs have made reasonable efforts to serve Sheikh Issa, and believe they have done so.[28]

It is clear that Sheikh Issa and his U.S. and U.A.E.-based lawyers all are "apprise[d] … of the pendency of the action" and have been afforded "an opportunity to present their objections." *Mullane*, 339 U.S. at 314. Service on his attorneys will obviously meet the standards of Rule 4(f)(3) and they can be served by personal service. Additionally, Sheikh Issa may be served via a private process server, by leaving process with the front attendant at his palace in the U.A.E. or an employee at the offices of his company, Pearl Properties, in the U.A.E. These are places that he is certain to be found. B. Nabulsi Aff., at ¶ 40. And, although the common law states that alternative service need not be in compliance with the law in the foreign country, according to Sheikh Issa's expert, service in this manner would meet the laws of the U.A.E. for service originating in the U.A.E.

Therefore, in the unlikely event that the Court finds that service has not been properly effected, Plaintiffs request that the Court enter an order allowing them to serve Sheikh Issa through his attorneys of record in this case; through his American lawyer who works in the U.A.E. (Christopher J. Pittinger, Al Sarfa Tower, Apartment #103, Khalidiya Street, Abu Dhabi, U.A.E.)[29]; or by private process service, Process Service Network, LLC, which may leave a copy of the service documents with the front gate

---

[28] Sheikh Issa claims that Plaintiffs' counsel's questioning of Sheikh Issa "demonstrate" that counsel knew that Sheikh Issa had a home in Germany. To be clear, until the deposition, counsel knew only that Sheikh Issa had a palace in Abu Dhabi and offices in Abu Dhabi and Dubai. And, he was served there. One of the very few things that counsel learned at Sheikh Issa's deposition (aside from perhaps, how a $1000 an hour lawyer can coach and instruct a witness and obstruct deposition questioning for more than two hours) is that he had a house in Germany, which he had been staying in for some time. While Sheikh Issa's counsel agreed on the record to provide the address, he has never done so.

[29] *See* **Exhibit V**, confirming this address and that Mr. Pittinger is one of Sheikh Issa's lawyers in this matter.

attendant at Sheikh Issa's palace in Abu Dhabi or with any employee at the offices of Pearl Properties, Oud Medha Road at 10th Street, First Floor, Dubai, UAE, or the current office of Pearl Properties.

## XI.    CONCLUSION AND PRAYER

The allegations made in this case are shocking, but true. Indeed, this case proves the old saying that truth is stranger than fiction. This case arises out of, or relates to, Sheikh Issa's contacts with Texas. Plaintiffs' counsel spent almost $30,000.00 serving Sheikh Issa in a manner that even Sheikh Issa's own expert was forced to admit is permitted under Abu Dhabi law. Sheikh Issa, who is obviously shielded by some very important people in the U.A.E., and who is represented by some very good lawyers, flicked his nose at this Court and the process, by essentially refusing to answer the overwhelming majority of the questions posed to him. Sheikh Issa, due to his family-- certainly not due to his own merit--holds a position making it virtually impossible for these Plaintiffs, who have literally lost everything, to get justice anywhere else but this Court. Everyone involved knows that a dismissal of this case ends this case. This case should be tried in Houston, Texas; Defendant's Motion should be denied.

Wherefore, Plaintiffs respectfully request that the Court deny Sheikh Issa's Motion to Dismiss and, in the alternative, if the Court finds that Plaintiffs' service on Sheikh Issa to date is not effective, that the Court permit Plaintiffs to serve Sheikh Issa by alternative means, as set forth herein.

Respectfully submitted,

## THE BUZBEE LAW FIRM

By:  */s/ Anthony G. Buzbee*
      Anthony G. Buzbee
      State Bar No. 24001820
      Federal Bar No. 22679
      JPMorgan Chase Tower
      600 Travis, Suite 7300
      Houston, Texas 77002
      Tel:  (713) 223-5393
      Fax: (713) 223-5909

OF COUNSEL:
THE AZEM FIRM
Samer Al-Azem
State Bar  No. 00793240
2425 West Loop South, Suite 200
Houston, Texas 77027
Tel: (713) 335-5527
Fax: (713) 528-7247

      ATTORNEYS FOR PLAINTIFFS
      BASSAM NABULSI, AND HIS WIFE,
      RIMA NABULSI

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of this document will be served or has been served on all interested parties in accordance with the Federal Rules of Civil Procedure on the *25th day of March, 2009.*   Service on E-Filing Users will be automatically accomplished through the Notice of Electronic Filing; non-Filing Users will be served by certified mail, return receipt requested and/or via facsimile.

      */s/ Tony Buzbee*
      Tony Buzbee