IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BASSAM NABULSI and His Wife,      §
RIMA NABULSI,                     §
                                  §
              Plaintiffs,          §
                                  §
v.                                §        CIVIL ACTION NO. H-06-2683
                                  §
H.H. SHEIKH ISSA BIN ZAYED AL     §
NAHYAN,                           §
                                  §
              Defendant.           §

## MEMORANDUM OPINION AND ORDER

Plaintiffs' Third Amended Complaint (Docket Entry No. 99) asserts claims against defendant, H.H. Sheikh Issa Bin Zayed Al Nahyan (Sheikh Issa), for torture in violation of the Torture Victims Protection Act, 28 U.S.C. § 1350, and for breach of contract, conversion, breach of fiduciary duty, intentional infliction of emotional distress, and malicious prosecution in violation of the common law of the State of Texas. Pending before the court are Defendant Sheikh Issa Bin Zayed Al Nahyan's Motion to Dismiss for (1) Lack of Personal Jurisdiction, (2) Enforcement of Contractual Forum Selection Clause, (3) Forum Non Conveniens, and (4) Improper Service (Docket Entry No. 132); Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan's Motion to Exclude the Expert Witness Statement and Testimony of Professor L. Ali Khan (Docket Entry No. 134); and Defendant Sheikh Issa Bin Zayed Al Nahyan's

Objections to Plaintiffs' Affidavit Evidence Submitted in Response
to Defendant's Motion to Dismiss (Docket Entry No. 145).  For the
reasons explained below, defendant's motion to dismiss for lack of
personal jurisdiction and improper service will be granted,
defendant's motion to exclude the expert witness statement of
Professor Khan will be granted, and defendant's remaining motions
will be declared moot.

## I.  Factual and Procedural Background

Plaintiffs allege that they are citizens of the United States
and the State of Texas and that the defendant Sheikh Issa is a
citizen of the United Arab Emirates (U.A.E.) and a member of the
royal family of Abu Dhabi.[1]  Plaintiffs allege that in 1997

> Sheikh Issa and [plaintiff Bassam] Nabulsi . . . agreed
> to become partners; they sealed the agreement with a
> handshake.  The partners agreed that Mr. Nabulsi would
> provide the "sweat" equity, and Sheikh Issa would provide
> financing or capital for any project or opportunity the
> partners mutually agreed the partnership would pursue.
> The partners further agreed that they would split profits
> from any venture on a 50/50 basis.  It was further agreed
> that, because of the partners' associations and
> connections in both Texas and Abu Dhabi, the partnership
> would focus its efforts to find business opportunities in
> these two areas.  Pursuant to the partnership, Nabulsi
> also began managing all of the Sheikh's assets and
> holdings, including his ranches, his buildings, and the
> companies, Western General Trading and Western General
> International, among others. . . . The partners also
> formed at least one new entity to further their
> partnership, IBA Co. L.L.C.  To further assist
> Mr. Nabulsi in performing his obligations under the

---

[1]Plaintiffs' Third Amended Complaint, Docket Entry No. 99,
pp. 1-2.

partnership, Sheikh Issa ultimately gave Mr. Nabulsi
power of attorney over all of his affairs, both business
and private.[2]

Plaintiffs allege that

Mr. Nabulsi ultimately moved to Abu Dhabi in 2002, but
continued to visit Houston regularly with Sheikh Issa, as
well as maintain a business office, now for the
partnership, in Houston, Texas.  In each of the Houston
visits, Nabulsi and the Sheikh, as partners, held
business meetings in Houston and sought out Texas and
United States opportunities for the partnership and
entities formed pursuant to the partnership.[3]

Plaintiffs allege that after Sheikh Issa's father's death in

November of 2004,

Sheikh Issa began demonstrating increasingly bizarre
behavior. . .

. . . unbeknownst to Mr. Nabulsi, Sheikh Issa had
begun a habit and custom of torturing his employees or
anyone else with whom he disapproved. . . . As his
degeneracy increased, Sheikh Issa began to have such
torture sessions videotaped . . .

. . .

As personal and business manager for Sheikh Issa,
. . . Mr. Nabulsi maintained all important business and
personal items for Sheikh Issa, including . . . the
videotapes containing the recorded torture sessions which
Sheikh Issa had given to Mr. Nabulsi.  As the relation-
ship between the partners deteriorated, Sheikh Issa
became desperate to retrieve the torture tapes. . . . In
his efforts to retrieve the tapes, Sheikh Issa asserted
his considerable influence with the Abu-Dhabi police,
ultimately having Mr. Nabulsi arbitrarily arrested on
April 6, 2005.[4]

---

[2]<u>Id.</u> at 6.

[3]<u>Id.</u> at 7.

[4]<u>Id.</u> at 9-11.

Plaintiffs allege that

. . . Mr. Nabulsi was held without charges for several days.  The police department, under the direction of Sheikh Issa, thoroughly searched Mr. Nabulsi's residence in an effort to find the torture tapes.  Further, the police confiscated all of Mr. Nabulsi's computers, along with any devices that might contain evidence of Sheikh Issa's involvement in the torture. . . .

In an attempt to justify Mr. Nabulsi's incarceration, Sheikh Issa then fabricated false accusations of marijuana possession against Mr. Nabulsi, which the police adopted.  Of course, the resulting search of Mr. Nabulsi's home revealed no marijuana, and the test performed on Mr. Nabulsi's urine was also negative for any type of drug use.  At Sheikh Issa's urging, the police and public prosecutor . . . then fabricated new charges that Mr. Nabulsi was in possession of, and was distributing, narcotics.  Various prescription medications prescribed to Sheikh Issa and Mr. Nabulsi by Houston physicians and purchased from pharmacies in Houston pursuant to these prescriptions, were at Mr. Nabulsi's villa. . . .

Mr. Nabulsi was kept incarcerated for approximately two and a half months. . . .

. . . Mr. Nabulsi was kept in jail, where he was continuously tortured.  Each day, the jailors, at the direction of Sheikh Issa, would have a "session" with Mr. Nabulsi, physically abusing him, humiliating him, and threatening him with immediate death. . .

. . . [I]n addition to the brutal torture he experienced almost daily, the safety of Mr. Nabulsi's wife and children were also repeatedly threatened.  These threats caused Mr. Nabulsi great stress.  Further, members of Mr. Nabulsi's personal staff (the "Staff") were kept at Sheikh Issa's palace where they were held captive for fourteen days without food or water. . . . After failing in his attempts to get those captives to provide him with the information that he was seeking, Sheikh Issa had the Abu Dhabi police come to his palace, arrest the Staff without any charges, and place them first in isolation cells with Mr. Nabulsi, and then in the same high security prison in which Sheikh Issa had placed Mr. Nabulsi. . .

. . . [T]he Abu Dhabi police, at the direction of
Sheikh Issa, asked repeatedly about the location of the
torture tapes, and repeatedly told Mr. Nabulsi that he
would be killed by being frozen to death, that his family
would be killed after Mr. Nabulsi's wife and children
were raped, and that the Staff would be killed as well.[5]

Plaintiffs allege that Mr. Nabulsi was eventually acquitted of

the charges for possession of marijuana and distribution of

narcotics, but that he was fined for holding prescription

medications without registering them with the government.  Despite

having been ordered released, Mr. Nabulsi stayed in jail for an

additional 13 days after which he was taken directly to the airport

and deported without a hearing pursuant to the order of Sheikh

Issa's brother, the Minister of the Interior.  Plaintiffs allege

that "Mr. Nabulsi's summary deportation deprived him of any

opportunity to seek redress or to collect the massive debt owed him

by Sheikh Issa as a result of their partnership and the various

businesses it formed and managed."[6]  Plaintiffs also allege that

"nearly all of the Nabulsi possessions and money were left in the

U.A.E. because [they] were not able to retrieve them after

Mr. Nabulsi was deported.  This included $257,000.00 USD in capital

that Mr. Nabulsi had personally provided for one of the companies

in the partnership and $150,000.00 USD worth of property."[7]

_____

[5]<u>Id.</u> at 11-14.

[6]<u>Id.</u> at 15.

[7]<u>Id.</u>

## II.  **Motion to Exclude Expert Witness Statement of Professor Khan**

In defense of their attempt to serve Sheikh Issa, plaintiffs have offered the statement of Professor L. Ali Khan, a professor of law at Washburn University in Topeka, Kansas.  Sheikh Issa moves to exclude Professor Khan's expert witness statement and deposition testimony because he "admits that he is not an expert on the U.A.E.'s law governing service of process and has only a superficial understanding of U.A.E.'s other laws."[8]  Citing Federal Rule of Civil Procedure 44.1, plaintiffs counter that "[t]here is no reason to 'exclude' Professor Khan's affidavit or deposition testimony. . . He is qualified and Plaintiffs respectfully submit that his testimony will be helpful to the Court."[9]

Rule 44.1 provides, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."  "Under this rule, expert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is determined."  <u>Access Telecom, Inc. v. MCI Telecommunications Corp.</u>, 197 F.3d 694, 713 (5th Cir. 1999),

---

[8]Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan's Motion to Exclude the Expert Witness Statement and Testimony of Professor L. Ali Khan, Docket Entry No. 134, p. 1.

[9]Plaintiffs' Response to Defendant's Motion to Exclude Expert Testimony, Docket Entry No. 139, p. 3.

<u>cert. denied</u>, 121 S.Ct. 275 and 292 (5th Cir. 2000).  The court may exclude opinions that are unfounded and unreliable.  <u>See</u> <u>Washington</u> <u>v. Armstrong World Industries, Inc.</u>, 839 F.2d 1121, 1123 (5th Cir. 1988).

Professor Khan is a native of Pakistan where he practiced law for one year in the 1970s before moving to the United States.[10]  In his deposition, Khan admitted that he is not licensed to practice law in the U.A.E.,[11] has never practiced law in the U.A.E.,[12] has never appeared before a U.A.E. court,[13] has no experience in service of process under U.A.E. law,[14] and does not hold himself out as an expert in either U.A.E. law or service of process.[15]  Professor Khan did not make use of any of the U.A.E. service of process rules for the work done on this case,[16] nor could he cite any U.A.E. law that authorizes service of process in a manner that he described as

---

[10]Deposition of Ali Khan, Exhibit 30 attached to Defendant Sheikh Issa Bin Zayed Al Nahyan's Motion to Dismiss for (1) Lack of Personal Jurisdiction, (2) Enforcement of Contractual Forum Selection Clause, (3) Forum Non Conveniens, and (4) Improper Service ("Defendant's Motion to Dismiss"), Docket Entry No. 132, p. 15:5-17.

[11]<u>Id.</u> at 23:23-24.

[12]<u>Id.</u> at 19:3-5.

[13]<u>Id.</u> at 6-8.

[14]<u>Id.</u> at 27-29.

[15]<u>Id.</u> at 21:5-7, 27:3-5, 58:1-9.

[16]<u>Id.</u> at 58:20-61:13.

proper in his statement.[17]   Professor Khan's failure to cite
extracts from U.A.E. legal material in his statement coupled with
his deposition testimony demonstrates that he has no experience
with or expertise in U.A.E. law.   Moreover, plaintiffs acknowledge
that Professor Khan's "testimony on U.A.E. law essentially echoed
the testimony of Defendant's legal expert (that is, the deposition
testimony of Defendant's legal expert)."[18]  Accordingly, defendant's
motion to exclude the testimony of Professor Khan will be granted.

### III.   Motion to Dismiss for Improper Service

Sheik Issa moves to dismiss the Plaintiffs' Third Amended
Complaint because Sheikh Issa has not been properly served with a
summons and complaint.  Plaintiffs argue that Sheikh Issa has been
properly served with the summons and complaint for this action.
Plaintiffs request the court to direct service by other means not
prohibited by international agreement as provided in Rule 4(f)(3),
should the court find that service was deficient.  For the reasons
explained below, the court concludes that Sheikh Issa has not been
properly served, that plaintiffs' request for alternative service
should be denied, and that this action is subject to dismissal for
failure to serve the defendant.

---

[17]Id. at 142:1-14.

[18]Plaintiffs' Response to Defendant's Motion to Exclude Expert
Testimony, Docket Entry No. 139, p. 1.

**A.    Standard of Review**

Federal Rule of Civil Procedure 12(b)(5) authorizes the court to dismiss a case for "insufficient service of process."  Fed. R. Civ. P. 12(b)(5).  Due process under the United States Constitution requires that

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum.  There also must be a basis for the defendant's amenability to service of summons.   Absent consent, this means there must be authorization for service of summons on the defendant.

Omni Capital International, Ltd. v. Rudolf Wolff & Co., Ltd., 108 S.Ct. 404, 409 (1987).

"When service of process is challenged, the party on whose behalf it is made must bear the burden of establishing its validity."   Aetna Business Credit, Inc. v. Universal Decor, 635 F.2d 434, 435 (5th Cir. 1981).  Plaintiffs normally meet the burden of establishing that the defendant was properly served by producing the process server's return of service, which is generally accepted as prima facie evidence of the manner in which service was effected.  See O'Brien v. R.J. O'Brien & Associates, Inc., 998 F.2d 1394, 1398 (7th Cir. 1993).  Unless some defect in service is shown on the face of the return, a motion to dismiss under Rule 12(b)(5) requires the defendant to produce admissible evidence establishing the lack of proper service.  Plaintiffs must produce admissible evidence showing that the service was proper, or creating a fact issue requiring an evidentiary hearing.   Id.  If a Rule 12(b)(5)

-9-

motion is granted, the court may either dismiss the action or retain the action and simply quash service.   See <u>Montalbano v. Easco Hand Tools, Inc.</u>, 766 F.2d 737, 740 (2d Cir. 1985).

**B.   Analysis**

Asserting that "Sheikh Issa has been served,"[19] plaintiffs cite the Declaration of Professor L. Ali Khan as evidence that Sheikh Issa has been served in accordance with the law of both the United States and the U.A.E.   Citing the Expert Witness Statement of Dr. Faraj Abdullah Ahnish, Sheikh Issa argues that he has not been properly served and that Professor Khan is not qualified to serve as an expert in the law of the U.A.E.

1.   <u>Sufficiency of Service</u>

(a)   Applicable Law

The Federal Rules of Civil Procedure distinguish between service of process of individuals within a judicial district of the United States and in a foreign country.   Since this case involves service of process on a defendant located in a foreign country, plaintiffs must comply with Fed. R. Civ. P. 4(f).   Federal Rule of Civil Procedure 4(f) provides that

> Unless federal law provides otherwise, an individual —
> other than a minor, an incompetent person, or a person
> whose waiver has been filed — may be served at a place
> not within any judicial district of the United States:

---

[19]Plaintiffs' Response to Defendant's Motion to Dismiss and Alternative Motion for Alternative Service ("Plaintiffs' Response"), Docket Entry No. 140, p. 69.

-10-

(1)  by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

      (A)  as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction

      (B)  as the foreign authority directs in response to a letter rogatory or letter of request; or

      (C)  unless prohibited by the foreign country's law, by:

           (i)  delivering a copy of the summons and of the complaint to the individual personally; or

           (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3)  by other means not prohibited by international agreement as the court orders.

Due to the inapplicability of the other subsections of Rule 4(f), whether service upon Sheikh Issa was sufficient turns on whether he was served pursuant to Fed. R. Civ. P. 4(f)(2)(A) in a manner "prescribed by the [U.A.E.]'s law for service in that country in an action in its courts of general jurisdiction," or pursuant to Fed. R. Civ. P. 4(f)(2)(C)(I) by "delivering a copy of the summons and of the complaint to [him] personally."[20]

_____

[20]The parties do not dispute that (1) there is no treaty between the U.A.E. and the United States governing service of process pursuant to Fed. R. Civ. P. 4(f)(1); (2) plaintiffs have
(continued...)

(b)  Underlying Facts

Plaintiffs hired Process Service Network, LLC — a process serving company based in Los Angeles, California — to serve the summons and complaint in this action.  Nelson Tucker, President of Process Service Network, LLC, states in the Declaration of Service attached to the Return of Service filed in this case that he has

> over 20 years experience in service of process on the international level, and [has] supervised the service of approximately 100 papers in the United Arab Emirates ("UAE").  The U.A.E. is not a signator to the Hague Convention, and the U.A.E. does not make use of Letters Rogatory.  The method of service I have always used in the U.A.E. is through mailing, through personal service of the individual or his agent using our affiliate process server in the UAE.[21]

On June 4, 2008, the District Clerk's Office issued a summons, and on June 5, 2008, plaintiffs' counsel asked Process Service Network, LLC, to personally serve the summons and a copy of the

---

[20](...continued)
not attempted to employ a letter rogatory or letter of request to an authority in the U.A.E. for purposes of accomplishing service pursuant to Fed. R. Civ. P. 4(f)(2)(B); (3) a previous attempt to accomplish service by certified mail with a return receipt from the clerk pursuant to Fed. R. Civ. P. 4(f)(2)(C)(ii) failed; and (4) the court has not authorized service to be accomplished by means other than those expressly laid out in Rule 4(f) because plaintiffs have failed to persuade the court that an alternative means of service would be more effective than the means prescribed by Rule 4(f).  See Plaintiffs' Response, Docket Entry No. 140, p. 71 (recognizing the lack of a treaty) and p. 73 n.23 (recognizing plaintiffs have not attempted service through diplomatic channels); Memorandum Opinion and Order, Docket Entry No. 46 (denying plaintiffs' second motion for alternative service and ordering plaintiffs to serve Sheikh Issa within sixty (60) days).

[21]Declaration of Service attached to Docket Entry No. 51, ¶ 2.

complaint filed in this case on Sheikh Issa at his home and business addresses in the U.A.E.  On June 5, 2008, Tucker forwarded the request to his affiliate process server in the U.A.E. along with instructions to serve Sheikh Issa at his residence.   On June 12, 2008, Tucker was advised by the process server that Sheikh Issa had moved.  On June 17, 2008, Tucker traveled to the U.A.E. to serve Sheikh Issa.[22]

On June 20, 2008, Tucker filed a return of service stating that he had "[l]eft copies [of the summons and complaint] at the defendant's usual place of business by serving Asmail Alabras, Assistant to Defendant, who on behalf of Defendant[, was s]erved at Pearl Properties, Oud Medha Road at 10th Street, First Floor, Dubai, UAE."[23]  Tucker explained that

> 8.   On June 19, 2008, I attempted service on the Defendant at his business address of Emirates Towers Office Building, 46th Floor, Sheikh Zayed Road, Dubai, UAE.  I was advised by the security guard that the Defendant had moved his offices.
>
> 9.   On June 19, 2008, at 1:45 p.m., using my cell phone from outside the Defendant's offices, I called the telephone number provided to me for the Defendant . . . .  The phone was answered as "Pearl Properties."   I inquired if the Defendant was available and the receptionist advised me that he was not in the office but that his Business Manager could assist me.   I have learned through my research that Defendant Sheikh Issa is the owner of Pearl Properties, and the individuals with which I spoke confirmed such.

---

[22]Id. ¶ 7.

[23]Return of Service, Docket Entry No. 51.

-13-

10. On June 19, 2008, I attempted service on the Defendant at his current business address of Pearl Properties, Oud Medha Road at 10th Street, First Floor, Dubai, UAE. I was advised by the receptionist that the Defendant was not in the office. I inquired if the Defendant's Business Manager, Seif Al Suwaidi ("Suwaidi") was present. The receptionist called an unknown party o[n] the intercom and she advised me that he would be right out.

11. On June 19, 2008, at 1:50 p.m., a male identified himself to me as Asmail Alabras, Assistant to the Defendant. He stated to me that he is employed by the Defendant. He further advised me that the Defendant was not currently in the office. I advised him as to the general nature of the papers and he agreed to accept them on behalf of the Defendant. He was over the age of 18 years. He spoke fluent English. He agreed to accept the papers on behalf of the Defendant and agreed to provide the papers to the Defendant.

12. On June 19, 2008, I mailed a copy of the service documents to the Defendant at the same address where the documents were left. The mailing was accomplished via certified mail in Dubai, UAE.

13. There are no other known addresses for service. Based on my experience, the service accomplished is proper under the laws of UAE and the United States of America. The service was made pursuant to Federal Rules of Civil Procedure, Rule 4(f)(2)(A) and, if ordered, would be proper pursuant to Rule 4(f)(3). There are no treaties between the United States of America and the UAE related to service of process, including The Hague Service Convention. There is no prohibition to such service accomplished herein, and, moreover, based on my experience, such service method is actually prescribed by the laws of the U.A.E. The method of service used to serve the Defendant herein has been used by my company many times.

14. In addition to the above-stated methods of service, I also mailed copies of the service documents to the Defendant at the addresses mentioned in paragraphs #3 and #4, above, via regular mail.

-14-

(There is no method of certified mail service in
the U.A.E. providing for a return receipt.)  Such
mailings are intended, in an abundance of caution,
to ensure that actual notice is given to the
Defendant.[24]

(c)  Rule 4(f)(2)(A)

Rule 4(f)(2)(A) imposes two requirements:  (1) the method of
service must be reasonably calculated to give notice; and (2) the
required method is that prescribed by U.A.E. law for service in
U.A.E. in an action in the U.A.E. courts of general jurisdiction.
See Retractable Technologies, Inc. v. Occupational & Medical
Innovations, Ltd., 253 F.R.D. 404, 406 (E.D. Tex. 2008) (for the
purposes of Rule 4(f)(2)(A) "a foreign court's general service law,
as applicable to its residents and citizens, will control").  The
sufficiency of service in this case turns on whether the particular
attempts at service made by plaintiffs are valid under U.A.E. law.

Plaintiffs argue that they properly effected service by
personally delivering the complaint and summons to Sheikh Issa's
place of business in the U.A.E. and leaving it with an individual
employed there, i.e., Ismail Alabras.  Citing the Expert Witness
Statement of Dr. Faraj Abdullah Ahnish, Sheikh Issa argues that the
method used to serve him is not prescribed by the laws of the
U.A.E.  Ahnish has identified two reasons why Tucker's service
attempt was not sufficient under U.A.E. law:  (1) Tucker was not

---

[24]Declaration of Service attached to Docket Entry No. 51, ¶¶ 8-
14.

-15-

authorized to serve process under U.A.E. law, and (2) Tucker did
not provide documentation of service.

### (1)  Authorization to Serve Process in U.A.E.

Citing Article 5 of Federal Law No. 11, Ahnish states that
process may be served in the U.A.E. by either (1) a summons clerk
who is appointed and trained by the relevant governmental
authorities, or (2) a private process server who works for a
company authorized by the government of the U.A.E. to serve
process.  Ahnish states that

> [h]aving reviewed the process adopted by Mr. Tucker in
> the current case vis-à-vis the provisions of the Civil
> Procedures Law, it is my view that the service of process
> as described by Mr. Tucker is fundamentally defective to
> the extent that it "defeats the purpose of the process"
> on the following accounts:
>
> a)   It was effected by a private person who under the
>      Civil Procedures Law does not qualify as a summoner
>      or a notification clerk.  Mr. Tucker is not an
>      employee of a UAE company or a branch of a foreign
>      company established in UAE for the purpose of
>      providing summons processing services;
>
> b)   Mr. Tucker does not obviously have any outsourcing
>      contract or similar arrangement with the UAE
>      Ministry of Justice for providing summons
>      processing services. . . .[25]

Asserting that plaintiffs do not contend that Tucker was a summons
clerk appointed and trained by governmental authorities, or that
the proper U.A.E. governmental agency authorized him or his

---

[25]Expert Witness Statement of Dr. Faraj Abdullah Ahnish,
Exhibit 25 attached to Defendant's Motion to Dismiss, Docket Entry
No. 132, ¶ 35.

Los Angeles company, Process Service Network, LLC, to issue service of process in the U.A.E., defendant argues that plaintiffs failed to effect service pursuant to Rule 4(f)(2)(A) because they failed to effect service in accord with the U.A.E.'s "general service law, as applicable to its residents and citizens."  See Retractable Technologies, 253 F.R.D. at 406.

Without disputing that neither Tucker nor his company have been authorized to serve process in the U.A.E., plaintiffs argue that common sense should override the requirements of U.A.E. law so long as Tucker used the "general methods of service available in the country of service."[26]  As evidence that Sheikh Issa was served in accordance with the "general methods of service available" in the U.A.E., plaintiffs cite Ahnish's deposition testimony that the U.A.E. does not have any law that specifically prohibits service of suits from outside the country,[27] and that service effected through an agent[28] and service effected by leaving documents with a person at a place of business are allowed.[29]

Although plaintiffs cite a number of cases in support of their interpretation of Rule 4(f)(2)(A), those cases are inapposite because they all involved service attempts that, unlike the service

---

[26]Plaintiffs' Response, Docket Entry No. 140, p. 74.

[27]Id. at 62.

[28]Id. at 107, 109.

[29]Id.

-17-

attempted by Tucker, were expressly found to have complied with the law of the foreign countries at issue.  See Inc21.com Corp. v. Flora, 2008 WL 5130415 at *5-6 (N.D. Calif. 2008) (The plaintiff took all actions required by the rule to effect service by publication in compliance with Philippine law.); Retractable Technologies, 253 F.R.D. at 407 (holding that service on a corporation through personal service on its CEO "was proper under Australian Federal law, Queensland law, and Federal Rule of Civil Procedure 4(f)(2)(A)"); Cosmetech International, LLC v. Der Kwei Enterprise & Co., Ltd., 943 F.Supp. 311, 316 (S.D.N.Y. 1996) (holding that service on corporation in Taiwan was properly made in accordance with Taiwan law by delivery of service to "the manager concerned").

Rule 4(f)(2)(A) is only one of several means provided by the Federal Rules of Civil Procedure for effecting service on an individual in a foreign country.  Service under this rule is acceptable only if it is in a manner "prescribed by the foreign country's laws for service in that country in an action in its courts of general jurisdiction." Fed. R. Civ. P. 4(f)(2)(A).  The only credible evidence as to whether Tucker's service attempt was made in a manner prescribed by U.A.E. law is the expert testimony of Ahnish.  Plaintiffs argue that Tucker's attempt to serve Sheikh Issa should be recognized as sufficient because U.A.E. law does not provide an alternative means to serve the defendant, but plaintiffs cite no authority for the principle underlying their argument that

the law of a foreign nation must provide a means for serving process that can be satisfied by foreign plaintiffs. See <u>Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries</u>, 353 F.3d 916, 924-28 (11th Cir. 2003), <u>cert. denied</u>, 125 S.Ct. 62 (2004) (holding that even though defendant had actual notice of the lawsuit, service of process was ineffective because it was not in substantial compliance with Rule 4(f), and dismissing action because plaintiffs failed to demonstrate that defendant was amenable to service).

Because plaintiffs have failed to submit any evidence showing that Tucker or his company has been authorized to serve process in the U.A.E., the court concludes that the service upon Sheikh Issa attempted by Tucker fails to satisfy the requirement of Rule 4(f)(2)(A) that service be effected "as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction." See <u>Emine Technology Co., Ltd. v. Aten International Co., Ltd.</u>, 2008 WL 5000526, *5 (N.D. Calif. 2008) (when plaintiff failed to refute defendant's showing that Taiwanese law did not permit an individual other than the court clerk to carry out service, plaintiff failed to show that service had been effected in compliance with Taiwanese law).

### (2)  Documentation of Service of Process

Citing Article 7 of the Civil Procedures Law of the U.A.E., Ahnish contends that Tucker failed to provide a "notification

document" required under U.A.E. law for service of process. According to Ahnish the required elements of a "notification document" include (1) the date and time of notification; (2) information about the party requesting service; (3) information about the party being served; (4) information about the "Notification Officer;" (5) the subject of the notification; and (6) the "full name of the person to whom notice is delivered and his signature, seal, or thumb print on the original [notification document] to acknowledge receipt or indicate refusal and the reason for such refusal."[30]

Tucker does not state that he presented any such "notification document" to Alabras but, instead, that he described the "general nature" of the contents of the envelope to Alabras,[31] and plaintiffs do not contend that Tucker asked Alabras to sign a "notification document" with the information required under U.A.E. law. The court concludes that Tucker's attempt to serve Sheikh Issa by leaving the summons and complaint with Alabras was ineffective under both U.A.E. law and Rule 4(f).

    (d)  Rule 4(f)(2)(C)(I)

Plaintiffs argue that the method of service of process used in this case is consistent with Federal Rule of Civil Procedure

_____

[30]Expert Witness Statement of Dr. Faraj Abdullah Ahnish, Exhibit 25 attached to Defendant's Motion to Dismiss, Docket Entry No. 132, ¶ 35.

[31]Declaration of Service attached to Docket Entry No. 51, ¶ 11.

4(f)(2)(C)(I) because personal service is not prohibited by U.A.E. law, and in the U.A.E. personal service on a person like Sheikh Issa can be made through agents.  Defendant argues that the method of service used in this case does not satisfy the requirements of Rule 4(f)(2)(C)(I) because service pursuant to that subsection requires personal service and does not recognize service through agents.  The court agrees.

Rule 4(f)(2)(C)(I) provides "an individual . . . may be served at a place not within any judicial district of the United States . . . by delivering a copy of the summons and of the complaint to the individual personally."  The provisions of Rule 4(e) that govern service on an individual in the United States are instructive for understanding the requirements of Rule 4(f)(2)(C)(I). Rule 4(e) distinguishes between service on "the individual personally" and service on the individual through agents.  Compare Fed. R. Civ. P. 4(e)(2)(A) (regarding service on "the individual personally"), with Fed. R. Civ. P. 4(e)(2)(B) & (C) (regarding service on agents or representatives).  Use of identical language in these two rules, _i.e._, Rule 4(e) and Rule 4(f), indicates that Rule 4(f)(2)(C)(I), like Rule 4(e)(2)(A), refers to actual personal service, not service on an agent or a representative.  Plaintiffs do not dispute that Tucker delivered an envelope containing the summons and complaint to Alabras, not to Sheikh Issa.[32]  Therefore,

---

[32]_Id._ ¶¶ 10-11.

even if Alabras were an agent of Sheikh Issa, delivery of the summons and complaint to him would not constitute personal service pursuant to Rule 4(f)(2)(C)(I).  See <u>Alcaraz Martinez v. White</u>, 2006 WL 1530111, *1 (N.D. Calif. 2006) (where plaintiffs offered evidence that summons and complaint were left at reception area of Mexican jail where defendant was incarcerated, plaintiffs failed to offer evidence capable of supporting a finding that the summons and complaint were personally delivered to the defendant in compliance with Rule 4(f)(2)(C)(I)).

       (e)  Conclusions

     For the reasons explained above, the court concludes that plaintiffs have failed to establish that they effected service in compliance with Federal Rule of Civil Procedure 4(f)(2)(A) because they have failed to present any evidence that Tucker is authorized pursuant to U.A.E. law to serve process in the U.A.E., or that Tucker documented his attempt to serve defendant through an agent as required by U.A.E. law.  The court also concludes that plaintiffs have failed to establish that they effected service in compliance with Federal Rule of Civil Procedure 4(f)(2)(C)(I) because they have failed to present any evidence that Tucker served the defendant personally.

     2.   <u>Plaintiffs' Motion for Alternative Service</u>

     When granting a Rule 12(b)(5) motion, federal courts have broad discretion to dismiss the action or to retain the case but

quash the service that has been made on the defendant.  <u>Stevens v.</u>
<u>Security Pacific National Bank</u>, 538 F.2d 1387, 1389 (9th Cir. 1976)
("The choice between dismissal and quashing service of process is
in the district court's discretion.").  "[D]ismissal of a complaint
is inappropriate when there exists a reasonable prospect that
service may yet be obtained.  In such instances, the district court
should, at most, quash service, leaving the plaintiffs free to
effect proper service." <u>Umbenhauer v. Wooq</u>, 969 F.2d 25, 30-31 (3d
Cir. 1992).  Plaintiffs request that

> [i]f the Court determines that service has not been
> properly effected, Plaintiffs seek an order of
> alternative service pursuant to Rule 4(f)(3).
> Rule 4(f)(3) provides:
>
> Unless federal law provides otherwise, an individual
> . . . may be served at a place not within any judicial
> district of the United States . . . by other means not
> prohibited by international agreement, as the court
> orders.[33]
>
> Citing <u>Rio Properties, Inc. v. Rio International Interlink</u>,

284 F.3d 1007, 1014 (9th Cir. 2002), plaintiffs ask the court to

> allow[] them to serve Sheikh Issa through his attorneys
> of record in this case; through his American lawyer who
> works in the U.A.E. . . . or by private process service,
> Process Service Network, LLC, which may leave a copy of
> the service documents with the front gate attendant at
> Sheikh Issa's palace in Abu Dhabi or with any employee at
> the offices of Pearl Properties, Oud Medha Road at 10th
> Street, First Floor, Dubai, UAE, or the current office of
> Pearl Properties.[34]

---

[33]Plaintiffs' Response, Docket Entry No. 140, p. 78.

[34]<u>Id.</u> at 81-82.

Plaintiffs argue that, even if these methods of service are contrary to the laws of the U.A.E., they could be employed pursuant to Rule 4(f)(3).

The authority upon which plaintiffs rely as persuasive, Rio Properties, 284 F.3d at 1007, is not applicable to the circumstances here.  In Rio the court held that the district court did not abuse its discretion by ordering service by e-mail upon an international corporation based in Costa Rica.  However, the primary issue in that case was whether Fed. R. Civ. P. 4(f) should be read to create a hierarchy of preferred methods of service of process requiring a party to attempt service by the methods enumerated in Fed. R. Civ. P. 4(f)(2) before petitioning the court for alternative relief under Fed. R. Civ. P. 4(f)(3).  Id. at 1014.

More importantly, the facts supporting the court's direction of alternative service in Rio differ from the facts here.  In Rio the court determined that the defendant, an international internet company doing business in the United States, had a viable presence in the United States; that physical personal service had been legally attempted by actually serving a legitimate agent of the defendant in the United States; and that the defendant had evaded the attempted service.  Plaintiffs in this case do not allege that Sheikh Issa is attempting to evade service and despite acknowledging that "Sheikh Issa has not lived in the U.A.E. since September 1, 2008, having moved to Germany,"[35] seek an order

---

[35]Id. at 16.

allowing alternative service on Sheikh Issa in the U.A.E. either through his American lawyer who works there, or by a private process server who would leave a copy of the service documents with the front gate attendant at his palace in Abu Dhabi or with an employee at the offices of Pearl Properties.[36]  Plaintiffs fail to explain why, if Sheikh Issa lives in Germany, the court should order alternative service through individuals located in the U.A.E. Moreover, for the reasons explained below in § IV, the court concludes that ordering service of process pursuant to Rule 4(f)(3) would constitute an abuse of discretion because plaintiffs have failed to establish that the court is able to exercise personal jurisdiction over Sheikh Issa.  Accordingly, plaintiff's motion for an order allowing them to serve Sheikh Issa pursuant to Rule 4(f)(3) will be denied.

**C.  Conclusions**

Plaintiffs do not seriously contend that they have substantially complied with Rule 4(f).  Instead, plaintiffs argue that Sheikh Issa has actual knowledge of this lawsuit and, therefore, the service is valid.  This argument is contrary to the law.  A liberal construction of Rule 4 "cannot be utilized as a substitute for the plain legal requirement as to the manner in which service of process may be had."  <u>Mid-Century Wood Products,</u>

---

[36]<u>Id.</u> at 81-82.

Inc. v. Harris, 936 F.2d 297, 300 (7th Cir. 1991).   See also
Prewitt, 353 F.3d at 924-25 ("Due process under the United States
Constitution requires that 'before a court may exercise personal
jurisdiction over a defendant, there must be *more than* notice to
the defendant . . . [t]here also must be a basis for the
defendant's amenability to service of summons.   Absent consent,
this means there must be *authorization* for service of summons on
the defendant.'").   See Prewitt, 353 F.3d at 925 & n.15 ("Personal
jurisdiction is a composite notion of two separate ideas:
amenability to jurisdiction, or predicate, and notice to the
defendant through valid service of process.").   The court has twice
denied plaintiffs' requests for alternative service.   After the
second order denying a request for alternative service, the court
stated that it would dismiss this lawsuit unless service was
effected within sixty days.   Nevertheless, plaintiffs have still
failed to effect service on Sheikh Issa in accordance with the
Federal Rules of Civil Procedure.   Based on the history of failed
or inadequate attempts to serve the defendant in this case, and on
the court's conclusions stated in § IV, below, that plaintiffs have
failed to establish a prima facie case for the assertion of
personal jurisdiction over Sheikh Issa, the court concludes that
plaintiffs' motion for alternative service should be denied and
that plaintiffs' failure to serve Sheikh Issa should result in
dismissal of their claims because Sheikh Issa is not amenable to
service in this case.

-26-

## IV.  __Motion to Dismiss for Lack of Personal Jurisdiction__

Plaintiffs' Third Amended Complaint asserts claims for breach of contract, conversion, breach of fiduciary duty, intentional infliction of emotional distress, and malicious prosecution under the common law of Texas and a claim for torture under federal law. Sheik Issa argues that all of these claims should be dismissed pursuant to Rule 12(b)(2) for lack of personal jurisdiction. Plaintiffs respond that Sheikh Issa's contacts with Texas in particular and the United States in general are sufficient to support the court's assertion of personal jurisdiction over him.

## A.  **Standard of Review**

When a foreign defendant moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "the plaintiff 'bears the burden of establishing the district court's jurisdiction over the defendant.'"  Quick Technologies, Inc. v. Sage Group PLC, 313 F.3d 338, 343 (5th Cir. 2002), cert. denied, 124 S.Ct. 66 (2003) (quoting Mink v. AAAA Development LLC, 190 F.3d 333, 335 (5th Cir. 1999)).  "When the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a prima facie case that personal jurisdiction is proper.'"  Id. (quoting Wilson v. Belin, 20 F.3d 644, 648 (5th Cir.), cert. denied, 115 S.Ct. 322 (1994)).  "In making its determination, the district court may consider the contents of the

-27-

record before the court at the time of the motion, including
'affidavits, interrogatories, depositions, oral testimony, or any
combination of the recognized methods of discovery.'"  Id. at 344
(quoting Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165
(5th Cir. 1985)).  The court must accept as true the uncontroverted
allegations in the plaintiffs' complaint and must resolve in favor
of the plaintiff any factual conflicts.  "Absent any dispute as to
the relevant facts, the issue of whether personal jurisdiction may
be exercised over a nonresident defendant is a question of law to
be determined . . . by th[e C]ourt."  Ruston Gas Turbines, Inc. v.
Donaldson Co., Inc., 9 F.3d 415, 418 (5th Cir. 1993).  However, the
court is not obligated to credit conclusory allegations, even if
uncontroverted.  Panda Brandywine Corp. v. Potomac Elec. Power Co.,
253 F.3d 865, 869 (5th Cir. 2001).

**B.   Analysis**

   1.   Applicable Law

   Exercise of personal jurisdiction over a nonresident defendant
comports with federal due process guarantees when the nonresident
defendant has established minimum contacts with the forum state,
and the exercise of jurisdiction "does not offend 'traditional
notions of fair play and substantial justice.'"  International Shoe
Co. v. State of Washington, Office of Unemployment Compensation and
Placement, 66 S.Ct. 154, 158 (1945) (quoting Milliken v. Meyer, 61
S.Ct. 339, 343 (1940).  Once a plaintiff satisfies these two

-28-

requirements, a presumption arises that jurisdiction is reasonable, and the burden of proof and persuasion shifts to the defendant opposing jurisdiction to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174, 2185 (1985). Federal courts "sitting in diversity may assert personal jurisdiction if: (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the [F]ourteenth [A]mendment to the United States Constitution." Johnston v. Multidata Systems International Corp., 523 F.3d 602, 609 (5th Cir. 2008). For claims arising under federal law, courts may assert personal jurisdiction over defendants who lack sufficient contacts to satisfy the due process concerns of any particular state's long-arm statute pursuant to Federal Rule of Civil Procedure 4(k)(2) when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law. See World Tanker Carriers Corp. v. M/V Ya Mawlaya, 99 F.3d 717, 720 (5th Cir. 1996).

### 2.   Texas Long-Arm Statute

Texas courts may assert personal jurisdiction "over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due process guarantees." See Moki Mac River Expeditions v. Drugg, 221 S.W.3d

569, 574 (Tex. 2007) (citing <u>Schlobohm v. Schapiro</u>, 784 S.W.2d 355, 356 (Tex. 1990)).  The Texas long-arm statute authorizes service of process on nonresidents "[i]n an action arising from the nonresident's business in this state."  Tex. Civ. Prac. & Rem. Code § 17.043.

> In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident
>
> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; [or]
>
> (2) commits a tort in whole or in part in this state; or
>
> (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

<u>Id.</u> at § 17.042.  The Texas Supreme Court has stated that the long-arm statute's "broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements of due process will allow.'"   <u>Moki Mac</u>, 221 S.W.3d at 575 (quoting <u>Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C.</u>, 815 S.W.2d 223, 226 (Tex. 1991)).  <u>See also</u> <u>Schlobohm</u>, 784 S.W.3d at 357 (holding that the limits of the Texas long-arm statute are coextensive with the limits of constitutional due process guarantees).

(a)  Minimum Contacts Analysis

"There are two types of 'minimum contacts:'  those that give rise to specific personal jurisdiction and those that give rise to

general personal jurisdiction." <u>Lewis v. Fresne</u>, 252 F.3d 352, 358
(5th Cir. 2001).   Sheik Issa argues that this action should be
dismissed pursuant to Rule 12(b)(2) for lack of personal
jurisdiction because plaintiffs have failed to carry their "burden
of presenting prima facie evidence that [he] purposefully
established 'minimum contacts' with Texas that are sufficient to
give rise to either 'specific' or 'general' jurisdiction under
relevant case law."[37]   Plaintiffs respond that "due to Sheikh Issa's
systematic and continuous contacts with both Texas and the
United States, this court has personal jurisdiction over Sheikh
Issa under both general and specific jurisdiction.[38]

### (1)  Specific Jurisdiction

A court may exercise specific jurisdiction over a nonresident
defendant if the lawsuit arises from or relates to the defendant's
contact with the forum state.   <u>Icee Distributors Inc. v. J & J
Snack Foods Corp.</u>, 325 F.3d 586, 591 (5th Cir. 2003).   Specific
jurisdiction exists where a defendant "purposefully avails itself
of the privilege of conducting activities within the forum state,
thus invoking the benefits and protections of its laws." <u>Burger
King</u>, 105 S.Ct. at 2185.   The Texas Supreme Court has recently
explained that there are three parts to a purposeful availment
inquiry.   First, only the defendant's contacts with the forum are

---

[37]Defendant's Motion to Dismiss, Docket Entry No. 132, p. 13.

[38]Plaintiffs' Response, Docket Entry No. 140, pp. 10-11.

relevant, not the unilateral activity of another party or a third
person.  Second, the contacts relied upon must be purposeful rather
than random, fortuitous, or attenuated.  Finally, the defendant
must seek some benefit, advantage, or profit by availing itself of
the jurisdiction.  In contrast, a defendant may purposefully avoid
a particular forum by structuring its transactions in such a way as
to neither profit from the forum's laws nor subject itself to
jurisdiction there.  Moki Mac, 221 S.W.3d at 575 (citing Burger
King, 105 S.Ct. at 2182).  Since specific jurisdiction is claim
specific, plaintiffs must show that specific jurisdiction exists as
to each of their claims against Sheikh Issa.  See Seiferth v.
Helicopteros Atuneros, Inc., 472 F.3d 266, 274 (5th Cir. 2006).

(i)  Breach of Contract

Plaintiffs allege that

Defendant, Sheikh Issa, entered into a legally binding
oral partnership agreement with Plaintiff, Bassam
Nabulsi.  Because it was formed in Texas and carried out,
in large part, in Texas, Texas law governs the
partnership.  Under the terms of the partnership,
Plaintiff, Bassam Nabulsi, was to receive fifty percent
of all of the profits from all of Sheikh Issa's business
enterprises which Mr. Nabulsi managed.  In exchange,
Plaintiff, Bassam Nabulsi, sought out business
opportunities throughout the world (including Texas),
developed such opportunities, and managed all of Sheikh
Issa's affairs.  Plaintiff, Bassam Nabulsi, fully
performed his obligations under the contract, or was
wrongly prevented from doing so by Defendant.  The
partnership formed at least one vehicle (IBA Co., LLC)
through which it conducted business, but the majority of
the partnership business was conducted through the
partnership itself.  All conditions precedent were
satisfied, or the Defendant wrongly prevented such.
Further, because he accepted the benefits of

-32-

Mr. Nabulsi's efforts and acted pursuant to the
partnership for literally years, Sheikh Issa is estopped
from denying the existence of the partnership
agreement. Defendant substantially and materially breached the
partnership in the following ways, among others:
1) failing to pay Plaintiff, Bassam Nabulsi, in
accordance with the agreement; 2) preventing Plaintiff,
Bassam Nabulsi's further performance under the agreement;
3) making false charges against Plaintiff, Bassam
Nabulsi, to the police; 4) using his influence over the
police to gain a business advantage over Plaintiff,
Bassam Nabulsi; 5) using his influence to have Plaintiff,
Bassam Nabulsi, deported from the U.A.E.; and
6) torturing or causing Plaintiff, Bassam Nabulsi, to be
tortured.[39]

Plaintiffs argue that "because the contract at issue in this

lawsuit was formed in Houston and was, in large part, carried out

in Houston, and because Sheikh Issa recruited the Nabulsis to

Abu Dhabi, specific jurisdiction exists in this case."[40]  Plaintiffs

argue that this case presents facts similar to those at issue in

Enviro Petroleum, Inc. v. Kondur Petroleum, 79 F.Supp.2d 720 (S.D.

Tex. 1999).   In Enviro Petroleum the district court exercised

specific jurisdiction over Indonesian defendants after concluding

that the defendants had actively negotiated a written contract in

Texas with a Texas-based company to design and construct an oil

refinery in Texas that was to be transported to the Republic of

Kazakhstan but managed by the Texas-based company from Houston,

Texas.  Id. at 723-25.  The court is not persuaded that the facts

of Enviro Petroleum are similar to those alleged in this case or

---

[39]Plaintiffs' Third Amended Complaint, Docket Entry No. 99,
pp. 16-17.

[40]Plaintiffs' Response, Docket Entry No. 140, pp. 37-38.

that they support the exercise of specific jurisdiction over Sheikh
Issa.

Merely contracting with a resident of the forum state does not
sufficiently support the exercise of jurisdiction over the
defendant.  See Icee Distributors, 325 F.3d at 591.  The Fifth
Circuit has consistently looked to other factors surrounding the
contract and its formation including, primarily, the place of
performance and/or intended performance, and the place of
subsequent breach.  See Religious Technology Center v. Liebreich,
339 F.3d 369, 375 (5th Cir. 2003), cert. denied, 124 S.Ct. 1085
(2004) ("[O]nly those acts which relate to the formation of the
contract and the subsequent breach are relevant [for purposes of
specific jurisdiction].").  See also Jones v. Petty-Ray Geophysical
Geosource, Inc., 954 F.2d 1061, 1068 (5th Cir. 1992) ("In contract
cases, this Court has consistently looked to the place of
contractual performance to determine whether the making of a
contract with a Texas resident is sufficiently purposeful to
satisfy minimum contacts."); Enviro Petroleum, 79 F.Supp.2d at 724
(quoting Barnstone v. Congregation Am Echad, 574 F.2d 286, 288 (5th
Cir. 1978) ("[I]t is the place of performance rather than
execution, consummation or delivery which should govern the
determination of [personal] jurisdiction."  Product Promotions,
Inc. v. Coustea, 495 F.2d 483, 492 (5th Cir. 1974) ("performance,
contemplated or accomplished, is the touchstone")).  The facts now

before the court are distinguishable from the facts at issue in
Enviro Petroleum because the evidence presented by the plaintiffs
in this case establishes that even if the handshake agreement
occurred in Texas, Sheikh Issa always intended for Nabulsi to work
with him in the U.A.E., in 2002 Nabulsi and his family moved to the
U.A.E., the breaches alleged in this action all occurred in the
U.A.E., and none of the projects for which plaintiffs seek
compensation were performed in Texas.

Evidence presented in Bassam Nabulsi's affidavit shows that
in 1997 before he entered the alleged partnership agreement with
Sheikh Issa, "Sheikh Issa began to strongly recruit me to come to
the U.A.E. to work for him.  I resisted his recruitment, but did
express interest in working with him on business deals."[41]  In 2002
Nabulsi moved his family to the U.A.E. so that he could work with
Sheikh Issa on all of his businesses.[42]  Plaintiffs allege that in
2005 Sheikh Issa substantially and materially breached the
partnership by (1) failing to pay Bassam Nabulsi in accordance with
the agreement, (2) preventing Bassam Nabulsi's further performance
under the agreement, (3) making false charges against Bassam
Nabulsi to the police, (4) using his influence over the police to
gain a business advantage over Bassam Nabulsi, (5) using his

---

[41]Affidavit of Bassam Nabulsi, Exhibit A attached to
Plaintiffs' Response, Docket Entry No. 140, ¶ 10.

[42]Id. at ¶ 27.

influence to have Bassam Nabulsi deported from the U.A.E., and
(6) torturing or causing Bassam Nabulsi to be tortured.[43]  All of
these alleged breaches occurred in the U.A.E., not in Texas or even
in the United States.  Moreover, plaintiffs have failed to present
evidence showing that any of the business projects for which they
allege Sheikh Issa failed to compensate Bassam Nabulsi were
performed or intended to be performed in Texas or the
United States.

Under the terms of the alleged partnership agreement, Bassam
Nabulsi was to have received fifty percent of the profits from all
of the business enterprises that he managed for Sheikh Issa.  With
few exceptions the undisputed evidence before the court identifies
the U.A.E. as the place of performance for the business enterprises
for which plaintiffs are seeking compensation in this action.  For
example, plaintiffs allege that Nabulsi negotiated the acquisition
of a prime piece of real estate in Dubai for the purpose developing
a hotel or residential tower and that because Sheikh Issa breached
the partnership agreement, such effort never materialized.[44]
Plaintiffs allege that Nabulsi negotiated contracts with the
Abu Dhabi police department that were cancelled because Sheikh Issa
had him falsely arrested, and that Nabulsi obtained sponsorship

--------

[43]Plaintiffs' Third Amended Complaint, Docket Entry No. 99,
pp. 16-17.

[44]Id. at 8.

-36-

agreements with a United Kingdom company and with defense-related companies to supply the U.A.E. armed forces.[45]

Although there is no evidence before the court identifying the specific place of performance for the remaining business enterprises that plaintiffs allege Bassam Nabulsi managed for Sheikh Issa, neither the plaintiffs' allegations nor the evidence pertaining to these enterprises allow the court to infer that they were performed in Texas or the United States.  These enterprises include a debt restructuring arrangement that Nabulsi negotiated between the Syrian government and Bankers Trust in Slovakia that failed to close because Sheikh Issa orchestrated Nabulsi's wrongful incarceration in the U.A.E., an alleged turnaround of Sheikh Issa's Chi-Chi franchise agreement with Tumbleweed, a United States corporation, and Nabulsi's alleged management of Sheikh Issa's investment portfolio.  Although plaintiffs allege that Sheikh Issa sent Nabulsi to Kentucky to meet with Tumbleweed representatives, in his affidavit Bassam Nabulsi states that the "Sheikh Issa's company developed Chi-Chi's restaurants in the U.A.E."[46]

Because plaintiffs have failed either to allege or show that since at least 2002 Nabulsi performed his management duties in Texas or the United States, that the business enterprises that

---

[45]Id. at 8-9.

[46]Affidavit of Bassam Nabulsi, Exhibit A attached to Plaintiffs' Response, Docket Entry No. 140, ¶ 29.

Nabulsi managed on behalf of Sheikh Issa and the alleged partnership were performed in Texas or the United States, or that any of the breaches of contract alleged in this action and for which the plaintiffs seek compensation occurred in Texas or the United States, the court concludes that plaintiffs have failed to make even a <u>prima facie</u> showing of specific personal jurisdiction over Sheikh Issa for their breach of contract claims.

### (ii)  <u>Intentional Torts and Torture</u>

Plaintiffs allege claims for a variety of tortious acts including, conversion, breach of fiduciary duty, intentional infliction of emotional distress, malicious prosecution, and torture, all of which occurred not in Texas but in the U.A.E.  In some circumstances tortious and torturous acts that occur overseas can constitute sufficient contact with the United States for due process purposes.  For example, in <u>Mwani v. bin Laden</u>, 417 F.3d 1, 10 (D.C. Cir. 2005), the plaintiffs alleged that Osama bin Laden "orchestrated the bombing of the American Embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States." <u>Id.</u> at 13.  Plaintiffs alleged that the embassy bombing was part of a conspiracy directed against the United States that included overt acts that occurred inside the United States.  <u>Id.</u>  On these facts the court had no trouble determining that bin Laden "purposefully directed" his activities

at residents of the United States and, therefore, could be subject
to personal jurisdiction there.  Id.  See also Sisso v. Islamic
Republic of Iran, 448 F.Supp.2d 76, 89-90 (D.D.C. 2006) (finding
specific personal jurisdiction supported by allegations that, if
proved, would show terrorist attack in downtown Tel Aviv was
calculated to cause injury to persons residing in the United
States).  Courts have made clear, however, that tortious acts
against an American citizen that occurs abroad that have no further
connection with the United States cannot support the exercise of
specific personal jurisdiction over a defendant.  See Price v.
Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C.
Cir. 2002).

In Price the plaintiffs were two American citizens who had
been arrested in Libya and allegedly tortured while incarcerated in
a Libyan "political prison."  294 F.3d at 86.  Although the court
ultimately held that the defendant was not entitled to the
protections of the Due Process Clause, it stated as part of its
analysis that "the alleged fact that [the defendant] tortured two
American citizens in Libya . . . would be insufficient to satisfy
the usual 'minimum contacts' requirement."  Id. at 95.  In support
of this conclusion, the court cited IMO Indus., Inc. v. Kiekert AG,
155 F.3d 254, 265-66 (3d Cir. 1998), explaining that "minimum
contacts do not exist in an intentional tort case unless the
defendant 'expressly aimed its tortious conduct at the forum'; the
mere fact that the harm caused by the defendant was primarily felt

in the forum because the plaintiff resided there is not enough."
Price, 294 at 95.  Thus, only the commission of an intentional tort
aimed at the forum state will satisfy the purposeful availment
inquiry of the minimum contacts requirement.  See Lewis v. Fresne,
252 F.3d 352, 359 (5th Cir. 2001).

Plaintiffs allege that Sheikh Issa planned, ordered,
authorized, or knowingly ignored acts committed against Mr. Nabulsi
that took place entirely in Abu Dhabi.  Plaintiffs have not alleged
that Sheikh Issa expressly intended the effects of those acts to be
felt in the United States.  Instead, plaintiffs allege that the
acts were targeted at Nabulsi as an individual living and working
in Abu Dhabi, in retaliation for his refusal to release videotapes
made in Abu Dhabi.  Because the plaintiffs have failed either to
allege or to show that Sheikh Issa purposely directed his tortious
and/or torturous activities at residents of Texas and/or the
United States, or that this litigation resulted from alleged
injuries that arise out of or relate to the activities that Sheikh
Issa directed at residents of Texas and/or the United States, the
court concludes that the plaintiffs have failed to make even a
prima facie showing of specific personal jurisdiction over Sheikh
Issa for the tortious and/or torturous acts alleged in this action.

### (2) General Jurisdiction

General jurisdiction exists when a non-resident defendant's
contacts with the forum state are substantial, continuous, and

systematic.  <u>Johnston v. Multidata Systems International Corp.</u>, 523 F.3d 602, 609 (5th Cir. 2008) (citing <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 104 S.Ct. 1868, 1872-74 (1984).   "The 'continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum.'"  <u>Id.</u> (quoting <u>Submersible Sys., Inc. v. Perforadora Cent., S.A.</u>, 249 F.3d 413, 419 (5th Cir. 2001)).   "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous, and systematic contacts required for a finding of general jurisdiction. . ."  <u>Id.</u> (quoting <u>Revell v. Lidov</u>, 317 F.3d 467, 471 (5th Cir. 2002)). Moreover, a defendant may "not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attentuated' contacts, or of the 'unilateral activity of another party or third person.'" <u>Burger King</u>, 105 S.Ct. at 2183.  In other words, the only contacts that matter for personal jurisdiction must "result from actions by the defendant *himself*."  <u>Id.</u>

    "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed."  <u>Access Telecom, Inc. v. MCI Telecommunications Corp.</u>, 197 F.3d 694, 717 (5th Cir. 1999), <u>cert. denied</u>, 121 S.Ct. at 275 and 292 (2000).  "The determination of what period is reasonable in the context of each case should be left to the court's discretion."  <u>Metropolitan Life Insurance Co.</u>

v. Robertson-Ceco Corp., 84 F.3d 560, 570 (2d Cir.), cert. denied,
117 S.Ct. 508 (1996).  For general jurisdiction purposes, the court
does not view each contact in isolation but, instead, views all the
defendant's contacts in toto.  Access Telecom, 197 F.3 at 717 (when
determining whether a nonresident defendant's contacts with the
forum state are sufficient to establish general personal
jurisdiction, contacts must be examined in toto rather than in
isolation).  "[V]ague and overgeneralized assertions that give no
indication as to the extent, duration, or frequency of contacts are
insufficient to support general jurisdiction."  See Johnston, 523
F.3d at 610 (citing Gardemal v. Westin Hotel Co., 186 F.3d 588, 596
(5th Cir. 1999)).

     The seminal general jurisdiction case is Perkins v. Benquet
Consolidated Mining Co., 72 S.Ct. 413 (1952), in which the Supreme
Court first articulated the idea that a court may exercise personal
jurisdiction over a foreign corporation based on general business
operations within the forum state.  The Supreme Court upheld the
district court's exercise of general personal jurisdiction in Ohio
over a Philippine corporation whose president and general manager
relocated to Ohio during the Japanese occupation of the Philippine
Islands.  While in Ohio, the president maintained a corporate
office where he kept the records of the corporation, conducted
director's meetings, and made all key business decisions.  The
corporation also distributed salary checks drawn on two Ohio bank

accounts and engaged an Ohio bank to act as a transfer agent.  In light of these activities, the Court held that Ohio could exercise jurisdiction over the corporation because the president had "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company."  <u>Id.</u> at 419-20.

By contrast, in <u>Helicopteros</u> the Supreme Court found that the defendant's general business contacts with Texas were insufficient to support an exercise of general jurisdiction despite the fact that the defendant had purchased equipment from a company in the forum state.  104 S.Ct. at 1873-74.  Over a six-year period the defendant purchased helicopters (approximately 80% of its fleet), spare parts, and accessories for more than $4 million from a Texas company; sent its prospective pilots to Texas for training; sent management and maintenance personnel to Texas for technical consultations; and received a check for over $5 million that was drawn upon a Texas bank.  Nevertheless, the Court held that none of the contacts were substantial enough standing alone or taken together to support the assertion of general jurisdiction.  The Court explained that the mere purchase of goods from a state, even at regular intervals and in substantial amounts, was not enough to warrant the assertion of general jurisdiction over a non-resident on a cause of action unrelated to those purchases.  Nor was the Court persuaded that the fact that the defendant sent personnel to

Texas for training in connection with the purchases enhanced the nature of the contacts.  Instead, the Court concluded that this was merely one aspect of the package of goods and services that the defendant had purchased.  Finally, the Court concluded that the receipt of a check drawn from a Texas bank was of no consequence because the bank from which payment was made was caused by the fortuitous "unilateral activity" of a third party.  Id.

The Fifth Circuit has consistently imposed the high standard set by the Supreme Court in Helicopteros when ruling on general jurisdiction issues.  See, e.g., Cent. Freight Lines Inc. v. APA Transp. Corp., 322 F.3d 376, 381 (5th Cir. 2003) (finding no general jurisdiction even though the defendant routinely arranged and received shipments to and from Texas and regularly sent sales people to Texas to develop business, negotiate contracts, and service national accounts).  Moreover, in Access Telecom, 197 F.3d at 717, the Fifth Circuit emphasized that in order to confer general jurisdiction a defendant must have a business presence in Texas.

In Access Telecom the evidence of Telmex's contacts with Texas from 1990 to 1996 were numerous:

> Up until 1990 Telmex leased telephone circuits between Arizona and Texas.  Telmex's current lines interconnect with Texas at the border in McAllen and El Paso.  Telmex leased real property in Texas in 1995 and paid taxes to Texas that same year.  Telmex contracted to warehouse 75,000 telephone poles in Laredo around 1990-1991. Telmex had correspondent agreements with a number of U.S. carriers.  Settlement revenues from these agreements

-44-

> totaled approximately $1 billion a year in 1994-1995.
> The total revenues derived from Texas residents totaled
> millions of dollars a month.  Telmex also solicited ads
> for yellow page ads in border cities of U.S., although it
> is unclear exactly where.  Additionally, SBC is alleged
> to be a Texas contact of Telmex, since SBC owns a portion
> of a controlling interest in Telmex and thus exerts some
> control over Telmex.

Id.  In a footnote the Fifth Circuit elaborated that "[a] number of

other contacts are also put forward, mostly involving Telmex paying

for services that were provided by corporations in Texas or the

U.S.  Such services included consulting and finance services."

Id. & n.6.  Asserting that "Telmex's . . contacts may be continuous

and systematic contacts which constitute doing business *with*

Texas," id. at 717, the Fifth Circuit rejected the plaintiff's

claim that Telmex's contacts were sufficient to confer general

jurisdiction because "Telmex ha[d] virtually no contacts which

constitute doing business *in* Texas." Id.   The Fifth Circuit

explained that

> Primarily, Telmex interconnects its Mexican lines with
> American lines, enabling long distance communication.
> The money U.S. companies pay Telmex is for service on the
> Mexican leg of the call; the money the U.S. carriers
> receive is for the U.S. leg of a call.  As such, Mexican
> and U.S. telecommunications companies do business *with*
> each other in these situations, but neither is doing
> business *in* the other country for jurisdictional
> purposes.
>
> . . .
>
> The one contact that could constitute doing business in
> Texas would be the yellow page ads.  However, the
> evidence on the yellow page ads consists of nothing more
> than a comment that Telmex solicited yellow page ads in
> border cities in the U.S. without naming which cities,

when this occurred, whether such ads actually were
actually placed, or for how long.  Without more, such
evidence does not help establish continuous and
systematic contacts.

. . .

In sum, the totality of the contacts suggests that Telmex
conducted a great deal of business with Texas, but
virtually none in Texas, as such general jurisdiction
cannot be shown, even on a prima facie basis.

Id. at 717-18.

Application of the standards articulated by the Fifth Circuit
in these cases shows that Sheikh Issa does not have sufficient
systematic and continuous contacts with Texas to establish general
jurisdiction.  See also Johnston, 523 F.3d at 611 (reaffirming that
a defendant must have a "business presence in Texas" before general
jurisdiction will attach).  Plaintiffs argue that "[u]nder either
a Rule 4(k)(2) 'nationwide contacts' analysis or a Texas long-arm
jurisdictional analysis, Sheikh Issa's extensive contacts establish
general jurisdiction here over both Sheikh Issa and all of
Plaintiffs' claims."[47]  Plaintiffs argue that

[a] proper analysis, pursuant to Fifth Circuit's
requirements, views the following contacts in toto:

* Sheikh Issa has spent millions of dollars in
  Houston and in the United States.

* In his individual capacity, he has entered into
  contracts in Houston with Houston companies and
  other United States companies.

---

[47]Plaintiffs' Response, Docket Entry No. 140, p. 37.

-46-

- He has spent, by his own admission, an average of three months per year in Houston from 1994 to 2004 (aside from 2000).  During this time, he brought his entire family and staff to Houston and set up an office here, essentially moving his residence to Houston for these periods.

- During these Texas visits, he hired off-duty Houston police officers as security, and used local limousine services, to travel to numerous Houston area restaurants and attractions.

- He traveled from Houston to other locations using Houston travel agents, Houston-based airlines, and a Houston jet charter service.

- He visited doctors in Houston at least seventy-four times, with the vast majority of the visits coming in the five year period before this suit was filed. He has a longstanding relationship with his Houston doctors; even today he flies his doctors to Abu Dhabi for treatment.

- He ordered voluminous goods from Houston and United States companies and had them shipped to him in Abu Dhabi.  He has used Houston shipping companies to do this.

- When he did not pay one of those shipping companies, they sued him in Houston court; he exercised his right to remove the case to federal court; then settled the case in a settlement agreement that called for the application of Texas law and consented to his jurisdiction in Texas.

- Sheikh Issa entered into a partnership agreement with a Houston resident, Mr. Nabulsi, in Houston. That agreement was to be performed, in large part, in Texas.

- Mr. Nabulsi, a Houston resident, acted as Sheikh Issa's agent in Houston.

- The partners sought business opportunities in Texas, with Texas companies.

- While in Houston, he personally began an aggressive campaign to recruit Mr. Nabulsi to work for him

-47-

full time.  Ultimately, he convinced Mr. Nabulsi to move from Houston to Abu Dhabi.[48]

Sheikh Issa argues that his contacts with Texas are insufficient to establish general jurisdiction because they derive from visits for tourism and medical services.  Plaintiffs respond that what Sheikh Issa's attorneys characterize as mere visits for tourism and medical services, were actually major endeavors.

The facts as stated in Bassam Nabulsi's affidavit show that from 1994 to 1999 and again from 2001 to 2004, Sheikh Issa spent approximately three months a year in Houston, Texas.  When Sheikh Issa came to Texas he was accompanied by his family and staff, he stayed at the Four Seasons Hotel in Houston where he maintained a room for conducting business, and he purchased goods, services, and medical treatment.  In 1997 Sheikh Issa and Bassam Nabulsi, a resident of Houston, Texas, executed a handshake agreement to establish a partnership pursuant to which Nabulsi was to manage Sheikh Issa's business enterprises in exchange for 50% of the profits.  During the initial years of the relationship Nabulsi worked with Sheikh Issa during the months he spent in Houston where Nabulsi continued to live with his family, but in 2002 Nabulsi and his family moved to the U.A.E.[49]

---

[48]Id. at 39-40 (citing Affidavit of Bassam Nabulsi, Exhibit A attached thereto).

[49]The facts that plaintiffs have cited in support of their argument that general jurisdiction may be asserted over Sheikh Issa
(continued...)

Plaintiffs have not presented any evidence that the staff that accompanied Sheikh Issa and his family to Texas was anything more than Sheikh Issa's household staff or that the room that Sheikh Issa maintained for conducting business at the Four Seasons Hotel in Houston, Texas, was used for anything other than purchasing of goods, services, and medical treatment.   Nor have plaintiffs presented any evidence that apart from the rooms that Sheikh Issa occupied at the Four Seasons Hotel, he had an office in Texas, he owned or rented property in Texas, he paid taxes in Texas, he had bank accounts in Texas, or he had regular or ongoing business in Texas.   Although plaintiffs rely heavily on the contention that Nabulsi, Sheikh Issa, and others discussed business during Sheikh Issa's trips to Houston, plaintiffs have failed to present evidence showing that any of the business discussions held in Texas ever resulted in any business activity anywhere.

Temporarily visiting a location with one's family and personal staff for the purpose of purchasing goods, services, and medical treatment is not sufficient to confer general jurisdiction over a nonresident defendant.   See Johnston, 523 F.3d at 612 (quoting Helicopteros, 104 S.Ct. at 1874) ("[P]urchases and related trips,

---

[49](...continued)
are stated in the affidavit of plaintiff, Bassam Nabulsi.   See Exhibit A attached to Plaintiff's Response, Docket Entry No. 140. Although many of these facts appear to be inconsistent with facts to which Bassam Nabulsi testified in his deposition, for purposes of this analysis the court has assumed without deciding that these facts are true.

standing alone, are not a sufficient basis for a State's assertion
of jurisdiction.")).  Therefore, the court can give only minimal
weight to the fact that Sheikh Issa purchased goods, services, and
medical treatment during his trips to Texas.  Similarly, the fact
that Sheikh Issa entered into an alleged partnership agreement with
plaintiff Bassam Nabulsi that was consummated by a handshake in
Houston, Texas, adds little to the analysis.  Plaintiffs have
failed to present any evidence that this handshake agreement
amounts to anything more than another example of Sheikh Issa
purchasing goods and services from a Texas vendor — a contract that
is not sufficient to form the basis for general jurisdiction.  See
id. (citing Access Telecom, 197 F.3d at 717 n.6 (stating that a
contact that involved paying for services that were provided by
Texas residents adds little to the analysis)).  Nor is the court
persuaded that Sheikh Issa, who has undisputedly not sold goods or
services in Texas, had a general business presence in Texas based
on his periodic trips to Houston and/or that while there he engaged
in discussions of business opportunities that never materialized.
See Access Telecom, 197 F.3d at 717 (holding that a presence in
Texas is not sufficient unless the defendant is doing business in
Texas).  The facts that (1) Sheikh Issa was physically present in
Texas for three months a year from 1994 to 1999 and again from 2001
to 2004, (2) he received medical treatment from Houston-based
doctors, (3) his household lived at the Four Seasons Hotel in

-50-

Houston, (4) he spent large sums purchasing goods and services, and (5) he engaged in some fruitless discussions of business opportunities, do not amount to engaging in substantial, continuous, and systematic contacts with Texas sufficient for the court to assert general jurisdiction over him.  Sheik Issa's contacts with Texas are not sufficient to establish general jurisdiction for the claims alleged in this action because taken in toto, they are not so substantial, systematic, or continuous that he "should have reasonably expected to be sued in Texas on any matter, however remote from [those] contacts." Johnston, 523 F.3d at 613 (citing Wilson, 20 F.3d at 650).

     (b)   Fairness Analysis

Because Sheikh Issa lacks minimum contacts with Texas, this court need not determine whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. See Felch v. Transportes Lar-Mex SA De CV, 92 F.3d 320, 329 n.20 (5th Cir. 1996) ("Because we find that the first due process condition of minimum contacts was not satisfied, we need not address whether the exercise of personal jurisdiction in this case would offend traditional notions of fair play and substantial justice.").

    3.   Rule 4(k)(2)

For defendants who lack sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state,

Federal Rule of Civil Procedure 4(k)(2) authorizes personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law. See World Tanker Carriers Corp. v. M/V Ya Mawlaya, 99 F.3d 717, 720 (5th Cir. 1996).  Rule 4(k)(2) provides:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).  To prove that jurisdiction is proper under this rule,

> (1) the plaintiff's claims must be based on federal law; (2) no state court could exercise jurisdiction over the defendants; (3) the exercise of jurisdiction must be consistent with the laws of the United States; and (4) the exercise of jurisdiction must be consistent with the Constitution.

Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 940 (7th Cir. 2000), cert. denied, 121 S.Ct. 1406 (2001).

When considering whether Rule 4(k)(2) grants jurisdiction over a foreign defendant, the court must determine whether the defendant has contacts with the nation as a whole sufficient to satisfy due process concerns.  The burden of persuasion remains with the plaintiffs to make a prima facie showing of the defendant's

-52-

nationwide minimum contacts.  <u>See</u> <u>Ham v. LaCienega Music Co.</u>, 4 F.3d 413, 415 (5th Cir. 1993).  Based on the record before the court, the plaintiffs have failed to satisfy their burden of establishing a <u>prima facie</u> case for the assertion of personal jurisdiction pursuant to Rule 4(k)(2) for the same reasons that the court has already concluded plaintiffs have not established sufficient minimum contacts with Texas to allow the exercise of general personal jurisdiction, i.e., because plaintiffs have failed to present any evidence of continuous or systematic contacts with the United States as a whole.

**C.  Conclusions**

    For the reasons explained above, the court concludes that Sheikh Issa lacks minimum contacts with Texas and/or the United States needed to support the court's assertion over him of either specific or general personal jurisdiction.

## V.  Objections to Plaintiffs' Affidavit Evidence

    Defendant objects to portions of the affidavits of Bassam Nabulsi, Rima Nabulsi, and Mohammad Taghizadeh that plaintiffs have submitted in opposition to defendant's motion to dismiss.[50]  Because the court has not considered the evidence to which the defendant objects, defendant's objections will be declared moot.

--------

    [50]Defendant Sheikh Issa Bin Zayed Al Nahyan's Objections to Plaintiffs' Affidavit Evidence Submitted in Response to Defendant's Motion to Dismiss, Docket Entry No. 145.

-53-

## VI.  <u>Conclusions and Order</u>

For the reasons explained above, Defendant H.H. Sheikh Issa Bin Zayed Al Nahyan's Motion to Exclude the Expert Witness Statement and Testimony of Professor L. Ali Khan (Docket Entry No. 134) is **GRANTED**; and Defendant Sheikh Issa Bin Zayed Al Nahyan's Objections to Plaintiffs' Affidavit Evidence Submitted in Response to Defendant's Motion to Dismiss (Docket Entry No. 145) are **MOOT.**  For the reasons explained above, the court concludes that this action should be dismissed without prejudice because Sheikh Issa has not been properly served with a summons and a copy of the plaintiffs' complaint, and because plaintiffs have failed to establish a <u>prima facie</u> case for the court's assertion of personal jurisdiction over Sheikh Issa.  Because these conclusions provide a sufficient basis on which to dispose of the pending motion to dismiss, the court does not reach defendant's remaining arguments. Accordingly, Defendant Sheikh Issa Bin Zayed Al Nahyan's Motion to Dismiss for (1) Lack of Personal Jurisdiction, (2) Enforcement of Contractual Forum Selection Clause, (3) Forum Non Conveniens, and (4) Improper Service (Docket Entry No. 132) is **GRANTED in part** and **MOOT in part**.  This action will be dismissed for lack of jurisdiction.

**SIGNED** at Houston, Texas, this the 12th day of June, 2009.

SIM LAKE
UNITED STATES DISTRICT JUDGE